IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-211T
(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

v.

THE UNITED STATES,

Defendant

**APPENDIX TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**VOLUME IV**


| Description | Page(s) |
|---|---|
| Senate Report on P.L. 99-514 (Tax Reform Act of 1986), reported at CCH Standard Federal Tax Rptr. (2006 ed.) at § 21,960 (Excerpts) | 82-85 |
| House Conference Report on P.L. 99-514 (Tax Reform Act of 1986) reprinted at 1986 U.S.C.C.A.N. 4075 (Excerpts) | 86-87 |
| *Gregg v. U.S.*, 186 F. Supp. 2d 1123 (D. Or. 2000) | 88-99 |

plete disposition (within the meaning of the passive loss rule) of the partner's entire interest in the publicly traded partnership, any remaining suspended losses are allowed.

In general, income and loss items attributable to an interest in a publicly traded partnership can offset each other. Thus, for example, assume that a holder of an interest in a publicly traded partnership has a net loss from the partnership in one year of $2,000, and net income from the partnership in the next year of $1,500. $1,500 of the loss from the first year may be applied against the $1,500 income in the second year. The remaining $500 loss continues to be suspended at the partner level, and may be carried forward to future years to offset net income from the partnership. Similarly, a partner's share of credits from the partnership may be applied only to offset the partner's income tax liability attributable to the partnership interest. It is intended, however, that a partner be entitled to the $25,000 allowance with respect to credits from the partnership as under present law. The election to adjust basis in the event of a disallowed credit upon a complete disposition is intended to apply, in the case of a complete disposition of an interest in a publicly traded partnership.

In the case of publicly traded partnerships with income that is treated as portfolio income (under the passive loss rule as generally applicable) and losses from business activities, the losses may not be applied against the portfolio income. Thus, under the amendment, partners' shares of the loss may not be applied against their shares of that portfolio income. Thus, partners in publicly traded partnerships cannot offset losses from partnership activities against portfolio income within the partnership that could not be offset against portfolio income derived outside the publicly traded partnership.

In determining which losses from the partnership interest are suspended and carried forward under the provision, the general rules normally applicable in determining which losses are suspended under the passive loss rule are applicable. Generally, the amount of the suspended losses is determined on a pro rata basis.

For purposes of this rule, partners in publicly traded partnerships treat their interests in each such partnership as separately subject to the loss (and credit) limitation and disposition rules of the passive loss rule. Thus, under this rule, no net losses or credits attributable to an interest in a publicly traded partnership are allowed against income other than income from that partnership (except as otherwise provided under the passive loss rule, for example, upon a complete disposition of the partner's interest in the partnership).

The rules applicable to transfers by reason of death and to gifts are also intended to apply in the case of transfers of interests in publicly traded partnerships. This is consonant with applying the loss and credit limitations and the disposition rules of the passive loss rule separately at the partner level to partners' items from publicly traded partnerships.

The intended overall result is that net losses and credits of a partner from each publicly traded partnership be suspended at the partner level, carried forward (not back) and netted against income, other than the partnership's portfolio income, from (or tax liability attributable to) that publicly traded partnership, and that suspended losses are allowed upon a complete disposition of the partner's interest in the partnership. * * *

**Effective Date**

The provision is effective as if included in the amendments made by section 501 of the Tax Reform Act of 1986. Thus, the provision is effective for taxable years beginning after December 31, 1986.—**Senate Finance Committee Report.**

The conference agreement follows the Senate amendment, with a technical modification to provide that the $25,000 allowance of (deduction equivalent) credits applies at the partner level, to the extent the amount of such credits exceeds the partner's regular tax liability attributable to income from the partnership. Such credits are allowable under the partner's $25,000 allowance to the extent that the partner has not fully utilized the allowance with respect to losses and credits from passive activities otherwise allowed under present law, sec. 469. The term publicly traded partnership has the same meaning for this provision as for the provision under the conference agreement treating certain publicly traded partnerships as corporations.—**Conference Committee Report.**

**See also Committee Reports on P.L. 100-203 (Revenue Act of 1987) at ¶ 43,180.90.**

## Committee Report on P.L. 99-514 (Tax Reform Act of 1986)

**.20 Limitations on Losses and Credits from Passive Activities**

**1. Overview**

The bill provides that deductions from passive trade or business activities, to the extent they exceed income from all such passive activities (exclusive of portfolio income), generally may not be deducted against other income. Similarly credits from passive activities generally are limited to the tax allocable to the passive activities. Suspended losses and credits are carried forward and treated as deductions and credits from passive trade or business activities in the next year. Suspended losses from an activity are allowed in full when the taxpayer disposes of his entire interest in the activity.

The provision applies to individuals, estates, trusts, and personal service corporations. A special rule limits the use of passive activity losses against portfolio income in the case of closely held corporations. Special rules also apply to rental activities. Losses from working interests in oil and gas property are not limited by the provision. Losses and credits attributable to a limited partnership interest generally are treated as arising from a passive activity. The provision is effective for taxable years beginning after 1986, and is phased in over 5 years. It becomes fully effective for taxable years beginning in 1991 and thereafter.

Losses and credits from a passive activity (taking into account expenses such as interest attributable to acquiring or carrying an interest in the activity) may

be applied against income for the taxable year from other passive activities or against income subsequently generated by any passive activity. Such losses (and credits) generally cannot be applied to shelter other income, such as compensation for services or portfolio income (including interest, dividends, royalties, and gains from the sale of property held for investment). For this purpose, property held for investment generally does not include an interest in a passive activity.

Salary and portfolio income are separated from passive activity losses and credits because the former generally are positive income sources that do not bear, at least to the same extent as other items, deductible expenses. Since salary and portfolio income are likely to be positive, they are susceptible to sheltering by means of investments in activities that give rise to tax benefits. The passive loss provision ensures that salary and portfolio income, along with other non-passive income sources, cannot be offset by tax losses from passive activities until the amount of such losses is determined upon disposition.

Under the provision, suspended losses attributable to passive trade or business activities are allowed in full upon a taxable disposition of the taxpayer's entire interest in the activity.[7] The full amount of gain or loss from the activity can then be ascertained. To the extent the taxpayer's basis in the activity has been reduced by suspended deductions, resulting in gain on disposition, the remaining suspended deductions will, in effect, offset such gain. However, the character of any gain or loss is not affected by this provision.

**Passive activity**

Under the bill, an activity generally is a passive activity if it involves the conduct of any trade or business, and if the taxpayer does not materially participate in the activity. A taxpayer who is an individual materially participates in an activity only if he is involved in the operations of the activity on a regular, continuous, and substantial basis. Regardless of whether an individual directly owns an interest in a trade or business activity (e.g., as a proprietorship), or owns an interest in an activity conducted at the entity level by a passthrough entity such as a general partnership or S corporation, he must be involved in the operations of the activity on a regular, continuous, and substantial basis, in order to be materially participating.

In the case of a limited partnership interest, special considerations apply. The form of entity most commonly chosen to maximize tax benefits in a tax shelter investment has been the limited partnership. Moreover, since a limited partner generally is precluded from participating in the partnership's business if he is to retain his limited liability status, the committee believes it should not be necessary to examine general facts and circumstances regarding material participation in this context. Therefore, under the bill, a limited partnership interest is treated as intrinsically passive (except as provided in regulations). Portfolio income of a partnership, however, is not treated as passive (see sec. 3, below). The committee intends that a share of partnership income, or a guaranteed payment to a partner (including a limited partner) attributable to the performance of personal services is not to be treated as passive. Losses from trade or business activities that are allocable to a limited partnership interest are not permitted, prior to disposition, to be applied against any income other than income from passive activities.

