IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 06-211T

(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

V

THE UNITED STATES,

Defendant

----------------------------------

ORAL DEPOSITION OF

JAMES R. THOMPSON

APRIL 23, 2007

Volume 1

----------------------------------

ORAL DEPOSITION OF JAMES R. THOMPSON produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 23rd of April, 2007, from 3:50 p.m. to 5:21 p.m., before Diana Pereira, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of WINSTEAD, 5400 Renaissance Tower, 1201 Elm Street, Dallas, Texas, pursuant to the Rules of the Court of Federal Claims.

GOVERNMENT EXHIBIT

1:1

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. STUART M. REYNOLDS, JR.
WINSTEAD
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 745-5360
(214) 745-5400 FAX

FOR THE DEFENDANT:

MR. JEFFREY R. MALO
MR. STEVE FRAHM
US DEPARTMENT OF JUSTICE, TAX DIVISION
COURT OF FEDERAL CLAIMS SECTION
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
(202) 305-7539

INDEX

PAGE
Appearances.................................... 2
JAMES R. THOMPSON
Examination by Mr. Malo......................... 4
Signature and Changes............................ 51
Reporter's Certificate........................... 53

EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 9 | Response to Interrogatories | 41 |
| 10 | Business overview for the period of early part of 2002 through the end of 2004 | 43 |
| 11 | Statement of assets, liabilities, and member equity income tax basis for Mountain Air Charter, LLC | 43 |
| 12 | 2002 partnership return for Mountain Air Charter | 44 |
| 13 | 2003 partnership return for Mountain Air Charter | 45 |
| 14 | James R. Thompson's personal 2002 return | 45 |
| 15 | James R. Thompson's personal 2003 return | 46 |
| 16 | Bill from E&Y relating to Mountain Air Charter from 2002 | 46 |
| 17 | The PC-12 insurance policy for the year 2002, May 2002 through May 2003 | 46 |
| 18 | James R. Thompson's logbook for 2002-2003 | 49 |
| 19 | Calendar from December 31st of 2001 through January of 2004 | 49 |

P R O C E E D I N G S

MR. MALO: Good afternoon. My name is Jeff Malo. I'm joined by Steven Frahm with the United States Department of Justice. We are here representing the United States in the matter of James Thompson versus the United States. Our deponent this afternoon is Mr. Thompson, and he is joined by his counsel Mr. Stuart Reynolds.

First, I would like to acknowledge that this deposition was scheduled by agreement of the parties, and I would like to express my thanks for everyone's cooperation and agreeing to be here today.

Second, I'd like to state that this deposition is being taken in accordance with the Rules of the Court of Federal Claims.

JAMES R. THOMPSON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. MALO:

Q. Mr. Thompson, have you ever been deposed before?
A. Yes.
Q. Okay. Then you're probably fairly familiar with the process, but I will summarize for you. I will be asking you a number of questions. If my questions are unclear, I ask that you not answer them. I will rephrase them at your request. If you don't know the answer, please tell me. I don't want you to

speculate, but if you have some idea what the answer is but you're not absolutely certain, please provide the information you have and describe the limits on your level of certainty.

We can take a break at any time. Please tell me if you would like to take a break. Mr. Reynolds may object to certain questions that I ask. He may object on grounds of privilege, such as attorney/client privilege, and he may instruct you not to answer. I ask you to follow his instructions.

However, if he does not claim privilege and he may object on other grounds, such as the form of my question, and I will have three options. I can either withdraw my question, rephrase the question, or ask you to answer the question as posed.

If at any time during this deposition you remember additional material or additional information, please provide it even if we have moved on to another topic. If you wish to revise an answer or believe that you were mistaken about a prior answer, please advise me of this fact at any time during the deposition.

Now, the years at issue are 2002 and 2003. All questions I ask, unless otherwise specified, relate to that period. Do you have any questions?

A. No.

Q. Mr. Thompson, would you please state your full name

for the record.
A. James Russell Thompson.
Q. Your date of birth?
A. 12/20/54.
Q. Your address?
A. 5555 Winston Court, Dallas, 75220.
Q. Your telephone number?
A. Work or home?
Q. Both, please.
A. Okay. Home is 214-361-0266. Work is 214-237-2001.
Q. When you refer to your work number, can you specify what you -- what your -- where are you employed?
A. USA Corporation.
Q. Thank you. Mr. Thompson, would you please describe your educational background.
A. I have a ninth grade education.
Q. Can you elaborate on that?
A. What more would you like?
Q. Did -- you completed through your freshman year of high school; is that correct?
A. That's correct, yes.
Q. Okay. And where did you perform your education?
A. Culver Military Academy.
Q. I'm sorry?
A. Culver Military Academy.

Q. Can you describe your current employment.

A. I'm the chief executive officer of ORIX USA Corporation.

Q. Do you hold any other positions with the company?

A. I'm on various subsidiary boards in both an executive and non-executive capacity.

Q. Can you identify these subsidiary entities?

A. Not all of them. There are -- there's approximately 95 subsidiaries. And many of the board meetings and other corporate formalities are held in concert, so -- not all of them. But the principal subsidiaries are ORIX Capital Markets, ORIX Real Estate Capital, and ORIX Financial Services.

Q. And do you have a title at each of these subsidiaries? Could you identify them?

A. No.

Q. When did you start working with ORIX?

A. 1990.

Q. How about ORIX Capital Markets?

A. 1997.

Q. What was your original position with ORIX?

A. I was engaged by ORIX in 1990 as an advisor to assist them with the development of an effort that they wanted to make in a segment of the mortgage markets -- in the commercial mortgage market segment, I guess is the best way to put it.

Q. And what prior experience or training did you have to

function in your role as an advisor with the development of -- I'm sorry -- what did you say, common mortgage?

