IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-211-T
(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

v.

THE UNITED STATES,

Defendant

*****************************************************************

ORAL DEPOSITION OF JAMES R. THOMPSON

VOLUME 2

*****************************************************************

ANSWERS AND DEPOSITION OF JAMES R. THOMPSON, produced as a witness at the instance of the Defendants, taken in the above-styled and -numbered cause on the 24th day of April, 2007, A.D., beginning at 8:52 a.m. before Andrea Reed, a Certified Shorthand Reporter in and for the State of Texas, in the offices of Winstead Sechrest & Minick, located at 1201 Elm Street, Suite 5400, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

GOVERNMENT EXHIBIT
1:2

# A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. STUART M. REYNOLDS, JR.
Winstead Sechrest & Minick
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214)745-5360
(214)745-5390 (fax)

FOR THE DEFENDANT:

MR. JEFFREY R. MALO
MR. STEVE FRAHM
U.S. Department of Justice
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
(202)305-7539
(202)514-9440 (fax)

# I N D E X

Appearances..........................................Page 56
Exhibit Index........................................Page 58
Stipulations.........................................Page 59
Examination by Mr. Malo..............................Page 59
Signature and Corrections............................Page 205
Reporter's Certificate...............................Page 206

# E X H I B I T   L I S T

| No. | Description | Page Marked | Page Ident. |
|---|---|---|---|
| 20 | Response to Information Request from Mountain Air Charter, LLC to the Internal Revenue Service.. | 59 | 59 |
| 21 | Pilot Proficiency Certificates.. | 60 | 60 |
| 22 | Mountain Air Charter, LLC, Letter of Compliance, Federal Aviation Regulations, Parts 43, 91, 119, 135.................... | 61 | 61 |

P R O C E E D I N G S

THE REPORTER: It's Tuesday, April 24th, 2007, 9:21 a.m. Do you have any stipulations or agreements for the record before I swear the witness?

MR. REYNOLDS: No, we're taking this under the Rules.

MR. MALO: And it's a continuation from yesterday's deposition.

MR. FRAHM: Actually, Mr. Thompson has already been sworn, so I think we can just continue from there.

JAMES R. THOMPSON,

having been first duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, testified on his oath as follows:

EXAMINATION

BY MR. MALO:

Q. This morning I have a few more documents that I would like to just have identified and entered as exhibits. If I'm not mistaken, I believe this is Exhibit No. 20 I'd like to have identified.

Mr. Thompson, can you identify this document?

(Deposition Exhibit No. 20 was marked.)

A. I believe this is a response to an information request made by the Internal Revenue Service.

Q. Ask you to clarify. Is it a response made by the

Internal --
A. No, a response by Mountain Air Charter --
Q. To an inquiry from --
A. To an information request.
Q. From the Internal Revenue Service?
A. Yes.
Q. Right.
A. I haven't seen it for a while, but I think that's what this is.
Q. Okay. And does it appear to be a true and accurate copy of response to that inquiry?
A. Yes.
MR. MALO: I'd like to have the following marked as Exhibit 21.
(Deposition Exhibit No. 21 was marked.)
Q. (BY MR. MALO) Mr. Thompson, can you identify these documents?
A. These a Pilot Proficiency certificates from Simcom.
Q. And whose certificates are they?
A. They are mine.
Q. Do they appear to be true and accurate copies of your certificate of completion of Simcom training?
A. Yes.
MR. MALO: I'd like to have the following marked as Exhibit 22.

(Deposition Exhibit No. 22 was marked.)

Q. (BY MR. MALO) Mr. Thompson, can you identify this document?

A. Yes. This is the Mountain Air Charter Letter of Compliance submitted in connection with the Part 135 application for Mountain Air Charter.

Q. And is this a true and accurate copy --

A. Yes.

Q. -- of your Letter of Compliance submitted with part of your 135 application?

A. Yes. Page 27 is missing. MAC 1527 or we skipped a sequence when we stamped it.

MR. REYNOLDS: I have Page 27.

(Discussion off the record at 9:26 a.m. for less than a minute.)

A. Yes. Anyway, the answer is, yes.

MR. REYNOLDS: Jeff, this is all one exhibit, this Exhibit 22?

MR. MALO: Okay. I believe it's all one document if I'm not mistaken.

A. I think it is, yes.

Q. (BY MR. MALO) Okay. Now, that we've identified quite a number of exhibits, I would like to discuss some of them in some detail in connection with some of the questions that we covered yesterday. And to recap some of our discussion

yesterday, I'd like to just clarify my understanding of some issues.

Mr. Thompson, yesterday did you tell us that you were not qualified for insurance purposes to fly the Pilatus when you first -- when Mountain Air Charter first owned the vehicle?

A. Yes.

Q. And I believe you said it was a 200-hour flight time requirement for you?

A. Yes, I believe that's what it was. We can look at the insurance policy to see.

Q. Okay. And, Mr. Thompson, was it required for you to fly the Pilatus for Mountain Air's business?

A. I fully expected to and I did.

Q. You fully expected to at the inception of Mountain Air?

A. Yes.

Q. And you stated yesterday that you found out about the insurance requirements just a few weeks before delivery of the aircraft?

A. No, the insurance requirements changed a few weeks before the delivery of the aircraft. I had started working on the insurance issue right after 9-11 and was led to believe that the requirement would be 25 hours and that I would have $10 million worth of liability insurance. That changed kind of

almost at the closing table. You know, I don't know whether it was the insurance company's fault or whether it was the broker's fault for not adjusting my expectations earlier.

At the time that I expected 10 million of liability insurance and 25 hours of what I call SOE experience, supervised operating experience, that was consistent with what the market was particularly for somebody with the number of hours that I had. I had did some cross-checking to make sure at the time. And then it, you know, literally almost at the closing table when it changed. There wasn't a lot of room to maneuver, so I took what I could get right then.

Q. Were any reasons offered as to why the requirements changed?

A. Yes. Underwriting -- aviation insurance underwriting backed up considerably in the wake of 9-11 because most of the large insurers had exposure to the events of 9-11. USAIG in particular was one of them. AIG was another. And underwriting levels backed up across the board. Now, I think they backed up earlier than that, and I think the broker was concerned about me jumping ship and running and hiring another broker and trying to canvas the market differently. So I suspect that the broker sandbagged a little bit and did not adjust my expectations earlier.

Q. Just for the sake of clarity of the record, can you identify the name of the insurance company that provided

insurance for Mountain Air during 2000 to 2003?
A. I think it might have been W.L. Brown. Did we -- we entered that as an exhibit yesterday, didn't we?
Q. We have the policy.
A. And your question is who was the broker or who was the underwriter?
Q. Both. Just for the sake of clarity in the record, you referenced broker and you referenced the insurance company. You referenced USAIG.
If you could just identify these parties and their roles.
A. Yes. Air Sure was the broker, and the broker's name was Mark Vaughan. And I don't know what's -- the first year's policy, it was written by USAIG.
Q. So the first year the insurance company was USAIG?
A. That's correct.
Q. And the broker was Air Sure?
A. Yes.
Q. Okay. Mr. Thompson, let me ask you a few other questions related to discussions we had yesterday.
Can you explain how to determine what the total number of hours are on the Pilatus PC-12?
A. Yes. There is a Hobbs meter, that's H-o-b-b-s, on the airplane that is activated when the wheels leave the ground and de-activated when the wheels touch the ground. And it

records the number of hours -- in effect, the number of hours that the wheels are off the ground.

Q. Is there any one log that would record total time for the plane, the aircraft itself?

A. Yes.

Q. Which log would do that?

A. Well, there would be entries in the airframe log, the engine log. There is electronic information that is recorded by the airplane itself that -- I wouldn't say that it backs up. It provides a different set of data -- relating to how long the airplane is in the air, how fast it went, what altitude it was at. I'm trying to think if there's anything else. Well, and then there's the Hobbs.

Q. And for 2002 and for 2003, if you're able to identify the total number of hours that the aircraft was in use, would you be able to identify the percentage or an estimate of the time that it was in use for your personal use versus in use for Mountain Air business?

A. Yes.

Q. And how would you do that?

A. Every flight in the airplane was recorded on a trip sheet. Trip sheets, I think, we provided. Those were done contemporaneously. And then that was rolled up into a spreadsheet different than my logs spreadsheet -- it was a Mountain Air Charter spreadsheet -- where we accounted for

every hour on the Hobbs meter; and how many landing cycles; how many engine cycles; where the airplane went; and the nature of the flight, whether it was Part 135 or whether it was a SIFL flight and who the pilot was.

Q. Okay. Is that spreadsheet what we've identified as Exhibit No. 9?

A. Yes. There's some columns missing. There's the engine cycles and landing cycles and fuel used and things like that. But that's the meat of it right there.

Q. To the best of your knowledge, you said that this exhibit is missing some columns of some information that I just requested. To the best of your knowledge, is that information provided in additional documents that we have? Is that supplemented anywhere else?

A. That looks like it. That's --

THE REPORTER: I didn't understand what you said, Mr. Thompson.

THE WITNESS: I'm sorry.

THE REPORTER: I just didn't understand what you said. Would you please repeat it?

MR. MALO: He said that this document looks like it could be.

THE WITNESS: Yeah, I couldn't quite see it, so I thought it was either my personal log or the Mountain Air Charter log.

A. Now, the Mountain Air Charter log looks like this except that it's got columns.
MR. FRAHM: "This," you're pointing to what?
A. I'm sorry. The --
Q. (BY MR. MALO) Exhibit No. 9?
A. Yes.
Q. Okay. We'll follow up on that --
A. Okay.
Q. -- on that question in a little bit.
A. But it goes from the trip sheets, which are contemporaneous to the Mountain Air Charter log, which is sometimes done a month in arrears. And then that information can be further backed up with EIS, electronic -- or engine information system data that is recorded by the airplane electronically.
Q. Okay. I'd like to talk to you about some of the destinations that we discussed yesterday. Yesterday we discussed one trip in particular with Mr. Travis in which Mr. Travis described that there were several overnight trips in which he was present and which you were present.
A. Yes.
Q. One of these overnight trips involved a series of flights from California to Colorado to Taos, New Mexico. And Mr. Travis told us that the destination for the night was a private home, a rental home or a leased property that you had



1ebda8ab-4c8a-4cb5-875f-72720db17d91

leased.

Can you tell us about that leased property?

A. Let's see, this is 2002. It's a property that -- it's a residential property. I still lease it till this day, located just outside of town. It's in a town called Arroyo Seco.

Q. Do you lease it on an annual basis, or do you lease it short-term periods during the year?

A. At that time, it was short-term. Now it's continuos.

Q. Was it what you would consider vacation property?

A. Yes, second home vacation.

Q. Would you characterize that trip as a recreational trip?

A. That trip was -- that was a fairly -- I think my recollection is that that was a trip to California, which then went up to Oregon, which then we kind of came back in a more or less direct line. That was an hour-building trip. I mean, if you look at -- well, maybe you can't tell by the log, but the stops were very brief. It was like overnight. If the overnight didn't work out because we hadn't make reservations, we just made up another destination, kind of kept going with the idea of doing just a big circle and building hours and coming back.

Q. Can you define what you mean by an hour-building trip?

A. Tom wanted time in the airplane, and I needed time in the airplane. So --

Q. And Tom wanted time in the airplane for his familiarity and comfort level with the aircraft?

A. He wanted to fly the airplane.

Q. And you wanted time in the aircraft for the sake of satisfying the 200 hours requirement that the insurance company imposed on you --

A. That's correct.

Q. -- shortly before receiving the plane?

A. Yes.

Q. Okay. And were you both able to count the hours on those flights as -- on this or any other hour-building flights, were you able to count time towards your requirement and Mr. Travis's requirements that he have familiarity with the aircraft?

A. Well, he wasn't required to count any time. He just wanted to spend more time in the airplane. And Tom's attitude was, you know, based on his airline experience. He didn't care whether he flew in the left seat or the right seat. In fact, when we did multiple approach trips where we would go out to Tyler or to Waco, we would just flip control of the airplane back and forth. You can legally fly that airplane -- unlike some airplanes, you can act as pilot in command from the right seat in that airplane.

And we would -- he would do -- fly one approach and then hand it off on the go to me -- on the go-around to me, and then I'd fly approach, and we'd flop back and forth like that. So, you know, he was satisfied. I think I flew a couple of those legs in the left seat, and he was happy with that. He didn't care as long as he was in the airplane and got a chance to talk more about the airplane and, you know, do whatever it was that he -- you know, that he felt good about.

Q. Was there any business purpose or any requirement that in order to conduct these hour-building flights, either for Mr. Travis's purpose or for your own, was there any reason that you needed to involve multiple destinations, flights of long duration, would Mr. Travis had been able to -- well, please answer --

MR. REYNOLDS: Would you take that question out and shoot it, please.

MR. MALO: Yes.

MR. REYNOLDS: It had too many --

MR. MALO: Allow me to rephrase.

Q. (BY MR. MALO) Was there any business purpose for hour-building flights to involve multiple destinations over a long duration?

A. Sure.

Q. Can you state the purpose?

A. The -- there were two ways to accomplish what we did

or what we wanted to accomplish. One was to go out and shoot -- I'm using vernacular here and I'll explain it if you need me to -- was to shoot multiple approaches on a repetitive basis. And we did do that. You'll see in the flight log trips to Waco and to Tyler where we did ten or 12 approaches. The other way to do it was just take longer trips. And rather than have the workload be focused primarily on the approach and landing phase of flight, focus more on the en route stuff.

And so on a trip like that, we'd sit there and we'd talk about -- we'd go through, you know, checklists, emergency procedures. We would talk about what we would do and how we -- if we would do it differently single pilot than versus, you know, two pilots. The main issue there was, you know, what items did we think had to be memory items on a checklist. Because if you're a single pilot and you're -- you know, things are starting to go wrong, you can't be grabbing for a checklist in certain situations. And so, you know, what you're going to consider to be a memory item is kind of a core element of that.

So we used both longer trips, and that was -- I don't know how many we did -- but that was one of them. And we used trips of shorter duration. I think they both served the same purpose.

Q. And was the business purpose in any way related to the destinations chosen --

A. No --

Q. -- for these trips?

A. -- not on that one.

Q. What dictated the destination?

A. It was far away. I mean, you can kind of see that by virtue of the fact that we really didn't have travel reservations made. There were a couple of instances where we just showed up and there were no hotel rooms, so we just went to the next place. And it was just a question of picking a spot, flying to it, going through the -- you know, talking on the way, doing the approach, in some cases landing, picking another spot and then just kind of working it around in a -- kind of a big circle to, you know, end up where we started.

Q. Would it be accurate to say that the destination was irrelevant, that the point of the flight was training?

A. The point of the flight was training, and I think some of the destinations were chosen because we flew -- we were looking for weather to fly into. I think that's why we went up to Oregon.

Q. Let me ask you about yesterday. We heard about Adelaide (phonetic) Lake.

A. I didn't. I think it was --

Q. Whitehorse, Canada?

A. Oh, Atlin Lake.

Q. Atlin Lake.

A. Yes.
Q. I misspoke.
A. Yes. I think that was our first Part 135 trip. Or we could look, but I'm pretty sure that was the one.
Q. Okay. And do you recall who the passengers were on that trip?
A. Yes. Well, at least, Ned Mundell, myself, Willa Mundell, maybe Elise Mundell. I don't know. We'd have to look at the manifest, but I think that was it.
Q. Okay. And what is your relationship to any of the passengers that were on board?
A. Ned Mundell is the -- is a fellow that hired me at ORIX in 1990. He is on the board of directors. He is the chairman of the audit committee. He's on the compensation committee. And his family are friends of mine.
Q. Do you know what the purpose of this trip was for the Mundells?
A. Yes, it was a fishing trip.
Q. And were you present as a guest of theirs on this fishing trip?
A. Yes.
Q. Where did you go fishing?
A. A -- Inklin River, which is a little south of Whitehorse.
Q. Okay. And who paid for that trip?

A. Mundell.
Q. Was he given any kind of special rate?
A. I'd have to go back and look. It would be -- I think we gave you billing records. It would be in the billing records.
Q. Once you obtained Part 135 certification, how long did it take to develop a customer base?
A. It took a while. You know, the first -- my initial business strategy was not ORIX centered. It was charter broker centered. And the idea there was to just get the airplane out with the charter brokers and stir up as much interest as I could and see -- and develop a customer base that way.
Q. Did you market Mountain Air Charter services to your co-workers?
A. No.
Q. How did your co-workers -- or how did ORIX become aware of Mountain Air services?
A. Some things came up and -- or some -- I think there were a couple -- I'd have to look at the log. But either in late 2002 or 2003, they asked me to do some things that involved travel, and I asked them if I could travel this way and they were fine with it. And that's kind of how it got started really.
Q. And who at ORIX makes decisions about air travel?
A. Well, at the time, I was chief executive officer of



1ebda8ab-4c8a-4cb5-875f-72720db17d91

ORIX Capital Markets. And if somebody else was -- the CEO -- a fellow named John Moss was CEO of the holding company, which is ORIX USA. And I might have been able to make -- I mean, that was certainly within my authority to make that decision, but because it was -- the fact it related party transaction, I asked Moss to make the determination and he did. And as the process evolved, it became more formalized. And there is now a -- those decisions are made by the compensation committee after conducting an inquiry and they're renewed annually.

Q. And since ORIX was first obtained as a customer, it has annually reviewed its contract; is that correct?

A. Yes, every year.

Q. And what are the criteria that ORIX considers in determining whether it would renew the contract?

A. The overall -- well, the overall cost, the rate -- you know, how much just total dollars gets put in that direction, the rate, what the comparable rates are. Early on, there was an inquiry directed at establishing or quantifying what the third-party liability might be if there were a problem, and they subsequently took out a wrapper, insurance wrapper, to mitigate that. And they looked at the usage.

Q. What do you mean by "look at the usage"?

A. Well, they looked at where it went and why it went and where it went.

Q. I see. In determining the rates and comparable

rates, how did Mountain Air Charter establish its rates that it would charge for all passengers and separately what it would charge for ORIX?

