IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 06-211T

(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

V

THE UNITED STATES,

Defendant

-----------------------------------

ORAL DEPOSITION OF

THOMAS E. TRAVIS

APRIL 23, 2007

Volume 1

-----------------------------------

ORAL DEPOSITION OF THOMAS E. TRAVIS, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 23rd of April, 2007, from 9:34 a.m. to 12:13 p.m., before Diana Pereira, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of WINSTEAD, 5400 Renaisssance Tower, 1201 Elm Street, Dallas, Texas, pursuant to the Rules of the Court of Federal Claims.

GOVERNMENT EXHIBIT 16



7320a7c2-1eda-44dc-982a-116eaa4cf3e6

A P P E A R A N C E S

FOR THE PLAINTIFF:
MR. STUART M. REYNOLDS, JR.
WINSTEAD
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 745-5360

FOR THE DEFENDANT:

MR. JEFFREY MALO
MR. STEVE FRAHM
US DEPARTMENT OF JUSTICE, TAX DIVISION
COURT OF FEDERAL CLAIMS SECTION
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
(202) 305-7539

ALSO PRESENT:
Mr. James R. Thompson

INDEX

| | | PAGE |
|---|---|---|
| Appearances | | 2 |
| THOMAS E. TRAVIS | | |
| | Examination by Mr. Malo | 4 |
| | Examination by Mr. Reynolds | 84 |
| | Further Examination by Mr. Malo | 86 |
| Signature and Changes | | 87 |
| Reporter's Certificate | | 89 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Resume of Thomas E. Travis and attachments | 6 |
| 2 | Affidavit of Thomas E. Travis | 10 |
| 3 | IRS Information Request - Mountain Air Charters Approximate Hours | 50 |
| 4 | Documents entitled Mr. James R. Thompson, Mountain Air Charter, Hour Analysis: Calendar Years 2002 and 2003 | 50 |
| 5 | Logbook Number 8 of Thomas E. Travis | 52 |
| 6 | Logbook Number 9 of Thomas E. Travis | 74 |

THOMAS E. TRAVIS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. MALO:

Q. Good morning.

A. Good morning.

Q. My name is Jeff Malo. I'm joined today by Steve Frahm. We're with the Department of Justice in the matter of James Thompson versus the United States. Today we are deposing Mr. Tom Travis, and he is joined by Mr. Stuart Reynolds and Mr. Thompson. Mr. Reynolds is the attorney for Plaintiff.

This deposition has been scheduled by agreement of the parties, and I'd like to thank everybody for being here today. We do appreciate your time. And we will be taking this deposition in accordance with the Rules of the Court of Federal Claims.

Now, Mr. Travis, have you ever been deposed before?

A. Yes, I have.

Q. Okay. Well, then from your experience, you may know that what I will do is ask you a number of questions. If my questions are unclear, I ask that you don't answer. I will rephrase at your request. If you don't know an answer, please tell me. I don't want you to speculate; but if you have some idea about what an answer is but you're not absolutely certain,



7320a7c2-1eda-44dc-982a-116eaa4cf3e6

I ask that you please provide the information you have and describe the limits on your level of certainty.

We can take a break at any time. Please simply ask if you'd like to take a break. And Mr. Reynolds here may object to certain questions that I ask. If he objects, then I have three options. I can either withdraw my question, I can rephrase my question, or I can ask you to answer the question as posed. If at any time you remember additional information, I ask that you please provide it, even if we have moved on to another topic.

If you wish to revise an answer or believe that you were mistaken about a previous answer, please advise me of this fact any time during the deposition. Now, the years at issue are 2002 and 2003. All questions that I ask will relate to these tax years unless otherwise stated. It is our understanding that you were employed by Mountain Air from March of 2002 through November 2003?

A. That's correct.

Q. So any questions I ask you about your employer during this period will refer to Mountain Air Charter, L.L.C. and/or Mr. Thompson.

If any of my questions or your answers to any of my questions relate to situations where the activities or the services you are performing occurred outside of the circumstances of your employment, I ask you to please indicate

so. Can you do that?
A. Yeah.
Q. Okay. Do you have any questions?
A. No.
Q. Very good. Then let's get started.
First, I would like to have marked for identification as Exhibit 1 this, Mr. Travis' resume and statement of qualifications.
(Exhibit No. 1 was marked.)
A. What do I do with this?
Q. (BY MR. MALO) Just be a reference for you.
A. Okay. Thank you.
Q. I would first like to verify that you are familiar with this material?
A. Yes.
Q. Now, if I could, consistent with the information that we have, if I could ask you to please state your full name for the record.
A. Yes. Thomas Edwin Travis.
Q. And your address?
A. 13532 Braemir Drive, B-R-A-E-M-I-R, Dallas, 75234.
Q. And telephone number?
A. (972) 241-8102.
Q. Could you please describe your educational background?

A. I have a bachelor of arts degree from Arkansas A&M.
Q. Okay. Is that the only formal education you have?
A. Define -- I'm sorry. Go ahead.
Q. Let me rephrase.
A. Yeah.
Q. Could you include in your education your flight training?
A. Yes. About 50 years of flight training.
Q. And formal education as it relates to flight training. Did you go to flight school, for example?
A. No, I didn't. I flew for American for 35 years.
Q. How did you become a pilot?
A. Hanging around the airport as a kid washing airplanes, taking flying lessons.
Q. Okay. Could you describe the flying lessons that you took, how long you took them?
A. Oh, I'm still taking them. I'm not being facetious, seriously. I started in -- formal lessons in 1960 and have continued training ever since.
Q. When did you first obtain a pilot's license?
A. 1960.
Q. When did you first become employed with American Airlines?
A. 1965.
Q. So is it an inaccurate statement that you had

approximately five years' flight training and experience prior to working with American?

A. That's correct.

Q. And when did you retire from American Airlines?

A. In August of 2001.

Q. Why did you retire?

A. The age 60 rule, which at age 60, you're required to retire.

Q. Could you describe your employment, experience since retiring from American Airlines?

A. You mean who I've worked for since then?

Q. Yes.

A. Okay. I worked for Jim Thompson first, Mountain Air Charter; left Thompson in '03, flew for a company called Links Jet International; and did contract work and various operators.

Q. And are you currently employed?

A. Part-time.

Q. And who is your current employer?

A. PlaneSmart! Aviation.

Q. Do you work full-time?

A. No, part-time.

Q. Part-time.

Could you please summarize the activities that you may have taken in relation to this case?

MR. REYNOLDS: Objection to the form.

A. I'm sorry. I don't understand.
Q. (BY MR. MALO) I'll rephrase.
A. Okay.
Q. When did you first become aware of this case?
A. I honestly don't remember. It's been three, four months ago, maybe. I don't remember how long it's been --
Q. Okay.
A. -- or even who contacted.
THE WITNESS: I think it was you who contacted me, Stuart.
MR. REYNOLDS: Probably was.
Q. (BY MR. MALO) So you learned about this case through Plaintiff's counsel?
A. True.
Q. Okay. Have you communicated with Plaintiff's counsel regarding this case since then, since you first learned of the case?
A. Yes, I have.
Q. And approximately how many times -- do you know offhand how many times you've discussed this case with him?
A. Just once.
Q. Have you ever met with Mr. Reynolds to prepare for this case or this deposition?
A. I met with Mr. Reynolds one time.
Q. Okay. Is Mr. Reynolds acting as your personal

attorney?
A. No.
Q. When were you first asked to testify in this case?
A. I guess when you called me. I guess that was the first time I knew I was going to be deposed.
Q. Okay. And you agree to testify when you were first contacted?
A. Yes.
Q. And what are the topics that you expect that you will be giving testimony on today?
A. I expect -- well, basically, whatever you ask me; but what I did for Mountain Air Charter, I assume.
Q. Have you reviewed any documents in connection with your deposition testimony here today?
A. No.
Q. Okay. Did you do anything to prepare for this deposition?
A. No -- well, just met with Mr. Reynolds, gave him a copy of my logbook. He gave me a thumbnail sketch of what it's about, and that was it.
Q. Okay.
MR. MALO: I'd like to have marked as Exhibit 2 an Affidavit submitted by Mr. Travis.
(Exhibit No. 2 was marked.)
Q. (BY MR. MALO) Mr. Travis, do you recognize this

Affidavit?
A. Yes, I do.
Q. When did you prepare this?
A. I don't know. I don't see a date on it.
Q. It's on the last page.
A. Oh, okay. 2005.
MR. MALO: The records show that the document was prepared on July 8th, 2005.
Q. (BY MR. MALO) Mr. Travis, why did you complete this Affidavit?
A. Somebody asked me to, and I don't remember who that was.
Q. Do you remember what the substance of your Affidavit statement is?
A. I'm looking at it. Yes, I do.
Q. And this appears to be an accurate copy of the Affidavit that you signed?
A. It does, uh-huh.
Q. Mr. Travis, I'd like to point your attention to the third statement you make in your Affidavit, where you discuss your responsibilities as an employee of Mountain Air Charter.
A. Okay.
Q. And you state that they were limited to the following activities: flying charter passengers for Mountain Air Charter in accordance with FAA-approved operating specifications,

flying the aircraft without passengers to a destination where charter passengers were to pick up, and coordinate a routine maintenance of the aircraft to the extent not performed by Mr. James Thompson.

Was this the full extent of your responsibilities at Mountain Air?