A passive activity under the bill does not include a working interest in oil or gas property. Thus, an owner of a working interest in oil or gas property is permitted to deduct otherwise allowable losses attributable to the working interest whether or not he materially participates in the activity being conducted through the working interest.

A passive activity is defined under the bill to include any rental activity, whether or not the taxpayer materially participates. However, operating a hotel or other similar transient lodging, for example, where substantial services are provided, is not a rental activity. An activity as a dealer in real estate is also not generally treated as a rental activity.[8] Long-term rentals or leases of property (e.g., apartments, leased office equipment, or leased cars), on the other hand, generally are considered to be rental activities. Losses from rental activities are allowed against income from other passive activities, but not against other income.

Interest on debt secured by the taxpayer's residence or a second residence is not subject to limitation under the passive loss rule, so long as the debt is secured by a security interest perfected under local law. Thus, if a taxpayer rents out his vacation home and a portion of the mortgage interest is allocable to rental use of the home which would otherwise be treated as a passive activity, it is not subject to limitation under this provision.

Under the bill, an individual may annually deduct up to $25,000 of passive activity losses (to the extent they exceed income from passive activities) that are attributable to rental real estate activities in which the taxpayer actively participates. The $25,000 offset is not available to corporations. A taxpayer is not treated as actively participating in a rental real estate activity if he has less than a 10 percent interest in the activity. (In such situations, the taxpayer's management activity would relate predominantly to the interests of his co-owners, rather than to the management of his own interest.) He is not presumed to be actively participating, however, if he has a 10 percent or greater interest. As discussed below, the active participation requirement is different from the material participation

[7] Gain recognized on a transfer of a partial interest in the passive activity, and gain (boot) on a tax-free transfer of an entire or partial interest, are treated as from a passive activity. Gain on such transfers may be offset by losses and credits from passive activities, but such transfers are not treated as dispositions triggering all suspended losses from the activity.

[8] Under the at-risk rules as extended by the bill to the activity of holding real estate, the holding of real property includes the holding of personal property and the providing of services which are incidental to making real property available as living accommodations. Whether an activity constitutes the holding of real estate for purposes of the at risk rules is not determinative of whether it constitutes a rental activity under the passive loss rule.

 ©2006 CCH. All Rights Reserved.

standard, and generally does not require as much personal involvement.

The $25,000 allowance is phased out ratably as the taxpayer's adjusted gross income (determined without regard to passive activity losses) increases from $100,000 to $150,000. Thus, under this rule, a middle income taxpayer who has invested in a condominium apartment, for example, and whose involvement in the operations necessary to rent it and maintain it amounts to active participation, may deduct up to $25,000 per year of losses from the rental real estate activity.

The $25,000 allowance for rental real estate applies, in a deduction equivalent sense, to credits attributable to rental real estate activities as well. Under a special rule, the $25,000 allowance applies to low-income housing credits regardless of whether the taxpayer claiming the credit actively participates in the low-income housing activity (including in the case of a limited partner).

A single $25,000 amount (and phaseout thereof) applies on an aggregate basis to credits (including the low-income housing credit) and to deductions, as opposed to allowing a $25,000 amount for each. If the total net rental real estate losses and credits (deduction equivalents) exceed the $25,000 amount allowable against other income, the taxpayer generally must allocate pro rata first among all the losses (including real estate rental activity losses suspended in prior years), and then the credits, attributable to each separate activity, in determining which are treated as allowed. This allocation is necessary for purposes of determining the total suspended losses attributable to each activity, which are allowable in full upon a disposition of the taxpayer's entire interest in the activity.

**Taxpayers subject to the rule**

The passive loss rule applies to individuals, estates and trusts. The rule also applies to personal service corporations (without regard to whether employee/owners whose services are provided own 10 percent and without regard to certain limitations in the applicable attribution rules). The committee intends that taxpayers not be able to circumvent the passive loss rule merely by virtue of the form in which they conduct their affairs. Thus, the rule is designed to prevent the sheltering of income derived from an individual's personal services simply by incorporating as a personal service corporation and acquiring tax shelter investments at the corporate level.

It is also not intended that incorporation of an individual's portfolio investments be available as a way to avoid the passive loss rule. For this reason, the passive loss rule, in modified form, also applies to closely held C corporations (other than personal service corporations) that are subject to the at-risk rules (generally, where 5 or fewer individuals, directly or indirectly, own more than 50 percent of the stock). Such C corporations may not offset losses or credits from passive activities against portfolio income. Such corporations may, however, offset passive losses and credits against active business income (i.e., trade or business income which is not from a passive activity). In determining whether a corporation materially participates in an activity, and hence whether the activity is a passive activity, the material participation in the corporation's activity of corporate employees and owners is examined. As is generally true under the passive loss rule, losses and credits from a non-passive trade or business activity are not subject to any special limitation.

**2. Treatment of losses and credits**

**In general**

*Losses.*—Losses arising from a passive activity generally are deductible only against income from that or another passive activity. Suspended passive activity losses for the year are carried forward indefinitely, but are not carried back, and are allowed in subsequent years against passive activity income. Suspended losses from an activity are allowed in full upon a taxable disposition of the activity, as discussed below.

If any passive losses are not deductible in any given year, the amount of the suspended losses from each passive activity is determined on a pro rata basis. With respect to each activity, the portion of the loss that is suspended, and carried forward, is determined by the ratio of net losses from that activity to the total net losses from all passive activities for the year. This allocation is necessary in order to determine the suspended losses for any particular activity, which are allowed in full upon a disposition.

In the case of the $25,000 allowance for passive losses from rental real estate activities in which an individual actively participates, a situation could arise in which losses would be allowable for the year under the passive loss rule, but the taxpayer has insufficient (or no) non-passive income against which to apply them. In such a case, the otherwise allowable rental real estate losses are thereupon treated as losses which are not from a passive activity. They are treated as net operating losses (NOLs) arising in that year, and may be carried forward and back in accordance with the rules applicable to NOLs.

In general, NOL carryovers, like current-year losses other than passive losses, are allowed against any income of the taxpayer. In the case of individuals, estates and trusts, and personal service corporations, however, such nonpassive losses and NOLs are taken into account only after reducing income from passive activites by current and suspended deductions from passive activities (but not below zero). Thus, the application of any prior-year suspended passive losses against current year passive income is taken into account before such NOLs are applied against net passive income. This permits the taxpayer to obtain the full benefit of suspended passive activity losses (which are limited in application) before using any losses that are not from passive activities (or NOL carryovers). If a taxpayer has net passive activity income for the year (after the application of all suspended passive losses), the income may be offset by current-year non-passive losses and by NOL carryovers.

In the case of a closely held corporation (other than a personal service corporation), the passive loss rule applies in modified form: passive losses may be used to offset active business income, but not portfolio income. In applying this rule, losses from passive activities (including such losses carried

over from prior years after the effective date) are offset against income from passive activities to determine the aggregate passive loss, if any. If there is such a loss, it may be applied only against active business income, but not portfolio income, of the corporation. As is generally the case, NOLs are applied after the application of the passive loss rule.