A. Commercial.

Q. Commercial mortgage?

A. Yes.

Q. Portfolios?

A. Commercial mortgage markets --

Q. Markets.

A. -- is really probably the best way to put it.

Q. Markets. What prior experience or training did you have for commercial mortgage markets?

A. I had been involved -- well, the issue at hand was primarily a technical one. It was whether or not commercial mortgages would ultimately be securitized the same as residential mortgages had come to be securitized. So the experience that I had at that point was primarily of a technical nature, and it began in 1979 when I first got involved in the mortgage markets and was subsequently involved in a number of -- or by virtue of a number of positions that I held in the early stages of the securitization of residential mortgage.

Q. Can you describe your responsibilities at ORIX.

A. Initially I was an advisor. And I was retained in connection with a joint venture that I had put together between ORIX and Wells Fargo Bank relating to the origination,

securitization, and sale of commercial real estate loans.

Q. From your original position as advisor, what role did you subsequently move to in the company?

A. In 1994, I became an employee with responsibility for directing their investment activities in the commercial mortgage securities markets.

Q. And how long did you hold that position as an employee? Did you have a specific title associated with that?

A. I'm sure I did, but I really don't remember what it was.

Q. Do you know how long you held that position?

A. Well, until 1997.

Q. And what happened in 1997?

A. I -- ORIX acquired a company called Bank One Management Consulting in Dallas, and at that point, I became chief executive officer of that company.

Q. Of Bank One?

A. Bank One Mortgage -- well, it was Bank One Management and Consulting when we bought it. It became Bank One Mortgage Capital Markets after we bought it, and then it became ORIX Capital Markets.

Q. So am I correct in stating that you became CEO in -- of this Bank One Mortgage entity in 1997 and retained this title through today, although the entity has undergone several name changes?

A. I'm no longer chief executive officer of Bank -- or of ORIX Capital Markets.
Q. But you are of ORIX USA?
A. Yes.
Q. When did you cease becoming CEO of ORIX Capital Markets?
A. I think it was April 1st of 2006. It could be 2005, but I think it's 2006.
Q. Over the course of your employment with ORIX or any ORIX subsidiary, what is the nature of your compensation, salaried or hourly or --
A. It's salary plus bonus.
Q. Is that the nature of the arrangement when you served as an advisor?
A. Yes. Well, there was no salary. Well, there were advisory fees. I don't recall how -- there was a -- there was a -- an advisory fee and then there was compensation that was tied to their ultimate profit.
Q. And when you became an employee, you moved to a salary plus bonus structure for compensation?
A. That's correct.
Q. Do you maintain regular business hours for ORIX Corporation?
A. No.
Q. How many hours a week do you work for ORIX or ORIX

subsidiaries?
A. As much as I need to.
Q. Are there any minimum requirements?
A. No.
Q. Would you be comfortable estimating average hours over a week or a month for any given year?
A. No.
Q. Okay. Mr. Thompson, I'd like to ask you about some of your other investment or professional activities. I'm aware that you have an ownership interest in a hay and donkey farm. Is there a name of this farm?
A. Yes.
Q. What is the name?
A. Hog Heaven. There's a reason for it.
Q. What is the reason?
A. It has a major infestation of wild hogs.
Q. Where is this farm located?
A. In Kaufman, Texas.
Q. How many acres is it?
A. 760-something.
Q. Do you know how many head of donkey you have?
A. Now?
Q. How many -- how large was the farm -- or how many head did you have in 2002, 2003?
A. Somewhere between 80 and 100.

Q. How about now?
A. Ten.
Q. Do you sell hay or do you sell livestock?
A. Not anymore.
Q. But you did?
A. I did.
Q. What were the years during which you sold hay?
A. Well, I bought it in 1998, and we sold hay for a couple of years, and donkeys. But it -- I wasn't capable of making any money, so all that's left are animals.
Q. Just donkeys?
A. No. There's 26 buffaloes. Is it buffaloes, plural, or buffalo?
MR. REYNOLDS: We probably each have an opinion on that. I think buffalo is plural.
MR. FRAHM: I think so. I'm with Stuart on it.
MR. REYNOLDS: Yeah.
THE WITNESS: But that doesn't explain the baseball team, the Orix Buffaloes.
MR. REYNOLDS: No, it doesn't.
THE WITNESS: They're the Japan league.
MR. FRAHM: Really?
THE WITNESS: Uh-huh.
MR. MALO: Probably because it's a Japan league.
THE WITNESS: Probably it's a good thing that

it's not its first language.
MR. MALO: That's right.
Q. (BY MR. MALO) You stated that you bought the farm in 1998?
A. Uh-huh.
Q. And sold hay and donkeys, or animals, for a time?
A. Yes.
Q. When did --
MR. REYNOLDS: I don't want there to be any ambiguity in the record. Mr. Thompson is alive and well. And the phrase "bought the farm" has a -- has a connotation that just to the average reader might be unsettling.
MR. MALO: I'll rephrase.
Q. (BY MR. MALO) You purchased the farm in 1998?
A. Yes.
Q. And for a while sold hay and donkeys?
A. Yes.
Q. Do you know when you stopped selling animals and hay, approximately?
A. 2002, I'm guessing.
Q. Okay. Why did you purchase the farm?
A. Well, it was complicated. I moved here from an environment where I was involved in a lot of underwater activities. I wasn't used to seeing all that concrete and steel. I needed to do something outside, and that was the

answer that I came up with in 1998.
Q. Now, I believe you just stated -- and correct me if I'm mischaracterizing your statement -- that the hay and donkey sales did not generate profits?
A. That's correct.
Q. Did you purchase the farm with the intention of it being a revenue-generating operation?
A. No.
Q. But the fact that the farm did not generate revenue was a factor in your decision to scale back operations?
A. Yes. Well, generate -- excuse me. It generated revenue. It just couldn't cover its expenses.
Q. Okay. So it didn't generate positive cash flow?
A. That's right.
Q. Okay. Would you characterize your investment in the farm as a hobby --
A. (Nods head affirmatively.)
Q. -- as an investment?
A. In the -- in the ranch itself? I never really thought of it one way or the other.
Q. Are you aware of any appreciation in the land value?
A. Yes.
Q. Okay. Was the value of the land a consideration in your decision to purchase the farm?
A. Yes.