A. I just called around and looked at what other guys were getting for PC-12s and tried to -- with ORIX tried to bring it in just a little bit below that. And with other people, it would depend on how good of a customer I thought they were. And then it was highly correlated to fuel prices. In 2000 -- when we first started out in 2000 -- I think it was 2003, in July of 2003, I bought bulk fuel as a way of insulating myself from fuel price increases. And as that bulk fuel purchase burned off and my fuel cost rate went up, I raised prices over time.

Q. To what extent, if any, were operating costs a factor in deciding rates?

A. They were huge. The question -- I mean, you're definitely going to cover your operating cost. The question is how much margin are you willing to work for. Margin against your fixed cost and then margin against sort of your soft cost that are out down the road, which is, you know, your engine reserve and other airframes items that are time or life limited that are not necessarily cash expenses day one.

Q. And when you talk about fixed costs and soft costs, are you including overhead --

A. Yes.

Q. -- in soft cost?

A. Yes.

Q. The initial rates you charged were sufficient to cover these costs?

A. Yes.

Q. And how did these compare to the standard industry fair level rates or SIFL rates for the record?

A. Or what?

Q. SIFL rates.

A. Well, you're going to get me into an area beyond my technical expertise. But SIFL rates are rates established by the Internal Revenue Service as a means for calculating what has to be included in your income if you take a flight for personal purposes. Now, it's all different now. So that was a period of time in which that was the methodology that you had to use. And I don't know how the IRS came up with that. I mean, to me it looked fairly low, but that was the -- what you had to do to comply with the regulations.

Q. Were the SIFL rates that you are aware of, were they sufficient to cover your costs, operating expenses for flights?

A. I never looked at them that way. I don't know. I'd have to figure it out. They were fairly low.

Q. Were they below what you would have charged paying passengers that inquired their flights?

A. Yes.

Q. Were they below what you would have charged ORIX?
A. I'd have to do the math, but I wouldn't be surprised if they were.
Q. When did you first consider starting a 135 operation?
A. Middle of 2001.
Q. And why?
A. Well, I had a -- I thought I could work. Charter rates at the time were fairly high. And I thought the -- I did a lot of research at the time and I thought that the PC-12 would be uniquely qualified as a charter vehicle because of its low operating costs, one engine versus two; one pilot versus two on many other platforms. Well, it was kind of that simple, looked at it, did the math. I mean, the published operating costs on it at the time, including reserves, were about $400 an hour and guys were getting 800.
Q. Did you view the decision to start Mountain Air Charter as an investment?
A. No.
Q. Was it personal interest?
A. It was a business decision.
Q. It was a business decision?
A. Yeah. It wasn't -- when you say "investment," meaning you buy something and you think over time, you know, the asset is going to appreciate. You know, it was more like a stock. I looked at it as you can -- you can buy this animal,



1ebda8ab-4c8a-4cb5-875f-72720db17d91

it depreciates very slowly because the long-term currency trend on the Swiss franc, which is how the costs are figured, has been favorable against the dollar so that that would -- you know, the prices of the -- the U.S. dollar prices of the asset would tend to increase over time, which they have. And in the meantime -- so that would cushion the depreciation that's sort of implicit or inherent in owning an asset with a fixed life, and that you could earn a rate of return on that asset that would be favorable on a cash basis. So in other words, excluding the depreciation.

Q. I'm a little confused by your reference to Swiss francs and depreciation. Are you --

A. The airplane is made by the Swiss.

Q. I see.

A. And so all of their input pricing is Swiss franc denominated.

Q. I see. I'd like to turn your attention, please, to what we've identified as Exhibit No. 10.

A. Is there a specific page number you want me to take a look at?

Q. We'll get to that. First, generally, you identified this document yesterday as a presentation that you were familiar with. And if I'm not mistaken, I believe you said you prepared large portions of this document yourself.

A. Yes.

Q. Can you tell me, again, what this document is?

A. When my return was selected for examination, it was for 2002, maybe 2003 initially -- in other words, maybe they were both selected at the same time -- I thought it would be a good idea -- it was clear from the questions that were being -- that were coming back to me from the examiner that she had trouble getting kind of her arms around what this was. I mean, she saw the big depreciation numbers, which is what I think got her attention. But this was an effort to kind of pull it all together and explain to her -- put it in one sort of simple presentation to what the underlying thought process and the results were.

Q. So is it accurate to state that this document was prepared for the benefit of the IRS examiner examining your return?

A. Yes, I think that's correct.

Q. And this document then was prepared to support your examination or support your positions on your examination of your tax return?

A. Yes.

Q. Okay. I'd like to ask you a couple of questions about the document itself.

A. Okay.

Q. On Page 8 --

A. Uh-huh.

Q. -- you state that "Mr. Thompson spent considerable time ensuring this part -- FAA Part 135 certification was obtained as quickly as possible in 2002 because it was key and critical to MAC's viability, and MAC could not generate revenue until it was obtained and a pilot was hired and trained."

Can you explain what you meant by this comment, specifically "could not generate revenue until a pilot was hired and trained"? What training are you referring to?

Q. Well, there are -- I'm struggling with it because it's -- I think you're just looking for clarification. But you can't just, in my estimation anyway, take a pilot in off the street, send them to Simcom, stick them in the airplane and say good luck. Particularly, you know, I viewed myself -- look, I had separate entities here. But I viewed myself as somebody that, if there was an accident, as somebody that would be attacked. As -- you know, because MAC didn't have -- I didn't -- I had very low insurance, and I didn't put a lot of capital into MAC as a result.

I mean, if you've gone through this stuff, you'll see that I funded the purchase of the airplane with a note from where I lent money to the Mountain Air Charter. I didn't want to expose a lot of capital in it. But I always assumed that if something went wrong that I would be named as a co-defendant, and I thought the best thing to do was to make sure that I minimized the chances of anything ever happening,

that that was the first line of defense; the second being, you know, corporate formalities and everything else. But -- so it's -- it's just the kind of thing you look at it and say I'm not going to turn anybody loose, a single pilot, in an airplane like this flying passengers for hire unless I'm satisfied that this guy is not going to bend metal or hurt people.

Q. Okay. On the same page, there's the statement is made "Mr. Thompson spent considerable time in 2002 ensuring that MAC's newly hired pilot obtained the necessary certification with the FAA, in parentheticals, even accompanying him on virtually every flight in 2002."

A. That's true.

Q. Can you distinguish between the time necessary to satisfy FAA certification and the time that you deemed necessary and proper to ensure the safety of your passengers and to insulate you from potential liability?

A. Well, not as we sit here. I mean, I haven't really -- never really thought about it that way. It was all sort of one to me. You know, typically, the FAA requirements are the easiest to address from the standpoint of, you know, complexity or things like that. I mean, insulating yourself or trying to reduce the theoretical possibility of an accident is a much less -- much more, you know, difficult thing to quantify. I mean, you just -- you do whatever you think it takes.

Q. Can I ask you, is the following statement accurate then, that considerable time may not have been necessary for FAA certification but considerable time actually modifies the time deemed necessary to train and properly ensure the safety of your passengers?

A. I don't know. I mean, you're asking me to parse it a lot thinner than I've ever thought about it. I was never terribly concerned that Tom couldn't pass an FAA check ride. But, you know, guys pass FAA check rides all the time and have accidents.

Q. I just want to make sure I understand. I think the way that the requirements for the FAA have been described, they are fairly minimal compared to what, in practice, was a sound decision to ensure the safety of passengers and provide additional training.

Is that an accurate statement?

A. Yes.

Q. And would it therefore be accurate that the descriptive term "considerable time" was not necessarily related to FAA certification as it relates to flight time, but considerable time most likely related to the safety and training of -- or the additional comfort level and familiarity with the aircraft that Mr. Travis required?

A. Well, I understand where you're trying to go, and I don't even think I mind giving you the point. However, I don't

like trivializing the FAA requirement. It's -- that's -- I mean, you've got to meet that requirement. And how much is too much? In this last -- just by way of explanation, I took the PC-12 off of the 135 certificate and put the CJ-3 on. And in connection with that, we were required to do what I call proving runs with the FAA where you go out with the FAA and you fly for a couple of days, and they give you some scenario cards and they watch how you perform and they make a determination. It's something like a lengthy check ride.

My pilot flunked that check ride. So how much is too much? And that was a very, very expensive, not to mention embarrassing situation for me as the -- sort of the ultimate person in charge of Mountain Air Charter, vis-a-vis the FAA. So I don't have a problem saying that there was a lot of time spent trying to make sure that -- you know, that the situation was as safe as it could be. But I can't be drawn into trivializing the FAA requirement, which is what I feel like you'd be asking.

Q. That's fair. That's fair. Again, on the same page, I believe -- I'm sorry. No, on Page 2, the same Exhibit 10. The stated goal of Mountain Air Charter was to achieve target earnings before interest, taxes, depreciation, amortization based on return of capital by building relationships with reliable and recurring air passenger customers, including executive business travelers and leisure travelers to vacation



1ebda8ab-4c8a-4cb5-875f-72720db17d91

destinations throughout Mexico, U.S. and the Caribbean.

Was that the intended original goal of -- or business model for Mountain Air?

A. Yes.

Q. And in practice, is this what developed?

A. No.

Q. Could you describe what Mountain Air's business developed into once it was operational?

A. Sure. In the early part of 2003, end of the first quarter and beginning of the second quarter, ORIX asked me to take on a lot more responsibility, primarily in connection with other businesses that were underperforming throughout various parts of the United States. And I previously turned them down as early as 1999 in connection with that request. But by 2003, the situation had become a bit more acute for them, and they -- it was a little tougher for me to say, no, to them.

And, you know, the one thing that I didn't want to do having spent, you know, 24 years of my life doing it, is spend a lot of time going through airports on air carriers, particularly with the way things were after 9-11. And so I said, well, you know, I'm willing to do this if you're willing to take some of the bite out of -- you know, the time friction out of the air travel component. And he said they didn't have a problem with it. I mean, the business that I was running was very healthy and was making a lot of money and would have been

easy for them just to -- certainly within their means to do that.

Q. If I could interrupt for a moment, when you said the business that you were running, which business?

A. That was ORIX Capital Markets.

Q. ORIX Capital Markets?

A. And they're a problem when the rest of the business was acute enough that it was easy to make a decision that the time was forecast to cost them a couple of $100,000 a year, so they did. And, you know, over time, they became, you know, really the most meaningful customer.

Q. What was the decision that was forecast to cost them a couple of $100,000 a year?

A. Well, before they said, yes, they went back and figured out what they thought it was going to cost them.

Q. The decision to use Mountain Air services?

A. Right, as opposed to commercial -- first-class commercial air travel. And they concluded that it was a pay up of a couple $100,000 a year. But they were losing a lot of money outside of my business or outside of ORIX Capital Markets. And, you know, they wanted to do whatever it would take to, you know, get me to do it.

Q. Was your decision to take on a new role with ORIX in any way contingent upon their consenting to this mode of transportation for you?

A. I don't know. I never really thought of it like that. I just didn't want to, you know, hunt through airports, you know, to Atlanta and New York and Chicago, you know, other parts the way that I knew that I would have to in order to fix things. And, you know, in the end if they had said, no, you know, I probably would have done it anyway. I mean, they needed someone to fix the problem. But we never had to get there because --

Q. And would this be an accurate statement then, as originally conceived, the business model for Mountain Air was to provide business and leisure travel services throughout Mexico, the U.S. and the Caribbean, but in practice what developed was a large majority of your business, if not exclusive, was dedicated to business travel; is that true?

A. Yes.

Q. And a large percentage of that business travel was ORIX Corporation?

A. Yes.

Q. And in the course of traveling for ORIX Corporation, did you ever pilot flights yourself?

A. Not revenue flights.

Q. So if you were traveling on Mountain Air services or charters on official business for ORIX as a passenger for revenue purposes, you never sat in a pilot seat either as a co-pilot or as an instructee?

A. That's correct. I sat -- I mean, it's legal to sit in the right front -- or in the front seat if you want to. I mean, if you've ever taken a commuter, sometime -- flown by a single pilot, sometimes if they're full, they'll stick you in the front seat. A caravan would be a good example. So there were times when there was -- there was one time the gear didn't go down, and I came up and held the checklist for the guy. There was -- if the weather was really bad, I would sit up front with my Mike Holderreade in case he needed anything. But I sat in the back, you know, 99 percent of the time.
Q. So when you were a passenger on a revenue flight for ORIX Corporation, did you log any of those hours in your flight log as flight time?
A. No.
Q. On the same page of this presentation, you referred to a two-prong strategy that was in part dependent on capturing reliable and recurring "King Air B-200 type" customers. I'm sorry. That's on Page 9 actually.
A. Yes. Oh, I'm sorry. I was reading part of it. There was some of it on 2.
Q. Some of it is on Page 2. Some of it is on Page 9.
A. All right.
Q. And you state that "Mountain Air Charter is successfully capturing a customer -- such a customer, ORIX USA Corporation. At the start ORIX USA Corporation flights

constituted less than 50 percent of total MAC flights. Since that time, increased usage by ORIX USA Corporation has coincided with the move of ORIX USA Corporation's headquarters from New York to Dallas and Mr. Thompson's added national responsibilities.

The move from New York increased the need for efficient executive travel option for flights originating from the new Dallas headquarters to locations nationwide.

In describing the increased use of ORIX travelers, how many ORIX executives used Mountain Air services in 2002 or 2003?

A. I don't know offhand. I mean, it would be evidenced by the passenger -- the manifest and the passenger tax that were paid.

Q. Would it be a small number, three, four, five?

A. No, it was more than that.

Q. More than that?

A. Yes.

Q. Would it be as large as 15?

A. It could be, yeah. I mean, I don't think it's more than that, but it could easily -- it could be that.

Q. Do you have any idea what the possible field of ORIX executives, how large that pool might have been? Does ORIX have a 100 executives or 20 executives?

A. Well, I don't really know what an executive is. You

know, there's -- we're fairly small. We have -- at that time, we had 600 employees. And the people that you might find on the airplane would have been the general counsel, the CFO, the president and chief operating officer for ORIX Capital Markets, any of the heads of the businesses. We had a number of Japanese ex-patriots that were here in the United States. They occasionally flew usually with us if we were doing something together. So, you know, 15 probably is not a bad number for an estimate.

Q. Okay. And were the ORIX personnel that flew on Mountain Air Charter, were they all personal acquaintances of yours or were there individuals that you did not personally know through your employment with ORIX that flew on Mountain Air services?

A. There were people that I never -- I mean, there were -- I'm confused.

Q. That you had never met.

A. There were customers that I had never met.

Q. Were there ORIX customers that you had never met that used Mountain Air?

A. No. I was the CEO of the business. I knew, you know, basically everybody at a senior level and the CEO of the business.

Q. Of which business, ORIX?

A. ORIX Capital Markets at the time. And the sort of

April period of 2003 was when I began a transition to being the CEO of the holding company, which is ORIX USA.

Q. And if I understand you correctly, are you saying that the only ORIX personnel that ever flew on Mountain Air Charter were people you knew personally through your employment?

A. Yes.

Q. Okay. You also make the statement that "the increase in ORIX USA Corporation flights with MAC continues to squeeze out other potential MAC customers; nonetheless, this result is consistent with the overall strategy to develop relationships with regular and reliable customers. The headquarter move from New York to Dallas has thus benefited MAC and has accelerated the realization of MAC's overall strategy."

Yesterday, we discussed with Mr. Holderreade policies that may have been in place with MAC regarding potential scheduling conflicts with potential customers. Could you state what these policies are?

MR. REYNOLDS: I object to the form of the question. I didn't get the connection between whatever you read and what the question was. But if the witness understands it, he can answer.

MR. MALO: I'll rephrase.

Q. (BY MR. MALO) Specifically, in reference to the statement that "MAC -- or the increase in U.S. -- ORIX USA


1ebda8ab-4c8a-4cb5-875f-72720db17d91

Corporation flights continues to squeeze out other potential MAC customers.

With specific reference to that statement, can you describe your scheduling policies where there is a potential conflict?

A. Well, the policy was very simple. No pilot, whether it was Mike or Tom or two subsequent pilots, has the ability to commit the airplane without talking to me. At the time, Mike's statement referred to, obviously, a period in 2003 when I was working the charter brokers pretty aggressively. And he just didn't -- he wasn't the nexus, so he had no way of knowing what was going on. So it was a very simple rule. If something comes up, and I think the Gehan trip was the first thing that came up, you know, you just got to check with me before we book the airplane.

Q. And if there was a potential conflict, what order of priority was assigned to customers?

A. Usually we gave it to the customer.

Q. If there was a conflict between ORIX usage and a new customer inquiring about availability?

A. It would depend on how important the ORIX trip was. You know, at that point, new customers were -- I mean, ORIX wasn't really kind of in the game plan, and so new customers would have been given priority.

Q. And to the extent that you had personal use of the

aircraft, if there was a conflict between your personal use of the aircraft and a potential customer, either ORIX or a new customer, what priority would be assigned?

A. I'd take the revenue. I'd take the customer.

Q. Okay. And to the best of your recollection, that was always the case?

A. Yes.

Q. Okay. You just mentioned that you were involved with broker deals that -- depending on what was going on, depending on how important the ORIX business was. Can you describe what you mean by those broker deals?

A. Most -- many charters -- I don't know about most. But many charters are booked through brokers, kind of like insurance policies or anything else these days. But -- so initially, anyway, I focused my efforts on getting -- becoming known to charter brokers. You know, we did some marketing here in Dallas with travel agents thinking that it might be effective to, you know, pay -- because we paid commissions, and pay commission to travel agents much the way the airlines do, to get them to book flights within the State of Texas or flights that were still short but represented destinations that were a little bit more difficult to get to from Dallas, Kabul, for example, which at the time necessitated a connection through LA, which, you know, for a 750 mile flight is kind of an inconvenience, Santa Fe being another. So that was the plan

initially anyway.