A. To the best of my knowledge, yes.

Q. They were limited to flying passengers, positioning, and maintenance flights?

A. Yes.

Q. Did you ever perform any training?

A. Yes.

Q. Could you describe the training you performed?

A. I went through training initially at SimCom in Florida, and then did flight training in the airplane.

Q. Okay. So this is training you personally received?

A. Yes.

Q. Okay. Did you ever provide any instruction?

A. Yes, I did.

Q. And did you provide instruction in your role as an employee of Mountain Air Charter?

A. It was in the airplane. As far as employee, not as a -- I don't -- we did -- we did training.

Q. Training or instruction?

A. What's the difference?

Q. Were you receiving training or providing training?
A. Yes.
I'm not playing games with you. Yes, both.
Q. Okay. To the extent that you provided training, who did you provide training to?
A. Jim Thompson.
Q. Okay. And why did you provide training to Mr. Thompson?
A. Because he asked me to.
Q. And did this training occur during the period of time in which you were an employee of Mountain Air Charter?
A. Yes.
Q. But you're unsure as to whether or not these training activities, training you provided to Mr. Thompson occurred during the scope or course of your employment for Mountain Air?
MR. REYNOLDS: Objection to the form.
A. That's correct.
MR. MALO: I'll rephrase.
MR. REYNOLDS: Mr. Travis, I'm going to try to get my objection in, if I have one, before you begin your answer.
THE WITNESS: Okay.
MR. REYNOLDS: But if you would just take one second before you answer to give me that chance, I'd appreciate it.

THE WITNESS: Okay.

Q. (BY MR. MALO) Did the training you provided Mr. Thompson occur in the scope of your employment with Mountain Air Charters?

A. It occurred during the time. As far as the scope, I'm not sure exactly what you mean by that. It was -- not as part of the job description, I suppose, if that's what you mean.

Q. It was not part of the job description?

A. No, I don't think so.

Q. Okay. What was the nature of your compensation for Mountain Air Charter?

A. In the form of a check.

Q. Were you salaried or were you hourly?

A. Salary.

Q. Did you receive additional compensation for training activities, training that you provided to Mr. Thompson?

A. No.

Q. Did training occur during normal hours? How many hours a week were you employed?

A. There were no set hours.

Q. On average, how many hours a week did you work?

A. I have no idea.

Q. I'd like to direct your attention to Point Number 5 in your Affidavit. A little more than halfway down, you

stated, "I insisted that a substantial amount of time and training experience occur prior to commencing charter flight operations."

Can you explain what you meant by this statement?

A. Yes. I had no intention of putting myself at risk financially, so I insisted on being trained to my satisfaction.

Q. Can you explain what you mean putting yourself at risk financially?

A. I didn't want to be sued.

Q. Are you suggesting that you would personally be liable for accidents that may occur if you were a pilot?

A. Yes.

Q. And therefore, you insisted that a substantial amount of training experience occur?

A. That's correct.

Q. Training for whom?

A. For me.

Q. Mr. Travis, had you ever flown a Pilatus PC-12 prior to working for Mountain Air?

A. No, I had not.

Q. You claimed also in Point Number 5 in your Affidavit, during the first couple of sentences, "During the first years of operation, Mr. Thompson and I spent considerable time in the aircraft together. These hours in the aircraft totaled

approximately 100, and we spent much more time than that before and after flights."

You claimed approximately a hundred hours of training?

MR. REYNOLDS: Objection to the word "claimed."

Q. (BY MR. MALO) Your Affidavit specifies that you spent approximately 100 hours in training. Is training what you refer to when you say, "spent considerable time in the aircraft together," "totaled approximately 100"?

A. Training and getting comfortable in the airplane, yes.

Q. Who was getting comfortable in the airplane?

A. Me.

Q. And you were getting comfortable in the airplane for your own purposes?

A. Yes.

Q. Because you didn't want to be liable for accidents that may occur?

A. That's true.

Q. Was the requirement that you spend approximately a hundred hours getting comfortable with the airplane a regulatory requirement?

A. No, it was not.

Q. Was it required by Mountain Air's insurance company?

A. I have no idea, but I don't think so.

Q. If you had not spent these hundred hours in the aircraft, would you have otherwise been qualified to fly the Pilatus PC-12?
A. Not in my judgment.
Q. Would you have been qualified under applicable federal regulations that you're aware of?
A. Yes.
Q. So why was this time necessary?
A. Because I deemed it necessary.
Q. Thus, it was your personal comfort level and familiarity with the aircraft that required you to conduct in excess of 100 hours' training?
A. I don't know about the word "in excess of 100 hours"; but whatever time we flew, yes.
Q. Thank you. I'll rephrase. That's true. Your Affidavit says, "approximately 100."
A. Okay.
Q. For the time that you spent training, was it necessary for Mr. Thompson to be with you?
A. It was not necessary. It was a good idea for safety.
Q. Why was it a good idea for safety?
A. Because most of the time, you're training on instruments; and in fact, it's required if you are under a hood, you have a safety pilot.
Q. How much time did you spend under a hood?

A. I have no idea, but a lot.
Q. Does -- the time that you spent under a hood, was it recorded in your personal flight logs?
A. I don't think so.
Q. Why not?
A. Not required.
Q. Who spent time under the hood, yourself or Mr. Thompson?
A. I did.
Q. Both or...
A. Both. He spent some time.
Q. You were hired by Mountain Air in March of 2002?
A. That's correct, I believe.
Q. To the best of our knowledge, the Pilatus PC-12 was purchased in May of 2002.
A. It was delivered in May. It was purchased sometime prior to that.
Q. What did you do during March and April of 2002 for Mountain Air?
A. I worked on the certification for the Part 135 operation.
Q. Were you paid your full salary during this period?
A. I think so.
Q. Did you participate in selecting the aircraft?
A. No.

Q. Were you asked for your opinion about the potential aircraft that Mountain Air might purchase?

A. No.

Q. You said you completed SimCom training prior to flying the Pilatus PC-12.

A. Yes.

Q. Do you know approximately when you completed that training?

A. No. May 11th, 2002.

Q. Was that the only time you completed SimCom training?

A. No. There was recurrent training.

Q. And you performed recurrent training in 2003?

A. I don't have that before me; but it was annually, I think, since 2003.

Q. Did you attend SimCom training with anyone else?

A. Yes.

Q. Who?

A. My daughter.

Q. Did Mr. Thompson attend SimCom training with you?

A. No.

Q. I would like to direct your attention to Item Number 8 in your Affidavit. On the second page, second line down, you state, "I personally witnessed or have direct knowledge of Mr. Thompson performing at least 50 hours per month of service with respect to Mountain Air Charter."

Can you explain what you mean by that statement?
A. Yes. Mr. Thompson worked more than 50 hours a month for Mountain Air Charter.
Q. Beginning when?
A. Prior to -- to my knowledge, prior to March 2002, all the way through the time I left.
Q. You state, "I personally witnessed or have direct knowledge." Can you explain the difference between "personally witnessed" and "or otherwise have direct knowledge"?
A. Can you rephrase that?
Q. You state in your Affidavit that you either personally witnessed or have direct knowledge. I'm uncertain what the distinction between the two means.
A. Well, what I mean by "personally witnessed" is I was there with him or was on the phone with him. That would be direct knowledge.
Q. Okay. So "have direct knowledge" refers to time that you spent on the telephone?
A. On the phone or I know the work he did and he told me about and I saw evidence of.
Q. So "or have direct knowledge" refers to time that you either spent on the telephone or time that Mr. Thompson reported to you that he spent --
A. No, that I saw of work he did.
Q. You saw evidence of work that he did?

A. Uh-huh.
Q. Could you describe a few examples of what evidence of work he might have did means?
A. Work in the office. I would come in, revisions would be posted. The flash cards would be installed in the airplanes. He did all the flash cards, all the data cards, data-card updates, things of that nature.
Q. You state later in your deposition, in the same item number, 8, towards the bottom of that paragraph --
MR. REYNOLDS: Are you referring to the Affidavit, Deposition Exhibit 2?
MR. MALO: Yes.
Q. (BY MR. MALO) Item Number 8, second to last sentence, you stated that "These hours included personal interaction with me in connection with my duties as a pilot from the time that he hired me until the time I left Mountain Air Charter as an employee. My knowledge of these hours is both direct and indirect interaction with Mr. Thompson on these matters."
Does that mean the same thing as "personally witnessed" or otherwise acquired direct knowledge?
A. Yes.
Q. Okay. So "indirect interaction with Mr. Thompson" refers again to either telephone conversations or work product that you saw completed that no one else could have performed

but for Mr. Thompson?
A. Right.
Q. Also in Item Number 8 of the same Affidavit, a little further up in that paragraph, you stated, "He arranged for the cleaning of the interior and the exterior of the aircrafts." Did Mountain Air Charter ever own more than one airplane?
A. No, not while I was there. I'm trying to find where you see that.
Q. Approximately four lines up from the bottom, five lines up from the bottom.
A. That's a typo.
Q. May be just a typo.
Did you ever fly any other aircraft for Mountain Air Charter?
A. No.
Q. Do you know if Mr. Thompson owned any other aircraft?
A. He owned a Mooney at the time.
Q. Did you ever fly the Mooney?
A. No.
Q. Do you know if the Mooney was ever flown to conduct Mountain Air Charter business, to transport passengers for example?
A. No.
MR. REYNOLDS: Excuse me. To my ear, that question and answer are ambiguous. Would you read them back,

please?

(Requested portion was read.)

MR. REYNOLDS: Do you hear the ambiguity?

MR. MALO: I'll rephrase.

MR. REYNOLDS: I would appreciate it.

MR. MALO: Let me phrase that as two questions.

A. Okay.

Q. (BY MR. MALO) Do you know if the Mooney was ever used to conduct Mountain Air Charter business?

A. I don't know that, no.

Q. Do you know if any other aircraft was ever used to fly passengers for Mountain Air Charters?

A. To the best of my knowledge, no.

Q. Thank you.

Getting back to the question of training that you personally felt was necessary to feel comfortable with the aircraft, on a flight-by-flight basis, how was it determined that more training was needed?