The determination of whether a loss is suspended under the passive loss rule is made after the application of the at-risk rules and the interest deduction limitation, as well as other provisions relating to the measurement of taxable income. A loss that would not be allowed for the year because the taxpayer is not at risk with respect to it is suspended under the at-risk provision, not the passive loss rule. Similarly, if an interest deduction is disallowed under the interest deduction limitation, it is not disallowed again under the passive loss rule. Such amounts may become subject to the passive loss rule in subsequent years when they would be allowable under the at-risk or interest limitations.[9] During the 5-year period over which the passive loss rule is phased in, these rules interact in the same manner. In the first year after the effective date, for example, the investment interest limitation is applied and a portion of previously deductible investment interest is disallowed. That disallowed interest is not disallowed again under the passive loss rule, but only the remaining portion of interest (not disallowed due to the interest limitation phase-in) can be subject to disallowance under the phase-in of the passive loss rule.

*Credits.*—Credits arising with respect to passive activities generally are treated in the same manner as deductions.[10] That is, credits may not be used to offset tax attributable to income other than passive income. The amount of tax attributable to net passive income is determined by comparing (i) the amount that the taxpayer would pay with regard to all income, with (ii) the amount that the taxpayer would pay with regard to taxable income other than net passive income (disregarding, in both cases, the effect of credits).

For example, if a taxpayer would owe $50,000 of tax disregarding net passive income, and $80,000 of tax considering both net passive and other taxable income (in both cases, disregarding the effect of credits), then the amount of tax attributable to passive income is $30,000. In this case, any credits not in excess of $30,000 attributable to the taxpayer's passive activities are allowable. Any passive activity credits not in excess of $30,000 are, in addition, subject to other limitations applicable to the allowance of credits. In the absence of net passive income for a taxable year, no tax is attributable to passive income, and passive credits generally are not allowable for the year.

Passive credits may be allowable to offset tax on income other than passive income with respect to the special rule providing up to $25,000 of benefit for certain rental real estate activities. Under this rule, credits are allowed to offset tax on the portion of the $25,000 (or less, as appropriate) that the taxpayer has not been able to offset by the use of deductions.

The amount of tax on such remaining portion (and thus, the amount of credits that can be used against other income, assuming that there are sufficient credits available) is determined by comparing (i) the amount that the taxpayer would owe (disregarding credits) with respect to income other than any net passive losses, but reduced by rental real estate deductions in the full amount allowable under the $25,000 rule, with (ii) the amount that the taxpayer would owe (again disregarding credits) if the allowable rental real estate deductions equalled $25,000 (or less as appropriate, i.e., in the phaseout range for this amount).

In general, credits arising with respect to passive activities, like deductions relating to such activities, can be carried forward indefinitely, and cannot be carried back. However, the character of a credit relating to a passive activity changes, in effect, when the credit becomes allowable under the passive loss rule (i.e., there either is sufficient passive income to allow its use, or it is within the scope of the $25,000 benefit for rental real estate activities). At such time, such credit is aggregated with credits relating to non-passive activities of the taxpayer, for purposes of determining whether all such credits are allowable in light of other limitations applying to the use of credits (e.g., the 75 percent tax liability limitation, and the provision that credits cannot be used to reduce regular tax liability to less than tentative minimum tax liability). In the event that any credits are not allowable because of such other limitations, the passive credits that are allowable under the passive activity rules are thereupon treated as non-passive credits arising in the current taxable year. The treatment of such credits then is determined in all respects by the general rules applying to such credits, including carryover periods.[11]

## Dispositions

*In general.*—When a taxpayer disposes of his entire interest in a passive activity, the actual economic gain or loss on his investment can be finally determined. Thus, under the passive loss rule, upon a fully taxable disposition, any overall loss from the activity realized by the taxpayer is recognized and allowed against income (whether active or passive income). This result is accomplished by triggering suspended losses upon disposition.

[9] Amounts at risk are reduced even if deductions which would be allowed under the at-risk rules are suspended under the passive loss rule. Similarly, basis is reduced as under present law, even in the case where deductions are suspended under the passive loss rule. However, if an amount at risk or basis has been reduced by a deduction not allowed under the passive loss rule, the amount at risk or basis is not again reduced when the deduction becomes allowable under the passive loss rule.

[10] The allowability of foreign tax credits, however, is unaffected by the passive loss provision. Instead, foreign tax credits are limited solely by the various rules applying generally to such credits (e.g., the section 904 limitation, which is applied after determining the amounts of foreign source and worldwide income consistently with the application of the passive loss rule).

[11] Credits that are subject to special limitations (e.g., the limitation on the use of research and development credits to offset certain unrelated income of the taxpayer) continue to be subject to such limitations when they cease to be limited by the passive activity rules.



©2006 CCH. All Rights Reserved.

P.L. 99-514, ****4075** TAX REFORM ACT OF 1986
DATES OF CONSIDERATION AND PASSAGE
House: December 17, 1985; September 25, 1986
Senate: June 24, September 27, 1986
House Report (Ways and Means Committee) No. 99-426,
Dec. 7, 1985 [To accompany **H.R. 3838**]
Senate Report (Finance Committee) No. 99-313,
May 29, 1986 [To accompany **H.R. 3838**]
House Conference Report No. 99-841,
Sept. 18, 1986 [To accompany **H.R. 3838**]
Cong. Record Vol. 131 (1985)
Cong. Record Vol. 132 (1986)
The Conference Report is set out below.

HOUSE CONFERENCE REPORT NO. 99-841
September 18, 1986

***III **4076** JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (**H.R. 3838**) to reform the internal revenue laws of the United States, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The Senate amendment struck out all of the House bill after the enacting clause and inserted a substitute text.

The House recedes from its disagreement to the amendment of the Senate with an amendment which is a substitute for the House bill and the Senate amendment. The differences between the House bill, the Senate amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary for agreements reached by the conferees, and minor drafting and clarifying changes.

SUMMARY OF CONTENTS

Page
Title I. Individual Income Tax Provisions ............................ II-1
Title II. Capital Cost Provisions .................................... II-38
Title III. Capital Gains and Losses .................................. II-105
Title IV. Agriculture, Timber, Energy, and Natural Resources ........... II-110
Title V. Tax Shelters; Interest Expense ............................... II-134
Title VI. Corporate Taxation ........................................ II-158
Title VII. Minimum Tax Provisions .................................... II-250
Title VIII. Accounting Provisions .................................... II-285
Title IX. Financial Institutions ..................................... II-326
Title X. Insurance Products and Companies ............................ II-338
Title XI. Pensions and Deferred Compensation; Employee Benefits; ESOPs . II-373
Title XII. Foreign Tax Provisions .................................... II-561
Title XIII. Tax-Exempt Bonds ......................................... II-683
Title XIV. Trusts and Estates; Minor Children; Gift and Estate Taxes;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4233 the original basis adjustment (to the extent of the amount of the unused credit) with respect to the property.

If the property is disposed of in a transaction that, under the passive loss rule, does not constitute a fully taxable disposition of the taxpayer's entire interest in the passive activity, then no basis adjustment may be elected at any time. To the extent the credit has been suspended by virtue of the passive loss rule, however, it may remain available to offset tax liability attributable to passive income.