Q. Prior to owning the farm, did you have any interest in farming activities?
A. Casual interest.
Q. Did you have any background in farming?
A. No.
Q. Mr. Thompson, when did you start flying?
A. The first time?
Q. Yes.
A. In 1966.
Q. How did you learn how to fly?
A. I was in the Civil Air Patrol, and they had a program for kids. And the first flying I did was in a sailplane.
Q. What is a sailplane?
A. A glider.
Q. What was the next step in your flight training?
A. In 1982, I picked it up again and took flying lessons.
Q. You said you picked it up again. Was there a period during which you did not fly?
A. Yes.
Q. Can you define that?
A. 19 -- well, from 1967 until 1982.
Q. And in 1982, you said you took flying lessons?
A. Yes.
Q. Can you define that?

A. I just need a better question. I mean --
Q. Okay. Certainly.
When you say you took flying lesson, do you mean you received formal flight instruction?
A. Yes.
Q. From whom did you receive instruction?
A. Well, I don't want it to sound flip, but a flight instructor. I have no idea what the name of that fella was.
Q. How much flight instruction did you receive from this flight instructor?
A. Enough to get a private pilot certificate and an instrument rating.
Q. Do you know approximately over what period of time your initial training began -- between when you began training and received your initial qualifications?
A. Three or four months.
Q. During those three to four months, approximately how often did you fly or receive instruction?
A. I don't know. I'd have to look it up.
Q. To the best of your recollection, was it daily, two, three, five days a week, something?
A. I'd be speculating. It's simple to look it up.
Q. Okay. And what was the initial qualification that you received as a pilot?
A. I'm not sure what the -- what you mean.

Q. What was the initial license you received or initial --
A. It was a private pilot's license.
Q. What was the type or rating?
A. There wasn't one.
Q. What aircraft were you authorized to fly with a private pilot's license when you first received it?
A. Well, just about anything that didn't have two engines or was not a turbine -- turbojet airplane or was not a seaplane. So lots of them.
Q. But there were restrictions on what you could fly as a private pilot?
A. Yes.
Q. Beyond that initial private pilot's license, have you gained additional flight qualifications or flight credentials?
A. Yes.
Q. Could you list those out and when you received them?
A. I have an airline transport pilot rating. That was received in 2006; commercial pilot rating, 2006; L-39 letter of authorization, that was received in -- which is the equivalent of a type rating -- functional equivalent anyway -- in 2005; and a type rating for a Cessna 525 airplane in 2006, July of 2006; and a multi-engine rating and multi-engine instrument rating in January or February of 2006.
Q. If I understand your testimony thus far correctly,

you held a private pilot's license from 1982, beyond which you did not obtain any additional flight qualifications or credentials until 2005. Is that an accurate statement?

A. That's a tough one to say yes to because it's ambiguous. What I think I can say to you is that I didn't obtain any additional ratings between, let's really say, April of 2000 -- or 1983 until January or February of 2005.

Q. And what is the significance of that additional ratings? What does that mean?

A. Well, if you want to fly a multi-engine airplane, you need a multi-engine rating. I only flew single engines, so I didn't need a multi-engine rating until I needed one, which was January or February of 2006. In the early part of 2005, I got my L-39, which is a turbojet letter of authorization, which, as I said, is the functional equivalent of a type rating. And I did that because I needed to buy -- or I needed to have that or it would be illegal to fly an airplane.

But my practice was typically to only have what I needed. And from 1983 until 2005, I had what I needed.

Q. Is it an accurate statement, then, that the universe of aircraft that you were restricted from flying, as you described; no multi-engine, no turbo engine, no seaplanes, the universe of restrictions on aircraft that you could fly was constant from 1983 through 2005?

A. I think that's true. The regulations changed

considerably during that period. So, you know, with -- with an exception for regulatory changes that may have come into play, the answer would be yes.

Q. And do you know how many hours you flew over this period?

A. Well, I have about 5,400 now. Which period?

Q. From 1982 or 1980, whenever you started officially tracking and logging your hours, through the present.

A. About 5,400, I think. Maybe 53.

Q. Do you know how many hours you had when Mountain Air was started?

A. Under 5,000. 4,800, something like that. Well, it was less than that. Above 4,000. Probably just -- I could look it up, but just below 4,500 would be a good -- a reasonable estimate, I would say.

Q. What was the first aircraft that you owned?

A. A Mooney 231.

Q. And when did you purchase that?

A. In December of 1982.

Q. How long did you own it?

A. Until 1988.

Q. What was the second aircraft you owned?

A. Well, I owned a pair of Cessna 152s.

Q. When did you acquire those?

A. '83.

Q. And how long did you own them?
A. A couple of years. '84, '85, something like that.
Q. Okay. What other aircraft have you owned?
A. The -- another Mooney in 1994, which was sold in 2003, I think. Early part of 2003.
Q. What was the model on that Mooney?
A. It was called a TLS. And the L-39 -- what -- what's the cutoff of the period that you're inquiring about?
Q. Through the present.
A. Oh. The L-39 and a -- through Mountain Air Charter, a Citation 525. And the Pilatus through -- also through Mountain Air Charter.
Q. I'm sorry. Citation --
A. 525.
Q. When did you acquire the -- I'm sorry. You said the Mooney TLS, '94 through 2003?
A. Yes.
Q. The L-39?
A. 2005 through the present. The Pilatus was May 2002 through January of 2007. And the Citation was September of 2006 through the present.
Q. And could you describe the category or type of aircraft that each of these are?
A. Yes. The L-39 is a single-engine turbojet. Both Mooneys were single-engine piston-driven airplanes. The

Cessna 152s were single-engine piston airplanes. The Pilatus is a single-engine turboprop. And the Citation is a multi-engine turbojet.