Q. And when you referenced ORIX business that depending on how important the ORIX business was would determine whether you would schedule new customers as priority over ORIX's business. What type of ORIX's business would take priority over new customers?

A. Well, that comment and, therefore, your question relates really to the period outside of 2002 and 2003. But I'll answer it anyway because in 2003 there weren't any conflicts. But generally, if it was somebody that we were interested in -- and we did have a number of people that came through over the years that booked us quite a bit -- you know, we -- if it wasn't something really important, we could give it to them and do the trip on a later date. You'd rather have two revenue trips than one. So, you know, if it was something that couldn't be moved and it was important, then the ORIX's customer took priority.

Q. In part the increase use of Mountain Air service by ORIX is attributed to move from New York to Dallas. In your role at ORIX, did you have any role in deciding to move the headquarters?

A. Yes.

Q. Can you describe that role?

A. I was the one who came up with the idea in part because I didn't want to go to New York all the time. But

really the underlying motive was that they had a cost problem that I needed to work on. And one of the ways to take out a lot of those costs was to get rid of the headquarters in New York. Now, I didn't -- ultimately, I didn't make the final decision because their headquarters in New York was a Japanese decision that had been made, you know, 25 years ago, and it was something that they did not want to give up.

The Japanese banks are there. They have a lot of -- you know, we borrow billions of dollars from those Japanese banks. And they thought it was important to have a headquarters there in the U.S. to -- for, say, some marquee value. And they thought it was important to be able to maintain the relationship with the Japanese banks. However, they had asked me to fix the problem, and I told them that was part of what they needed to do to fix that problem --

Q. Okay.

A. -- or at least that element of the problem, which was a cost problem.

Q. And when you refer to fixing the problem, that is the other element I think that is attributed to the increase use by ORIX of Mountain Air Services, Mr. Thompson's added national responsibilities; is that correct?

A. Yes.

Q. And can you describe what these added national responsibilities were?

A. I can, but I have to go to the bathroom, first.

Q. Oh, let's take a break.

(Break was taken at 10:22 a.m. to 10:30 a.m.)

Q. (BY MR. MALO) Mr. Thompson, you were in the process of describing to me the big problems that ORIX had that were responsible for you taking on a national role with the organization.

A. Uh-huh.

Q. Can you describe what those problems were?

A. Well, beginning in 2000 or 2001, they -- the company I ran at that time was ORIX Capital Markets, and it was making money. And one by one, sort of, the other businesses in the U.S. started losing money. That sort of culminated -- let me just look something up real quick if that's all right -- in a situation in 2003. I'll give you the numbers in a second. I can't remember this stuff anymore. Where in 2000 -- fiscal year 2002, which was March of 2002, ORIX Capital Markets, for example, made 126 million pretax. And ORIX USA overall as a -- you know, even after taking that into account, lost 16 million. So that means they lost 65 -- maybe about 150 million in the other businesses. In March of -- fiscal year ended March of 2003, ORIX Capital Markets made $65 million, and they lost, you know, 90 million in the other businesses. And so that was the problem that they were trying to fix.

Q. And how were you to address this problem?

A. Well, there were a number of problem areas. There were cost issues, rampant everywhere in the businesses. There were margin issues in terms of the financial business that they were taking on, you know. And there were credit issues. There were fairly serious credit issues. Guys were doing deals that they weren't getting a spread for them, the deals weren't working, so there were credit costs. And, you know, they sort of needed to be addressed, you know, at a very high level, but also, you know, at a day-to-day level.

I mean, they were decisions that in many respects that were sort of overarching and then there were, you know, who's doing what deals, why are they doing the deals that they're doing, you know, what do they think they're supposed to be getting paid for and how are they underwriting them. And then there were operational issues that were kind of grandular (sic) in nature.

Q. And were you personally involved in deals?

A. Yes.

Q. And was this a challenging role, this new role that you took on?

A. Yes, and, no. I mean, in terms of understanding what the problem was and fixing it, no.

Q. In terms of correcting it?

A. Yeah. I mean, it was just -- just something you had to do. You looked at it, you said, Okay. Here's the problem.

How am I going to fix that problem. Okay. Typically, my business plans consist of, you know, sort of one, two, three, and that's what it was. You know, cut costs, get the right people in the right spots doing the right things for the right reasons.

Q. Did it involve a lot of travel?

A. Yes.

Q. Business travel?

A. Yes.

Q. And you were personally involved with many of the deals that needed corrections, then, correct?

A. Most of them, yes.

Q. And were these time-consuming activities?

A. Yeah, it -- it ate up time.

Q. Was it labor intensive? Did it require a lot of hours from you?

A. It did for the period from April 2003 until the first part of 2004. So there was about a nine-month period where it was -- it was -- you know, it was busy.

Q. And by "busy," did that imply working more than standard 40-hour workweeks?

A. I have no idea. I mean, there were periods when I worked a lot of hours, and there were --

Q. What do you mean by "a lot of hours"?

A. Well, a 60-hour week. And then there were periods

where I worked a lot less than that. I mean, I work as much as I need to, and if I don't need to be in the office, I'm not there. If I don't need to be somewhere else, you know, and they've never had a problem with that.
Q. And that nine-month period you referred to where you worked a lot of hours, that coincides with your assumption of a new role with the company?
A. Yes.
Q. And the relocation of the headquarters?
A. Yes.
Q. Okay. I'd like you to turn to Exhibit 9 just to clarify some things from our earlier discussion. Here's a copy.
A. Hang on. I know I've got them all here. Okay. Log book?
Q. No. I'm sorry.
A. That's 6. It's got a "9" on it. Log Book No. 9. All right. Seven, 11 -- there it is. Okay.
Q. If I could ask you to flip to the fifth to last page, count from the back. I'm sorry.
A. Is there a Bates label on it?
Q. I don't believe so.
A. Okay.
Q. And the last page and the fifth to the last page both are relevant here.

A. So --
Q. Yes, sir.
A. Okay. And the last page.
Q. Yes.
A. All right.
Q. These pages in Exhibit No. 9 --
MR. REYNOLDS: Let's go off the record for a second.
(Off the record at 10:38 a.m. for less than a minute.)
Q. (BY MR. MALO) Okay. Looking at the fifth to last page and the last page of Exhibit No. 9 --
A. Uh-huh.
Q. -- these pages provide a column with notes identifying dollar amounts of fees paid for revenue flights.
Is that -- am I correct in my understanding?
A. Yes.
Q. And in the legend at the bottom of the data sheet, there are amounts associated with the note references provided in this column.
A. Uh-huh.
Q. And the amounts, if I'm not mistaken in my understanding, are annual totals; is that correct?
A. (No response.)
Q. For example, on the fifth to last page where a note

appears "See Note A," and in the legend Note A refers to "total fare charged and received in 2002," $6,100?

A. Well, that's for the flights designated "A."

Q. Okay. Are the flights designated "A" all one trip?

A. Yes.

Q. Okay. Then the annual summaries that are provided on this fifth to last page and last page of Exhibit No. 9 --

A. Uh-huh.

Q. -- are these amounts each referencing single flights, or are they referencing annual totals paid by MAC customers?

A. They reference -- each one of those is a flight or flight sequence.

Q. So it would be accurate to characterize each note number or each note letter as one paying customer trip?

A. I don't -- I mean, it should be, yeah. I mean, the easy way to do it is just go back in here and look on the identity of the paying passengers and tie them all out that way.

Q. Okay.

MR. FRAHM: Can we go off the record a second.

(Off the record at 10:41 a.m. for less than a minute.)

Q. (BY MR. MALO) And to clarify that again, if a customer booked four separate trips over the course of the year, each of these trips would be assigned a separate letter

in this reference column?
A. Yeah, I think that's the way we did it.
Q. Okay. And fares that were charged for these trips, how were these fares set?
A. I set them.
Q. And what methodology did you employ in setting fares?
A. I had a base rate that I used that I thought would provide the margin, my target margin. And then I varied that up or down depending on how bad I wanted the customer, or in some cases if I didn't really like the customer very much. Then I varied it up or down. I mean, there were some rates that were somewhat concessionary. The initial ORIX rate was a little bit concessionary, about $100 an hour or something like that. I'm sure, looking at the Mundell rate, that it looked -- that it looks concessionary for 2002.
Q. Okay. And the Mundell rate is in reference to the trip to Canada --
A. Yeah.
Q. -- that we discussed earlier?
A. Uh-huh.
Q. In establishing your fares and in establishing your base rate, did you perform any cost analysis on the operating cost of the Pilatus PC-12?
A. Sure.
Q. And do you know what it cost to operate the Pilatus



1ebda8ab-4c8a-4cb5-875f-72720db17d91

PC-12 on an hourly basis?

A. Yes. You can -- the published material suggests a rate of about $400 an hour. That's a little stale. Fuel prices have gone up since then, so you've got to effect it for that, including certain reserves. And, you know, to the extent then you've got -- you've got certain fixed expenses, you know, pilot, hangar, things like that, you know, are not included in that. And when you set your prices, you can try to set it for a breakeven point of 200 hours or a 100 hours. You can -- however you want, right? It's all about how much margin you want to try and build in.

The more margin you try to build in, i.e., the lower that you set your breakeven point -- or the higher that you set your breakeven point, the less likely it is that you're going to get business because you're not going to be competitive. It's a business where people are willing to assume a breakeven point of lots of hours. My initial breakeven point was around 300 to 350 hours is the way that I calibrated it.

Q. Okay. And to confirm that, I think on Exhibit No. 10, Page 2, I think you make the statement, In 2002, it was determined that a targeted 3 to 4 percent EBITDA based ROC would be realized if, one, there was moderate long-term economic depreciation; and, two, annual flight hours were no less than 350 hours.

A. Yeah, that sounds about right.
Q. Can you tell me what you mean by the return on capital here is dependent upon moderate, long-term economic depreciation?
A. Well, that got back to the unfortunate, you know, discussion I got into about Swiss francs, but it ties. One of the larger expense components of a business like this is the economic depreciation, not the tax depreciation, but the economic depreciation of the asset. There are a number of ways to mitigate that. It's the equivalent of looking at resale value on cars. You know, if you think a car has a great resale value, you might be more inclined to buy one new because you think your economic depreciation would be lower.
Part of the calculation relating to the PC-12 was aimed at moderating the cost of economic depreciation. And the fact that it was a foreign-built airplane was relevant in that context. So there was a lot of analysis about -- at the time and estimates related to what my economic depreciation was.
Q. And was this taken into account with the published rate of $400 per hour operating expense that you --
A. No.
THE REPORTER: I didn't get the end of your question.
THE WITNESS: I'm sorry.

MR. MALO: The published cost of operating expenses that he referred to earlier.

Q. (BY MR. MALO) I'm sorry. Your answer.

A. No.

Q. Did the published rate of $400 an hour include any profit margin?

A. No.

Q. It was pure operating expense?

A. Yes.

Q. Did it include overhead?

A. I'd have to go back and look at it now. It was an estimate published by Conklin & Decker, which is an industry resource for operating cost. And it may actually, I think even in 2002, have been a little lower than that. I think it was in the 3s. But my recollection of it now is that it was direct operating costs with an allocation for maintenance and some reserves, but not a depreciation reserve on the airframe.

Q. Do you recall what your base rate was for 2002 and 2003?

A. I think I started out at rate of -- a published rate of around 850 an hour.

Q. And that rate included your profit margin?

A. Yes.

Q. And you would vary your rate according to the criteria you identified earlier?

A. That's correct.
Q. And how much variance would you have in your base rate? How much above or below the rate would you go?
A. I don't think I ever went down to 400. 400 would be as low as I would go, but I varied it quite a bit. I mean, I think I took the initial ORIX flights at -- maybe my initial base rate was 900. And I think maybe I took the first ORIX flights at 850 or something like that. You know, I'd have to go back and look at every one of them to give you a really good answer.
Q. Okay. Let me ask you a few more questions about Mountain Air.
Did Mountain Air have any other investors aside from yourself or JRT Holdings, Inc.?
A. No.
Q. And are you sole owner of JRT Holdings, Inc.
A. Yes.
Q. And why was JRT Holdings, Inc. created as a co-owner of Mountain Air Charter?
A. Well, I was going to -- initially, I was going to use it for someone else. But there was also -- I did not want Mountain Air -- I wanted Mountain Air Charter to be a regarded entity for tax purposes. Now, don't ask me the follow-up question, ask me why, because I don't remember. But at the time it was -- I needed it to be a recognized entity for

tax purposes.
Q. And without the introduction of the S corporation and the ownership structure, it would have been what?
A. It would have been a single member LLC.
Q. Which is a disregarded entity; is that correct?
A. Yes.
Q. Okay. And you don't know why you wanted it to be a regarded entity?
A. I'd have to go back through the --
Q. Okay.
A. -- tax work that we did at the time.
Q. Okay. When you started Mountain Air Charter, did you intend to be a pilot for charter revenue flights?
A. I intended to be at least an SIC, yes.
Q. A second-in-command; is that --
A. Yes.
Q. And as a second-in-command, would that authorize you to fly revenue flights?
A. Yes.
Q. Did you eventually become a pilot of revenue flights for Mountain Air?
A. I can be now. You recall when we went through the description of the rate interest, stuff like that.
Q. Yeah.
A. So I'm -- now, I'm okay. I could do it now. I'd

just have to sit for a check ride.

Q. Have you ever piloted revenue flights for Mountain Air Charter?

A. Never.

Q. Do you hope to eventually?

A. That's the plan. You know, and the predicates are in place now. They weren't at the time.

Q. Did you ever, in addition to Mr. Travis or Mr. Holderreade and maybe eventually yourself, did you ever have reserve pilots or anyone who could fill in for either of your primary pilots if they were unavailable?

A. No. Would you like an explanation?

Q. Certainly.

A. Initially, the certificate that I wanted -- there are three different types of Part 135 certificates. One is a general Part 135 certificate. You can have as many airplanes and as many pilots, co-pilots and everything else as you can swallow. Then there is what is called a single pilot/single ship certificate, which is the type that MAC had while it had the Pilatus. And then there is what is known as a single pilot in command certificate, which allows you have to a single named pilot in command and up to three second named, second-in-commands.

When we first went into the FAA, what we wanted to get was a single pilot in command certificate, which is a

little bit more complex for the FAA to issue than the single pilot/single ship certificate. And they discouraged us. And the idea was, okay, Tom would be the pilot in command and I would be one of the second-in-commands and maybe we'd have a few others. We weren't sure how much resistance there would be to single pilot charter by customers. As it turns out, there was plenty, but -- and in addition to that, I was going through a period in my life where I thought I was going to retire, and that was kind of -- that was going to be the next thing that I was going to do. And that didn't happen obviously.

But anyway the FAA persuaded us to go -- to make it very simple for us, single pilot/single ship because that eliminated the requirement for certain of the management positions that would otherwise be extant in a 135 certificate, which would be the director of operations, director of training and director of maintenance. So, what, we were just two guys that wanted something from them, so we made it as simple as we could. And so we went with the single pilot/single ship certificate, which, you know, took me and any other, you know, prospective second-in-command out of the loop. We have since converted the certificate to a certificate now where second-in-commands are authorized.

Q. When you say that "single pilot operations were met with customer resistance," can you explain what you mean by that?

A. There were two sort of unquantifiable variables in the analysis of this -- of the PC-12 as a viable platform for a Part 135 operations. One of them is that it is typically flown single pilot primarily for cost reasons, but also because it can be. The other is that it's a single engine plane. And when you're dealing with the public, those are two things that people have wildly different views about. There are some people, such as myself, who think it's not an issue. You've got a pilot. That's all you need, and an engine, which is all you need. And if the engine for some reason stops running, you have a glider.

You know, a lot of other people don't realize, for example, that if the power plant stops running on an airplane that you still have an airplane. It just doesn't have a motor. It glides. They don't think about the fact that the space shuttle glides in without power from, you know, 225 miles up and lands just fine. So it -- the two variables that were in play as we went into this thing were what was the public reaction -- or the customer reaction going to be to single engine and what was it going to be to single pilot?

Q. Now, referring to Exhibit No. 10, and just to confirm as well, you make the statement, Pursuant to FAA guidelines, all flights are operated in accordance with Part 135 regulations and piloted only by Part 135 certified pilots. This excludes Mr. Thompson from operating the aircraft on ORIX

USA Corporation flights.
A. That's correct. If that was your question, is it accurate.
Q. Yes. That's the statement, I believe, that's made on Page 9 of Exhibit 10. And is this what you -- is this statement in reference to what you just said about single pilot/single plane operations and the certification that you were attempting to acquire from the FAA, is the --
A. Where -- I remember writing that, but I don't remember where it is in this thing. You want to direct me to a page?
Q. I believe it's on Page 9, second to last bullet point.
A. That's correct.
Q. Okay. And that statement is in reference specifically to what you were just describing, I think, that the certification you were attempting to achieve from the FAA was for single pilot/single plane operation. Mr. Travis was named as the pilot. The Pilatus PC-12 was the plane, and therefore, the certification you eventually achieved excluded you from being able to be a pilot or function as second-in-command?
A. You know, you're -- this is written as a statement of fact in 2005. I'm not sure I -- to be honest with you, your question is confusing.

Q. Okay. Let me rephrase. The certification that you applied for with the FAA excluded you from being able to operate as a pilot. Is that an accurate statement?

A. The certification that we got. The first certification that we sought, which was sort of an oral around table discussion with the FAA was single pilot in command, which would have permitted up to three SICs.

Q. Okay. And that was the certification that the FAA dissuaded you from --

A. Yes.

Q. -- pursuing?

A. Yes.

Q. And the certification you got excluded you from being able to be a pilot?

A. That's correct. Excluded anybody, other than Tom, from being a pilot. If I had wanted to be the pilot, I could have replaced Tom, I could have gone and gotten my commercial rating, which is not that hard to get, sat for a check ride and replaced Tom as the pilot, myself.

Q. Okay.

A. And that would have been perfectly legal. But the certificate that we had allowed only one named pilot in command at a time.