A. The training was ongoing. Because of the delay in getting the certificate, once you complete training, your proficiency level does not -- does not stay static, and so the FAA was rather -- let me rephrase that.

It took a while to get the air-taxi certificate, so I had to maintain proficiency throughout that -- let's see -- four months.

Q. What was required, from a regulatory standpoint, to maintain proficiency?
A. Prior to certification, there was none.
Q. Thus, when you say that it was required that you maintain proficiency in order to retain certification, what do you refer to?
A. That was my requirement.
Q. I'm confused. You stated that certification was delayed and that certification required maintaining proficiency.
MR. REYNOLDS: Objection; misstates the witness' testimony.
MR. MALO: Could you please reread the witness' testimony to me?
(Requested portion was read.)
Q. (BY MR. MALO) Thus, the proficiency that you sought to maintain was required for your personal comfort level with the aircraft?
A. Yes, and it would be -- was going to be required to demonstrate proficiency for the FAA later.
Q. How would you be required to demonstrate proficiency?
A. In a checkride.
Q. And what is a checkride?
A. A checkride is an exercise where an examiner rides with you, gives you a series of maneuvers to perform, and

you're expected to perform to certain standards, air transport standards in this case.

Q. Could you describe the maneuvers?

A. Take-offs, landings, approaches, malfunctions, emergency procedures.

Q. Would you be required to demonstrate any proficiency under the hood?

A. Yes.

Q. As part of the checkride?

A. Yes.

Q. In the course of maintaining your personal comfort level and your personal proficiency with the aircraft, how frequently did you feel that you needed to fly in order to maintain this proficiency?

A. That's a hard question to answer. It's just if you don't fly for two weeks, you really notice a difference.

Q. During your employment with Mountain Air Charter, beginning with the delivery of the aircraft in May of 2002, did you ever experience a period where you didn't fly for two weeks?

A. I'm sure there was, but I don't -- I can't say specifically.

Q. So on a flight-by-flight basis, you made a personal determination that additional proficiency training was necessary for yourself?

A. Yes.
Q. And on a flight-by-flight basis, how did you obtain authorization to continue these training flights?
A. I would just tell Jim I needed to fly.
Q. And what was the approval process?
A. Just Okay.
Q. Just Okay. Okay.
A. Uh-huh.
Q. And did Mr. Thompson accompany you on all of these flights?
A. Yes, I think he did.
Q. Were there any flights, to the best of your recollection, that Mr. Thompson did not accompany you on?
A. What kind of flight are we talking about, training or...
Q. The proficiency flights that you described earlier.
A. I'd have to look at my logbook, but I think he was with me -- I think so. I think he was with me on those flights.
Q. And his presence on those flights, according to what you said earlier, was not necessary but was a good idea?
A. It was for safety reasons -- requiring, in my judgment.
Q. What was your role in these proficiency flights, did you personally control the aircraft?

A. Yes.
Q. On all of these flights?
A. Except when I was -- when Jim was flying, yes.
Q. How often was Jim flying?
A. I don't know.
Q. Did Mr. Thompson ever initiate these training flights?
A. Occasionally, yes.
Q. What was the reason that Mr. Thompson initiated training flights?
A. I don't know.
Q. So based on what you said earlier, you would come to Mr. Thompson expressing your need to fly in order to maintain your proficiency?
A. Part-time, yes.
Q. And in addition to those occasions, there were times when Mr. Thompson came to you and asked you to fly with him?
A. That's correct.
Q. And no reason was ever provided as to why Mr. Thompson wanted additional flight time?
A. Well, for training. It was obvious it was training.
Q. Training for you?
A. For both of us, but mostly for me.
Q. Mostly for you?
A. Uh-huh.

Q. During the period May 2002, delivery of the aircraft through the time that Mountain Air obtained its Part 135 certification, did Mr. Thompson ever fly the PC-12 solo?
A. I don't know.
Q. Did he ever express that as a goal?
A. Express it as a goal, I --
Q. Did he ever tell you that he was attempting to gain experience needed to fly the aircraft by himself?
A. I think he did, yes.
Q. To the best of your knowledge, was Mr. Thompson qualified to fly the aircraft by himself at the time it was delivered?
A. No.
Q. No, he was not?
A. No, he was not.
Q. Do you know what requirements he was lacking in order to fly the aircraft solo?
A. I don't think Jim had been to school on the airplane. I don't recall.
Q. What does "been to school on the airplane" mean?
A. He was going through formal training.
Q. Such as SimCom?
A. Correct.
Q. Is there additional training that would be needed?
A. Yes, flight training.

Q. And where do you obtain flight training?
A. You can either go through an organization like SimCom or a flight instructor like me could do it.
Q. Did you provide any flight instruction to Mr. Thompson?
A. Yes, I did.
Q. Did you provide him with this instruction for the purpose of satisfying the requirement you just said he was lacking at the time the aircraft was delivered?
A. I'm not sure exactly during the time -- which time frame it was, but yes.
Q. So from May 2002 through the date, I believe September 3rd, 2002, on which Mountain Air Charter received it's Part 135 certification, you provided flight instruction for the purpose of satisfying the flight school requirements that Mr. Thompson would need to fly a PC-12 solo?
A. Flight school requirements, no, there was no flight school requirement that I know of.
MR. MALO: Sorry. Could you reread the testimony to me.
A. I thought the term "flight school" is what you used.
THE REPORTER: You want me to read the last question and answer or --
MR. MALO: The question and answer where I asked what requirements he was lacking, and he responded that he

hadn't completed the -- I thought he had said "flight school."
MR. REYNOLDS: Let's go off the record.
(Discussion off the record)
Q. (BY MR. MALO) So the instruction that you provided Mr. Thompson between May and September of 2002 was flight instruction that serves as an alternative to formal flight school with an organization like SimCom?
A. No, it wouldn't be as an alternative. It would be as a supplement.
Q. As a supplement?
A. True.
Q. Okay. In 2003, do you know if Mr. Thompson ever flew the PC-12 solo?
A. I think he did, but I -- yes, I think he did in 2003.
Q. What changed in his status that allowed him to fly solo in 2003?
A. He had been to school at SimCom, I believe, and had received enough instruction and time in the airplane.
Q. Who provided him with enough instruction and time in the airplane?
A. I did, part of it.
Q. Did anyone else provide him with instruction time in the airplane?
A. I can't testify to that, but I believe SimCom did.
Q. Are you aware of any other flight instruction that

either yourself or Mr. Thompson may have received in Colorado?
A. Yes.
Q. Could you describe that?
A. Yes. Mr. Thompson hired an instructor to check me out at mountain airports in Colorado by a young man who was -- I think he flew for one of the commuters up in Colorado. And we went to various airports, high-altitude airports or airports with tricky approaches.
Q. I refer to your Affidavit, Statement Number 5. "Mr. Thompson caused Mountain Air Charter to engage an instructor pilot in Colorado to train us on flight patterns and approaches to high-altitude airports in the State of Colorado. Mr. Thompson was on all of these training flights with me."
With respect to the training that occurred for flights in Colorado, there was an instructor in addition to yourself on these flights?
A. That's correct.
Q. And Mr. Thompson was on these flights?
A. That's correct.
Q. Who did the instructor provide instruction to?
A. Mostly to me but to both of us, but it was mostly me.
Q. Was Mr. Thompson's presence on these flights necessary?
A. Whose standards? I don't know.
Q. Earlier you stated that it was not necessary for

Mr. Thompson to fly with you on proficiency training flights that you needed for your own comfort level, but that it was a good idea because he served as a safety pilot. For the flights in Colorado with a flight instructor and yourself present, did Mr. Thompson serve as a safety pilot?

A. No, he did not.

Q. Was there any regulatory requirement that he be there?

A. No.

Q. What was Mr. Thompson's role, to the best of your observations, on these flights?

A. Observing.

Q. And what was your role on these flights?

A. As a trainee.

Q. Did you serve as safety pilot on these flights?

A. No.

Q. When did you begin flying passengers for Mountain Air Charters?

A. I don't know. Sometime after we received the certificate.

Q. Is that when you began flying passengers for revenue?

A. Wait. Let's back up on that. When you say "passengers," you mean for hire or for people on board?

Q. I'm about to inquire on that and make that distinction.

When did you first fly passengers for Mountain Air Charter on a nonrevenue basis, if at all?
A. We had guests on board occasionally.
Q. Who were these guests?
A. My daughter, my wife. That was basically it. My wife was -- went along with us.
Q. Did Mr. Thompson ever have guests on these flights?
A. I honestly don't remember. I don't recall any guests on those flights, Mr. Thompson's.
Q. Prior to receiving Part 135 certification, is it an accurate statement that the only passengers on the Pilatus PC-12 were guests of a personal nature for either yourself or Mr. Thompson?
A. Do you mean as opposed to paying passengers?
Q. Yes, sir.
A. That's correct.
Q. And do you recall when you began flying passengers for revenue?
A. Sometime after the certification was complete.
Q. In 2002?
A. 2002, yes.
Q. And do you know who these passengers were?
A. No, I don't.
Q. Do you know what their relationship was to Mr. Thompson?