Disposition of activity of limited partnership.--In general, under the passive loss rule, suspended deductions are allowed upon a taxable disposition of the taxpayer's entire interest in an activity, because it becomes possible at that time to measure the taxpayer's actual gain or loss from the activity. Under the Senate amendment, a special rule would apply to dispositions with respect to limited partnership interests. The special rule requires the taxpayer to dispose of his entire interest in the limited partnership (along with all other interests that are part of the passive activity) in order to trigger suspended deductions with respect to any activities conducted by the limited partnership.

The conferees believe that it is not appropriate to disallow a true economic loss realized upon the disposition of the taxpayer's entire interest in an activity by reason of the taxpayer's form of ownership. Therefore, the conference agreement eliminates this special rule for dispositions of limited partnership activities, and provides instead that a disposition of the taxpayer's entire interest in an activity conducted by a limited partnership, like a disposition of an activity conducted in any other form, may constitute a disposition giving rise to the allowance of suspended deductions from the activity.

The conferees do not, however, intend to change the rule that a limited partnership interest in an activity is (except as provided in Treasury regulations) treated as an interest in a passive activity. Because a limited partner generally is precluded from materially participating in the partnership's activities, losses and credits attributable to the limited partnership's activities are generally treated as from passive activities, except that items properly treated as portfolio income and personal service income are not treated as passive.

Changes in nature of activity.--The fact that the nature of an activity changes in the course of its development does not give rise to a disposition for purposes of the passive loss provision. For example, when a real estate construction activity becomes a rental activity upon the completion of construction and the commencement of renting the constructed building, the change is not treated as a disposition.

3. Treatment of portfolio income

In general

The conference agreement generally follows the Senate amendment with respect to the definition and treatment of portfolio income, with several modifications and clarifications.

**4234 Generally, portfolio income of an activity (for example, interest, dividend, royalty or annuity income earned on funds set aside for future use in the activity) is not treated as passive income from the activity, but must be accounted for separately. [FN20] Similarly, portfolio income of an entity which is not attributable to, or part of, an activity of the entity that constitutes a passive activity is also accounted for separately from any passive income or loss. Gain or loss from sales or exchanges of portfolio assets (including property held for investment) is treated as portfolio gain

Hummell factors weigh against an award of attorney's fees to Defendant. Accordingly, and in its discretion, the court DENIES an award of attorney's fees to Defendant.

*CONCLUSION*

Based on the foregoing, the court DENIES Plaintiff's Motion for Summary Judgment and GRANTS IN PART and DENIES IN PART Defendant's Cross–Motion for Summary Judgment. The court GRANTS Defendant's request for summary judgment in that Plaintiff is not entitled under ERISA to the relief it seeks, but DENIES Defendant's request for attorney's fees.

IT IS SO ORDERED.

**Stephen A. GREGG and Kristina K. Gregg, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. CIV 99–845–AA.**

United States District Court, D. Oregon.

Nov. 29, 2000.

Taxpayer brought action for refund of income taxes and penalties. On cross-motions for summary judgment, the District Court, Aiken, J., held that taxpayer's flow-through loss from Oregon limited liability company (LLC) was ordinary rather than passive activity loss, and thus was deductible against member's ordinary income.

Plaintiff's motion granted; defendant's motion denied.

**1. Internal Revenue ⟹3418**

Ordinary losses can be applied against any income; passive activity losses, however, can be applied only against passive activity income. 26 U.S.C.A. § 469.

**2. Internal Revenue ⟹3439**

Passive activity losses that are not currently deductible are carried forward to next taxable year. 26 U.S.C.A. § 469(b).

**3. Internal Revenue ⟹3418**

Member of Oregon limited liability company (LLC) which had elected partnership tax treatment was treatable as general, rather than limited, partner for purpose of determining whether pass-through losses were ordinary or passive. 26 U.S.C.A. § 469.

**4. Corporations ⟹215**

Limited liability company (LLC) members may materially participate in LLC without losing their limited liability protection.

**5. Internal Revenue ⟹3418**

Test requiring partner to have participated in activity for more than 500 hours in tax year in order to characterize pass-through losses as ordinary rather than passive activity losses was not proratable in event of short tax year; 500 hour re-

*no* evidence to establish a claim for equitable relief of the type unquestionably required under Ninth Circuit law.... Knowing it had no claim, why did it choose to put plaintiff through the expense and ardor of litigation. A state court action brought by plaintiff on the agreements was earlier dismissed on jurisdictional grounds. The import of [*Owens, Knudson,* and *Ellis* ], however, was fully brief [sic] therein and their holdings asserted as an alterative ground for dismissal." Opposition, at 13–14. However, defendant has not filed a separate motion for sanctions pursuant to Rule 11. *See* Fed.R.Civ.P. 11(c)(1)(A). Thus, to request fees pursuant to Rule 11 at this time is inappropriate.

quirement was absolute minimum. 26 C.F.R. § 1.469–5T(a)(1).

**6. Internal Revenue ⇔3418**

Taxpayer could not count his material participation activity in corporation as significant participation activity in related limited liability company, for purpose of determining whether taxpayer's pass-through losses from company were ordinary rather than passive activity losses. 26 C.F.R. § 1.469–5T(a)(4).

**7. Internal Revenue ⇔5007**

Under "doctrine of variance," taxpayer is generally barred from asserting claim in refund action that was not raised in administrative process of claim for refund. 26 U.S.C.A. § 7422(a).

See publication Words and Phrases for other judicial constructions and definitions.

**8. Internal Revenue ⇔5007**

Taxpayer's argument in refund action was not barred under doctrine of variance; argument was not frivolous and was raised in good faith, and Internal Revenue Service (IRS) was given opportunity to respond. 26 U.S.C.A. § 7422(a).

**9. Internal Revenue ⇔3418**

Taxpayer could group his activities conducted through C corporation with his subsequent activity on behalf of limited liability company (LLC), for purpose of determining whether taxpayer materially participated in LLC activity and thus whether his pass-through losses from LLC were ordinary or passive activity losses; professional service activities of corporation and LLC were related and taxpayer's played comparable role in both. 26 U.S.C.A. § 469; 26 C.F.R. §§ 1.469–4(c, d), 1.469–5T(a).

**10. Internal Revenue ⇔3418**

Member's flow-through loss from Oregon limited liability company (LLC) was ordinary rather than passive activity loss, and thus was deductible against member's ordinary income; member had participated in activity of LLC and related predecessor corporation for more than 500 hours in tax year. 26 U.S.C.A. § 469(c); 26 C.F.R. § 1.469–5T(a)(1).

---

Marc K. Sellers, Schwabe, Williamson & Wyatt, P.C., Portland, OR, for plaintiffs.

Kristine Olson, United States Attorney, District of Oregon, Portland, OR, Jian H. Grant, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

AIKEN, District Judge.

Plaintiffs, Stephen A. Gregg and Kristina K. Gregg, bring this action for refund of income taxes and penalties plus interest under the Internal Revenue Code, 26 U.S.C. § 1 *et seq.* Pursuant to Fed. R.Civ.P. 56, defendant filed a motion for summary judgement seeking to dismiss plaintiffs' complaint. Plaintiffs filed a cross-motion for summary judgment. For the reasons set forth below, the defendant's motion is denied, the plaintiffs' cross-motion is allowed, and this case is dismissed.