Q. How would you describe the range of each of these aircraft in terms of their flying capability?

A. The -- I don't know what the range of a 152 is. That was a long time ago, so I -- I won't -- I'll just -- I just won't deal with that. But the -- the Pilatus was a 2,000-mile airplane. The Citation is about an 1,800-mile airplane. The L-39 is a 500-mile airplane. And the Mooney was -- you could get 1,800 -- an 1800-mile airplane, both of them.

Q. What type of insurance did you maintain on each of these aircraft?

A. Well, I don't remember -- I'll just run through them in sequence. The Mooney in 1982, I have no idea. The 152s, I have no idea. The TLS, I don't remember. The Pilatus was full hull value, one million liability in 2002, going up to three million in 2003, and then I think five in 2004. And the Citation is 10 million. The L-39, all you can get is a million, but it's got 100,000 per seat limitation. The others are smooth -- what we call smooth, meaning they apply to all the seats without any sub-limits.

Q. So those coverage levels that you've just described would be per seat?

A. No, total.



7fbb0d73-2cf3-4273-a5d5-5e266ff96f63

Q. Total?

A. But sometimes -- without regard to how many seats sue you. In the case of the L-39, you've got what I call -- or what the industry calls a sub-limit of 100,000. So each -- each seat can only recover 100,000, but you have a million in liability. Now, it's only got two seats, so why -- you know, why you pay for a million in liability, I'm not sure. But the others were without sub-limits.

Q. And which did you describe as being smooth?

A. The Citation and the Pilatus.

Q. Which again? I'm sorry. If I could get you to define that term "smooth" again.

A. Smooth means without sub-limits, without per seat limitations.

Q. Okay. For each of these aircraft, are the insurance requirements for a pilot to fly the aircraft the same as FAA requirements that are required to fly the aircraft?

A. No -- well, they might be, but it would be probably a coincidence.

Q. Okay. And do you know enough about them to comment on the differences?

A. Just on the basis of my own experience.

Q. Okay. And from your experience, as far back as you can go on any of these aircraft, do you know what was required in terms of a pilot's experience or pilot's qualifications to

fly either the Mooneys, the Cessnas, the Citation, the Pilatus, the L-39 from an FAA regulatory standpoint? Do you know how many hours were required?

A. I'm not sure that -- well, first of all, the answer to that might be no. I can kind of speculate based on my own personal experience. I'm not aware of any FAA-mandated minimum number of hours for those airplanes. I've got a reasonable confidence level on that. It is typically an insurance company requirement. If you have an instructor sign off for a complex airplane, meaning retractable gear, more than 180 horsepower in a piston -- I think that's right. 200 in flaps, I think, is the other thing -- you can fly any complex airplane for which you have a rating. So if you just have a single-engine rating, you can go out and fly any single-engine airplane. You're -- it's completely legal. It's not smart and you might not be able to get insured for doing that, but you can do it.

Here's another example. The day that I bought the Pilatus, I could have flown it off the field and been completely legal. I had my high altitude signoff, which is another signoff that you have to have to go -- for airplanes that can go above 25,000 feet. And that's all I needed. But it wouldn't have made a lot of common sense and I would have been uninsured.

Q. If I understand you correctly, then, it's your understanding that the FAA does not establish requirements that

are expressed in terms of hourly minimums for any specific flight privileges as it relates to specific aircraft?

A. There is a minimum requirement for a private pilot certificate of about 40 -- of 40 hours, if I -- I think that's still in play. And if you take a checkride in a simulator for a jet that is certificated for single-pilot purposes and you don't hold any other single-pilot ratings, you could have it -- you could come up with a 25-hour supervised operating experience requirement. But if you do a checkride in the airplane, in a single pilot, then you don't have that. Those are the only things that I'm aware of.

There is a minimum number of hours that the FAA publishes before you can get your instrument ready, although I think they may have done away with that one.

MR. REYNOLDS: They've done away with it.

THE WITNESS: So, by and large, I think it's safe, if not fair -- certainly fair to say, if not safe, that there aren't minimum-hour, really, requirements that are published for different kinds of airplanes.

Q. (BY MR. MALO) Okay. What about for insurance purposes?

A. That's a whole different matter. The -- and it's all over the plot. When -- and it varies by insurer, it varies by airplane, it varies by the perception of the experience level of the pilot. It can vary with the accident experience that an



7fbb0d73-2cf3-4273-a5d5-5e266ff96f63

insurance company has had with an airplane or with owner pilots, for example. It's all over the place. But there -- that is where you're going to find minimum requirements.

Q. And, to the best of your recollection, again, going back as far as possible on each of the aircraft you own, do you recall what specifically hour -- what specific hourly requirements were -- were required for insurance purposes on either of the Mooneys, the Cessna, the L-39, the Citation, or the Pilatus?

A. Some of them I do. The Mooneys, I don't think there was one. The 152s, I don't think there was one. You just had to hold a private pilot -- pilot license in the case of all of those. And with the Mooneys you had to have a complex signoff -- or a signoff for complex aircraft.

With the Pilatus, there were -- I had an hour requirement. Tom Travis had one. Mike Holderread may have had one. With the Citation, there was one, both for my 135 pilot and for me. And the L-39, there was one. I don't recall how long it was.

Q. Do you recall what the specific hourly requirement was for each of these aircraft?

A. Some of them. It would be -- first of all, it would be -- the fact would be in the insurance policy because it would be listed either in the -- on the face of the policy or in the endorsements relating to a pilot. So it's possible to



7fbb0d73-2cf3-4273-a5d5-5e266ff96f63

establish definitively what they are.

In 2002, I think Tom's requirement was 25 hours; mine was 200. In the Citation, mine was 100 and my 135 pilot's was 100. So we had identical requirements. Mike Holderread might have been 25 hours for the PC-12.

Q. If I can interrupt you for a moment. You said in 2002 your requirement might have been 200. Was that for the Pilatus?

A. I think it was, yes.

Q. And the requirements you mentioned for both Mr. Travis and Mr. Holderread were both for the Pilatus as well.

A. Yes. But as a -- if we need to establish definitively what those are, we should go back and look at the policies. That's my recollection.