Q. Did the exclusion of -- or did your exclusion from piloting MAC flights for revenue ever change?

A. No.
Q. And it's still in effect till this day?
A. It's still in effect till this day. Because although I have my commercial and my ATP certificate, I have not sat for a Part 135 check ride with the FAA or with Flight Safety.
Q. But you did pursue all of the necessary requirements to become a pilot in command for Mountain Air Charter?
A. In 2006, yes.
Q. And in 2002 and 2003, did you complete Simcom training as one of the predicates for eventually achieving this goal?
A. No.
Q. Okay. Why did you complete Simcom training?
A. Well, for one thing, it was required by the insurance company. But the other was that, you know, it's what you got to do if you want to be a safe pilot.
Q. It was required by the insurance company for you to fly the aircraft?
A. Yes.
Q. And was your flying the aircraft in 2002 or 2003 a business requirement for Mountain Air Charter?
A. Yes, I did -- yes, I did some.
Q. And the "some" you refer to, you did some flights in 2002, 2003?
A. Well, I don't want to test my memory. I mean, we



1ebda8ab-4c8a-4cb5-875f-72720db17d91

have the flight log from 2002. If you want to get into that, we can -- I can see if there are any.

Q. Well, I believe we discussed some of this yesterday, maintenance flights, for example?

A. I did maintenance flights. I did a couple of demo flights for people. I think there were three during that period. And I did -- yeah, I did a number of maintenance flights.

Q. How do you distinguish a demo flight from a revenue flight?

A. Well, revenue versus nonrevenue.

Q. Okay.

A. I can fly a demo flight as long as we don't take any revenue --

Q. Okay.

A. -- and you're not flying for hire.

Q. Okay.

A. The minute you charge somebody a penny, you got to have the 135 pilot in the air flying the airplane as pilot in command.

Q. You can provide a demo flight for a passenger who takes off from a point of origin and arrives at a point of destination other than that point of origin?

A. Sure. As long as you don't charge for it.

Q. And independent of the charge for the service,

there's no other characteristic that would distinguish between the two?

A. Not that I can think of.

Q. Okay. How did you select the Pilatus PC-12 as the aircraft for Mountain Air Charter?

A. I think I started in 2000 looking at -- kind of started with the entire universe, turbo prop universe. And started at the outset just eliminating ones that I thought would be undesirable. And most of the older turbo prop twins were eliminated as a consequence of that process or as a part of that process. And, you know, what I ended up with were the newer turbo prop twins -- I mean, for consideration the newer turbo prop twins, and the TBM 700, the Meridian, the Pilatus, and there were a couple of other platforms under development at the time which never came to fruition that I looked at.

And I just kind of went through -- you know, looked at them all, looked at the published operating cost, you know, Conklin operating cost, talked to people that flew them. I had experience in some of them, you know, either as a charter customer or as just a passenger. And just kind of whittled it down to the PC-12 really.

Q. Okay. The criteria that you used then for evaluating potential aircraft were Conklin operating costs?

A. Operating costs, the cabin and how comfortable was the cabin. How long or how far could it go, what the range

was. Some of them are fairly short range, which nobody likes making fuel stops, so that's an inherent indication. You know, maintenance, customer support was a big factor. I mean, there were at least those considerations and probably more.

Q. Okay. What was the range of the Pilatus?

A. 2000 miles.

Q. Were insurance requirements for any of the aircraft you considered a factor in your decision?

A. I don't think so. Because I didn't really pick up the insurance question until September of 2001, and I had already pretty much made up my mind at that point. I mean, it was still a none -- I had a deposit out there. It was a refundable deposit. So I hadn't made a final, final decision, but I pretty much decided that that's what I wanted to do.

Q. You had a deposit on what up until?

A. On a PC-12.

Q. A PC-12?

A. A delivery position. A refundable deposit.

Q. As of?

A. Around 2000 -- September of 2001 --

Q. Okay.

A. -- which is when I remember picking up the insurance question for the first time.

Q. And when was the final decision made that the Pilatus PC-12 would be the aircraft you would use for Mountain Air?

A. When the decision became -- when the deposit became nonrefundable, which I think was in December.
Q. Okay.
A. I mean, I could be wrong by a month or two, but it was maybe four months or five months -- well, five or six months before delivery, so, you know, November or December.
Q. Do you know if insurance for any of the aircraft models you considered was more expensive?
A. I don't think I looked at the -- I really don't remember looking at the insurance questions for any other airplanes.
Q. Okay. Were tax considerations at all considered in your evaluation of the aircraft?
A. No.
Q. Did anyone discuss with you tax treatment of potential investments in an aircraft?
A. No, not until I hired E&Y to look at it, which was quite a bit later than that.
Q. Do you have any idea when?
A. No. But we have the billing records, which I think we submitted to you. But my recollection of it is, is that it kind of -- is that I turned to that question in March or April of 2002.
Q. If you could turn to Exhibit 16.
A. Okay.



1ebda8ab-4c8a-4cb5-875f-72720db17d91

Q. Was this the E&Y invoice that you referred to?

A. Well, I'm not -- yes, but I'm not sure if it's the only one. It looks like it might be, though. It says, Final billing.

Q. And each page of this document is part of that invoice?

A. Yes.

Q. And the description of services on this invoice include "Application of passive activity loss rules and specifically the 'extraordinary personal services' exception to the potential treatment of the activity as a 'rental' operation"?

A. It says that, yes.

Q. Okay. And it also includes on the next page, "Application of the 'hobby loss' rules"?

A. Yes, it does.

Q. Were these analyses that you were aware of, these services?

A. I don't think so. I mean, what I -- my aim was to figure out what the issues were and make sure that I didn't run afoul of anything. You know, I didn't really understand the tax treatments for this stuff. I had no idea actually. And so I needed to become educated. I paid them to educate me, and then I paid them to write an opinion letter that covered all of the issues and laid out the treatment, which I think we've

provided to you, and just give me a road map to follow so that I didn't end up where I am today.

Q. So the services that you received from Ernst & Young then, they identified issues and brought them to your attention long after you've made -- committed to these business decisions?

A. Yes.

Q. One other question about this invoice. The address here is for "Mountain Air Charter, LLC, care of ORIX, Main Street, Dallas."

A. Yes.

Q. Just out of curiosity, in the letter of compliance, which we've identified as Exhibit No. 22, I think the address provided for Mountain Air Charter on MAC Page 1485 --

A. Uh-huh.

Q. -- indicates that the principal base of operations is 13532 Braemar Drive?

A. That -- yeah, we just gave them that. That was where the mail needed to go. That's Tom's home address.

Q. Mr. Travis's home address?

A. Yes.

Q. Okay. And also the insurance policy, which we have identified as Exhibit No. 17 --

A. Uh-huh.

Q. -- I believe on Page MAC 423, we have an address of

704 Main Street, Jordan Valley, Oregon.
A. Uh-huh.
Q. What is that address?
A. Well, that was where the Mooney had been registered. And the broker just took it off the Mooney's registration without asking me, and I think I eventually corrected it but it took a while.
Q. Okay. So that particular address for Mountain Air is really an error?
A. It's an error.
Q. Okay. I'd like to take a closer look at that Exhibit No. 17, if you don't mind.
A. Which is?
Q. This is the insurance policy.
A. Uh-huh.
Q. We discussed this in part yesterday. But my reading of this document and what I believe it to be is a policy which on Page MAC 423 states that the policy period is May 15th, 2002 through May 15th, 2003.
A. Yes.
Q. And it appears that at some point in time this policy was amended throughout that period.
A. Okay.
Q. And if I understand correctly, the amendment includes the addition of Endorsement No. 11 as evidenced by the letter

dated June 30th, 2000 -- I'm sorry -- January 30th, 2003, on MAC 420 from Mr. Vaughan?

A. All right.

Q. Stating that Endorsement No. 11 which allows you to fly solo.

Can you explain what that means?

A. Well, I think I had asked him for that. I had met the requirements earlier and was flying solo earlier.

Q. Do you know when you met the requirements?

A. No, we could figure it out by the log book.

Q. Okay.

A. And November of 2002 or something, somewhere in there.

Q. Okay.

A. And I just asked him for it so that I had something in the file.

Q. And this endorsement relates to your satisfaction of having completed the 200 hours that was required for insurance purposes; is that correct?

A. Well, whatever the requirements were.

Q. Okay.

A. I don't think -- I think it was more than that. I mean, not that it wasn't 200 hours, but that there were more stipulations.

Q. And they may be stated on MAC 0421, which I believe,



1ebda8ab-4c8a-4cb5-875f-72720db17d91

if I'm not mistaken, is the initial coverage that was provided under this policy stating that --

A. I'm sorry. Go ahead.

Q. -- James R. Thompson holding an FAA private pilot certificate with an FAA instrument rating; Mr. Thomas Travis with an FAA pilot transfer pilot rating; any pilot holding an FAA commercial pilot certificate with FAA instrument rating who's flown a minimum of 3000 hours as pilot in command; at least 1000 hours of which shall also have been in retractable geared aircraft; at least 500 hours of which shall have been in turbo prop aircraft; at least 50 hours of which should have been in a Pilatus PC-12 aircraft and who has successfully completed the manufacturer approved ground and flight school in the preceding 12 months.

Are these the criteria you're referring to?

A. I think there was more.

Q. I think I misspoke as well. I think this is the updated coverage that shows Endorsement No. 11 at the bottom of this page, MAC 0421.

A. You see what's missing from there is the requirement that I attend Simcom. And I remember it being spelled out more definitively than that. But I can't find it in here. So my recollection could be in error. But they did -- as you see, they require it for even commercial pilots that so -- and actually I think I may have had a requirement to attend it

twice, but I don't see it here.

Q. When you say "attend it twice," you mean initial training and recurrent training?

A. Yeah.

Q. If you could turn to Page MAC 0445. Correct me if I'm wrong in my reading of this document. I believe this to be the initial policy coverage where it states that the pilots authorized to fly are James R. Thompson, holding an FAA private pilot's certificate with FAA instrument ratings but only while accompanied at all times by Thomas Travis.

Thomas Travis holding an FAA airline transfer pilot certificate, and any pilot holding an FAA commercial pilot certificate with all of the experience that I mentioned earlier. And this is identified as Endorsement No. 10.

A. Yeah. But there's -- well, I'm not sure what the question is on the table, but --

Q. Well, is that --

A. There's something missing.

Q. Okay. Is my understanding of the document, even though something is missing, am I correct in understanding that for the initial policy period, May 15, '02, through May 15th, '03, initial coverage for pilots authorized to fly the aircraft including Mr. Travis and you under Mr. Travis's supervision. And at some point, most likely November 2002, you satisfied whatever these other requirements were in addition to what I

just read, and perhaps the Simcom training, you satisfied the requirements to be authorized to fly the plane solo, and the endorsements in the policy were amended to reflect the fact that you were authorized to now fly the plane solo; is that correct?

A. Yes.

Q. The requirements for pilots generally stated, in addition to the named pilots, yourself and Mr. Travis, mentioned that pilots are to complete ground and flight school by a manufacturer approved school within the preceding 12 months.

Can you distinguish between ground and flight school? Can you define what the difference is for me?

A. The ground school is in a classroom. The flight school is either in the airplane or in a simulator.

Q. Okay. And how did you complete ground school and flight school for the Pilatus PC-12?

A. Through Simcom.

Q. Both ground school and flight school?

A. Correct.

Q. Okay. And in the course of completing both ground and flight school through Simcom, did that involve more than the 20-hour program that we discussed with Mr. Travis yesterday?

A. The way I did it, it might have. I also brought John

Morris out to fly with me in the airplane. I was less interested in the sim than I was in the airplane. There's certain limitations in the simulator. There are benefits, but there are certain limitations as well. I wanted a more hands-on, real world, more challenging experience.

Q. Okay. If I could turn your attention again to Page MAC 423.

A. Uh-huh.

Q. Under "Aircraft Use," there's an restriction indicating "you agree not to charge anyone for using your aircraft."

A. Uh-huh.

Q. "They can, however, reimburse you for operating expenses."

A. Uh-huh.

Q. Can you explain what that means?

A. That is a typical Part 91 limitation. But this is a Part 135 policy. So they either amended that --

Q. The policy date, if I understand it correctly, was May 15th, 2002, precedes your certification.

A. Yes.

Q. Was this a restriction that applied to the period only preceding your certification?

A. I don't remember when we did. There was clearly some subsequent negotiation here because the 200-hour thing came

into play. And the Simcom requirement came into play. It's not evident here, but it did. And this was always intended to be a Part 135 policy. I don't know why at the outset it wasn't. I just don't remember really.
Q. Okay.
A. But it ultimately was for obvious reasons.
Q. So --
A. In fact, that's -- if I remember correctly, one of the reasons I had to go with -- you had the universe of carriers that's out there that will write the PC-12. A subset of those will write Part 135 coverage. Some of them just won't write it under any circumstances. And as I recall, the reason I had to go with USAIG, even though they significantly retraded the terms of insurance for myself, was that that's where I could get Part 135 coverage.
Q. When you say "they retraded the terms of insurance" to yourself, is that the substitution in the policy limits that you were talking about earlier, the 10 million to 3 million?
A. Yes.
Q. As we discussed earlier, your business plan indicates that you intended to provide flights throughout the U.S., Mexico and the Caribbean?
A. Yes.
Q. This policy on Page MAC 430 discusses Mexican operation warnings in which --

1ebda8ab-4c8a-4cb5-875f-72720db17d91

A. I'm sorry. Page what?
Q. MAC 430.
A. Oh, I passed it. Okay.
Q. Advising you to seek coverage from Mexican insurance carriers.
A. Uh-huh.
Q. Did you, in fact, receive such coverage?
A. Yes.
Q. And did you operate in Mexico?
A. No.
Q. During both 2002 or 2003?
A. That's correct.
Q. Okay. And do you know why once you received Endorsement 11 in the policy that changed the coverage allowing you to fly solo flights? Do you know why the coverage limitations were reduced for flights that you flew from 3 million to 1 million?
A. They were reduced at the outset. Well, you might be right about that. I remember that they told me at the beginning that if I were to have -- that I would have 1 million. Now, they didn't have to get to that initially is what I'm thinking because this initial -- and I don't know how long it survived. But the initial endorsement says you can't even fly solo. At some point that became 200 hours. And at some point that became 1 million versus three. I just don't --

and my recollection is that it happened pretty quickly because I was very -- I was angry about this. And in particular, I was angry with the broker for surfacing it at the last minute.

As I said, I delivered the airplane coming up with -- in a very short period of time. I was looking at -- I guess I don't have a date for the binder. But it was bound -- I mean, it was put in place days before the airplane was delivered. And so there was subsequent negotiation that went on for some period of time and resulted in that more favorable arrangement.

Q. Do you recall if hiring a flight instructor for high altitude training in airports in Colorado was required by an insurance company?

A. It was not.

Q. And why did you hire a flight instructor to provide such training in Colorado?

A. I thought that Colorado was going to -- well, there were a couple -- there was more to it than that, but let me take your question. I thought that we were going to do a lot of business in the Colorado airports and Texas. If you at all -- I mean, if you kind of understand what happens with Texans in the summer, you really -- there's like this dispora that, you know, spreads out from, you know, New Mexico through Colorado. And I viewed that as a very promising market opportunity.



1ebda8ab-4c8a-4cb5-875f-72720db17d91

I thought, well, it's going to be, you know, Aspen, Vail, Telluride, Montrose, Rifle, you know, airports. And I remember Tom looking at me going, you know, okay, I hear what you're saying, but that's a different kind of flying than what I've done. And so, you know, I can't recall offhand whether -- I think he had already completed Simcom training or something like that. And he was trying to make the point to me that, look, just because I got out of the simulator -- check ride in the simulator, you know -- you know, I want to fly the airplane with somebody, and I found that guy. His name was Steve Author. And I found him through Pilatus, I think, and hired him to fly around for five days with Tom mostly. I mean, I got some hours out of it.

And we tried to make most efficient use of it by combining the high altitude airports with that initial training experience. I thought, well, you know, if you're going to do one, you may as well do it all. So that's what that was.

Q. Did ORIX conduct any business in Colorado?

A. No.

Q. In some of your other business activities, farming activities we mentioned yesterday, did you ever conduct -- I know yesterday we discussed the fact that you were exploring potential ranches in -- I think it was Pueblo. Did you ever use the Pilatus to conduct business related to your farming activity?



1ebda8ab-4c8a-4cb5-875f-72720db17d91

A. No.
Q. Can you explain what you were looking at ranches in Pueblo for?
A. Yeah. A broker had sent me a -- a ranch broker had sent me a brochure or something like that, and I looked at it and said, Oh, we can fly over this while we're going past and so we did. So I circled it a couple of times and kept going.
Q. You didn't actually land?
A. No.
Q. Oh, okay. When did you first learn that your 135 certification would be delayed?
A. Well, we started on it pretty early. That's why I started paying Tom before the airplane was delivered. You know, I had in mind a very concise, logical progression on a time scale that involved getting the Part 135 certificate almost immediately after the airplane was delivered. And I think we figured out by the time the airplane was delivered that it was going to be a lengthier process than what we had envisioned. So in May I guess is a good answer.
Q. Did anyone at the FAA give you an indication of how long it might be delayed?
A. No.
Q. During the period in which your application was outstanding beyond the original anticipated certification date, were you concerned about cost that Mountain Air was incurring

without the ability to generate revenue?
A. Yes.
Q. And to the extent that considerable time was spent flying the plane with Mr. Travis for his own proficiency with the aircraft and with the dual purpose of providing you with hours, if one -- if certification had not been achieved on September 3rd of 2002, and you had satisfied your 200-hour requirement for insurance purposes, to what extent would you have continued to incur flying expenses for Mountain Air without the ability to generate revenue?
MR. REYNOLDS: Objection; form.
A. You're very good at long questions.
Q. (BY MR. MALO) I apologize. I'll rephrase. I'll rephrase.
A. But I --
Q. No, I'll rephrase.
A. -- you know, I think I have -- I think I can -- you're asking me to speculate what I would have done had we not have obtained FAA certification. I can't do that because we knew we were going to get it. It just took a lot longer than we thought, and it never had to get to that.
Q. Okay. And would you have allowed Mr. Travis to fly as frequently as he did if you had no intention of ever flying the plane?
A. Yes. I mean, you kind of had to take Tom the way he



1ebda8ab-4c8a-4cb5-875f-72720db17d91

was. You know, if -- it's hard to explain this, but, you know, you got to fly with a guy. And I flew with him, and I saw -- and he's a very, very good pilot. And he's very cool under pressure. And, you know, he just had his rules. And if you wanted him, you had to play by his rules. And I explained the indemnity issue to you yesterday.