A. No. They were customers.
Q. Did Mr. Thompson ever fly as a customer after certification was obtained?
A. Yes, he did.
Q. Did he ever fly as a safety pilot after certification was obtained?
A. Yes.
Q. Did he continue to receive flight instruction from you after certification was obtained?
A. I don't recall if we did -- I think maybe so, but I'm not sure. I can't testify for sure on that. I think so.
Q. I'd like to refer again to your Affidavit, again, Item Number 5, about halfway down the paragraph. "I had been flying large commercial jets for American Airlines for 36 years. I had never flown a turboprop before. In particular, the Pilatus aircraft owned by Mountain Air Charter was a specialty aircraft with characteristics that make it particularly capable of take-off and landings at high-elevation mountain airports and small landing strips. Further, I had normally flown with a crew rather than as a single pilot."
Am I correct in understanding that statement to mean that part of the reason you felt it personally necessary to engage in approximately 100 hours of training prior to flying revenue passengers, revenue paying passengers, part of the reason was that you had normally flown with a crew rather

than as a single pilot?
A. Partially, yes. In revenue service, that's true.
Q. Can you describe the difference in the role that you play with and without a crew?
A. If you have a crew, you have assistance, you have help.
Q. What does a crew do?
A. Whatever the captain asks.
Q. In your role as a single pilot for Mountain Air Charters, by the time you began flying passengers for revenue, what services did you perform for them or what activities did you undertake in addition to being the single pilot?
A. I'm sorry. Rephrase that, please.
Q. Certainly.
What did you do for your passengers beyond flying the aircraft on revenue flights?
A. That's pretty much it.
Q. Can you help me understand, then, what the complication is between having a crew and having assistance and not having a crew and not having assistance if -- and correct me if I'm wrong, but it sounds as though your role in either environment is essentially the same. You're piloting the aircraft and nothing else.
A. I'm not sure exactly where you're going with that. But when you are flying with passengers on board, you have a

responsibility of paying attention to them, seat belt, no smoking, that sort of thing, but basically more responsibility.
Q. Okay. Whether -- during the period of time between the date that the aircraft was delivered and you obtained the Part 135 certification or afterwards on the revenue flights -- and if there's a difference please describe it to me -- what type of pre- and post-flight activities need to occur?
A. Obtaining weather briefings; planning the flight; catering the flight, if necessary; fuel; servicing of the airplane; executing the flight, of course; and then post-flight activities.
Q. If I can stop you there for a moment. Does that mean that the activities you just described are all pre-flight activities?
A. No.
Q. If you could break it out into pre-flight and post-flight activities, I'd appreciate it, if possible.
A. Okay. The things I just mentioned, and then conduct the flight. Post-flight, you've got to conduct a post-flight inspection; secure the aircraft; arrange for storage; servicing, whatever is necessary for the airplane.
Q. Did you perform pre-flight and post-flight services?
A. Yes, I did.
Q. Did you perform these activities on all of the flights?

A. Every one I conducted, yes.
Q. When you say "Every one I conducted," what does that mean?
A. If I fly the airplane, I do the pre-flight, I do the post-flight. It's regulatory.
Q. Would you do the pre-flight and post-flight for flights on which dual pilots were involved?
A. If I were on the airplane, yes.
Q. Is it an accurate statement that every flight in which you flew or co-piloted, you conducted pre-flight and post-flight activities?
A. That's true.
Q. The same list that you just read through?
A. Yes.
Q. Did you conduct these activities alone?
A. Not always. If Jim were there, he'd help me with the pre-flight, post-flights.
Q. And to what extent would he help you, what would he do?
A. Anything I asked him to do, arrange for the fuel; be with me on the walk-around if he happened to be there; on the shut down, he always helped if he were there; securing the airplane, which is quite a complex operation on a Pilatus.
Q. Why is that a complex operation on a Pilatus?
A. Well, you have to put on harnesses, you have to

secure the propeller. It's different than a jet or just an airplane.

Q. How did you learn how to do these activities?

A. At SimCom.

Q. And Mr. Thompson performed the same activities, securing the aircraft after -- post-flight?

A. You mean when he flew?

Q. When he performed activities with you, post-flight activities with you?

A. He would assist me, yes.

Q. And I would assume he learned the same procedures at SimCom.

A. Yes.

Q. Did you play any role in obtaining the Part 135 certification?

A. Yes, I did.

Q. What did you do?

A. Met with the FAA repeatedly, wrote off specs, operation specifications, all the functions necessary to get the certification.

Q. Did you have any assistance in preparing the op specs?

A. Yes, toward the end, I did.

Q. Who assisted you?

A. David Norton.

Q. Who is David Norton?
A. David Norton is an attorney with Akin -- some law firm here in Dallas.
Q. Akin, Gump?
A. Yeah, Akin, Gump.
Q. Did Mr. Thompson assist you in obtaining Part 135 certification?
A. Yes, he did.
Q. And what did he do?
A. Whatever was necessary. We spent hours going through documents trying to write correct operation specifications, defining terms for the FAA, that sort of thing.
Q. Do you know how many hours you spent preparing for 135 certification?
A. No, I don't. It was significant.
Q. Do you know how many hours Mr. Thompson spent preparing for 135 certification?
A. No, I don't.
Q. Once you received certification, did you ever assist in managing some of the operations of Mountain Air Charter?
A. I think -- define "managing operations."
Q. Did you ever schedule passenger flights?
A. No, I did not.
Q. Did you ever receive or accept or process payment from passengers?

A. No.
Q. Do you know how passengers were billed?
A. No.
Q. Do you know if you ever provided services for ORIX Corporation?
A. Provided services for ORIX.
Q. Transportation services through Mountain Air Charter.
A. Yes, there were some ORIX employees on board, yes.
Q. Were there ever ORIX employees on board prior to receiving Part 135 certification?
A. I don't recall.
Q. But you do recall ORIX personnel being on board post 135 certification?
A. Yes.
Q. Was ORIX a paying customer for these flights?
A. As far as I know, yes.
MR. REYNOLDS: We've been going a little over an hour. Do you want to take a short break?
MR. MALO: That's fine with me.
(Break taken from 10:30 a.m. to 10:48 a.m.)
Q. (BY MR. MALO) If I can just take care of a couple of minor follow-up questions here from our prior discussion today.
First, in reference to Exhibit Number 1, if I could ask -- I believe I asked you if you were familiar with this document. If I can ask you to specifically identify this

document.

A. Yes. It's my resume, but it's an old resume.

Q. Does it appear to be a true and accurate resume?

A. Yes, it does.

Q. Do you recognize it as your resume?

A. Yes, I do.

Q. Was it prepared by you?

A. Yes.

Q. Does it appear to be the resume that you submitted to Mountain Air Charter for consideration as an employee?

A. I can't testify to that. I don't know. I don't see a date on it.

Q. But you can affirmatively say that it is your resume?

A. Yes, I can.

Q. Okay. With respect to your Affidavit, Exhibit Number 2 --

A. Okay.

Q. -- did you draft this document?

A. I don't think so. I approved it and obviously signed it. I don't know who wrote that.

Q. You don't know who drafted this document?

A. No, I don't.

THE WITNESS: Did you do it, Stuart?

MR. REYNOLDS: No.

Q. (BY MR. MALO) Do you know if this document was

drafted by an attorney?
A. I assume it was.
Q. Do you remember signing the document?
A. Yes, I do.
Q. If I could follow up on some of our subject matter areas that we discussed earlier as well.
You indicated earlier today that Mr. Thompson received some training under your instruction during the period May 2002 through at least September 2002.
A. Yes.
Q. Did he indicate why he wanted this training?
A. No.
Q. You also indicated that Mr. Thompson was not authorized to fly the aircraft solo when it was first delivered through the date on which certification was obtained.
A. To the best of my knowledge, through the date. I know he was not qualified when the airplane was delivered.
Q. When you say "he was not qualified," is that a regulatory restriction?
A. It would be an insurance requirement.
Q. That was an insurance requirement?
A. Uh-huh.
Q. So he was not qualified for insurance purposes?
A. Best -- to the best of my knowledge, correct.
Q. Do you know when he became qualified for insurance

purposes?
A. I don't recall.
Q. Do you know how he became qualified for insurance purposes?
A. He went through SimCom training.
Q. And that was all?
A. He received dual, in the airplane from a SimCom instructor; and of course I had given him a dual in the airplane, also.
Q. So is it an accurate statement that the insurance requirements needed for Mr. Thompson to fly the plane solo were satisfied by a combination of SimCom training and private flight instruction under your tutelage?
A. That's accurate.
Q. You mentioned also that there was a delay in the certification for Part 135 for Mountain Aircraft charters.
A. Yes.
Q. Was this delay expected?
A. No.
Q. When was certification originally anticipated?
A. I expected to have it by the end of May, first of June.
Q. Of what year?
A. 2002.
Q. And was it, in fact, obtained on September 3rd, 2002?

A. I don't recall the exact date, but that's about correct, somewhere in that time frame.

Q. So it's an accurate statement that the Part 135 certification was delayed, at a minimum, three months?

A. That's correct.

Q. Once certification was obtained, did you continue to feel personally obliged to maintain proficiency through frequent flights --

A. Yes, I did.

Q. -- on the PC-12?

Once Mr. Thompson met the insurance requirements, did you continue to feel personally obliged to maintain your proficiency on the aircraft?

A. Yes, I did.

Q. And once Mountain Air Charter began revenue operations, did you feel personally obliged to maintain your proficiency on the aircraft?

A. Yes, I did.

Q. And you maintained proficiency on the aircraft through frequent flights?

A. Yes.

Q. When you conducted revenue flights, did you perform training maneuvers --

A. No.

Q. -- with paying passengers?

A. No.
Q. Did you ever spend time under the hood with paying passengers?
A. Never.
Q. So once revenue operations commenced, training and proficiency was something you had to maintain over and above flight times you recorded as a revenue flight?
A. That's correct.
Q. Can you tell me what a currency training requirement means?
A. Well, you have to have a minimum of three take-off and landings in class, category, and type, in this case, the PC-12, in the last 90 days. And if you operate at nights, you have to have three take-off and landings at night in the last 90 days.
Q. Three take-offs and landings during day for day currency?
A. Right.
Q. Three take-offs and landings during night for night currency?
A. That's correct, plus instrument proficiency, which is a series of approaches and various maneuvers.
Q. Is there -- similar to currency requirements which can be defined numerically, for instrument proficiency, are there any minimum number of approaches required?