## STATEMENT OF THE FACTS

Plaintiff Stephen A. Gregg ("plaintiff") was a member of Cadaja, L.L.C. ("Cadaja") in tax year 1994. Cadaja is a limited liability company formed pursuant to the limited liability company statutes of the State of Oregon on November 4, 1994. The tax year for Cadaja in 1994 commenced on November 4, 1994, and ended on December 31, 1994. For tax year 1994, Cadaja filed a U.S. Partnership Return (Form 1065) with the Internal Revenue

Service ("IRS"); and plaintiffs filed a joint federal income tax return.

Prior to forming Cadaja, plaintiff was the CEO for Ethix Corporation. He worked five days a week, at least eight hours per day for the corporation, until he sold his stocks in Ethix Corporation on November 4, 1994. Prior to the stock sale, plaintiff had held sixty percent ownership interest in the corporation since 1990. According to plaintiff, Ethix Corporation was a managed health care company formed to establish networks of physicians. Insurance companies then used the networks to gain access to professionals and obtain their services. Specifically, Ethix Corporation was a service company that provided consulting, marketing, networking, and business services to the health care industry. Plaintiff alleges that capital is not a material income-producing factor in its business operations. Affidavit of Plaintiff in Support of Plaintiffs' Motion for Summary Judgement ¶ 3.

In November 1994, plaintiff created Cadaja with an intent to transfer the business techniques he had developed in traditional medicine into fields of alternative medicine. Plaintiff solicited the participation of other members: Candace Cappelli and Judith Fleming. Both Cappelli and Fleming were employees of Ethix Corporation before they joined Cadaja on November 4, 1994. Plaintiff was the sole financier of Cadaja; the other two members contributed no cash or property to Cadaja, however, according to plaintiff, their investment was "know-how." Both Cappelli and Fleming worked at least 40 hours per week for Cadaja in 1994 with an annual salary of $75,000. In 1994, plaintiff worked approximately 100 hours for Cadaja, but did not receive compensation for services he provided, because plaintiff thought it illogical for him, as the sole financier of Cadaja, to take money out of the business on one hand and return it to the business on the other hand.

Although Cadaja was formed in 1994, it had no offices until 1995. Each of the individuals employed by Cadaja worked from their homes and from the offices of Ethix Corporation until early 1995. In addition, Cadaja did not have an Operating Agreement until May 1995, after it changed its name to "Alternaré Group, LLC" in February 1995. The effective date of the Operating Agreement relates back to November 4, 1994.

According to plaintiff, Cadaja was formed to create a network of credentialed alternative medicine practitioners and develop management capability for alternative medicine clinics. Like Ethix Corporation, Cadaja is a service company, providing consulting, marketing, networking, and business services in the alternative medicine and alternative health care industry. Plaintiff alleges that capital is not a material income-producing factor in Cadaja's business operations. Affidavit of Plaintiff in Support of Plaintiffs' Motion for Summary Judgement ¶ 14.

The IRS audited the plaintiffs' 1994 joint income tax return. It disallowed plaintiffs' characterization of a flow-through loss from Cadaja in the amount of $230,723 as an ordinary loss, and re-characterized that loss as a passive activity loss. On March 3, 1998, the IRS issued a Notice of Deficiency to plaintiffs, setting forth a deficiency amount of $91,366 and an accuracy-related penalty of $18,273.20 pursuant to 26 U.S.C. § 6662(a). On July 27, 1998, the IRS made assessments of the audit deficiency, accuracy-related penalty under § 6662(a), and interest on deficiency against plaintiffs for tax year 1994, in the amounts of $91,366, $18,273.20, and $36,281.76, respectively.

On August 13, 1998, plaintiffs paid the deficiency assessment of $91,366. On Jan-

uary 11, 1999, in response to plaintiffs' claim for refund of $91,366, the IRS issued a Claim Disallowance. On August 26, 1999, plaintiffs paid $26,530 toward the accuracy-related penalty assessment. On November 10, 1999, in response to plaintiffs' claim for a refund of $26,530, the IRS issued a Claim Disallowance.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Fed.R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630, (9th Cir.1987).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all interferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630.

## DISCUSSION

Limited liability companies ("LLCs") are hybrid entities that are, under state law, neither partnerships nor corporations. For federal income tax purposes, an LLC can be treated as either a partnership or a corporation. To avoid double tax for corporations, most LLCs are carefully structured to be treated as partnerships for federal income tax purposes and file annual information tax returns for partnerships using Form 1065. In this case, Cadaja filed a Form 1065 for tax year 1994, and was, therefore, treated as a partnership and subject to a single tax on its earnings, as well as deduction on losses, at the member or partner level rather than on the entity level.

### I. Passive Activity Loss

The issue in this case is whether plaintiff's ratable share of the flow-through operating loss from Cadaja should be characterized as ordinary loss or passive activity loss in plaintiffs' joint tax return for tax year 1994.

**[1, 2]** Ordinary losses can be applied against any income; however, passive activity losses can be applied only against passive activity income. Passive activity losses that are not currently deductible are carried forward to the next taxable year. *See* 26 U.S.C. § 469(b). Defendant characterized plaintiff's flow-through loss from Cadaja as a passive activity loss, thus limiting any deductions to applicable passive gains. I disagree.

Passive activity loss rules pursuant to 26 U.S.C. § 469 apply to individuals. *See* 26 U.S.C. § 469(a). "Passive activity" means any trade or business in which the taxpayer does not "*materially participate.*" 26 U.S.C. § 469(c)(emphasis added). "A taxpayer shall be treated as materially participating in an activity only if the [taxpayer's involvement] in the operation of the activity [is] regular, continuous, and substantial." 26 U.S.C. § 469(h)(1).

The regulations promulgated for Section 469 further interpret the "material partic-

ipation" standard by instructing that a taxpayer materially participates in an activity if the taxpayer meets one of the seven tests set forth in Temporary Treasure Regulation § 1.469–5T:

(1) The individual participates in the activity for more than 500 hours during such year;

(2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;

(3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

(4) The activity is a significant participation activity for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours;

(5) The individual materially participated in the activity for any five taxable years during the ten taxable years that immediately precede the taxable year;

(6) The activity is a personal service activity, and the individual materially participated in the activity for any three taxable years preceding the taxable year; or

(7) Based on all of the facts and circumstances, the individual participates in the activity on a regular, continuous, and substantial basis during such year.

Temp. Treas. Reg. § 1.469–5T(a)(1)–(7).

In addition, if a taxpayer is a limited partner of a limited partnership, the taxpayer is presumed to not materially participate in the activity of the partnership, except as provided in the regulations. 26 U.S.C. § 469(h)(2). The regulations provide an exception to the general presumption of non-material participation as limited partners, that is, if the taxpayer is a limited partner of a limited partnership, but meets test (1),(5) or (6) of the seven material participation tests set forth in Temporary Treasure Regulation § 1.469–5T(a)(1)–(7), the taxpayer is found to materially participate in the activity of the partnership. Therefore, to satisfy the "material participation" standard, a general partner in a partnership needs to meet one of the seven tests set forth in Temporary Treasure Regulation § 1.469–5T(a)(1)–(7); however, a limited partner needs to meet one of the three tests set forth in Temporary Treasure Regulation § 1.469–5T(a)(1), (5) and (6). The standard of "material participation" for a limited partner is higher than that for a general partner.

The question becomes whether plaintiff, a member of an LLC, should be treated as a limited partner or a general partner in a limited partnership for Section 469 purposes. This court believes that this issue is one of first impression.