Q. Okay. Would the insurance requirements in terms of hourly -- accumulated hourly experience have varied between pilots?

A. Oh, yes.

Q. And what would be the factor of that? Who's responsible for that variance?

A. The experience -- the professional experience and prejudices that an insurance underwriter might have.

Q. When you acquired the PC-12 in 2002 -- or allow me to rephrase that.

When Mountain Air acquired the Pilatus PC-12, were you authorized to fly the plane?
A. By whom?
Q. You mentioned already for FAA purposes you could have flown it right off the lot. What about for insurance purposes?
A. No, I would not have been -- or I was not.
Q. And do you know what you were lacking in terms of insurance authorization?
A. As I said, I think it was -- well, they wanted the SimCom. They wanted the -- they wanted me to complete the SimCom instruction, and I think the requirement was 200 hours.
Q. Do you know how far short of 200 hours you were?
A. 200.
Q. In other words, you needed 200 hours on the actual Pilatus PC-12 or that -- that make and model?
A. Yes.
Q. Okay. And you didn't have any experience on a Pilatus PC-12 at the time that Mountain Air acquired the aircraft?
A. That's correct.
Q. Were you interested in flying the PC-12?
A. Yeah. Yes.
Q. And you were interested in acquiring the 200 hours' experience that you needed to fly the PC-12?
A. Yes.


7fbb0d73-2cf3-4273-a5d5-5e266ff96f63

Q. And when did you hire Mr. Travis?
A. Well, we could -- first of all, we could establish the fact definitively from the payroll records, but I think it was 30 to 45 days before the delivery.
Q. So 30 to 45 days before May 15th --
A. The May 15th delivery, yes.
Q. -- 2002?
A. Yes.
Q. Okay. And what was the job description that you provided Mr. Travis?
A. Well, it was more a question of the one that he provided me with. I wanted a guy who could do as much as needed to be done. And Tom had some -- he had his own requirements. One of them was he didn't do paperwork, any paperwork except that which the op specs said that he, as the pilot in command, would have to do. So -- and he was -- you know, all the flying was his. I asked him if he would help work on the negotiation with the FAA, because I figured he would be -- it would be helpful for them to see who the pilot was.
What were some of his other requirements? Well, the main was -- the main one was that he didn't -- wasn't going to do any paperwork and his duties would just be limited to the flying and whatever he was required to do by the op specs.
Q. Okay. And, in addition to kind of the requirements

that you say that Mr. Travis specified, what activities did you expect him to perform in his role as pilot in command in addition to the -- to the op specs? What activities was he expected to perform in the course of his employment for Mountain Air as pilot in command?

A. This is going to sound like a flip answer, but it's not. He had -- he had to -- his job was to avoid bending metal or hurting people, period.

Q. Did that entail preflight and post-flight activities?

A. Yes.

Q. Were they all safely -- safety-related?

A. Well, I mean, that was the main requirement. You know, there's all kinds of little things. First of all, with respect to any flight, it was his -- where he was flying as a Part 135 pilot, he was responsible for the preflight and the post-flight. It doesn't mean I didn't do my own, but he -- he was legally responsible for that, and it was his job to comply with that. So I expected him to do whatever he was obligated to do by virtue of the regulations and, as I said, to avoid bending metal or hurting anybody.

Q. In the course of interviewing Mr. Travis, did you discuss with him the possibility of providing you with flight instruction?

A. I don't think so. I don't think I thought I was going to need it.

Q. How did you intend to acquire 200 hours of time in the Pilatus PC-12?

A. I didn't find out about the 200 hours until the last minute.

Q. When was the last minute?

A. Two or three weeks before the airplane was delivered.

Q. So late April, maybe?

A. Something like that.

Q. And once you learned about the requirements of actual operating time that you would need, did you discuss your need to acquire hours with Mr. Travis?

A. Yes.

Q. And what did you say to him.

A. Well, that was five years ago. I have no idea. But he had a requirement that had to be -- I think he had a requirement that had to be fulfilled. I had a requirement. And the whole issue was kind of bound up in the fact that at the last minute the insurance company -- when I started working on the insurance before I hired Tom, which was probably six months before the delivery of the airplane, what I had expected in terms of a policy was $10 million in liability, a 25-hour requirement for supervised operating experience for myself and likely for one that -- anybody that I hired.

What got delivered at the -- there was a little bit of a change-up by the insurance company at the last minute



7fbb0d73-2cf3-4273-a5d5-5e266ff96f63

blaming 9/11. And what I walked away from after the -- at the delivery, or what I walked away with, was a million dollars in liability, a 200-hour requirement, and various other restrictions, if I recall correctly. So it was a much different can of worms, really.

Q. So the insurance requirements came as a surprise to you?

A. A complete surprise.

Q. At the time that you learned of the insurance requirements, when were you expecting to complete Part 135 certification?

A. Well, one had nothing to do with the other. I mean, they weren't interrelated, or they weren't related at all. I was expecting to have the Part 135 shortly after the airplane was delivered. We started on it well before the time the airplane was delivered.

Q. Okay. Did you at any point ask Mr. Travis to provide you with flight instruction?

A. Well, I must have.

Q. And did you ask him to provide you with flight instruction for the purpose of satisfying the 200 hours you needed for insurance requirements to fly the plane personally?

A. Well, it was kind of yes and no. I mean, it was kind of of all wrapped up in a larger issue. When Tom found out that I had only a million dollars in liability insurance, he asked me

for a personal indemnification; in other words, running from me to him because, you know, a million dollars just doesn't go very far anymore. I mean, you can't -- you can't have an accident with one person in the airplane and have that -- and reasonably expect that to cover anything. And I declined to provide that indemnification for a variety of reasons.