Q. Yes.

A. That was a factor.

Q. I'd like to turn to Exhibit 4 for a minute, which we used yesterday.

MR. REYNOLDS: Here you go. Give me 10 to put back together while you're looking at 4.

THE WITNESS: (Complies.)

A. I'm sorry. Was it Exhibit 4?

Q. (BY MR. MALO) Exhibit No. 4, yes.

A. Okay. Two, 3, and of course, it goes right to 5. Okay. I got it.

Q. I believe this is the exhibit that Mr. Travis identified with reference to his affidavit --

A. Uh-huh.

Q. -- when he stated that he had reviewed the hours that Mr. Thompson had incurred in performing services for Mountain Air Charter.

A. Uh-huh.

Q. Can you identify and explain what this document is?



1ebda8ab-4c8a-4cb5-875f-72720db17d91

A. Yes. This was prepared in response to a -- I believe we prepared it in response to an information request from the IRS. They'd asked for a -- some detail in terms of hours. And this is what we gave them or part of what we gave them.

Q. Referring to your notes associated with the hours that you claim for the various categories and time that you incurred --

A. Uh-huh.

Q. -- in 2002, you said you spent 36 hours on equipment selection.

Was anyone else involved in equipment selection?

A. No.

Q. All of this time was incurred prior to obtaining the 135 operational certificate?

A. Yes.

Q. With reference to Note B, you said that you spent 40 hours in 2002 and five hours in 2003 on general procurement activities.

Can you identify, including in the note here, research and negotiating fixed priced fuel contracts, supplies, rent, equipment, other necessary items? And I think you said earlier today that the fuel contract might have been negotiated in 2003.

A. I think there was one in 2000 -- well, it was either 2003 and 2004 or 2002 and 2003. There were two of them. Both



1ebda8ab-4c8a-4cb5-875f-72720db17d91

done for 20,000 gallons. One was $1.51 a gallon and one was a $1.53, which seems kind of quaint right now. But that was, as I said earlier, an effort to lock in my operating cost.

Q. And was this fuel exclusively for the Pilatus PC-12?

A. Yes.

Q. Did the Mooney use the same type of fuel?

A. It cannot.

Q. Cannot. Would you have been able to negotiate this fuel contract as a private individual, or was this a business rate?

A. It was a business rate.

Q. So having Mountain Air Charter as a business operation was an advantage in negotiating this contract?

A. Yes. I bought it from the same people that provided the hangar for the PC-12 and provided the office. So I was renting a hangar, renting an office, and they gave me a concessionary rate on the fuel provided that I pay for it in advance, which I did.

Q. Looking at Note C, Aircraft marketing and promotion, which includes 40 hours in 2002 and 23 in 2003.

Can you explain what these hours entailed?

A. Well, it was -- 2002 is a little different than 2003. If we take aircraft marketing and promotion in 2002, that was primarily working the universe of, you know, brokerage operations, charter brokerage operations. I put up a website.

I did -- I made a brochure. I don't remember whether or not that was in 2002 or 2003. You know, I spread the brochures around. I had somebody create words that functioned as links in the search engine environment so that if people typed in "charter," you know, "Dallas," the -- you know, Mountain Air Charter's website would come up.

Let's see, what else was in there. Well, negotiating any of the flights that took place. There were a couple of demonstration flights. There were some business issue flights. There were some maintenance flights. Let's see, marketing efforts. That's -- I mean, that's pretty much it.

Q. In reference to Mountain Air's website, can you provide detail on the functionality that the website originally had in terms of what you could or could not do with the website?

A. Well, what's there today is what was there then. So MountainAirCharter.com, with the exception of the name of the pilot has been changed. Initially, I thought the web was going to be a much more powerful tool than it proved to be. So it did not keep up. In other words, it did not evolve really beyond, you know, sort of the 2003 era.

Q. Okay.

A. So if you go to MountainAirCharter.com, you'll see what was there in 2002 and early 2003.

Q. Can you schedule or book flights through the website?

A. No.

Q. Okay.

A. You can make contact. It's a little sales pitch on the PC-12. It talks about where you can go and what you can do. I put some pictures up. I mean, I'm not very good with this stuff, so, you know, it's reflective of that.

Q. Look at Note D --

A. Uh-huh.

Q. -- which relates to accounting and treasury, including non-income tax filings. You describe these as accounts receivables, accounts payable, accounting entries, treasury functions, reconciliation of bank accounts.

Would you describe your time as time you spent managing your investment in Mountain Air Charter?

MR. REYNOLDS: Objection to form.

Q. (BY MR. MALO) I'll rephrase. Under the heading "Accounting and Treasury," the hours you accumulated in 2002 and 2003, is this time you spent managing your investment in Mountain Air Charter?

MR. REYNOLDS: Objection --

A. You know, no. I mean, it's time spent operating the business. You can't operate the business unless you can bill your customers. You can't operate the business unless you know you have money in the bank. You can't operate the business

unless you file your payroll tax returns or unless you make the entries and calculations required to pay.

Q. (BY MR. MALO) And you were responsible for setting all of these policies and managing all of these functions?

A. Yes.

Q. What was your billing policy?

A. If I thought I could trust them, I billed them afterwards because it's a little more polite. I've been a charter customer where I've had to pay in advance, and it's a little bit offensive. So I think without -- I'm guessing, but I don't think we ever ended up collecting in advance except for one guy. So, you know, the flight would get done, and I would bill them right away, like the next day, just so that people didn't get the idea that there was, you know, going to be a long delay between the time that they had to pay or the time that they took the flight and the time that they would have had to pay.

Q. And how long would you usually expect payment?

A. Right away.

Q. When would you consider payment delinquent?

A. If it didn't show up right away like by return mail.

Q. Did you track 30-day accounts outstanding, 90-day accounts outstanding, anything like that?

A. Never let it get that -- well, I mean, it did get that far with the Gehans once and with LaRue. But if they

didn't come in right away, I knew about -- I mean, I could tell, you know. And then I would start making phone calls.

Q. Did these same billing practices and policies apply to ORIX?

A. Well, they always paid right away. I was obviously a little less concerned about the collectability of that than I was with some of these people that showed up.

Q. Taking a look at the description associated with Note E, and in category flight hours, you have 205 in 2002 and 83 in 2003.

In 2002, if I'm correct in my understanding, there was a partial year in which you acquired the aircraft May 15th and owned it through -- or Mountain Air owned it through December 31st.

A. Uh-huh.

Q. In 2003, was the entire calendar year; is that correct?

A. I think it is, yes.

Q. Okay. Can you explain why in 2003 far less hours were required of your participation than in 2002 of flight hours?

A. Well, I think it's clear. 2002 was a start-up year and, you know, I did everything I could to be in a position myself in order to fly the airplane, even though I couldn't fly it for revenue purposes. And there was a lot more of that in

2002. And in 2003, there just wasn't all that much of it.
Q. And in 2002, some portion, perhaps a large portion, of these hours were dedicated to Mr. Travis's flying the craft for his own comfort level and proficiency; is that correct?
A. Yes.
Q. And it was deemed advisable for you to be involved or on board the plane during those flights for safety purposes, even if not necessary, but advisable?
A. I really didn't think Tom needed me. But I wanted to know, you know, who was going to be -- you know, and, I mean, I liked him. I loved flying with him. I thought he was a great pilot. But at the end of the day I was the guy who was going to write the check if something went wrong or pay the fine if he did something that got me in trouble with the FAA. And, you know, I did -- I took every opportunity I could to just know as much as I could know.
Q. About Mr. Travis?
A. Yeah. And just about how it was going to work -- well, perfect example, when I trained -- when I transitioned the MAC from the PC-12 to the CJ-3, I tried to -- or I put the PC-12 pilot through the transition course rather than hiring -- I thought a known quantity was a known quantity -- rather than hiring a new pilot and going through all that again, you know. And when he flew in the simulator, I sat in the observer seat for every hour that he flew in the simulator because I wanted

to know what I had. Same thing with Tom.

Q. Did you spend or invest this much time in your consideration of Mr. Holderreade?

A. No.

Q. And can you explain, based on what you just said, why not?

A. It was kind of a situation that felt like it was -- well, first of all, my comfort level with the airplane was a lot higher by then. And I understood more what a pilot needed, too. I mean, I was just more comfortable than I was at the outset. I was intimidated initially by what I saw as the regulatory risk and the financial risk in this business. And I flew at some point with Mike, and I could see that he was comfortable and had been flying corporate jets Part 135. And, you know, the only real distinction that I made between the two of them is that Tom was a lot more comfortable in difficult weather situations than Mike was.

And, you know, the way I wired around that was just if I was flying with Mike and it was a difficult weather situation, I either came up and sat in the right seat while he did his approach, or we briefed, you know, the approach before he did it. So, I mean, I kept him, in some ways, on a shorter leash than I did Tom. But, you know, it's a combination of my comfort level being higher as well.

Q. Were you aware of the fact that he had not piloted a

Pilatus PC-12 prior to working for Mountain Air?

A. Very much.

Q. And did he ever express to you any concern about his proficiency of the aircraft or his comfort level with flying the aircraft?

A. No, not that I remember.

Q. From a management or a business operational perspective, did you ever deem it necessary to require him to train beyond what he did prior to accepting revenue flights?

A. You know, I didn't ask him to. And he is just a different person than Tom. You know, everybody has got their own personal safety margins. And his -- you know, I mean, he's just a different person than Tom is. You know, my approach, personal approach, is a lot more consistent with Tom's than it is with Mike's. And, you know, I paid a lot more attention when I was -- I flew behind in the airplane with Mike a lot in 2003 and until November, I think, of 2004. And if it was a challenging situation, you know, I was more involved than I was with Tom.

Q. Did you allow Mike to pilot revenue flights solo?

A. Yes.

Q. Where you were not a passenger?

A. Yes.

Q. And not on board?

A. Yes.

Q. How long into his employment before he began flying passengers solo?

A. Right away. He took the Gehans, which was a customer of his, from another carrier up to Telluride, I think, in December of 2003. But it was an airport he had been into quite a bit, so the weather was good. So I didn't really have a lot of reservations about it.

Q. Did you have any reservations about Mr. Holderreade piloting the aircraft once he had completed the Simcom training?

A. Reservations is -- you know, look, I flew with the guy. And I sat in the back for a lot of it. But he was -- he was a different pilot than Tom. And let's put it this way, I always checked the weather when I flew with him. I made my own assessment of what the -- what it was going to be like. And if it was a complex or a challenging situation, I often sat up front with him. And if he needed anything, I did it for him.

Q. Okay. Referring to Exhibit 4, Note H --

A. Uh-huh.

Q. -- you make a comment this time that's identified as "employee hiring, training and other HR related matters."

A. Uh-huh.

Q. You make a comment that you had reviewed -- for 2002 read hundreds of resumes, multiple phone and in-person interviews, hired Tom Travis. For 2003, time includes



1ebda8ab-4c8a-4cb5-875f-72720db17d91

approximately reading 200 resumes, interviewed candidates, hired new pilots.

Can you compare the time -- you have 32 hours in 2002 and 15 hours in 2003 dedicated to these activities. Can you explain the difference or compare the hiring process that was different from 2002 to 2003?

A. I was a little -- yes. I was a little more relaxed in 2003 than I was in 2002.

Q. And why is that?

A. I had done it before. I knew -- I had been through the experience. I knew what to look for, or at least I thought I did, and I just felt more confident.

Q. In reviewing resumes in 2002, did any candidates have Pilatus PC-12 experience?

A. Yes.

Q. Were there any that were qualified to fly the plane from the day that the certification was granted?

A. I think there were.

Q. Were there any that would have had opportunities to fly Pilatus PC-12 for other companies or privately independent of the certification delay for Mountain Air?

A. You got me. I'm confused by the question.

Q. Well, let me rephrase it. Were there any candidates that had opportunities to fly Pilatus PC-12 that was not owned by Mountain Air during the period in which the certification

was delayed?

A. Well, first of all, I don't remember. But, secondly, I don't think I ever had to get that far because the one or two PC-12 candidates -- my first choice would have been not to hire someone that had 500 or a 1000 hours in a PC-12. But the couple that I came across, I disqualified for other reasons.

Q. Okay. And what type of reasons did you disqualify candidates?

A. One of them, I remember, it was a telephone interview, being sort of an angry person. You know, my interview processes were aimed at eliciting personality traits because personality traits can be influential in how somebody exercises their pilot privileges. And one of them I remember being a fairly -- a person who as you picked at his experience or something like that, kind of got this fulminate response, and so I just disqualified him on that basis. And the other one -- I can't remember his name -- I just heard some things about that I -- that bothered me.

Q. Okay.

A. And I just shied away from it.

Q. Referring to Comment I on Exhibit 4 --

A. Uh-huh.

Q. -- category identified as "Insurance," ten hours 2002, five hours 2003. In the note you indicate that you had to fire your old broker, hire a new broker and obtain coverage

with a new carrier that is identified as W. Brown.

A. Uh-huh.

Q. And can you explain why you fired your old broker and hired a new broker?

A. Well, yeah. I felt very poorly served by the broker and for all the reasons that we've put into the record already. You know, my recollection of it is that in 2003, it was sort of the same thing where I start six months ahead of time so that I can eliminate or -- as much uncertainty as possible. And I personally believe that what the brokers try to do so that you don't jump ship is keep all of the unpleasant news from surfacing until the very last minute. Same thing that happened in 2002. And we started going down that road in 2003, and the broker didn't survive that process.

Q. Did the insurance rates change as a result of changing brokers or carriers?

A. I don't recall. But the premium would have been identified. I think the premium ended up going up. But I think I got more coverage in 2003.

Q. More coverage for yourself personally to apply to the aircraft up from the 1 million limit we discussed earlier?

A. Yeah, I think it went to three. Either I got it to five for the 135, or I got a promise of it going to five with W.L. Brown, is what I think where it went. Let's see --

Q. And just again for the sake of identification, W.L.

Brown was the broker?

A. W.L. Brown is an insurance company. The broker initially was Air Sure, and then it became Nationwide, I think, was the second broker.

Q. And the original insurer was USAIG?

A. That's correct.

Q. Again, on Exhibit 4 looking at note identified as letter "L" --

A. Uh-huh.

Q. -- under the category, "Weekly aircraft logbook review and inspection --

A. Uh-huh.

Q. -- 24 hours in 2002; 48 hours in 2003.

Can you identify the logs that you were reviewing?

A. I would go -- well, there was a sequence. There was like a little checklist that I had for this stuff. And if there were -- if there were flights, I would look at the trip sheets. There's a requirement to have in the airplane a maintenance, a prediction of maintenance, when maintenance will be due next. So I look at the trip sheets. I pull out the maintenance book, update the hours, see if anything was going to be due, you know, in the next week or two or as a result of what the hours were on the airplane.

I would pull the EIS data card, download the



1ebda8ab-4c8a-4cb5-875f-72720db17d91

data, look at the data, make sure that -- EIS had a problem with corrupting the data inadvertently after the lightning strike. I would go through that data, wash it, make sure that it was okay. Sometimes I'd go ahead and send it to Pilatus so that they could update their database. And then I would look -- you know, periodically, depending on whether or not there had been maintenance in another -- I would look at the aircraft logs to make sure that they were -- the airframe and power plant logbook to make sure that it was up-to-date.

Q. What are the -- what is the data recorded on the EIS data card?

A. There is a flash data card -- or it's actually a compact flash card in the engine and simurtation (phonetic) system that records when you start it up what the temperatures are, when the wheels left the ground, every two minutes what the altitude is, what the air speed is and other -- what they deem to be essential flight parameters. And then when you touch down, it records that, and it records when the airplane was shut down.

Q. And what's the importance of reviewing this information?

A. Well, the -- the idea was that -- ordinarily, in the life of a power plant, turbine power plant, which in this case was 3500 hours, at 1700 -- halfway through the life, you do a hot section inspection, which means you tear open the turbine

section of the power plant, and you inspect all the turbine blades, and in some cases, the last stage of the compressor. If you are meticulous about your Trend Monitoring in the engine, which is this electronic monitoring, you can bypass that requirement.

And so being meticulous or careful about the electronic data was a means of reducing the long-term cost of operating the airplane. Because if your data had been looked at by Pilatus, and I paid a third-party service to look at it again beyond that -- it was Trend Monitoring -- then you could size up the hot section inspection. And that can be, you know, a $100,000 item. So just a little bit of time every week or every two weeks to --

Q. So it was primarily a business decision to monitor the EIS data.

A. Yes.

Q. Was it an FAA requirement?

A. No.

Q. Was it an insurance requirement?

A. No.

Q. Taking a look now at Exhibit 4 at note identified as letter "N" --

A. I take that back. I'm not sure it is -- how you get there is kind of funny. But there was a requirement -- our maintenance program -- maintenance inspection program required

that we comply with the 100-hour inspection -- on the PC-12 per the manufacturer's specification. And embedded in that is a requirement for the Trend Monitoring. So in a backhanded way, there was an FAA requirement to pursue the Trend Monitoring. And at the time, it was a new system. And lot of the maintenance centers couldn't read the cards because they didn't have the equipment to read the cards.

And -- but I think the more relevant reason was that a lot of them were intimidated by it. It was very complex to get the data off the card and to make it comprehensible. You know, I finally corralled the people at Pilatus -- at the U.S. Pilatus manufacturer's facility in Broomfield, I got them to teach me how to do it. And then I kind of took the responsibility for making sure the data cards were appropriately stripped of the data and forwarded it on to Pilatus and subsequently Trend Monitoring.