A. Yes, six approaches.
Q. Over what period?
A. Six months.
Q. Over six months?
A. Over six months, yes.
Q. So it's an accurate statement that -- and whose regulations are these, by the way?
A. Those are the federal regulations.
Q. Federal Aviation Administration's regulations?
A. Yes.
Q. Over 90 days, three take-offs and landings for day and three for night if night currency is at issue?
A. That's correct.
Q. And over six months, six instrument approaches?
A. That's correct. The landings at night will count for the day landings, but not vice versa.
Q. With regards to the currency requirement?
A. Correct.
Q. And you personally felt obligated to exceed these requirements?
A. Yes, I did.
Q. Did you substantially exceed these requirements?
A. I'm sure I did.
Q. You also indicated earlier that at least by 2003, Mr. Thompson was able to fly the PC-12 solo?

A. I'm not sure exactly when it happened, but it was, I think, somewhere around 2003.
Q. Do you know why he flew the plane solo?
A. No, I don't.
Q. Do you know if he flew the plane to transport passengers, paying passengers?
A. No, not paying passengers.
Q. Do you know if he flew guests?
A. I don't know.
Q. Do you know if his use of the plane was personal in nature or related to Mountain Air business activities?
A. I assume it was personal. There was, I think, some business in taking the airplane to the service centers for maintenance.
Q. Where were the service centers?
A. Denver, Colorado.
Q. Were there any other locations for service centers?
A. At first, no. That was the only location.
Q. For 2002 and 2003, were those the only --
A. In late -- in 2003, a service center in Fort Worth became available for limited maintenance.
Q. Okay. Do you know -- when Mr. Thompson flew solo, do you know what the destination of any of his nonservice-related flights were?
A. I didn't keep track of that, no.


7320a7c2-1eda-44dc-982a-116eaa4cf3e6

Q. Do you know -- for the period during which you did not have certification in which you were maintaining proficiency for your own comfort level, do you know the destination of the flights that you piloted?

A. Yes, I do.

Q. Were any of these destinations related to business that Mr. Thompson had to conduct in his capacity as an ORIX employee?

A. Not to my knowledge.

Q. Were any of the destinations to which you flew recreational in nature?

A. Recreational how? I don't understand.

Q. Maintaining proficiency on the aircraft required frequent flight time for you?

A. Uh-huh.

Q. This was for your own comfort level?

A. Right.

Q. Between take-offs and landings, what type of activities occurred on the ground, if any?

A. I'm not sure exactly what you mean by that. Could you rephrase the question?

Q. Certainly.

In the course of maintaining your proficiency for your comfort level, when you took off and landed at a destination that was not the point of origin, how long would



7320a7c2-1eda-44dc-982a-116eaa4cf3e6

you be on the ground before taking off again?
A. It varied. It would depend on where you were. Sometimes if you need the fuel, you'd stop and get the fuel; otherwise, you'd keep going.
Q. Were you ever on the ground for more than a few hours?
A. Yes, occasionally.
Q. Were you ever on the ground for more than a few days?
A. No.
Q. So the proficiency training that you conducted prior to certification were essentially day trips; would that be an accurate statement?
A. Mostly day trips. There were some overnights.
Q. And do you recall any of the destinations for overnight trips?
A. Yes. We went to California, Oregon, Colorado, New Mexico.
Q. And during the overnight trips, did you spend your time on the ground at the destination with Mr. Thompson?
A. Yes.
Q. A hundred percent of it?
A. No, not a hundred percent.
Q. Did you spend all of your waking-day hours with him on the ground?
A. No.


7320a7c2-1eda-44dc-982a-116eaa4cf3e6

Q. What type of activities did you conduct on overnight trips, did you do any recreational activities for yourself?

A. I don't recall. I know we went to Taos. In fact, we worked on certification out there quite a bit.

Q. Do you know if Mr. Thompson ever engaged in recreational activities during overnight trips?

A. If I wasn't -- if I was not with him, I don't know what he was doing.

Q. I would like to refer once again to your Affidavit, Exhibit Number 2, and I would like to have the following documents marked as Exhibits 3 and 4.

(Exhibit Nos. 3 and 4 were marked.)

Q. (BY MR. MALO) Paragraph Number 9 in your Affidavit, you state, "I reviewed the attached hours analysis of Mr. Thompson and believe that it accurately describes the activities that Mr. Thompson undertook while I was employed at Mountain Air Charters."

In the materials I received, there were no hourly analysis attached. The materials I did receive, however, contained two separate documents with hourly analysis of Mr. Thompson's time. Could you identify either Exhibit 3 or Exhibit 4 as the document to which you referred in your Affidavit?

A. Yes, Exhibit 4, that's the one we're talking about.

Q. And how many hours are you certifying in your

Affidavit that Mr. Thompson partook in activity at Mountain Air Charters?

A. I would say -- Exhibit 4, that would be 638 and 369 in 2002/2003.

Q. And going back to your earlier statement, are these hours for which you had direct knowledge or indirect knowledge?

A. Yes.

Q. Both?

A. Both.

Q. In 2003, your employment with Mountain Air Charter terminated?

A. Yes.

Q. Can you tell me why?

A. I decided to try retirement again.

Flunked it again, too, by the way.

Q. You resigned?

A. I did.

Q. Did you participate in hiring your replacement?

A. No, I did not.

Q. You did not interview him?

A. No.

Q. Did you provide any training to him?

A. Yes, I did.

Q. Are you familiar with his background?

A. Vaguely. I don't have any direct -- I don't recall

anything special about him.
Q. Did you ever review his resume?
A. I don't think I saw that resume.
Q. Do you know how his level of experience compared to yours?
A. No, I don't.
Q. How much training was needed?
A. I don't know. I think I gave him 25 hours of dual, plus he went through SimCom. I believe that's correct. I know he went through SimCom. And I believe I gave him -- I gave him dual. I think it was 25 hours.
Q. The training that you provided him, was that for regulatory or insurance purposes?
A. I think it was -- it had to be insurance purposes.
Q. And the pilot that replaced you was, in fact, Mr. Holderread?
A. Mike Holderread, yes.
Q. Did Mr. Holderread ever express to you any personal sense of obligation to maintain proficiency with the aircraft?
A. No. We didn't talk about it.
Q. I would like to have the following marked as Exhibit 5.
(Exhibit No. 5 was marked.)
Q. (BY MR. MALO) Mr. Travis, can you identify this document?

A. This is a copy of my logbook.

Q. Does it appear to be a true and accurate copy of your logbook?

A. Yes, it does.

Q. Beginning with the first page of your logbook, just for my own edification, would you please explain to me how this logbook works.

A. Okay. The -- you mean go through the columns?

Q. If you could define the terms at the top of each column, please.

A. Okay. The date is, I think, self-explanatory. Aircraft make and model, that's self-explanatory. Identification of the aircraft, that's the -- what we call the in-number or registration certificate. From and To are the airport identifications. And then Total Duration of Flight. Classification, single-engine land is what the airplane was. Then continuing over, you have the conditions of flight, night, instrument, as flight instructor or -- and then, Remarks, anything you want to write in there to remind yourself about the flight.

Q. And Mr. Travis, what about some of the columns you skipped over, particularly on the second page?

A. Okay. Which ones are we talking about?

Q. Can you define -- I think you left off with actual instrument and skipped over to flight instructor.

A. Okay.
Q. Can you define the terms between those two?
A. Okay. You've got Simulated Instrument, which means typically underneath a hood or a view-limiting device. Approaches. "APP" means approaches. The number of approaches and type. Flight Simulator. Cross-country means some distance over 49 nautical miles. I think that's right.
THE WITNESS: Do you Steve?
MR. FRAHM: I concur.
A. Solo is solo occupant of the airplane. Pilot in Command is if you are PIC second in command. Dual Received means if you were receiving instruction as flight instructor as if you are the instructor.
Q. (BY MR. MALO) And specifically with reference to this second page, under what circumstances would you make an entry into each of these columns?
In other words, if you're flying at night, you'd log your time as nighttime; is that correct?
A. That's correct.
Q. If you're flying under actual instrument conditions, you would log your time as actual instrument?
A. Uh-huh.
Q. Does that apply to all of these columns?
A. Yes.
Q. And in flipping through your log for 2002, it appears

that a majority of these columns are blank --
A. Uh-huh.
Q. -- between Simulated Instrument Hood versus Dual Received?
A. Uh-huh.
Q. Those columns, inclusive, and everything between are almost entirely blank.
A. True.
Q. Why is that?
A. Because I didn't choose to put anything in there. It's not required, and I didn't choose to do it.
Q. Can you explain when you would be required?
A. Only if you're going to use it to verify flight time for a higher rating of certificate.
Q. And why was it not required of you to --
A. Because I have an airline transport certificate. There is no higher.
Q. In other words, your level of licensure exceeds these requirements?
A. That's correct.
Q. Okay. Under what set of circumstances would you log time as a flight instructor?
A. Well, anytime I give flight instruction, I log it. In fact, that's required.
Q. Your level of licensure does not exceed that

requirement?
A. No. That's required to give -- if you give instruction, you're required to log it.
Q. In flipping through your log, it appears that a substantial number of entries were recorded as flight-instructor time.
A. Uh-huh.
Q. Who did you provide flight instruction to?
A. Well, let's see. Jim Thompson, Mike Zerr. I'm sure there are others. Do you want me to keep going and name them all?
Q. No. Well, let me ask you this --
A. Okay.
Q. -- are the names of all the individuals that you provided flight instruction to recorded in the Remarks and Endorsements column?
A. Yes, I believe so.
Q. Did you provide flight instruction to any one individual more frequently than others?
A. Yes. It appears Jim Thompson.
Q. And during the flights which you recorded as flight instructor time and during which you were providing instruction to Mr. Thompson, would these hours have counted towards your currency requirements?
A. I may have to defer and ask a flight instructor here.