Plaintiffs argue that plaintiff should be treated as a general partner. Cadaja was designed to be taxable as a partnership for federal taxation purposes for tax year 1994. Oregon state law distinguishes limited partner status from general partner status based on a taxpayer's "control," rather than liability, of an business entity. *See* ORS 70.135. Under Oregon law, a general partnership interest is defined by exclusion referring to the definition of limited partner, i.e., general partner status is conferred upon a partner who is not subject to restrictions upon participation in the control of the business. *See* ORS 70.185. According to plaintiffs, because none of the members of Cadaja are subject to restrictions under Oregon law or under

the Cadaja's Articles of Organization and Operating Agreement, all members of Cadaja, including plaintiff, should be treated as general partners.

Defendant argues, however, that plaintiff should be treated as a limited partner. Although Cadaja was an LLC formed under the Oregon Limited Liability Company Act, for federal taxation purposes, and more relevantly, for Section 469 purposes, Oregon law is preempted and does not apply, except as otherwise directed by the provisions of Section 469 and its regulations. The regulations provide that for purposes of Section 469, a partnership interest shall be treated as a limited partnership interest if "[t]he liability of the holder of such interest for obligations of the partnership is limited, under the law of the State in which the partnership is organized, to a determinable fixed amount ...." Temp. Treas. Reg. § 1.469–5T(e)(3)(i)(B). In other words, in the context of Section 469, without a specific designation in the partnership agreement or certificate, the question whether a partnership interest is limited or general turns on whether there is limited liability under state law. If a partner has limited liability in the partnership under state law, the partner has a limited partnership interest, and therefore, is a limited partner in the partnership. The defendant argues that because Cadaja, as an LLC, extended the protection of limited liability to all of its members, including plaintiff, under Oregon law and its Operating Agreement, plaintiff's interest in Cadaja was a limited partnership interest and he was a limited partner for Section 469 purposes in tax year 1994.

[3] According to defendant, for Section 469 purposes, all members of an LLC will be treated as limited partners of the LLC that is taxable as a partnership, because of their limited liabilities under Oregon law. Plaintiffs argue that the limited partnership test, as set forth in Temporary Treasure Regulation § 1.469–5T(e)(3)(i)(B) and recited by defendant, is obsolete when applied to LLCs and their members, because the limited liability statutes create a new type of business entity that is materially distinguishable from a limited partnership. I agree.

A limited partnership must have at least one general partner who is personally liable for the obligation of the limited partnership. If, for federal tax purposes, an LLC is treated as a limited partnership, and all members of the LLC are treated as limited partners because of their limited liability, the consequence of such a treatment does not satisfy the requirement of "at least one general partner." In addition, LLC members retain their limited liability regardless of their level of participation in the management of the LLC. But a limited partner in a limited partnership cannot, by definition, participate in the management.

Furthermore, the legislative history clearly shows that Congress enacted the limited partnership test for the purpose of the passive activity loss rules to thwart the deduction by investors, such as limited partners in a limited partnership, of "passive" losses from "tax shelter" investments against other non-passive income, since "a limited partner generally is precluded from participating in the partnership's business if he is to retain his limited liability status[.]" Senate Finance Committee Report on P.L. 99–514 (Tax Reform Act of 1986), *reprinted in* CCH Standard Federal Tax Rptr. (2000 ed.) at ¶ 21,960.

[4] The limited partnership test is not applicable to all LLC members, because LLCs are designed to permit active involvement by LLC members in the management of the business. *See* Barbara C. Spudis, *LLCS: Recent Developments and the Developing Uses of Hybrid LLCs,* 373

PLI/Tax 1003, 1034 (1995); Hughlene A. Burton, *Taxing LLC Members as General or Limited Partners,* J. Limited Liability Companies, Spring 1996, at 168, 170. Further, LLC members may materially participate in the LLC without losing their limited liability protection. *See, e.g.,* J. Larry Lee, *The Future of Limited Liability Companies for Business and Estate Planning Purposes in Mississippi,* 18 Miss. C.L.Rev. 91, 101 (1997); Keen L. Ellsworth, *Utah Limited Liability Companies: The "Ugly Ducklings",* 1992 B.Y.U. L.Rev. 1091, 1103 n. 47 (1992). In the absence of any regulation asserting that an LLC member should be treated as a limited partner of a limited partnership, defendant's conclusion is inappropriate. Therefore, the higher standard of material participation test for limited partners should not be applied to plaintiff. Plaintiff materially participated in the activity of Cadaja "if and only if" he satisfies one of the seven tests set forth in Temporary Treasure Regulation § 1.469–5T(a)(1)–(7).

The first test is whether plaintiff participated in the activity for more than 500 hours in tax year 1994. *See* Temp. Treas. Reg. § 1.469–5T(a)(1). Facts show that plaintiff worked approximately 100 hours for Cadaja in tax year 1994, much less than the 500–hour requirement. However, plaintiffs argue that this test provides an easy quantitative measure of "material participation." Five hundred hours per year equates to 9.62 hours per week, or 10.42 hours per week assuming 48 work-weeks per year. Plaintiff alleges that he worked at least 112 hours during the period of approximately eight weeks, from November 4, 1994 to December 31, 1994, equaling approximately 14 hours per week on average. On an annualized basis, plaintiff's participation of 112 hours equates to 728 hours per year. Therefore, according to plaintiffs, plaintiff satisfied the first test.

[5] Defendant argues, however, that neither Section 469 nor the regulations promulgated thereunder provide for such proration in the event of a short year. The defendant states that the plain language "if and only if" contained in § 1.469–5T(a), denotes a requirement of strict compliance. In addition, if proration is allowed, 500 hours per year equates to less than 10 hours per week. Such a *deminimis* standard of "material participation" acts against the Secretary of the Treasury's strong interest in preventing taxpayers from initiating or acquiring passive activities at the close of a taxable year, and then characterizing those losses as non-passive, and deducting the losses against ordinary income. Although, as plaintiffs argue, no regulation or case law prohibits annualizing the participation hours in the event of a short year, I defer to the defendant's explanation on how the first test should be applied.

I appreciate plaintiff's frustration regarding the application of this test, since timing of the formation of a business entity ironically affects the determination of the nature or level of a taxpayer's participation in the business activity under the first test. However, plaintiff chose to form Cadaja as an LLC over other organizational forms in November of tax year 1994 for various business reasons, which may or may not include tax considerations. Application of this test without strict compliance will open the floodgates defeating the regulations' purposes. Therefore, I find that plaintiff fails to meet the 500–hour–per–year threshold requirement under the first test.

The second test is whether plaintiff's participation in the activity for tax year 1994 constitutes substantially all of the participation in such activity of all individuals (including non-owners) for the same tax year. *See* Temp. Treas. Reg.

§ 1.469–5T(a)(2). The third test is whether plaintiff participated in the activity for more than 100 hours during tax year 1994, and the plaintiff's participation is not less than that of any individual (including non-owners) during the same year. *See* Temp. Treas. Reg. § 1.469–5T(a)(3). Plaintiff did not argue his material participation under these two tests.