And his requirement was, Well, then, you've got to be prepared to let me fly this airplane as much as I want so that I'm completely comfortable doing what I'm doing. And you know, I was -- I mean, it wasn't -- it's not a cheap airplane to operate, but I was kind of in a position where I felt like I couldn't say no based on my denial of an indemnity to him. And I understood his situation. I mean, it wasn't an unreasonable request. It was just something I didn't think I wanted to provide.

So, on the one hand, you had his desire to -- in his own -- to -- you know, to kind of be as comfortable as he wanted to be. And you've met him now. You understand that he has his own idea about what's required, and it's a lot different than what, you know, other people might assume is the case.

And I also had a requirement to complete hours. So, I mean, it was one of those things where we just said, "Okay, I'll fly with you, you fly with me, and at the end of it, you know, hopefully" -- you know, this is me speaking to

Tom -- "you'll have what you feel you need and I'll have what I need."

Q. If I understand you correctly -- and correct me if I'm wrong in this statement -- it's your assertion that there were dual purposes for the flights that occurred between the date that the aircraft was delivered and the date in which Part 135 certification was achieved?

A. Well, that's how we got to that point, yes.

Q. And those dual purposes were specifically Mr. Travis' familiarization with the aircraft, his own comfort level with flying the Pilatus PC-12, is what he benefitted from; and you gained an opportunity to acquire the hours needed for insurance purposes to fly the aircraft solo. Is that an accurate statement?

A. That's correct.

Q. Okay. During this period in which these dual purpose flights occurred, did you ever have any passengers in the aircraft?

A. I believe so.

Q. Could you identify them, either individually or --

A. Not off the top of my head. I mean, I heard some conversation. I wasn't listening to all of it today, but I heard some of it and I recall some of those flights.

Q. Could you identify them collectively as a group of such as friends, family, coworkers? Do --

A. I think there was a little bit of everything.

Q. A little bit of everything?

A. You know, with Tom, I kind of gave him whatever he wanted. I mean, you know, I suggested to him that he bring his wife on a couple of trips because he's the kind of guy who just recently retired, didn't want to be away from home that much, you know. And I wanted him to be as comfortable as he wanted to be in the airplane, so there were a number of occasions, Okay, bring Cheryl, or do whatever you want. And so that did happen.

Q. And on any of these flights that occurred during this period between the date of delivery of the aircraft and the date on which Part 135 certification was obtained, were there any other purposes for these flights aside from the dual purpose that you described earlier?

A. I don't think I can answer that without referring to my logbook and looking at every flight.

Q. Okay. We'll save that for followup.

A. I'm sure there were maintenance flights, for example.

Q. Prior to the inception of Mountain Air Charter and prior to the company's ownership of the Pilatus PC-12, could you describe your use of some of the prior aircraft you owned, particularly the Mooney, I guess, was the most recent plane you owned prior to the Pilatus. Can you describe how you used the Mooney from '94 through 2003?

A. I'm not sure what I -- what you mean by how I used it.

Q. Okay. Did you -- for example, did you use the Mooney to fly yourself to business destinations?

A. Sometimes.

Q. For meetings?

A. Sometimes.

Q. And did you use the Mooney as an alternative to commercial air travel to provide your own transportation?

A. Yes.

Q. For activities related to ORIX?

A. I think I did, yes.

Q. Did you ever fly coworkers at ORIX on the Mooney?

A. I think so.

Q. Did you fly them to business destinations as well?

A. I don't think so.

Q. And to the extent that you flew ORIX' personnel on the Mooney, it was for recreational use?

A. The one trip that I can remember off the top -- offhand, yes, that's what it was.

Q. You said you remember one trip?

A. Yes.

Q. Do you remember any other trips, or was there just one?

A. No, I remember one. I'd have to consult the records

to figure out whether there was anything else.
Q. Is that information that you would have recorded in your pilot log?
A. I may have.
Q. To the extent that you flew yourself to ORIX-related business destinations, did you receive reimbursement from ORIX for your flying expenses?
A. No.
Q. And were they personal expenses?
A. Well, if they were business expenses, I -- you know, it's -- it would have been small enough, I wouldn't have bothered with it.
Q. Am I correct in understanding, then, that you didn't deduct or otherwise treat these on your personal tax return as business-related expenses?
A. Yes, you are.
Q. Okay. Did ORIX have a stated company policy on reimbursement for employment-related travel expenses?
A. Yes.
Q. And can you -- do you know what that policy is?
A. No.
Q. To the extent that you flew the Mooney to ORIX' destinations or for business at locations on behalf of ORIX, can you describe what type of activities that would entail? Is this for client meetings, for management or --

A. You know, I -- I felt okay kind of speculating that there were some. I feel a little less comfortable trying to define what they were, because I'm not -- without benefit of an examination of the record, you know, my flight logs, that's just a little too far.

Q. Do you have flight logs from the Mooney in your possession and control?

A. Yes.

Q. Is that something you might be able to bring with you tomorrow?

A. I could bring my logbook.

Q. Your logbook?

A. Yeah.

Q. That would be -- we'd appreciate that.

MR. REYNOLDS: I thought I produced the logbook.

MR. MALO: The only logbook that I have relates to the period 2002 and 2003. It's a spreadsheet with --

MR. FRAHM: It's electronic as opposed to paper.

THE WITNESS: Well, the whole thing is electronic.

MR. FRAHM: The whole logbook is electronic?

THE WITNESS: Yeah, 20-something years ago. I mean, I've got the logbook -- the paper logbook with nothing more than the endorsements that are required to be handwritten. And then pasted into that are the electronic pages going -- I

think I converted it in -- 15 years ago, or something like that.

MR. REYNOLDS: Well, I guess I've -- I hate to create more paperwork that's not related to the lawsuit. I mean, I gave you the flight logs for the period that we're involved in the lawsuit, right?

MR. MALO: Yes, sir.

MR. REYNOLDS: All right. So now you're asking the witness to bring other flight logs for other periods of time for what purpose?