Q. In taking a look at the note identified as letter "N" under the category "Research and Education," in which you have 48 hours for 2002, 41 hours for 2003. Some of the detail provided in this note indicates review of Pilatus insurance problems report.

A. Uh-huh.

Q. Can you describe what that is? Do you recall?

A. Yes, I do. In 2000 -- well, in -- I mentioned earlier a general sort of industry wide revision to risk

premiums in the aviation insurance business after 9-11. You know, I wasn't the only guy that had a problem. The industry took a big step back from risk generally, and they priced their risks a lot different than they had in the past.

So -- and about that time, there were a couple of unfortunate incidents in the PC-12 fleet that had the effect of further exacerbated really the difficulty that people were having -- that owner/operators were having with the insurance. And to the extent you were a Part 135 operator that problem was a little bit even more acute because 135s are looked at as vehicles for, you know, insurance claims, dangerous ones by the insurance companies. They filled the airplane with a bunch of people. You take them somewhere, the guy wants to go into an airport that's difficult or pushes you past your own weather limit -- tries to push the pilot past the weather limitations. I mean, the history is replete with examples of unfortunate 135 experiences.

But in any case, 2002 and 2003 were very difficult years for PC-12 operators. There were a couple of incidents, as I mentioned, relating to failure of a component in the engines. It was a fuel governor. And a couple of them made unpowered landings. One of them on a street in Indiana, pulled right up to a stop light. But there were no fatalities, but there were a couple of -- in connection with those. But in any case, in the broad scheme of things, there were problems

with insurance. And the industry -- or the PC-12 owners and manufacturers were collectively grappling with a way to confront the situation effectively.
Q. Okay. Also in that note, you identify Simcom class on aircraft operations and traveled to and from the POPA and Simcom meetings and conferences, collectively 27 hours if -- in each of 2002 and 2003.
If I understand correctly, the Simcom syllabus for the training you received is 20 hours; is that correct?
A. I think it is. The recurrent is different than the initial. And I think the recurrent is 20 hours. If it's not, it's real close. It's within a couple of hours.
Q. Okay.
A. It might be 24 actually.
Q. In the time that you spent at Simcom and Simcom conferences, did you also consider that to be time that you would have recorded as simulator time in your flight logs?
A. I don't think I ever put simulated time on my flight log.
Q. Okay. Would it have been time that you would have included in the flight hours category of time that you counted for participation in 2002 or 2003?
A. I don't think it was.
Q. Okay. I'd like to turn to Exhibit 3. I'm going to be real short with this one, and then I think maybe break for

lunch.

MR. REYNOLDS: Okay.

A. Okay.

Q. (BY MR. MALO) Can you identify what this document is?

A. This is an information -- response to an information request by the IRS.

Q. Okay. And it's an response that addresses the same inquiry as Exhibit No. 4; is that correct?

MR. REYNOLDS: Don't speculate.

A. I don't know. I mean, that's --

Q. (BY MR. MALO) Okay.

A. Without having the information request in front of us and lining them up -- this says Information Request No. 3, and the other one said -- it wasn't specific.

Q. I'll rephrase instead of identifying the exact IDR question that was posed.

What does this document purport to represent?

A. This is a compilation of hours.

Q. And what are these hours related to?

A. The question of material participation.

Q. Of your material participation?

A. Yes.

Q. In Mountain Air Charter?

A. Yes.

Q. Okay. And the hours listed in Exhibit 4, is this also a compilation of hours related to material participation in Mountain Air Charter?

A. Is 4 the one we were just dealing with, I believe?

Q. Yes, sir.

A. Yes, it is.

Q. Okay. And on the second page of Exhibit 3, the total hours identified for calendar year 2002 include 205 flight hours, 502 total hours; is that correct?

A. Yes.

Q. Okay. I think the comments are substantially similar to the comments of Exhibit 4.

Can you explain why the difference in the hours reported between Exhibit 3 and Exhibit 4?

A. Yes.

Q. Please do.

A. When this first came up -- I never spoke with Karen Graham. But what came back through my representatives were, you know, look, you've got to go through and figure out -- you know, come up with some hours or some way of demonstrating your material participation in the business of MAC. And at first, you know, I didn't even -- I hardly took it seriously because I guess I knew what I had done. And so I made a very quick pass through the check ledger, the airplane flight logs, notes that I had at the time, which didn't relate to hours, but were



1ebda8ab-4c8a-4cb5-875f-72720db17d91

things that I did. And this was the first swipe through it.

And the other one was a consequence of the fact that they came back and said, Well, you know, there's -- you know, she's pushing an issue -- "she," Karen Graham -- is pushing an issue that we don't think we need to address, but can you go back and take another look at it and see if you can refine this a little bit. I said, sure, and I did. So I went back through everything again.

Q. And in your first initial accounting of the hours, how was it that you determined that 502 was the total number?

A. Somebody pushed the subtotal for the total button.

Q. Can you explain what you mean by that?

A. Well, I didn't ever total them. I didn't -- you know, in my mind, you know, there was -- in my mind, I didn't -- there was no question that -- you know, I never counted hours at the time. I knew what I had done, bought an airplane, hired the pilot, sat there with the FAA, trained the pilot or sat through that, you know, element of the process, found customers and done everything. It never even occurred to me to keep track of how many hours I had spent and -- or to really even dig into the material participation question until it came up in connection with the audit. And so when they asked for it, I went back through everything and just came up with hours and their estimates.

Q. And, to your knowledge, at the time, there was no

significance to any threshold such as 500 hours --
A. No.
Q. -- in your counting of time?
A. No.
Q. Okay.
A. And you can see that by looking at the accountant's opinion that was rendered at the time by Paul Wilson. You'll note that he -- nobody tied together the notion of calling an LLC a partner -- a limited partnership or treating an LLC member as a holder of a limited partnership interest.
Q. Okay. When did you first learn what material participation was?
A. I think there was a comment about it in the opinion letter, but I didn't really pay much attention to it.
Q. And can you identify -- when you refer to the "opinion letter," what are you referring to?
A. The E&Y opinion letter.
Q. The one prepared by Mr. Wilson?
A. Yes.
Q. After the examination of your return commenced?
A. No. There was one prepared -- I asked for -- when I -- there's some things I delve into all the way.
Q. Uh-huh.
A. I never really cared that much about the tax, except that I didn't want to be ever sitting where I am sitting today.

And so I had -- I hired E&Y to go through it and identify all the issues and to figure out what I was supposed to do and what I was not supposed to do and to sensitize me the issues. There was an opinion letter prepared in conjunction with that at the time -- you know, probably around the time that that bill was cut. And, you know, it's a, well, you know, you got to avoid this, you got to avoid that.

But, you know, material participation was not high on the list because I knew what I was going to be doing. It wasn't a passive activity for me. And although I understood being a -- sort of a -- someone who came of age in 1986, I understood what passive income was and was not. I didn't really focus on it as an issue until the audit, the return was selected for the audit. And we started getting information requests aimed in that direction from Karen Graham.

Q. Had you ever been subject to a passive activity of loss limitation prior to the audit of your 2002 or 2003 returns?

A. No.

MR. MALO: I suggest we break for lunch.

(Lunch break was taken at 12:11 p.m. to 1:06 p.m.)

MR. REYNOLDS: Just to note that Mr. Malo identified as Defendant's Exhibit 18 yesterday Mr. Thompson's pilot log for the years 2002, 2003 that we had previously

produced in response to the government's request. And after we finished yesterday, Mr. Malo requested that we supplement that pilot's log. And this morning we did. We produced to the government Mr. Thompson's pilot logs from 1997 through 2002. And they were marked as Document No. MAC 2775 through 2779.

All of that true, Mr. Malo?

MR. MALO: Yes, sir.

MR. REYNOLDS: Thank you. You may proceed.

Q. (BY MR. MALO) Mr. Thompson, I'd like to ask you a little bit more about your Simcom training. And specifically, if you could turn to what we've identified as Exhibit 21.

A. (Witness complies.)

Q. And I believe you stated that these are the certificates of completion for the training that you completed at Simcom?

A. Yes.

Q. With respect to each session of training that you received at Simcom, can you specify whether the flight component of training was in a cockpit or in a simulator?

A. Some was and some was not.

Q. Can you identify certificate by certificate which were and which weren't?

A. Each one had components that both were and were not.

Q. Okay. And was that also in addition to ground training?

A. No. The component that was not in the cockpit would be considered ground training.

Q. Even if it was in a simulator?

A. Well, if it was in a simulator, then it was in a cockpit.

Q. Okay. Was there any time that was spent in flight?

A. Yes.

Q. And for any occasion that you were in training at Simcom, did you perform training exclusively in flight?

A. I performed some of it in flight in November 2002. And if we have that log book right here (indicates).

MR. REYNOLDS: Which one?

THE WITNESS: The 2002. Either one. The one that was informally provided.

MR. REYNOLDS: Deposition Exhibit 18.

A. Yeah. If you look in here in 2002, on 11 -- I think it began on 11/8, but it could be 11/9 -- you will see PC-12 flights for 11/8, 11/9, 11/10, that I believe, going up through 11/11, were in-flight training.

Q. (BY MR. MALO) Can you tell me how many hours in total those flights represent in your log?

A. Well, I'll have to add them up. 3.8 --

Q. Okay.

A. -- 1.4, so that's 5.2. 2.2 is 7.4. 1.4 is 8.8.

MR. FRAHM: 8.6. Oh, no, I'm wrong. You're

right.

A. And then if it was also on the eighth, then it would be another hour there.

Q. (BY MR. MALO) So it would be accurate to say between eight and nine hours?

A. Something like that, yes.

Q. And that was actual flight time?

A. Yes.

Q. Not simulator time?

A. Yes.

Q. For 2003 -- incidentally for 2002, that training that we just discussed, that was your initial course training --

A. Yes.

Q. -- is that correct? For 2003, are you aware of whether or not you completed recurrent training that's identified as May 14th, 2003, on the completion certificate? Do you know if you completed that training in actual flight time?

A. I think some -- I think there was a little of both. What was the date?

Q. May 14th, 2003.

A. Yeah. If you look on the flight log here, you'll see on the 11th of May, Simcom recurrent training. Let's see, and then on the 13th, there's another flight, Dave EFR training, Simcom.

Q. How many hours are associated with those entries?
A. 5.1.
Q. For both?
A. Total, yeah.
Q. Okay. So to the extent that there was additional time in Simcom training as set forth in the syllabus or as set forth in the summary of hours that you counted towards participation, they would be over and above the time that was recorded in your flight log?
A. Yes, I think so. I mean, the way to find out would be to get the training records from Simcom because I think they book the time in the sim. And then just title out, you know, push it all together and see what you got at the end of it, come up with a number.
Q. Okay. And incidentally, in taking a look at the certificate of completion for April 28th, 2004 --
A. Uh-huh.
Q. -- identified as recurrent course training --
A. Uh-huh.
Q. -- there is an asterisk entry on the training certificate indicating "pro card status."
A. Yes.
Q. Can you tell me what that means?
A. It's a designation of skill level.
Q. Is it a Simcom term, or is it an industry term?

A. It's a Simcom term as far as I know.
Q. And do you know what skill level it represents?
A. Higher than a skill level indicated without that asterisk.
Q. Okay. Indicating completion of additional training or something to that effect?
A. I don't remember how it was done.
Q. Okay.
A. I, frankly, forgot what it meant.
Q. Okay. I'd like to ask you a little about the pre- and post-flight procedures in the flight time 205 hours and the 83 hours recorded in 2002 and 2003, respectfully. The description that we discussed earlier in Exhibit 4 and Exhibit 3 indicated in the note that flight time included pre- and post-flight activities that you performed.
Can you describe what these activities were?
A. Yes. First of all, let me say it all was an estimate. Sometimes it's shorter than that. Sometimes it's longer than that. But generally speaking, a pilot is obligated by regulation to familiarize himself with all aspects of the flight, weather, the runways at the intended destination, alternates that may be required to be available. The condition of the airplane, both in terms of any maintenance inspection items that might be coming up, but also with regard to the condition of the airplane as it stands on the ramp before you

fly it.

So generally speaking, what you do is you say, okay, I'm going to fly somewhere. All right. How long are the runways? Are there any notices to airmen that might be relevant to that flight, either in or out or at the destination? What do I think the weather is going to be? Am I required to -- if the weather is not good, am I required to file an alternate? What is the forecast weather at the alternate, and does it make it a legal alternate.

Then you have to figure out how you're going to get there. It's pretty easy just to file direct, but that's not the real world. The real world you have to fly routings. And there's a certain amount of science to the routings because what you're trying to do is comport with the traffic flow that has been kind of established or the traffic flow routine that's been established by the air traffic control centers, particularly if you're going to the Northeast. But at the same time, minimize the mileage that you fly relative to a straight line distance. And there's a little bit of a science to that or a little bit of art maybe.

So you figure out how you're going to get there. Okay. That's fine. And then you show up and you want to fly the airplane, and you got to basically unstow the airplane, which is to pull all the little flags and port covers off of it. If you got to do a walkaround inspection, there's a

checklist for it. It takes 20 minutes to complete. And you make visual inspections. You look at the checklist to figure out if there's anything else you have to do. You move to sort of the next, you know, point around the compass, if you will, around the airplane. And when you're satisfied that you have a good airplane, you fly it. That's pre-flight.

Q. Okay. And post-flight?

A. Post-flight is little less complex. I typically do a walkaround inspection of the airplane to make sure that nothing has happened in flight. The common thing that might happen is you might lose a static wick. Well, you know, you're not going to be airworthy if you're missing a certain number of static wicks on the airplane. So if you're going to find that out, better to find that out after you fly the airplane rather than your pre-flight the next time.

I usually clean the airplane up a little bit, again if there's charts and stuff floating around the airplane afterward. Then you go through and you put the flags on it, put all the little port covers on it and stow the propeller with its little harness, make sure the brake is off and everything that sucks in the battery is turned off, and then you're done. So that's a 15-, 20-minute exercise. Sometimes a little more.

Q. You just said that these were all estimates the pre- and post-flight time.

In estimating the time that you spent in 2002 and 2003 on pre- and post-flight activities, did you estimate a flat number of hours or a flat period of time for each pre- and post-flight activity?
A. My recollection is that I did.
Q. And about how much time is that?
A. I don't know. Probably 30 minutes would be --
Q. 30 minutes preflight and 30 minutes post-flight?
A. Yes. I don't remember whether I differentiated or not. But I think I used a 30-minute estimate.
Q. And you would only include the additional pre- and post-flight time if you yourself were piloting?
A. You know, I don't recall offhand. It wasn't -- it was not uncommon for me to -- I didn't always walk around with Tom, but I did sometimes. And I almost always did my own weather. I mean, we could figure out what it actually is by going through and rationalizing the estimate that was provided. I'm just telling you what I usually did.
Q. Uh-huh.
A. And certainly with Mike, I always checked the weather. And a lot of times, I even worked out my own routes just -- and then we'd compare and see who had the better route. And if we didn't -- couldn't tell, we'd see what we got. And usually unless I was in a hurry on a 135 trip, I'd help put the airplane to bed. If I was in a hurry, I left.

Q. And would you assist or participate in pre- and post-flight activity if you were listed as a passenger on the manifest in your capacity at ORIX, for example?

A. Sure.

Q. Yes.

A. Absolutely. That didn't relieve the pilot of the obligation, you know. If you're the guy riding in the airplane and you had the ability to look over somebody's shoulder, you'd do it.

Q. So would it be accurate to say that on any flight that you were either a pilot or a passenger, you probably participated in some way to some extent in pre- and post-flight activities?

A. Not to the extent that it alleviated or eliminated or otherwise mitigated the Part 135 pilot's requirement to conduct that pre- and post-flight.

Q. Would you have spent approximately the same amount of time on pre- and post-flight activities as the primary pilot?

A. No.

Q. Would you have spent more time or less time?

A. Less.

Q. Okay. And approximately how much less time where there was a pilot who was the pilot in command?

A. You know, it would depend. Sometimes I would just check the weather and figure out a route, you know. If we

landed and I was in a hurry to get someplace, I didn't even -- I didn't mess with walking around the airplane. If I showed up late, sometimes -- not all the time, but sometimes I'd show up late -- I didn't do anything on the pre-flights. So I can't generalize really beyond that. Because if I had the time and I was there, I did it. Probably the thing I did most consistently was look at weather before we went anywhere.

Q. Okay. I'd like to take a look at Exhibit No. 20.

MR. REYNOLDS: Why don't you give those other ones back to me.

THE WITNESS: Okay.

Q. (BY MR. MALO) And can you identify what this document is?

A. This is another response to an information request by Mountain Air Charter to the IRS.

Q. And take a look at the page labeled MAC 481.

A. Okay.

Q. These handwritten notes, do you know whose those are?

A. (No response.)

Q. Do you know the names of --

A. Yes, I recognize all the names.

Q. Okay. If we'd turn to Page 482 --

A. Uh-huh.

Q. -- can you identify what this document is?

A. This is an attachment to the same response to

information request.

Q. Okay. And can you tell me what this attachment is purporting to show?

A. This looks like an invoice -- a reconciliation of flights for the first 135 flight that we did.

Q. And who's the passenger?

A. Mundell.

Q. Mr. Mundell?

A. Yes.

Q. And he was a co-worker of yours at ORIX?

A. He was not an employee of ORIX. He was a board member.

Q. A board member?

A. Yes.

Q. The note on this document indicates that "Low introductory rate was applicable in start-up phase of operations only. Mundell was considered to be an important potential repeat customer. Thus, the introductory rate and substantial discount were considered necessary to make the initial flight attractive and to ensure that he would consider using the aircraft for future travel.

"The rate incorporates introductory discounts and low bulk fuel purchase discounts. This rate was temporary and applied for introductory and marketing purposes only. Discounts were applied to eliminate cost of positioning flights

for this important first time customer. Mundell became a repeat customer and his rates have increased substantially from these initial introductory rates."

Can you identify what these initial introductory rates were?