7320a7c2-1eda-44dc-982a-116eaa4cf3e6

MR. FRAHM: You are one.
A. I'm looking for the hook here, quite frankly, Jeff.
Q. (BY MR. MALO) Okay. Let me rephrase as a matter of personal practice then.
A. Okay. Thanks.
Q. Did you record or count the hours that you logged as a flight instructor as flights in which you satisfied currency requirements that we discussed under the FAA regulations or instrument approaches under the FAA regulations?
As a matter of personal practice, would you typically record this time or these flights?
A. No. That would -- for the currency, you'd have to be actually manipulating the controls.
Q. And if you were actually manipulating the controls, you would not have recorded that time as flight time, if I understand correctly.
A. That's correct.
Q. Okay. So it's an accurate statement then to say that no required -- regulatory required training was conducted for yourself or your own benefit for entires in your log that are dedicated to training of Mr. Thompson or others?
A. I think that's correct; however, we did some flights where we split the -- in fact, most of the flights were split in the flight time.
Q. And by that, you mean that a single flight would be

recorded as two flights so that the hours could be broken out between time that you dedicated to currency or instrument-approach required training versus time you spent as flight instructor?

A. No. It was always flight instructor, but what would happen is we would make an approach -- I'd make an approach, he'd make an approach; I'd make one, he'd make one.

Q. And those approaches counted towards your instrument-approach requirements?

A. The ones that I did, yes.

Q. And your currency requirements?

A. Yes.

Q. And the time dedicated to these approaches and currency flights for you personally, would you have included those in the total flight-instructor time that you logged for that particular flight?

A. I did, uh-huh.

Q. So to clarify, if I understand you correctly, your earlier statement was that you would not record flight-instruction time on a flight which you were performing for currency and instrument-approach regulatory requirements personally, for your own benefit. Are you recanting and saying that you would?

A. Yeah. Yeah. Sometimes we did. Sometimes these would count for my currency. When I would make the approach,

that would count for my currency.

Q. Okay. Would revenue flights count towards your currency?

A. Yes, it would, if you made -- if you made the approaches during a revenue flight, they would.

Q. Do you know what the purpose of any of the flights or the destination -- do you know how these destinations were chosen for any of the flights that you piloted during which you trained Mr. Thompson between May and September of 2002?

A. The purpose? The purpose of the destination?

Q. No. Why certain locations were chosen to fly to.

A. Well, let me take a look --

Q. Who made that decision?

A. Jim did.

There were some -- I would make a suggestion, for example, if the weather were better in one place or worse in one place, I might suggest that we go to Waco rather than Tyler, for example. We'd typically choose a place where the weather was worse.

Q. Was it more frequent that Mr. Thompson chose the destination than you?

A. Yes, it was.

Q. I would like to turn your attention to a few specific dates, if I may. I believe delivery of the PC-12 occurred on May 15th, 2002.

A. That's -- I think that's correct.
Q. In your log, there are several entries on PC-12s prior to that date, some of which have different aircraft identification numbers. Can you tell me what these flights were or why you took these flights?
A. I only find one. That was a demonstration flight from Kissimmee, Florida to Leesburg, Florida to Kissimmee. It was an orientation flight given by an instructor at SimCom that was on May 7th. Is that the one we're talking about?
Q. That's -- yes.
And the entry below that?
A. That was the PC-12's simulator in Orlando.
Q. And that was the SimCom training that you attended?
A. Uh-huh.
Q. And that's 20 hours?
A. Uh-huh.
Q. Let me ask you about flights that occurred on May 23rd.
A. Okay.
Q. They appear to be Dallas to Van Nuys to Santa Anna. And then falling over to the 24th, I believe, to Oregon, Klamath Falls; is that correct?
A. That's correct.
Q. Is this one of the overnight trips that you discussed earlier?

A. Yes, it was.
Q. And this occurred over a 24-hour period, 23rd through 24th, two days at least?
A. Yes. The flight went on beyond that, if you'll notice down to the 26th, I guess.
Q. Okay. Were any elements of this trip recreational?
A. I enjoyed it.
Q. You indicate in your remarks, "Circled Catalina Island off the coast of Mendocino"?
A. Uh-huh.
Q. Do you remember those trips?
A. Yes, I do.
Q. Were circling Catalina Island for recreation, was that done for pure enjoyment?
A. I thoroughly enjoyed it. I asked him could we circle Catalina, and we did it.
Q. Was there any training purpose for you to circle Catalina Island?
A. I have no idea.
Q. Do you remember going to Mendocino?
A. Yes, I do.
Q. Do you remember any of your activities that you may have engaged in while in Mendocino?
A. We stopped. I don't remember if we got fuel or not. And we went to lunch there, and then we took a break in

Mendocino.
Q. If I could ask you about May 25th.
A. Okay.
Q. Oakland to Pagosa Springs, Colorado.
A. Okay.
Q. Comments in your logbook.
What's up with these dates on different pages?
I'm sorry. That's actually on May 24th.
A. Okay.
Q. "Circled the lodge at Susanville"?
A. Uh-huh.
Q. No room at the inn, on May 24th. And then on May 25th, it looks like Oakland to CB1. I think that's Pagosa Springs.
A. I -- okay.
Q. To Pagosa Springs, Colorado, no rooms. And then on May 26th, it looks like from Pagosa Springs to New Mexico and then from New Mexico back to Dallas. And your comments: "On to Taos, New Mexico for the night."
Can you explain what you meant by these entries referring to lodging?
A. Yeah. We needed to find a place to spend the night. We were going to stop at Susanville, California, but there were no rooms available, so we went to Pagosa Springs, no rooms available there. So we went to Taos and spent the night.

Q. When you say there were no rooms available at Susanville, do you mean that the entire city or town had no vacancy?
A. Well, I don't know about that. We called the airport. There was a lodge at the airport, and there were no rooms available there.
Q. And the same with Pagosa Springs and Taos?
A. We landed at Pagosa Springs, went and got something to eat, and couldn't find any rooms.
Q. And again, you note that there were no vacancy in any hotels in Pagosa Springs?
A. I don't know about that.
Q. Or none at the hotels that you inquired?
A. Correct.
Q. That's correct?
A. Jim made the arrangements, and --
Q. Okay.
A. -- we didn't find a room.
Q. Do you know where you eventually stayed in Taos, New Mexico that night?
A. We stayed in a house that Jim had leased.
Q. Rental property?
A. Yes, I think so.
Q. Okay. If I could take a look at an entry on July 6th. It seems to be from Taos to JAC, which I think is West

Yellowstone, Montana.

A. JAC is Jackson Hole.

Q. Jackson Hole. Okay. I'm sorry.

On that date, the entry in your logbook: "Touched down at West Yellowstone, Montana." Do you remember that trip?

A. Yes, I do.

Q. And was that a trip to West Yellowstone as in Yellowstone Park or...

A. No. West Yellowstone Airport. I don't recall why we went in there, but we went in -- just a second. Let me find that entry. July 6th, Taos to Jackson Hole to Taos. We did a touch-and-go at West Yellowstone and then went to Jackson Hole, and we stopped for lunch at Jackson Hole.

Q. Was that one of the overnight trips that you discussed earlier, or was that a day trip?

A. That was a day trip.

Q. Okay. You only had lunch in Jackson Hole?

A. Uh-huh.

Q. The following entry on the following date, which I believe is the 7th, July 7th, you have an entry, J.T. looked at ranches near -- and I'm not sure what that last word is. Is that Taos?

A. Near Pueblo, P-U-E-B-L-O.

Q. Do you know what Mr. Thompson was looking at ranches

for?
A. No.
Q. Do you know, is that what the purpose of the trip was on that date, specifically going to Pueblo then to look at ranches?
A. Let's see. That was on the 7th?
Q. Yes.
A. We were going from Taos, it appears, to Redbird and we must have deviated up to -- near Pueblo to look at a ranch, look at some property, I think.
Q. On July 13th, you have an entry in which your remarks and endorsements, in addition to logging as instructor time 30 minutes, "Jim Thompson high-altitude airport familiarity"?
A. Uh-huh.
Q. "Kevin and Maggie flew down, back with us. Deb, Thomas and T.J. met us in Leadville, Colorado for lunch"?
A. Uh-huh.
Q. Can you tell me who these individuals are that are named in your remarks?
A. Yes. Starting from the -- of course, Jim Thompson is the obvious one. Kevin was my ex-son-in-law. Maggie is my granddaughter. Deb is my daughter. Thomas and T.J. are my grandsons.
Q. And they met you in Leadville, Colorado for lunch; is that correct?