**[6]** The fourth test is "[t]he activity is a significant participation activity . . . for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours." Temp. Treas. Reg. § 1.469–5T(a)(4). "Significant participation activities" are defined as

> (1) *In general.* For purposes of paragraph (a)(4) of this section, an activity is a significant participation activity of an individual if and only if such activity -
>
> (i) Is a trade or business activity . . . in which the individual significantly participates for the taxable year; and
>
> (ii) Would be an activity in which the individual does not materially participate for the taxable year if material participation for such year were determined without regard to paragraph (a)(4) of this section.
>
> (2) *Significant participation.* An individual is treated as significantly participated in an activity for a taxable year if and only if the individual participates in the activity for more than 100 hours during such year.

Temp. Treas. Reg. § 1.469–5T(c).

Plaintiffs argue that plaintiff's participation in both Cadaja and Ethix Corporation were significant participation activities, and his "aggregate participation in all significant participation activities during [the tax year 1994] exceeds 500 hours." Therefore, according to plaintiffs, plaintiff satisfies the fourth test. Plaintiffs' arguments err in mis-characterizing his participation in Ethix Corporation as a significant participation activity under Temporary Treasure Regulation § 1.469–5T(c).

Plaintiff was a full-time CEO of Ethix Corporation working at least 40 hours per week on a continuous basis until he terminated his employment with the corporation in November 1994. His participation in Ethix Corporation far exceeded the 500-hour minimum standard as set for in Temporary Treasure Regulation § 1.469–5T(a)(1). Therefore, his activity in Ethix Corporation in tax year 1994 is a material participation activity under Temporary Treasure Regulation § 1.469–5T(a)(1). Consequently, it is not a "significant participation activity" under Temporary Treasure Regulation § 1.469–5T(c)(1)(ii). Plaintiffs mistakenly treat plaintiff's participation in Ethix Corporation as a significant participation activity and combine it with his participation in Cadaja that is arguably a significant participation activity. Therefore, plaintiff fails the fourth test.

Since the fifth and sixth tests raise common questions, they are discussed together. The fifth test is whether plaintiff "materially participated in the activity (determined without regard to this paragraph (a)(5)) for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year [1994]." *See* Temp. Treas. Reg. § 1.469–5T(a)(5). The sixth test is whether the activity is a personal service and plaintiff materially participated in the activity for any three taxable years (whether or not consecutive) preceding the tax year 1994. *See* Temp. Treas. Reg. § 1.469–5T(a)(6). An activity is a "personal service activity" if it involves the performance of personal services in "[t]he fields of health, law, engineering, architecture . . . or consulting" or "[a]ny other trade or business in which capital is not a

material income-producing factor." Temp. Treas. Reg. § 1.469–5T(d). Both Ethix Corporation and Cadaja were business entities performing consulting, marketing, networking, and business services for the health care industry, and capital was not a material income-producing factor to either of them. Therefore, plaintiff's activities in them are personal service activities.

Defendant argues that Cadaja was formed in tax year 1994, so plaintiff's activities in Cadaja alone do not meet the requirement of the fifth and the sixth tests. Plaintiffs argue, however, that plaintiff's material participation in Ethix Corporation, prior to the formation of Cadaja, should be included in considering whether plaintiff satisfies the fifth and the sixth tests.

Plaintiffs did not raise this grouping argument of plaintiff's activities in both Ethix Corporation and Cadaja until their Memorandum in Support of Plaintiffs' Motion for Summary Judgment. Defendant responds that plaintiffs' grouping argument is barred by the doctrine of variance.

[7, 8] Under the doctrine of variance, a taxpayer is generally barred from asserting a claim in a refund action that was not raised in the administrative process of a claim for refund. *See* 26 U.S.C. § 7422(a); *Robinson v. United States,* 84 F.Supp.2d 1124, 1127–28 (D.Or.1999). "The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas. Reg. § 301.6402–2(b)(1). The purpose of this requirement is "to prevent surprise and to give the IRS adequate notice of the claim and its underlying facts so that it can make an administrative investigation and determination regarding the claim." *Boyd v. United States,* 762 F.2d 1369, 1371 (9th Cir.1985). "If the [refund] claim on its face does not call for investigation of a question, the taxpayer may not later raise that question in a refund suit." *Quarty v. United States,* 170 F.3d 961, 972 (9th Cir. 1999) (*quoting Boyd,* 762 F.2d at 1372).

Plaintiffs argue that the issue of whether plaintiff materially participated in the business operation and affairs of Cadaja was raised with their administrative Claims for Refund filed with the IRS, and since their claim never changed, there was no variance. In addition, the IRS considered all seven tests for "material participation" in its administrative decision. Therefore, plaintiffs argue that their grouping argument under the fifth and sixth tests should be allowed.

The question here is how detailed a claim need be to provide the IRS with sufficient notice to consider a refund claim raised by a taxpayer. A broad claim, as occurred here, does not, on its face, call for investigation of a question as to whether plaintiffs can group plaintiff's activities in Cadaja and Ethix Corporation together as a "single activity" in order to decide whether plaintiff materially participated in that activity. Such a question may thus be barred. *See Quarty,* 170 F.3d at 972.

The grouping argument, however, is an argument only under the "material participation" claim. Requiring that a taxpayer list all possible arguments for each test under "material participation" claims in his Claim of Refund is not reasonable. Further, plaintiffs' grouping argument is not frivolous and was raised in good faith. To provide defendant with an opportunity to respond to plaintiffs' grouping argument, this court requested both parties address the issue "[w]hether Plaintiffs' activities in Ethix Corporation, a C corporation, and Cadaja, a limited liability company, can be grouped for the purpose of Treas. Reg. § 1.469." *See* Civil Minutes, doc. # 61. Therefore, under the circumstances of this case, this court will consider the merit of plaintiffs' grouping argument.

Treasure Regulation § 1.469–4(a), in defining the term "activity," allows a taxpayer to group his or her trade or business activities, including those conducted through C corporations that are subject to Section 469, S corporations, and partnerships, for purposes of applying the passive activity loss rules of Section 469. *See* Treas. Reg. § 1.469–4(a). This regulation is effective for taxable years ending after May 10, 1992. Treas. Reg. § 1.469–11(a)(1). Therefore, Treasure Regulation § 1.469–4 applies to this case for tax year 1994.

[9] No dispute arises as to the fact that Ethix Corporation is a C corporation that is subject to Section 469. Therefore, the issue is whether plaintiff's activities in Ethix Corporation, a C corporation, and Cadaja, a limited liability company, can be grouped for the purpose of § 469. Partners and shareholders may group activities they conducted directly through a Section 469 entity (i.e., a partnership, an S corporation or a C corporation that is subject to § 469) with activities they conducted directly through other Section 469 entities. *See* Treas. Reg. § 1.469–4(d)(5)(i). A taxpayer may group his activities conducted through a C corporation subject to Section 469 with another activity of the taxpayer only for purposes of determining whether the taxpayer materially participates in the other activity. *Id.* § 1.469–4(d)(5)(ii). Therefore, the grouping of plaintiff's activities in Ethix Corporation with his activities in Cadaja is available to plaintiffs in determining whether plaintiff materially participated in his activities with Cadaja.

Treasure Regulation § 1.469–4(c) provides general rules for grouping activities: the activities to be grouped must form an "appropriate economic unit" that is determined by looking to all "facts and circumstances" with the "greatest weight" placed upon "(i) [s]imilarities and differences in types of trades or businesses; (ii)[t]he extent of common control; (iii)[t]he extent of common ownership; (iv)[g]eographic location; and (v)[i]nterdependencies between or among the activities." Treas. Reg. § 1.469–4(c)(2). Furthermore, "the fact that two undertakings are conducted by different entities does not establish that they are different activities." Staff of the Joint Comm. on Taxation, 100th Cong., General Explanation of the Tax Reform Act of 1986, 87 CIS J 86215, at 247.