MR. MALO: Well, a number of questions that I'm asking relate to the nature of the witness' use of aircraft, which is directly relevant to the issue at play in the years in question.

MR. REYNOLDS: Well, I don't agree with that, but I now hear you say that. So I -- but I'm not happy about having my witness go home tonight and pull out a bunch of documents for periods unrelated to the issues in the lawsuit, although I'm going to think about it.

MR. MALO: Okay.

MR. REYNOLDS: But, I mean, do you need the kind of specificity that you are seeking in the pilot logs, because I thought you were getting the witness' recollection of the uses of the airplane, and pinning it down flight by flight may not be necessary.

MR. MALO: Well, I'm -- I agree it's not necessary to pin things down flight by flight. However, the witness has responded a few times that he feels uncomfortable responding to some of these questions without the benefit of the flight log and that he would like to reference -- or could reference it as a resource to more completely respond to these inquiries.

MR. REYNOLDS: Right. Well, I understand that. And that's certainly understandable for the witness not to be able to recall flight by flight, but this has nothing to do with the witness. This has to do with my concern that we're expanding this discovery into a lot of areas that is going to require homework by my client. And I'm not real sure that it's relevant to our lawsuit, although I've heard what you've said.

MR. MALO: Okay.

MR. REYNOLDS: So can you -- well, we'll go off the record when you complete today --

MR. MALO: We can discuss it off the record.

MR. REYNOLDS: -- and talk about what homework I'm going to make my client do.

MR. FRAHM: Certainly. Certainly. And maybe Jeff and I can talk a little bit before our conversation with you.

MR. REYNOLDS: Okay. That's fine.

Q. (BY MR. MALO) And prior to the inception of Mountain

Air Charter, did you ever fly ORIX' personnel for profit?
A. No. Or loss.
Q. And what do you mean by that?
A. Well, literally your question was, did I ever make a profit doing it. And I'm just saying no, nor did I ever do it and make a loss.
Q. Because it wasn't a business activity?
A. Well, because I never flew for revenue. I didn't have a 135 certificate.
Q. Right. So to the extent you flew any ORIX' personnel it -- there was no profit or loss equation?
A. There was no revenue whatsoever.
Q. Correct. Aside from ORIX' personnel, did you ever fly other passengers to destinations of their choosing?
A. I don't think so.
Q. So to the extent that you flew any passengers in the Mooney, you flew them to destinations that were consistent with your stated objective, your stated destination? They joined you in your travel?
A. I think so.
Q. Would you feel comfortable providing an estimate of the percentage of time that you used the Mooney for personal use versus business use?
A. Yes.
Q. And how would you break down that percentage?

A. Very high 90s personal use. If there were a dozen uses over five years of business use, I wouldn't be shocked, but I'd be surprised.

Q. Would you ever use the aircraft, this -- the Mooney I referred to, for other -- well, I guess this was prior to owning the hay and donkey farm, for example, so you probably would not have used the Mooney for the hay and donkey farm; is that correct?

A. That's correct.

MR. MALO: Okay. Let's spend some time here with exhibits. I'd like to mark this Exhibit 9.

(Exhibit No. 9 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. How would you like me to identify it?

Q. Do you know what it is?

A. It looks like it's a response to interrogatories.

Q. Have you seen this before?

A. I may have.

Q. Did you prepare this document?

A. Did I prepare it personally?

Q. Yes.

A. No.

Q. Do you know who did prepare this document?

A. Either counsel or tax people.

Q. Can you specify what you mean by "either counsel or tax people"?
A. Well, it could have been his -- I mean, it looks like it's been cut and paste -- cut and pasted from the master Mountain Air Charter log, with some exceptions. So, I mean, it could have been counsel, it could have been Paul Wilson, it could have been Andy Lasner (phonetic).
Q. Okay.
A. I'm not sure who did the cutting and pasting.
Q. Okay. But you recognize the document?
A. I didn't recognize -- I don't recognize the header, but I recognize this stuff -- or this material, yes.
Q. You recognize the data?
A. Yes, I do.
Q. And can you express an opinion as to whether or not this is a true and accurate statement of flight log data maintained by Mountain Air?
A. I believe it is.
MR. REYNOLDS: We'll have a subject of scrivener error exception if anybody discovers anything.
MR. MALO: Understood.
MR. REYNOLDS: But we believe it to be a fair and accurate answer to your interrogatory.
MR. MALO: I'd like to identify the following as Exhibit Number 9 -- I'm sorry, 10.

(Exhibit No. 10 was marked)
Q. (BY MR. MALO) Mr. Thompson, can you identify this document?
A. Yes.
Q. What is it?
A. It is a business overview for a period running from inception, roughly 2000 -- or early part of 2002 through the end of 2004.
Q. Do you know who prepared this document?
A. I did quite a bit of it. I think it was edited by -- it may have been edited by Paul Wilson.
Q. But it appears to be a fair and accurate representation of the document that you recall from the time?
A. Yes.
MR. MALO: I'd like to mark this as Exhibit 11.
(Exhibit No. 11 was marked)
Q. (BY MR. MALO) Mr. Thompson, can you identify this document?
A. Yes.
Q. And what is it?
A. It's a statement of assets, liabilities, and member equity income tax basis for Mountain Air Charter, LLC.
MR. MALO: Off the record.
(Break taken from 5:02 p.m. to 5:03 p.m.)
Q. (BY MR. MALO) Mr. Thompson, can we, for the sake of

convenience, refer to these as financial statements?
A. Yes, that's fine with me.
Q. And did these financial statements refer to the operations of Mountain Air Charter, LLC for the period -- periods ending December 2002 through December 2005?
A. Yes.
MR. MALO: And I'd like to mark the following as Exhibit 12.
(Exhibit No. 12 was marked)
THE WITNESS: That's a duplicate of --
MR. REYNOLDS: What is this, Jim?
THE WITNESS: That's a duplicate of 9.
MR. REYNOLDS: Did you give the witness one in addition to the one we marked?
THE WITNESS: I don't know. I ended up with it somehow. I'm giving it back.
MR. MALO: Do -- do you have an Exhibit Number 9?
THE REPORTER: No, I don't.
MR. MALO: You don't?
THE REPORTER: It's right here (indicating).
MR. MALO: Okay. Yeah, we may just have an extra copy on the table.
Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. It's a -- well, let me make sure there's nothing else. But it looks like the 2002 partnership return for Mountain Air Charter.