A. Only by looking at the invoice.

Q. And what is the rate that's identified on the invoice?

A. It says, Total invoice at standard pricing 625. There's a discount, and then there's an applied and then there's a total invoice.

Q. Okay. And then at 625 per hour, the total is 14,375?

A. That's correct.

Q. The discount applied is 8,275?

A. Correct.

Q. The total invoice amount is $6,100?

A. Yes.

Q. Thinking back to the conversation we had earlier about your initial standard rates, is that 625 the initial standard rate or is that the discounted per hour rate?

A. You know, I thought the initial rate was 850, and it may have been. Yeah, there was really, to be honest with you, no standard. You know, I tried to get 850 wherever I could. And I always looked at the other rates that I got from people. I could have been wrong about what the first rate was.

THE REPORTER: I can't hear you.

THE WITNESS: I said I could have been wrong about what the first rate was.

A. It looked like we applied it pretty consistently here. But I -- I'd have to go back and look. All of the invoices have been made available to you. We can go back through them.

Q. (BY MR. MALO) Okay. Just for the sake of identifying the additional passengers on the other pages, on 43, passenger identified is Norman.

Can you explain who that is?

A. Yeah, that is Deborah Norman. That is Tom Travis's daughter who -- where did the flight go?

Q. The route is identified on the invoice. Oakland.

A. Do you know what the MAC 135 is on?

Q. 2002?

A. Yeah.

Q. Exhibit No. 9.

A. I don't remember the details of the flight.

Q. That's fine. Passenger, though, is Deborah Norman, you said?

A. Deborah Norman. I did a demo flight for her at some point.

Q. But this is a revenue flight. It's not a demo flight; is that correct?

A. Yeah, this is flown by Tom. I didn't fly this one. That's why I don't remember it.
Q. Okay. And the final attachment to this IDR response, MAC 0484 --
A. Right.
Q. -- the passenger is listed as ORIX USA (Chris Smith, Managing Director Corporate Finance --
A. Right.
Q. -- Rob Stobo, Associate Director and associate).
A. Right.
Q. Okay. And were these ORIX employees?
A. Yeah, they were.
Q. Personally known to you?
A. Yes.
Q. Okay. For Ms. Norman, the total invoice at standard pricing was 625 per hour for a total of 6,500; is that correct?
A. Yes.
Q. Discounts applied, 1,498?
A. Right.
Q. Total invoice, 5,002?
A. Right.
Q. And for ORIX employees, Chris Smith and Rob Stobo, total invoice at standard pricing $625 per hour for a total of $3,312.50?
A. Uh-huh.

Q. Discount applied 87.50 for a total invoice 3,225, correct?

A. Yes.

Q. Do you remember your discount policy in 2002, 2003?

A. Well, do I remember my discount policy? My discount policy was to get people in the door and get them to start using the airplane. You know, I made it up as I went along to be honest with you.

Q. Uh-huh.

A. If I thought somebody had potential and I wanted to get them in the airplane, I did what it took to get them in the airplane, and I tried to cover my cost as best as I could. But, you know, I wanted to get people in the airplane.

Q. Uh-huh. And to use imprecise percentages, and correct me if I'm mistaken, for Mr. Mundell, the discount appears to be in excess of 50 percent, the value of the flight?

A. Something like that.

Q. For Ms. Norman, it appears to be somewhere approximately at 20 percent, so the value of the flight?

A. Right.

Q. And for the other ORIX employees -- or for the ORIX employees, Chris Smith and Rob Stobo, a negligible discount, $87 dollars.

Just curious to know if there was any overriding company policy regarding these discounts as they --

A. A MAC policy?

Q. Yes.

A. A monetary policy? No, my policy was to get people in the airplane, particularly people who I thought would -- I mean, Mundell for example. You know, he became a customer. He takes one or two trips a year. He pays now at or near the full rate. And, you know, he was ultimately a guy I was going to have to persuade if I ever wanted to use it for ORIX business. And there was some concerns. I mean, folks lived in fear that I was going to kill myself in an airplane. And it was a risk that they insured for years. And I don't know whether they still do it or not. And, you know, I felt like I kind of needed to knock that down a little bit.

Q. The note here describes this as a discount policy that was in effect during your start-up period. These flights occurred September 9th, 2002, September 29th of 2002, October 6th, 2002, for Mr. Mundell.

Was this your start-up period? Did they occur during your start-up period?

A. Yes.

Q. Okay. And would you define what your start-up period was?

A. I think we pretty much got out of the discount business by the end of 2003. In other words, I don't think -- I think there -- I don't -- I'd have to look at invoices. And

by looking at the invoices, I could tell you. But I don't think -- I think there was little to no discount except for to protect new customers by the end of 2003.

Q. By the end of 2003, the last of these invoices is more representative of your discount policy, negligible discount, if any?

A. Well, this is the end of 2002.

Q. Well, this particular invoice is. But this would be more representative of your --

A. I think the rates were higher. I mean, if you had an invoice from 2003, we could look. But I'm pretty sure I was getting 850 or $900 an hour by then.

Q. Okay. Do you know who prepared these documents?

A. Who typed them out? No. I had a number of people working on this, responding to these information requests. I dug out the information. I gave it to my -- work product, which was either in spreadsheet form or handwritten to Wilson, Steve Fine, maybe Andy Lester. I don't know whether he worked on the information request or not. And I think PWC did some work early on. So I'm not quite sure who did the typing.

Q. Okay. And do you recognize the invoice format?

A. No.

Q. Does it appear to represent information that you would have provided in an original invoice? Would you have provided the original invoice?

A. I think so. How else would it have gotten there?
Q. Would you have drafted or written the original invoice?
A. I think so.
Q. Would anybody else at Mountain Air be invoicing passengers for services rendered?
A. No. I mean, it was kind of a one-man band at that point.
Q. Okay. You'll notice on each of these invoices flights occurred September, October 2002, November 2002, November 2002. The date payment received indicates October 17th, 2004, for Mr. Mundell. December 31st, 2004, for Ms. Norman. And December 12th, 2004, for ORIX Corporation.
A. I think those are typos.
Q. You think the dates are typos?
A. Yes.
Q. Okay.
A. Because MAC is a -- is a more cash basis taxpayer. And if we have the -- which we -- anyway we provided to the IRS bank account records so it would be fairly easy just to go in and find those things.
Q. Okay. But it's likely that these dates 2004 were intended to be 2002?
A. Yeah.
Q. Okay.

A. We didn't collect any -- I mean, if we collected something 30 days late, I was exercised.

Q. Did you ever refer customers to collections for failure to pay bills?

A. I was the collection department.

Q. And did you ever have to issue any collection actions against potential customers?

A. I would threaten them.

Q. Just threaten them?

A. Yes.

Q. What's the longest that customers would go without paying?

A. I think LaRue got out -- he was -- I don't know if he was a customer in 2003. He might have been. I think John LaRue got out to 60 or 75 days once. It was a small bill, but it was the fact of the matter not the amount of money. It was a $2000 bill or something.

Q. And who was John LaRue?

A. He was a customer that -- well, he was -- yeah, he was a customer in 2003. You'll see him in the logs.

Q. Did you have any personal relationship to John LaRue?

A. No. I only met him twice. I'm not sure how we found him.

Q. I'd like to reference Exhibit No. 11.

A. Got it.

Q. Yesterday, we agreed we could identify these documents as Mountain Air Charter financial statements.
A. Uh-huh.
Q. And in the first year of operations, the short period, was Mountain Air Charter profitable?
A. By what measure?
Q. By the income statement.
A. Well, this is an income tax basis, and there's generally accepted accounting principles, then there's cash --
Q. Uh-huh.
A. -- and then there's tax payments.
Q. Well, for financial statement purposes, not for tax accounting purposes, was Mountain Air Charter profitable, do you recall?
A. Well, I don't recall and these are all tax basis. I'm sorry. What was the year in question?
Q. 2002.
A. I don't think it was.
Q. And was there a point of loss position?
A. For book or tax?
Q. Both.
A. For 2002, I think it would have been both.
Q. Okay. And to the extent that there were losses, what were the losses attributable to?
A. Well, the largest expense is -- on this tax basis

income statement is probably depreciation. Hold on a second. Is depreciation. So, you know, I'm on MAC 19. Oh, this is 2003. Okay. You wanted 2002.

Q. 18.

A. Okay. Appreciation and amortization a million one. Total expenses were $132,000 approximately.

Q. Okay.

A. So you can see that depreciation was the largest, single expense item.

Q. And what was that depreciation related to?

A. The airplane.

Q. And do you know what percentage of cost were depreciated in the first year of the airplane being placed in service?

A. No. The law changed in late 2001 and early 2002. And frankly, I didn't remember how -- I don't remember how it worked. But the effect of it was to dramatically accelerate depreciation in the early years of an asset life. So the first couple of years of Mountain Air Charter, there was an enormous amount of tax depreciation expense.

Q. Have you ever heard the term "bonus depreciation"?

A. Yes, in that context.

Q. And that's what these numbers -- this depreciation figure is representing, bonus depreciation on the first year --

A. Yes.

Q. -- when the aircraft was placed in service? Okay. Among the other expenses that are listed here, which I guess are for income tax basis purposes.

A. Yeah.

Q. For either book or tax purposes, the other expenses, were these expenses all inclusive of cost related to Pilatus PC-12 during 2002?

A. No, I think there were some expenses that were capitalized. Precertification expenses, I think -- I don't remember what they totaled -- but I think we capitalized those. And now that you said that, depreciation and amortization, it looks like they've been lumped together. So some, presumably, small part of the -- this 1.121 million depreciation expense consists of amortization of otherwise capitalized expenses. So there were probably -- there were certainly other expenses that were capitalized, which if you need to, we can probably figure that out.

Q. Well, in terms of some of the direct expenses that were related to the operation of the aircraft itself, are the expenses that were recorded for book for tax purposes for Mountain Air Charter all inclusive of the Pilatus PC-12 incurred expenses, namely, fuel expense, for example?

A. Yeah. I'm struggling with the characterization of "all-inclusive PC-12 expenses." I'm not exactly sure what you mean.


1ebda8ab-4c8a-4cb5-875f-72720db17d91

Q. Okay. Let me rephrase. What I'm trying to identify is whether there were any expenses allocated as non-Mountain Air expenses that were incurred while operating Pilatus PC-12 in 2002 or 2003?
A. Non-PC-12 operating expenses.
Q. Non-Mountain Air expenses.
A. Okay.
Q. In other words, were expenses for operating the PC-12 allocated between Mountain Air Charter and your personal use or any other use of the aircraft?
A. I don't think so. I don't think we were required to do that until the law changed in 2005.
Q. So all operating expenses would have been recorded for book and tax purposes to Mountain Air Charter --
A. Yes.
Q. -- in 2002 and 2003?
A. I think that's -- yes.
Q. Okay. And to the extent that you had any personal use of the aircraft, that was reflected in SIFL rates that were assigned to you as income on your personal return; is that correct?
A. I believe that's the way the law worked, yes. You're going to have Andy Lester in here tomorrow. And I don't know. Are you taking Paul Wilson?
Q. I believe so.

A. Okay. Well, you'll get an earful that way.
Q. Okay. Did Mountain Air Charter become profitable?
A. On a book or tax basis?
Q. Both.
A. I think the 2004, it had a very small loss on the cash -- let's talk about cash basis --
Q. Okay.
A. -- because that's the one I'm more familiar with. In 2004, it had a relatively small loss. In 2005, it came within $50,000 of breakeven. We just filed 2006. 2006 was not as good because we had start-up expenses relating to the substitution of the CJ-3 for the PC-12. So the high water mark was probably a 50,000, $40,000 deficit in 2005.
Q. However, were the operating experience -- or was the operating experience consistent with your business projections that we discussed as part of Exhibit 10?
A. No.
Q. How did they differ?
A. Well, it has never on a cash basis -- on the basis that was identified or set forth in the Power Point presentation, it has never achieved that kind of rate of return. It has come close to breaking even, but it just -- you know the idea was to have on an EBITDA basis, which is earnings before interest, taxes, depreciation and amortization, a rate of return of 3 to 4 percent. And it hasn't worked.

THE REPORTER: I'm sorry.
THE WITNESS: It hasn't worked.
Q. (BY MR. MALO) And the reason it hasn't worked you attribute to investment in new aircraft?
A. No. I think there are a number of reasons. A significant handicap was the fact that the fuel prices doubled or more than doubled. We're paying -- 2003 -- July rates, July 2002, July 2003, we were paying about $1.50 a gallon. You go to Teterboro, Midway, Oakland -- or maybe not Oakland. But Teterboro, Midway, Santa Monica, we paid $6 a gallon. So it's a quadrupling effectively of the cost. In addition to that, the utilization -- in order to make the kind of rate of return that I want, the airplane has to fly more.
You say, Well, you know, you just increase the margin and charge more. But you got competitive issues. Not that ORIX is going to -- as the main client in 2004 would hire somebody else, but I can't make a case that they should pay me more than they should pay somebody else. In fact, I didn't try to. And the performance crested in 2005, primarily because we got the hours up. It was a busy year and it was a lot of flying.
The other thing that sort of handicaps this, the performance of it, was the -- the way that we had to treat individual expenses. As you have asked questions about, the expenses for personal utilization of the airplane were just

lumped all together. Now that the tax code has been clarified such that those are segregated, it's going to relieve some of the expense pressure on the airplane. It'll probably perform better from a return on capital standpoint. This is -- the treatment that we have now pursuant to the legislative changes is a lot more rationale.

The other thing that kind of handicapped this airplane, which I seriously underestimated, was single pilot and single power plant. And I think I overestimated the extent primarily because I saw things through things -- saw things through my own filtration system to the extent to which people were willing to sit in that airplane for an extended period of time. It's a slow airplane. You know, I don't know -- you know, I look back now and look at my op specs from that period and see the Caribbean and Mexico and Canada in there.

And, you know, people just aren't willing to sit in a 260 knot airplane for, you know, a 1500-mile, plus flight. It just takes too long. I never thought anything of it. So the ability to scale it up, I think, to a level where you get past that inflection point was overestimated, at least by me. And the shift in platforms, I think, is going to remedy that.

Q. I think we discussed earlier the fact that you had described a breakeven point of flying 350 hours based on your standard rate?

A. Yes.

Q. In 2002, did you achieve 350 hours?
A. No. Revenue hours.
Q. Even on an annualized basis for a short period that you were operational?
A. I don't think so.
Q. In 2003?
A. I don't know. Let's -- you're asking me to guess, and we're sitting here with the documents right in front of us. Do you have anything that breaks out the hours by year? Is it in that Power Point?
Q. I don't believe it's in the Power Point.
MR. REYNOLDS: Well, this interrogatory answer has a yearly total.
THE WITNESS: Does it?
MR. REYNOLDS: Uh-huh. We've got 2002.
THE WITNESS: I don't see it.
MR. REYNOLDS: Oh, this is a revenue basis.
THE WITNESS: You know, but we may have summarized it in the Power Point presentation, which is where I'm going.
MR. REYNOLDS: Exhibit 10?
MR. MALO: Exhibit 10, yes.
THE WITNESS: Yeah.
A. Well, we never broke out -- yeah, we did break out the hours. Here we go. Except I don't understand Year 1.

Okay. That's two. Year 2, 315 hours.

Q. (BY MR. MALO) Can you identify what page you're on in this document?

A. Yeah. I'm sorry. Five. 315 hours, this was -- I think Year 3 was a projection. Or maybe not. I see revenue -- yeah, it looks like a projection. What's confusing here is I can't remember whether Year 1 was really considered to be 2003, and Year 2 was 2004 or why we did it that way. First full year. Okay. So these are full years. So let's just, for clarification, these are full years. So Year 1 is 2003; Year 2 is 2004.

Q. Full calendar years?

A. Yes.

Q. 284 hours in 2003. 215 hours in 2004. And a projected 250 hours in 2005, which I think we met. So we came close. But those -- I don't know whether these are revenue hours or not to the extent these might have been total hours. And so there is a drag effect on the -- those may have been revenue hours. I built that thing, but I don't remember.

MR. REYNOLDS: Well, the footnotes, I think, explain because this is a revenue growth chart.

THE WITNESS: (Reading document.)

A. No. I'd have to go back and look at the spreadsheet and figure out how we did it. But in any case, in 2003, 2004 and part of 2005, until the legislation -- or the law changed,



1ebda8ab-4c8a-4cb5-875f-72720db17d91

there would be SIFL hours included in total hours and expenses would have been included as well.

Q. (BY MR. MALO) Bringing down the rate?
A. Yeah, as drag item.
Q. On the prior page, Page 4 of Exhibit 10 --
A. Uh-huh.
Q. -- you also list the Years 1, 2 and 3 along with --
A. Right.
Q. -- what appear to be operational costs per hour.
These rates, 587 per hour, 916 per hour, are these total operational costs for Mountain Air Charter, or are they just cost for the aircraft or --
A. I thought it was revenue --
Q. Revenue?
A. -- per 135 hour.
Q. Okay. Just revenue achieved per hour?
A. Yeah, remember, we were talking about that earlier --
Q. Right.
A. -- when I said by the end --
Q. Yeah.
A. -- of 2003, I thought it was up to eight or $900.
Q. Okay.
(Discussion off the record.)
Q. (BY MR. MALO) If we could, in loud clear tones of voice here, refer to Exhibit No. 12.

MR. REYNOLDS: And are you finished with Exhibit 11?

MR. MALO: I believe so.

MR. REYNOLDS: Okay.

Q. (BY MR. MALO) We agreed yesterday that this is the 2002 short period return for Mountain Air Charter, LLC.

A. Yes.

Q. And did you sign this return?

A. Yes, I did.

Q. Did you prepare this return?

A. No, I did not.

Q. Did you review this return?

A. Yes, I did.

Q. Okay. And who did prepare this return?

A. Ernst & Young.

Q. What services were Ernst & Young providing in 2002?

A. They provided advice relating to the organization of Mountain Air Charter. I asked them to provide -- an opinion letter might have been an inaccurate characterization. But it was a letter that kind of set forth the basic facts and circumstances of the organization of the activity and identified the certain areas of concern. And then they did the tax preparation based on bank statements and invoices and things that I gave them.