A. That's correct.
Q. Turning now to August 21st, it looks like Dallas to Albuquerque to Taos.
A. Okay.
Q. In which you logged flight instructor time of three hours ten minutes.
A. Okay.
Q. And the comments are, "Jim Thompson, picked up Jim's nephew and niece" --
A. Uh-huh.
Q. -- and Deb." Can you explain who those individuals are?
A. Jim Thompson's nephew and niece. I don't remember their names.
Q. Okay. And then on August 25th, it looks like Taos to MKE, which I can't --
A. Milwaukee.
Q. Milwaukee, in which you logged three and a half hours -- I'm sorry -- three hours, 50 minutes as flight-instructor time?
A. Uh-huh.
Q. And the entry states that you flew Jim's sister, niece, and nephew; is that correct?
A. That's correct.
Q. Do you know if any of these individuals, either

family or friends of yours -- or family or friends of Mr. Thompson's -- do you know if they paid for their flights?
A. No, they did not. We didn't have certification. It would be illegal to charge.
Q. So these were guests that were flying for free?
A. True.
Q. Do you know if the purpose of any of these trips was to visit family?
A. Family was visiting Jim. I don't know.
Q. Well, if there was a flight from Taos, New Mexico to Milwaukee, I don't know who lives in Taos and who lives in Milwaukee.
A. The guests were flown from Taos to Milwaukee.
Q. By Mountain Air Charter?
A. By Jim Thompson's airplane.
Q. By Jim Thompson's airplane?
A. Yes.
Q. Okay.
A. Big --
Q. And you piloted?
A. Beg your pardon?
Q. And you piloted during these flights?
A. Yes, I did. I gave dual instruction, apparently.
Q. Can you define "dual instruction"?
A. Yes. It's when the flight instructor gives

instruction.
Q. What does the term "dual" indicate?
A. Dual means two; in other words, one person gives instruction to another.
Q. Is there any such thing as solo instruction?
A. Not that I know of.
Q. So all instruction is dual instruction?
A. There's ground instruction. I think that might be a reasonable statement.
Q. All in-air flight instruction is dual instruction?
A. Yeah, I think so.
Q. Do you remember taking any trips to Canada?
A. Yes, we did.
Q. Do you remember what your destinations were?
A. We went to Whitehorse, Yukon Territory, a couple of times.
Q. And what's in Whitehorse?
A. It was a charter trip.
Q. For paying customers?
A. Yes.
Q. Were you piloting the aircraft?
A. Yes.
Q. Was Mr. Thompson with you?
A. Yes, he was.
Q. Did flights to Whitehorse serve any training purpose

for you?
A. To me?
Q. Yes.
A. Not that I know of.
Q. Was there any requirement that Mr. Thompson be on those flights?
A. No.
Q. Was it, as you phrased earlier, smart to have Mr. Thompson on these flights to serve as safety pilot?
A. From the leg from here to Vancouver, the first one was a repositioning flight. And if I recall -- let me refer to this logbook a minute. It was eight hours; and yeah, it was, because eight hours you got to get up out of the seat at some point, and having him along made all the difference. Couldn't -- you can't sit in a seat eight hours.
Q. Do you know how long you were in Whitehorse?
A. No. Let's see. But we can figure it out, though. It looks like we came back on the 10th of October.
Q. And departed on the same date? Wait.
You said you came back on the 10th of October?
A. We departed Whitehorse on the 10th of October, yes.
Q. When did you arrive in Whitehorse?
A. September 29th -- no. We originally arrived in Whitehorse on September 28th, and then we took the party from Whitehorse to Atlin Lake, and I ferried the airplane back to

Whitehorse on the 29th.
Q. Okay. Was Mr. Thompson present during the entire trip?
A. No.
Q. Where did he go?
A. He got off in Atlin Lake.
Q. And went where, did he return to Dallas or somewhere else or --
A. No. He stayed with the party, the guests.
Q. Stayed with the guests?
A. Uh-huh.
Q. Do you know what activities were occurring during that time?
A. I wasn't there.
Q. Okay. Let me ask you again about just flight logs in general, if I may.
Are there standard practices for maintaining flight logs, or could pilots vary the way they maintain their personal flight logs?
A. There's a lot of individuality. There are regulatory requirements, and I believe I met each one of them, but there's a lot of -- a lot of ability to customize your own log.
Q. Okay. And are you familiar with any practices that -- when you say "customize your own log," what do you mean by that?

A. I write in the Remarks section.
Q. And there's no requirement to do that?
A. Only if you're given dual instruction. You have to write who it was and what you did.
Q. You're required to log your hours in terms of hours and minutes or --
A. It could be hours and minutes or hours and tenths.
Q. Hours and tenths?
A. It could be either, as long as you're consistent.
Q. And define tenths. That's round --
A. Tenths of an hour, six-tenths to an hour.
Q. Rounding to the nearest six minutes?
A. That's correct.
Q. Is it standard practice to keep handwritten logs?
A. Yeah.
Q. Do all pilots you know keep handwritten logs?
A. No.
Q. What is an alternative to keeping handwritten logs?
A. Not keeping a log at all. Most airline pilots don't keep logs.
Q. Are you familiar with pilots maintaining electronic logs?
A. I've heard of it. I've never done it.
Q. Did you ever see Mr. Thompson use a flight log?
A. No, I don't think so.

Q. Do you have any idea how Mr. Thompson recorded his flight time?
A. No, I don't. Jim's an electronic guy, so I -- I'll bet you it was electronic.
Q. When using a handwritten log, when do you actually make an entry in the book?
A. After the flight.
Q. So you would maybe fill out the first part when you depart, fill out the second part afterwards, or fill out the whole thing afterwards when you land?
A. No. No. I keep my logbooks at home. So when I'd come back from my trip, I'd write it down. Sometimes keep it on scraps of paper and log it days or weeks later.
Q. And that's fairly common?
A. Oh, yes.
Q. Fairly standard practice throughout the industry?
A. Uh-huh.
Q. Okay. Did you ever compare your entries in your logbook with Mr. Thompson's?
A. I don't recall doing that.
Q. Were you ever asked to certify or verify that he had certain numbers of flight hours under certain categories listed in these logs?
A. I don't recall doing that.
Q. If I can refer back to your log for a moment,

beginning with the page dated December 17th, 2002, and at the end of 2002 page.

A. Okay.

Q. And I only received through approximately April of 2003. Additional information was provided to me this morning, so I don't have the full list of your flight-log entries for 2003.

A. Okay.

Q. However, there is a dramatic difference in 2003, beginning at -- in the last few entries of 2002 and carrying over into 2003, there is a precipitous decline in the amount of time that you logged as a flight instructor.

A. Okay.

MR. REYNOLDS: Objection to form.

Q. (BY MR. MALO) In 2003, it appears that you logged very few hours as a flight instructor. Can you explain this?

A. Because I acted as flight instructor less in 2003.

Q. And why did you act as a flight instructor less in 2003?

A. Why did I act as a flight instructor less?

Q. In 2002, nearly every entry was logged as flight-instructor time.

A. Okay.

Q. In 2003, very few entries are logged as flight-instructor time. What changed?

A. Did less flight instructing.
THE WITNESS: Could I take -- excuse me a second. Take a break?
MR. MALO: Certainly.
(Break taken from 11:44 a.m. to 11:52 a.m.)
Q. (BY MR. MALO) Returning from a break. As a preliminary matter here before we get back into questions, I would like to have this identified as Exhibit 6.
(Exhibit No. 6 was marked.)
Q. (BY MR. MALO) Mr. Travis, I explained earlier that I had not received the full log for 2003 and was provided with these copies of your log earlier today, prior to starting this deposition. Can you please identify this document?
MR. REYNOLDS: You want to look at mine? Is this --
A. Yes. It's my logbook from -- Logbook Number 9.
Q. (BY MR. MALO) And it does appear to be a true and accurate statement of your flight -- or a true and accurate copy of your flight log?
A. Yes, it does.
Q. For 2003 or at least from April 7th, 2003?
A. That's correct.
Q. Through the end of 2003, calendar year?
A. Yes.
Q. Thank you.

Going back to our conversation earlier about some of the destinations for the flights that occurred in 2002 and 2003, you mentioned earlier that one of these destinations brought you to a house for lodging in Taos, New Mexico.
A. That's correct.
Q. And that the house was leased by Mr. Thompson.
A. Yes.
Q. Do you know if this house was leased as vacation property?
A. No, I don't.
Q. Do you know if it was a long-term lease or a short-term lease?
A. I don't know.
Q. Okay. Referring to the charter flight that you took to Whitehorse, Canada --
A. Okay.
Q. -- you said that this was a paying customer flight.
A. It was my understanding, yes, it was a paid flight.
Q. Do you know who the customer was?
A. Just a second. I think I can tell you. I think his name was Ned Mondol (phonetic), but let me look back right quick. Let's see.
Yes, Ned Mondol and his daughter, Alise Mondol.
Q. And do you know who was paying for that flight?
A. No, I don't.

Q. Do you know if Mr. Mondol or Ms. Mondol had any association or relationship to Mr. Thompson?
A. They knew each other, but I don't know what the relationship was.
Q. Do you know if they were employees of ORIX?
A. No, I don't.
Q. Would you describe them as friends?
A. Yes.
Q. And you indicated that Mr. Thompson stayed with them at -- I'm sorry -- the lake?
A. They went somewhere. I don't know where. I flew them into a place called Atlin Lake and dropped them off, and they went from there somewhere else.
Q. Okay. But you don't know any of those destinations?
A. No, I don't. I took the airplane back to Whitehorse.
Q. Okay. When you are providing flight instruction, do you sign the logbooks for your students?
A. If it's -- if necessary, if they want me to.
Q. So they're only signed at a student's request?
A. Yes.
Q. Did Mr. Thompson ever ask you to sign his logbooks?
A. I don't remember. I don't know.
THE WITNESS: I think I probably did, didn't I, Jim?
A. I honestly don't know.