The business activities of Ethix Corporation have significant similarities with those of Cadaja. Both are personal service activities, providing counseling, marketing, networking, and business services to the health care industry. The only difference between the business activities is that Ethix Corporation was involved in traditional medicine, while Cadaja was involved primarily in "alternative medicine," such as chiropractors, naturopaths, and acupuncturists. Plaintiff had common control of both Ethix Corporation and Cadaja: plaintiff was a CEO of Ethix Corporation prior to November 1994, and a founding member and managing member of Cadaja since November 1994. Plaintiff held a majority portion of ownership interest in both Ethix Corporation and Cadaja. Finally, both business entities had their principal places of business in Portland, Oregon.

Defendant, however, argues that the activities of Ethix Corporation and Cadaja existed entirely independently of each other, because Ethix Corporation was sold before Cadaja commenced operating on November 4, 1994. Defendant fails to recognize one dependency between Ethix Corporation and Cadaja and that is that plaintiff formed Cadaja primarily because he intended his expertise and reputation in the medical community established through his activities with Ethix Corporation be transferred to Cadaja. *See* Affidavit of Plaintiff in Support of Plaintiffs'

Motion for Summary Judgment ¶¶ 7 and 15. Such a dependency is particularly important for success of a professional service.

Defendant further argues that both examples under Treasure Regulation § 1.469–4(c)(3) involve a taxpayer engaging in two or more trade or business activities at the same time. *See* Treas. Reg. § 1.469–4(c)(3), Example 1 and Example 2. Since plaintiff's activities in Ethix Corporation and Cadaja did not occur simultaneously, the defendant alleges that plaintiff cannot group his activities. Defendant errs, because no rules or regulations require that activities to be grouped occur at the same time. Regulation § 1.469–4, applying to taxable years after 1992, offers a broader "facts-and-circumstances" test for reasonable grouping to define the term "activity" than previous Temporary Regulation § 1.469–4T that applies to taxable years before 1992. *See* Treas. Reg. § 1.469–11; *compare* Treas. Reg. § 1.469–4 *with* Temp. Treas. Reg. § 1.469–4T. However, Temporary Regulation § 1.469–4T provides some useful insights in dealing with activities in professional services, such as "services performed in the fields of health ... or consulting." *See* Temp. Treas. Reg. § 1.469–4T(h)(1)(ii). Example 3 under Temporary Treasure Regulation § 1.469–4T(h) clearly stated that "[t]his [grouping] rule is not limited to cases in which the taxpayer holds such interests simultaneously." *Id.* § 1.469–4T(h), Example 3. Example 3 describes a scenario of medical services in which a taxpayer owned a partnership in Partnership A in 1989 and became a partner in Partnership B in 1990. The grouping of the taxpayer's activities in Partnership A and those in Partnership B is permitted. *See id.* Therefore, plaintiff can group his activities in Ethix Corporation and Cadaja as a single activity for determining whether he materially participated in the activities in Cadaja in tax year 1994.

Defendant argues that even if plaintiff's activities can be grouped for determining his material participation, plaintiff cannot materially participate in the activity of Ethix Corporation in tax year 1991 or earlier years to satisfy the fifth and sixth tests. According to temporary regulations in effect for 1991 and earlier years (i.e., the Tax Reform Act of 1989), a taxpayer could not be considered to be materially participating in an activity through a non-pass-through C corporation. *See* Temp. Treas. Reg. § 1.469–4T (1989); *Connor v. Commissioner,* 218 F.3d 733, 737 (7th Cir.2000) ("Prior to 1992, the temporary regulations promulgated by the Secretary to apply the passive activity rules ("temporary regulations") provided that shareholders in non-pass-through entities, such as the corporation, did not participate materially in the activities of such entity," and the final regulations effective from 1992 applied a broader "facts-and-circumstances" test to all entities to determine whether the activities of an entity and an individual of the entity should be considered as a single activity, rather than explicitly excluding the shareholders in non-pass-through entities).

[10] Defendant's argument has merit. However, if plaintiff can group his activities in Ethix Corporation and Cadaja as a single activity under Treasure Regulation § 1.469–4 ("Definition of activity"), plaintiff can satisfy the first test, i.e., plaintiff participated in a "single activity" (grouping his activities in Ethix Corporation and Cadaja) for more than 500 hours during tax year 1994. Plaintiffs need only satisfy one of the seven tests to meet the "material participation" requirement. Therefore, I do not need to decide whether plaintiff materially participated in the activity of Ethix Corporation in tax year 1991 and

previous years in order to satisfy the fifth and sixth tests.

In conclusion, plaintiff's ratable share of the flow-through operating loss from Cadaja should be characterized as ordinary loss for tax year 1994.

II. Accuracy-related Penalty

Based on the conclusion that plaintiffs' pass-through loss from Cadaja LLC is an ordinary loss for tax year 1994, defendant's assessed accuracy-related penalty against plaintiffs is improper.

## CONCLUSION

The defendant's summary judgement motion (doc. # 32) is denied and plaintiffs' cross-motion for summary judgement (doc. # 40) is allowed. The parties are directed to confer and agree upon a final order which specifies all payments and/or refunds in accord with this opinion. The order should be submitted to the court for signature.

IT IS SO ORDERED.

**Glenn S. PAGE, Plaintiff,**

**v.**

**Michael J. NORVELL, Defendant.**

**Nos. CIV. 96–1511TC, CIV. 96–1702–ST.**

United States District Court,
D. Oregon.

Dec. 21, 2000.

State inmate brought a § 1983 action against manager of correctional institution's counseling treatment services, asserting a claim for violation of his Eighth Amendment rights in manager's alleged deliberate indifference to his medical needs arising from a diagnosis of bipolar disorder. On motion for summary judgment, the District Court, Aiken, J., held that there were genuine issue of material fact, precluding summary judgment, as to whether manager caused the prisoner to not receive a medication review, whether manager purposefully misdiagnosed prisoner's mental illness, and whether the lack of medication review was harmful.

Motion denied.

**1. United States Magistrates ⇔27**

When a party objects to any portion of a magistrate's findings and recommendation, the district court must make a de novo determination of that portion of the magistrate's report. 28 U.S.C.A. § 636(b)(1)(B).

**2. Federal Civil Procedure ⇔2470.1**

For summary judgment purposes, the materiality of a fact is determined by the substantive law on the issue, and the authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Fed.Rules Civ.Proc. Rule 56(c), 28 U.S.C.A.

**3. Sentencing and Punishment ⇔1546**

A determination of deliberate indifference to a prisoner's medical needs, in violation of the Eighth Amendment, involves an examination to two elements: the seriousness of the prisoner's medical need and the nature of defendant's response to that need. U.S.C.A. Const.Amend. 8.

**4. Sentencing and Punishment ⇔1546**

Prisoner's medical need was sufficiently serious due to his mental health disorder, diagnosed as bipolar disorder, and the anxiety he allegedly suffered due to a lack of medication review, such that deliberate indifference to such need would violate the Eighth Amendment. U.S.C.A. Const.Amend. 8.