Q. Does it appear to be a fair and accurate representation of that return?

A. Yes.

MR. MALO: Please mark the following Exhibit 13.

(Exhibit No. 13 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. 2003 return for Mountain Air Charter.

Q. Does it appear to be a fair and accurate representation of that return?

A. Yes. I'm sorry. I'm just checking to make sure all the pages are here.

Q. Certainly. Take your time.

A. Yes.

MR. MALO: Mark this as Exhibit 14.

(Exhibit No. 14 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. It is my personal 2002 return.

Q. And does it appear to be a fair and accurate representation of that return?

A. Yes.

MR. MALO: Identify the following as Exhibit 15.

(Exhibit No. 15 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. It is my personal 2003 return.

Q. And, again, does it appear to be a true and accurate copy of your 2003 return?

A. Yes, except for the blank pages at the end, but --

MR. MALO: We can discard those.

THE WITNESS: Okay. Oh, they -- yeah, just looks like copy machine.

MR. MALO: Yeah. Mark the following as Exhibit 16.

(Exhibit No. 16 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify these documents?

A. Yes.

Q. And what are they?

A. This is a bill from E&Y relating to Mountain Air Charter from 2002.

Q. Does it appear to be a true and accurate copy of the bill?

A. Yes.

MR. MALO: Please mark the following Exhibit 17.

(Exhibit No. 17 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. This is the policy for the PC-12 -- well, the cover letter is misleading. This looks like the 2003 policy. Wait a minute. Well, they're different -- there's a number of different things in here. I'm not -- I'm not sure how you want to manage that.

Q. When you say "there's a number of different things in here," what do you mean by that?

A. Well, for example, there's a certificate of insurance here for Hanks Corporate Maintenance for the $5 million combined single limit. There -- there's a cover page from 2003 and a cover page from 2002 -- or a letter from Air Share, which was the broker -- insurance broker. And then it looks like my 2003 policy on the PC-12.

Q. Which cover page is the correct cover page?

A. Let's talk about -- which one is --

Q. The one dated June 7th, 2002 or the one dated January 30th, 2003?

A. Well, let's see. Well, I don't know. Hang on. This is -- the letter relates to -- well, let's see. Endorsement, January 30th, 2003. I guess that relates to an endorsement. And the letter, June 7th, that looks like the 2002 policy.

Q. My -- if I may offer my interpretation of this document?

A. Yeah.
Q. It appeared to me to be a policy in effect from May 2002 through May 2003.
A. I think that's what it is.
Q. Along with a subsequent change in the policy or an updated modification of the policy that occurred during that period.
A. Yeah, I think it is.
Q. So if I ask you to identify the document again, could you tell me more precisely what you think it might be?
A. Yes. The setting is --
MR. REYNOLDS: May we go off the record just a moment?
MR. MALO: Yes, sir.
(Break taken from 5:14 p.m. to 5:18 p.m.)
THE WITNESS: It is the PC-12 insurance policy for the year 2002, May 2002 through May 2003.
Q. (BY MR. MALO) With some subsequent modifications?
A. With subsequent modifications, yes.
Q. Okay.
MR. MALO: And, for the record, it is understood that this policy is rather lengthy. And rather than take the time to review each page in the document today, if needs be, we will modify our description of this document if it is revealed that there is a misunderstanding as to what it is in the course

of deposition.

I believe that's 18.

(Discussion off the record)

MR. MALO: We can mark this 18.

(Exhibit No. 18 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. This is my logbook.

Q. For what period?

A. 2002 and 2003.

Q. Does it appear to be a fair and accurate representation of your logbook?

A. Yes.

Q. Did you prepare this logbook?

A. Yes.

MR. MALO: Mark this as Exhibit 19.

(Exhibit No. 19 was marked)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. This is my calendar from December 31st of 2001 through January of 2004.

Q. And is this a true and accurate copy of your calendar for that period?

A. Yes.

MR. MALO: May I suggest that we break here for

the day?

MR. REYNOLDS: Uh-huh. You certainly may.

(Proceedings ended at 5:21 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: JAMES R. THOMPSON DATE OF DEPOSITION: APRIL 23, 2007

PAGE LINE CHANGE REASON



7fbb0d73-2cf3-4273-a5d5-5e266ff96f63

I, JAMES R. THOMPSON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________________
JAMES R. THOMPSON

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared JAMES R. THOMPSON, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

___________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________
COMMISSION EXPIRES: _______________

STATE OF TEXAS)

I, Diana Pereira, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 23rd of April, A.D., 2007, at 3:50 p.m., at WINSTEAD, located at 5400 Renaissance Tower, 1201 Elm Street, in the city of Dallas, State of Texas, the following name person, to wit: JAMES R. THOMPSON, who was by me duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath, and his examination was reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn to and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows.

Mr. Stuart M. Reynolds, Jr. - 00:00,
Mr. Steve Frahm - 00:00,
Mr. Jeffrey R. Malo - 01:26.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.



7fbb0d73-2cf3-4273-a5d5-5e266ff96f63

I further certify that, before completion of the deposition, the Deponent, JAMES R. THOMPSON, and the Plaintiff, did request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this ___ day of _________________, A.D., 2007.

Diana Pereira
______________________________.
Diana Pereira, Texas CSR 8129
Expiration Date: 12/31/2007
Firm Registration No. 286
Esquire Deposition Services
1700 Pacific Avenue
Suite 4750
Dallas, Texas 75201
(214) 257-1436

AUTHENTIC COPY
The original certified E-Transcript file was electronically signed using RealLegal technology.