Q. Okay. Turning to Exhibit No. 13 --

A. Exhibit 13.

Q. -- which we agreed yesterday is the 2003 partnership return for Mountain Air Charter, LLC.

A. Yes.

Q. Did you sign this return?

A. No, I think this was e-filed.

Q. Did you prepare this return?

A. No.

Q. Review this return?

A. Yes.

Q. Okay. And who did prepare this return?

A. Grant Thornton.

Q. Okay. Can you explain to me why Ernst & Young no longer prepared the returns for Mountain Air Charter in 2003?

A. Yes. They -- I provided the information for the -- relating to the return -- the information for the preparation of the return in early January -- late January, early February of 2003. Ernst & Young were very slow. They were behind all the way through, and they showed up the day before that return was supposed to be filed, which basically gave me, if I remember correctly, less than 24 hours to review it. And that was unacceptable.

So the young man who you are going to depose tomorrow, Andy Lester, is my nephew. He is a CPA. He's got his master's in tax. And when I complained to him about it,

you know, he said, Well, I'm sure that at Grant Thornton we can do a better job. So he encouraged me to retain Grant Thornton, which I did. And they did a better job. The return was done -- let's see what the dates are here. You'll note that the date on this return is the 14th of February, which is more consistent with the way that I like to handle my tax matters, plenty of time.

Q. So you were dissatisfied with Ernst & Young's services?

A. I was.

Q. Independent of the timeliness of their services, were there other concerns you had about Ernst & Young's services?

A. No.

Q. Did you disagree with them on any technical positions that they expressed to you?

A. No. I wasn't competent to disagree with them on any technical position.

Q. You never expressed any opinion about their findings and what you referred to as an opinion letter or some other type of a letter?

A. No. Actually, I was very -- I thought they were responsive. Paul, as you know now, works for ORIX, was very thoughtful, and I had no problems with that. But the tax preparation was done by a whole different group, and that was an entirely different matter as it related to their service.

Q. The tax preparation was done by a whole different group of --
A. Within Ernst & Young.
Q. The tax preparation as opposed to what?
A. The tax return preparation.
Q. As opposed to what other service?
A. The consulting service.
Q. Consulting. Looking at Exhibit 14, which we identified as your personal income tax return for 2002 --
A. Uh-huh.
Q. -- did you prepare this document?
A. No.
Q. Did you sign this document?
A. No, I think it was e-filed.
Q. Did you review this return?
A. Yes.
Q. And this return was also prepared by Ernst & Young?
A. Yes.
Q. Looking at Exhibit 15, which we agreed yesterday is your 2003 personal income tax return.
A. Yes.
Q. Did you sign this document?
A. Yes -- no, this was e-filed as well.
Q. Okay. Did you prepare this document?
A. No.

Q. Okay. Grant Thornton prepared this document?
A. Yes.
Q. And the reasons that Grant Thornton prepared your 2003 personal return the same as the reasons that Grant Thornton was chosen as a new service provider for Mountain Air Charter, LLC?
A. Yes.
Q. Looking at Exhibit No. 18 --
A. Uh-huh.
Q. -- this is your personal flight log?
A. Yes, it is.
Q. The copy that we received prior to this meeting?
A. Yes.
Q. In reviewing these entries, it strikes me that there are a number of airports that are frequently used by -- that frequently occur in entries in your personal log, including Dallas; Taos, New Mexico; locations in Colorado.
Can you with any level of certainty indicate which airports are related to ORIX related locations or business meetings that you may have had and which airports or destinations in your personal log did not relate to ORIX conducted business?
A. I can try.
Q. Okay.
A. Where would you like to start?

Q. Maybe the best way to express this is for you to list the destinations to which you frequently had to fly on behalf of ORIX.

A. Cobb County Airport. That identifier is RYY. That's the one I refer to as Atlanta. The Teterboro Airport. The identifier is TEB. That's New York.

Q. Flying into Teterboro, New Jersey?

A. Yes. Midway Airport in Chicago. That's MDW. Well, in 2002 and 2003, those would have been the primary airports for ORIX related businesses. There were others, but those are the ones that occurred the most frequently.

Q. In addition to Dallas?

A. Well, yeah, the airplane is based here, so I don't really think of it as flying into Dallas.

Q. To the extent that there are entries in other locations, Colorado, for example, what's in Colorado?

A. (Indicates.)

Q. Let me rephrase that. Why does Colorado appear as a frequent destination? Is it for the example you offered as one reason that Colorado was chosen for high altitude training was the potential for leisure travel for customers who demand leisure travel to Colorado during the summers from the Dallas area?

A. Well, I guess one of the Colorado airports that you'll see frequently is APA, which is Centennial, Colorado.

And during 2002 and most of 2003, that was only the maintenance base that was available for the PC-12. So to the extent that you see the airplane going into APA, it is for maintenance. I don't think it frequented, if that term is right, any other Colorado airports on a regular basis.

Q. Do you have any friends or family that live in Colorado?

A. No.

Q. What about Taos, New Mexico?

A. I have a second home in Taos, New Mexico.

Q. Do you have other -- any friends or family that live in Taos, New Mexico?

A. No -- well, friends. They're incidental due to the fact that I have a second home.

Q. I think we discussed yesterday with Mr. Travis that occasionally your niece or nephew or sister may have been on the flight with him piloting.

A. I think there was one instance. There was an Albuquerque/Taos leg in 2003 anyway.

Q. And where do your niece, nephew and sister live?

A. Milwaukee.

Q. Milwaukee, Wisconsin?

A. Although, the nephew in question, Andy Lester, lives here now.

Q. And during '02 and 03?



1ebda8ab-4c8a-4cb5-875f-72720db17d91

A. In Milwaukee.
Q. Where does Mr. Mundell live?
A. San Francisco.
Q. And to the best of your knowledge, does Mr. Travis's family all live in the Dallas area?
A. Yes.
Q. So to the best of your knowledge, the personal acquaintances that he have, family and friends that he brought with him on flights, were all local to this area?
A. Yes.
Q. Okay. I'd like you to flip to Exhibit No. 22.
A. (Witness complies.) This is only part of 22, right?
Q. Correct.
MR. MALO: That was a much larger document.
MR. FRAHM: It was a paper clip on the front part of it.
MR. MALO: That (indicates). Right.
MR. REYNOLDS: Okay. Good grief. Is this part of it, too?
MR. FRAHM: Yeah.
MR. MALO: I believe so.
Q. (BY MR. MALO) I have a short line of questions on it. Don't let the size intimidate you.
You stated earlier that this was the letter of compliance that was submitted in conjunction with Mountain Air

Charter's application for Part 135 certification --
A. Yes.
Q. -- is that correct? Can you identify what a letter of compliance is?
A. Beyond --
Q. Define the term. "Compliance" with what, for example?
A. You've got me there. You have to have -- this document is a framework for the Part 135 operation of the airplane, and it's got what I would think would be self-explanatory sections that deal with maintenance, certification, Part 135 operations, aircraft and equipment and on and on and on. I'm not sure how else I can define it.
Q. The front page of the document indicates, Federal Aviation Regulations Parts 43, 91 --
A. Uh-huh.
Q. -- 119, 135.
A. Right.
Q. Are these the Federal Aviation Regulations that govern the operations of Mountain Air Charter?
A. Yes. Only to Part 135, yes.
Q. Is Mountain Air Charter not subject to 43, 91 or 119?
A. I think it is in some measure, subjected to elements of it.
Q. Okay. And for what purpose is this letter of

compliance prepared?

A. Well, that's what the FAA tells you you have to do.

Q. As part of the certification --

A. Yes.

Q. -- application?

A. Yes, as part of the certification application process.

Q. Okay. Do you know who prepared this document?

A. It was kind of -- it was a little bit of everybody. Norton had a piece of it. I did some of it. I don't think I -- I don't remember which part of this one I did. I bought a package from someone that served as a template for it. Travis sat in the meetings -- some of the meetings with them on this. And Benny Kelly was involved. He's an aviation safety consultant. And there was another lawyer. I can't remember his name. And as you can see, this is sort of a template for -- you've got all these.

Q. And you said you bought a template to prepare this document?

A. I think I did. There is a -- I'm not sure. I don't want to get into it. I mean, I just can't remember whether I did or whether I didn't. I know I looked at it. There's an outfit in Colorado that sells the software package for Part 135 people that want to go sort of -- through the process.

Q. Does this document describe your training

requirements for crew -- pilots or crew?

A. It may. I'd have to go through it to see. But the operating specs would be the more definitive delineation of the training requirements.

Q. As defined by the FAA?

A. That's correct.

Q. Okay. Is the operating specs where we would turn to find the FAA required training provisions or requirements?

A. I think -- I think they're in there. The reason I'm hedging a little bit is because we did a Part 1 for a single pilot/single ship 135 certificate. A lot of the training requirements, which are otherwise voluminous, is evidenced by the training -- the section of our op specs now that deal with training, which kind of subsume our training -- our MAC, Mountain Air Charter training program, which we now have, I think may have been waived early on because they had the ability to waive it or because it was not required in connection with a single pilot/single ship certificate. Having said that, there are -- there is undoubtedly something in the op specs. I haven't read them since 2002. So there's undoubtedly something in the op specs dealing with training.

Q. When the FAA persuaded you to submit application for single pilot/single aircraft operation, which as we discussed earlier today, limited the number of pilots that might be involved in the operation of Part 135 charter services, did you

get as far as completing any op specs or letter of compliance or any other application materials for the operation as you originally envisioned it --

A. No.

Q. -- with additional pilots?

A. Huh-uh.

Q. No. Referring back to, I think, Exhibit No. 4 -- Exhibit 4. Yes, Exhibit No. 4. Under the heading "FAA Certification and Compliance for 2002," you reported 90 hours; 2003, four hours.

Are the 90 hours that you reported in 2002 related to the preparation of documents such as this letter of compliance, Exhibit No. 22?

A. To the extent that your question relates to or doesn't confine the 90 hours to that document, the answer is, yes.

Q. Correct. So the 90 hours relates to the -- your participation in the creation of any and all application materials for Part 135 certification?

A. Yes, it does.

Q. Including the letter of compliance and the op specs?

A. Let me look at the notes. As I am pretty sure I wrote the notes. Let me see what -- yeah, that's correct.

Q. Okay.

A. The answer is, yes.

Q. And all of these application materials have to be complete and submitted to the FAA prior to your receiving certification to Part 135?

A. Yes, it is.

Q. And prior to you getting any revenue flights?

A. That's correct.

Q. Okay. I suggest we take a short break.

(Break was taken at 2:16 p.m. to 2:30 p.m.)

Q. (BY MR. MALO) I would like to just summarize some of the critical understandings that I have walked away from from our discussion today and yesterday, if I may.

First and foremost that the document that we've identified as Exhibit No. 4 is the full accounting of the hours that you count towards material participation in Mountain Air Charter for 2002 and 2003?

A. Well, there was another exhibit that was an initial accounting, or this may be the initial accounting.

Q. This is the updated accounting?

A. Okay.

Q. The initial accounting showed 502 hours for 2002?

A. So is your question to me --

Q. My question is the position that you are taking in your testimony and your statement of the number of hours that you materially participated in Mountain Air Charter 2002 and 2003 is accurately represented by this document; is that



1ebda8ab-4c8a-4cb5-875f-72720db17d91

correct?
A. It is accurately represented by that document, yes.
Q. So for 2002, 638 hours; for 2003, 369 hours?
A. Yes.
Q. Okay.
MR. REYNOLDS: That's Exhibit 4.
MR. MALO: Exhibit 4, yes.
Q. (BY MR. MALO) And I would also like to confirm my understanding that in the flight logs for either Mountain Air, yourself, any of your pilots, to the extent that there was personal use of the aircraft by you in the flight log for Mountain Air, personal use was always recorded as an item of income to you that was reported on your personal return; is that correct?
A. Yes.
Q. So on the log for Mountain Air, there would have been no entries for your personal use of the aircraft that would not associated with a dollar amount identified as an amount that appeared on your personal return?
MR. REYNOLDS: I object to that question. That triple negative just threw me for a loop.
MR. MALO: Allow me to rephrase, then.
Q. (BY MR. MALO) On the log for Mountain Air, there are no entries for which you personally use the aircraft that do not list a dollar amount reported as income on your personal

return?

MR. REYNOLDS: That didn't help me much. Do you understand that question?

THE WITNESS: I think I understand what he's trying to do, but I think it's a hazardous question to try to answer because you can --

MR. REYNOLDS: Well, then don't answer it. Make him get it right.

MR. FRAHM: Can I try to ask the question, because I think I know where he's trying to get at?

MR. REYNOLDS: Yeah.

MR. FRAHM: Are there any entries on the Mountain Air Charter log as to which you personally use the aircraft that are not reflected in a dollar amount attributable to you?

THE WITNESS: I don't think so. And if there were, it would be inadvertent and we'd fix them.

MR. FRAHM: Okay.

Q. (BY MR. MALO) All right. Okay. And I just want to make sure for my own understanding that in trying to analyze the entries on the Mountain Air log that I properly understand what entries are related to your personal use and which are business related. And if I understand correctly, the appearance of a dollar value attributed as income to you is a reliable criteria to distinguish between your personal and

nonpersonal use of the aircraft?

A. It is not the most reliable criteria. I think it's reliable. If you want to establish definitively, what we ought to do is we ought to go through those flights one by one. There's only really one -- there's not much in 2002 and 2003 -- and just make sure. But, you know, I typically designated those flights myself. So, you know, I don't think there are any errors.

Q. To the best of your knowledge, I have all the information that I need to perform that analysis, do I not?

A. Well, I only know that you have what you showed me you have. I don't know what you haven't showed me that you have.

Q. Okay. The analysis that you just described, can that be completed by cross-referencing what we've identified as Exhibit 9, the log from Mountain Air Charter with the document that we have identified as Exhibit 18, your personal flight log?

A. Well, there would have been maintenance flights or positioning flights or demo flights that would have been non-SIFL that would be in my log book.

Q. And they would have been identified as such?

A. I don't know. You know, typically what I did at the end of the year is I -- there was the Mountain Air Charter log and there were the trip sheets. And I always tried to note on



1ebda8ab-4c8a-4cb5-875f-72720db17d91

the trip sheets if it was SIFL and how many passengers because part of the inclusion is how many passengers you have. Then I would go through at the end of the year and look at it and make sure that I thought I had them all. And I don't think I ever used my personal flight log to do that, though. I don't know. I mean, yeah, you could -- I mean, you could get there with a reasonable degree of certainty. But you also have, presumably, the trip sheets.

Q. Yes. And would it be accurate to state, though, that going solely by the dollar values that appear in the Mountain Air log that a reasonably accurate description of your personal use of the aircraft would be established?

A. Yes.

Q. Okay.

MR. REYNOLDS: Exhibit 9 was prepared in whole or in part from the trip sheets, which we also produced to the government.

MR. MALO: Okay.

A. Well, and the -- this is a response -- well, yes. Okay. All right.

Q. (BY MR. MALO) Was it prepared -- was Exhibit 9 prepared solely for the purpose of this litigation, or was this -- is this Mountain Air log maintained in the regular course of business? You maintain the Mountain Air flights --

A. That's a prepared item.

Q. Okay.

A. The Mountain Air log doesn't have any SIFL amounts in it. The SIFL amount are calculated by the accountants at the end of the year. All I do is tell them how many people and how many miles.

Q. Okay.

A. And they apply the IRS formula and come up with the SIFL amount, and it shows up on my W-2 or a 1099.

Q. So the trip sheets are the documents that are prepared in the course of business?

A. Yes. That, and the -- and a larger spreadsheet that tracks engine cycles and landing cycles and hours and fuel burn and stuff like that.

Q. Okay. Well, Mr. Thompson, I don't think I have any further questions for you today. I would assume you would like to review this transcript and sign off on the testimony that you've provided today?

A. Sure. I'll read it. Thirty days after we get it.

MR. REYNOLDS: Yes. So you're excusing the witness?

MR. MALO: I am excusing the witness.

MR. REYNOLDS: You've completed his deposition?

MR. MALO: Yes, sir, we've completed his deposition.

MR. REYNOLDS: Okay. Thank you.

THE WITNESS: And you have nothing?

MR. REYNOLDS: No. Thank you. We'll reserve. Off the record.

(End of proceedings at 2:39 p.m.)



1ebda8ab-4c8a-4cb5-875f-72720db17d91

CORRECTIONS AND SIGNATURE

PAGE/LINE CORRECTION REASON FOR CHANGE

I, JAMES R. THOMPSON, have read the foregoing deposition and hereby affix my signature that same is true and correct except as noted herein.

__________________________
JAMES R. THOMPSON
NO. 06-211T

STATE OF TEXAS )

Subscribed and sworn to before me by the said witness, JAMES R. THOMPSON, on this the __________ day of __________________, 2007.

__________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

STATE OF TEXAS )

I, Andrea L. Reed, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 24th day of April, A.D., 2007, at 8:52 a.m., at the offices of Winstead Sechrest & Minick, 1201 Elm Street, Suite 5400, in the City of Dallas, State of Texas, the following named person, to-wit: JAMES R. THOMPSON, who was by me duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn to and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows:

MR. JEFFREY R. MALO - 04 hours, 00 minutes,

MR. STUART M. REYNOLDS, JR. - 00 hours, 00 minutes.

I further certify that I am neither counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that before the completion of the

deposition, the Deponent ______, and/or the Plaintiff/Defendant ______ did ______ did not ______ request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this ______ day of ________________________, A.D., ______.

Andrea L. Reed, CSR
Esquire Deposition Services
1700 Pacific Avenue, Suite 4750
Dallas, Texas 75201
Registration No. 286
Cert. No. 7773
Cert. Expires 12/31/08
(214)257-1436

AUTHENTIC COPY
The original file was electronically certified E-Transcript using RealLegal technology.



1ebda8ab-4c8a-4cb5-875f-72720db17d91