Q. (BY MR. MALO) Would it have been standard practice for you to sign other students' logbooks?
A. If they presented a logbook, yes.
Q. And did they frequently present logbooks for your signature?
A. Yes.
Q. Turning again to your log for 2003 and 2002, do you notice that a significant number of entries in 2002 were recorded as flight-instructor time?
A. Yes.
Q. And is it accurate that a majority of these entries related to training dedicated to Mr. Thompson?
A. That's correct.
Q. And do you notice in your log for 2003 that there are far fewer entries recorded as flight-instructor time?
A. I think that's accurate to say, yes.
Q. And you notice that in 2003, there are far fewer entries in which you are providing training for Mr. Thompson?
A. Yes, I do.
Q. Is it accurate that in 2003, you provided some training, but primarily to other individuals?
A. I provided training to -- no, I wouldn't say primarily.
Q. Okay.
A. I'd have -- I'd honestly have to look and see who I

flew with and when.
Q. But it is accurate that you provided much less training to Mr. Thompson in 2003?
A. That's correct.
Q. Do you know why that is?
A. I presume he was -- well, he was qualified by then and --
Q. Qualified for what?
A. To fly the airplane.
Q. To fly the Pilatus PC-12?
A. Yes.
Q. Qualified to fly as a commercial pilot for revenue flights?
A. No.
Q. Qualified to fly solo?
A. Yes.
Q. And in 2003, you are aware of occasions on which Mr. Thompson flew --
A. Yes.
Q. -- the Pilatus PC-12?
A. Yes.
Q. But he was not qualified to fly revenue-generating flights?
A. No, he was not.
Q. Do you know why Mr. Thompson flew in 2003?

A. Mostly pleasure or personal business. I don't know. To answer your question, no, I don't.
Q. Did you ever observe Mr. Thompson flying the Mooney or have any knowledge of his flying the Mooney?
A. Yes.
Q. Prior to his being qualified on the Pilatus PC-12, did he fly the Mooney regularly?
A. I can't say regularly. I don't think he flew the airplane that much.
Q. And once he was qualified on the Pilatus PC-12, did he continue to fly the Mooney?
A. I think occasionally, but the Mooney was not hangared at the same location, so I -- that was somewhere else. I don't know.
Q. Okay.
A. Not part of our operation.
Q. Did -- when -- to the best of your knowledge, when you knew that Mr. Thompson flew solo, do you know if he had any guests?
A. No, I don't.
Q. Do you know what any of his destinations were?
A. No, I don't. Well, I know he went to Taos occasionally; but all his destinations, I don't know.
Q. And you don't know -- you previously stated that you don't know what the purpose of his solo flights was.

A. No, I don't. Let me -- let me retract that a little bit, because I know on a couple of occasions, he took the airplane for maintenance.

Q. Okay. On a couple of occasions, he flew solo for maintenance?

A. I believe that to be correct.

Q. Do you know enough about his use of the plane to state whether his -- a majority of his flights were for maintenance?

A. No.

Q. Solo flights?

A. No.

Q. Do you know if a majority of his flights were for what you phrased earlier as personal enjoyment?

A. It's personal. I can't say enjoyment. I'm not qualified to say that. He flew it personally. I have no idea why.

Q. Was there any business purpose for Mountain Air Charter to have Mr. Thompson pilot the Pilatus PC-12 solo?

A. Yes, to go -- to take the airplane to maintenance occasionally.

Q. Were there any other conceivable business purposes for him to fly solo?

A. I don't know that.

MR. MALO: Well, Mr. Travis, I think that's the

extent of the questioning that I have for you.
THE WITNESS: Okay.
MR. MALO: Why don't we take a quick two-minute break.
(Break taken from 12:02 p.m. to 12:05 p.m.)
Q. (BY MR. MALO) Okay. Mr. Travis, this will be our final round of questioning.
A. Okay.
Q. You stated earlier that Mr. Thompson was not qualified to fly for Mountain Air Charters.
A. That's correct.
Q. Can you explain what you mean by that?
A. Well, yes. I'd like to expand on that a little bit. He was not qualified to fly customers, passengers, in revenue service. He could take the airplane after he got qualified in the airplane, which was important -- to be able to take the airplane, when I was not available, to maintenance bases and for demonstrations, potential customers, that sort of thing.
Q. What is a demonstration flight?
A. Well, if you're not familiar with the airplane, perhaps you'd like to -- and you think you'd like to charter it, but you're not familiar, take you on a ride, a quick flight to -- or long flight, take you on a flight to see if you like it, to see if it's what you need.
Q. Would passengers pay for a demonstration flight?

A. No. Let me retract that. If I were doing it, possibly. I don't know. But if Mr. Thompson did it, they didn't pay. Very careful about keeping that -- Mr. Thompson was very careful about maintaining that distinction.

Q. Why was Mr. Thompson not qualified to fly passengers for revenue?

A. Well, because of our operation specifications under the FAA, I was the only one authorized to fly the airplane in revenue service.

Q. Did the operation specifications intend Mr. Thompson to ever become qualified to fly for revenue?

A. There's no intent on operation specifications. It's simply black and white.

Q. So if I understand you correctly, if Mr. Thompson were to become capable of flying passengers for revenue, it would require a revision to the operation specifications for Mountain Air Charters?

A. That's correct.

Q. Are you aware that any effort was ever made during the course of your employment to revise Mountain Air Charter operation specifications?

A. No, there was not. Let me rephrase that.

Not in that respect. I think we got revised op specs for different -- you know, as you go along, you change op specs, but never as far as changing pilots, until I left.

Q. Independent of the operations specifications limitations on Mr. Thompson's ability to fly revenue-paying passengers, were there any other qualifications that he lacked to fly for revenue?
A. Yes. You'd have to have a commercial or higher certificate to charge; and as I understand it, he had a private certificate at the time.
Q. As you understand it, he had a private certificate throughout the entirety of 2002 and 2003?
A. That's my understanding.
Q. Aside, then, from the licensure requirements and the operation specifications, were there any other requirements that he failed to satisfy in order to fly revenue passengers, insurance, for example?
A. I don't know about insurance. I never dealt with the insurance part of it, but that would preclude it. I mean, if he didn't have a commercial certificate or an ATP, you couldn't fly for hire.
Q. What was your understanding of his license type and rating?
A. It was a private pilot certificate.
Q. And that authorized him to fly the Pilatus PC-12 once he had satisfied the flight-instruction requirements provided by your instruction and SimCom?
A. That's correct.

MR. MALO: Okay. Mr. Travis, I can't think of anything further.

THE WITNESS: Okay.

MR. MALO: Thank you very much for your deposition testimony today.

MR. REYNOLDS: I'm going to reserve most of my questions for trial, but I want to go back to one area with Mr. Travis.

EXAMINATION

BY MR. REYNOLDS:

Q. The topic was solo pilot versus a pilot with a crew.

A. Okay.

Q. Do you recall that line of inquiry by Mr. Malo?

A. Uh-huh.

Q. Please explain why, in your mind, as you were training for the PC-12, it was important to you that you would be flying solo as opposed to having a crew?

A. Okay. The PC-12 is a fairly complex airplane, single-engine. It's a turbo prop. Relatively complex airplane, what we would call a technically advanced airplane with the avionics with the flight displays and such. And I had been flying a 767, triple 7s, those airplanes, and you always have at least one other crew member, a co-pilot. If you're flying internationally, you'll have three or four in the cockpit. So plenty of help. Well, with a single pilot, you

drop your chart, what do you do? You know, it's a big deal to -- just cockpit management, cockpit resource management. It's a huge difference in flying by yourself versus having some assistance.

Q. Please put some meat on the bones of the phrase you just used, "cockpit resource management."

A. "Cockpit resource management" is sort of a nebulous term, but it basically is a program whereby pilots use all resources available to them. You learn to manage everything you have, external and internal, within the cockpit, outside, use all the help you can get.

And in a single pilot, you have no help internally, so you're on your own. Like I said, little things like tuning a radio, holding a chart, hand me a -- with the airline, you'd say Hand me an approach plate, where you don't have that luxury with Pilatus. You dig it out yourself, set up your own approaches. You're a one-man band. Is that what you mean?

Q. Mr. Travis, is -- in all the years that you've been flying, is there any such thing in your mind as too much safety?

A. No.

Q. Were all of the hours that you donated or otherwise spent in the business of Mountain Air Charter necessary, based on your experience?

A. You mean the training hours?
Q. Yes, sir.
A. Yes, they were.
Q. Okay.
MR. REYNOLDS: I'll pass the witness.

FURTHER EXAMINATION

BY MR. MALO:
Q. Could I just ask you to clarify that last statement.
A. Sure.
Q. I'm sorry. And not sure the use of the word "donate."
MR. REYNOLDS: It may have been a poor term, but go ahead.
Q. (BY MR. MALO) Could you just simply clarify whether or not any and all services that you performed for Mountain Air were services that -- for which you received compensation?
A. Yes, I did. I did receive compensation.
MR. MALO: Thank you.
(End of proceedings at 12:13 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: THOMAS E. TRAVIS DATE OF DEPOSITION: APRIL 23, 2007

PAGE LINE CHANGE REASON



7320a7c2-1eda-44dc-982a-116eaa4cf3e6

I, THOMAS E. TRAVIS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_______________________________
THOMAS E. TRAVIS

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared THOMAS E. TRAVIS, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

_______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________
COMMISSION EXPIRES: _______________

STATE OF TEXAS)

I, Diana Pereira, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 23rd of April, A.D., 2007, at 11:08 a.m., at WINSTEAD, located at 5400 Renaissance Tower, 1201 Elm Street, in the city of Dallas, State of Texas, the following name person, to wit: THOMAS E. TRAVIS, who was by me duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath, and his examination was reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn to and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows.

Mr. Stuart M. Reynolds, Jr. - 00:02,
Mr. Steve Frahm - 00:00,
Mr. Jeffrey R. Malo - 02:12.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that, before completion of the deposition, the Deponent, THOMAS E. TRAVIS, and the Plaintiff, did request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this ___ day of _________________, A.D., 2007.

Diana Pereira
______________________________.
Diana Pereira, Texas CSR 8129
Expiration Date: 12/31/2007
Firm Registration No. 286
Esquire Deposition Services
1700 Pacific Avenue
Suite 4750
Dallas, Texas 75201
(214) 257-1436

AUTHENTIC COPY
The original certified E-Transcript file was electronically signed using RealLegal technology.