IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 06-211T

(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

V

THE UNITED STATES,

Defendant

---------------------------------

ORAL DEPOSITION OF

MICHAEL D. HOLDERREAD

APRIL 23, 2007

Volume 1

---------------------------------

ORAL DEPOSITION OF MICHAEL D. HOLDERREAD, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 23rd of April, 2007, from 2:07 p.m. to 3:22 p.m., before Diana Pereira, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of WINSTEAD, 5400 Renaissance Tower, 1201 Elm Street, Dallas, Texas, pursuant to the Rules of the Court of Federal Claims.

GOVERNMENT EXHIBIT
21



09d02059-7e04-4a87-b6af-ca76c090f8d5

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. STUART M. REYNOLDS, JR.
WINSTEAD
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 745-5360
(214) 745-5400 FAX

FOR THE DEFENDANT:

MR. JEFFREY R. MALO
MR. STEVE FRAHM
US DEPARTMENT OF JUSTICE, TAX DIVISION
COURT OF FEDERAL CLAIMS SECTION
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
(202) 305-7539

ALSO PRESENT:

Mr. James R. Thompson



09d02059-7e04-4a87-b6af-ca76c090f8d5

# INDEX


| | PAGE |
|---|---|
| Appearances.................................... | 2 |
| MICHAEL D. HOLDERREAD Examination by Mr. Malo.......................... | 4 |
| Signature and Changes.............................. | 37 |
| Reporter's Certificate............................. | 39 |


# EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Michael D. Holderread's resume.................. | 6 |
| 8 | Photocopy of my logbook starting at December 18th, 2001, ending February 3rd, 2004... | 24 |




09d02059-7e04-4a87-b6af-ca76c090f8d5

P R O C E E D I N G S

MR. MALO: Good afternoon. My name is Jeff Malo, and I'm joined today by Steve Frahm. We're with the Department of Justice, representing the United States in the matter of James Thompson versus the United States.

With us this afternoon is Michael Holderread, our deponent. And he is joined by Mr. Thompson and his attorney, Mr. Reynolds.

MR. REYNOLDS: Do you want to swear the witness in?

MR. MALO: Oh, yes. I'm sorry.

MICHAEL D. HOLDERREAD,

having being first duly sworn, testified as follows:

EXAMINATION

BY MR. MALO:

Q. First, I'd like to acknowledge that this deposition has been scheduled by agreement of the parties and express our thanks for everyone's cooperation in meeting with us here today. And, second, I'd like to state that this deposition is being taken in accordance with the Rules of the Court of Federal Claims.

Now, Mr. Holderread, have you ever been deposed before?

A. I don't understand what "deposed" means.

Q. Have you ever given testimony under oath outside of a

courtroom in a --
A. No.
Q. -- in a meeting environment like this? No?
A. No.
Q. Okay. Well, let me explain the process to you a little. I will ask you a number of questions. If at any point my questions are unclear, I ask that you not answer the question; instead, ask me to rephrase and I will. If you don't know the answer, please tell me.
And I don't want you to speculate, but if you have some idea of what the answer is, but you're not absolutely certain, please provide the information that you have and describe the limits on your level of certainty.
We can take a break at any point in time. Please, just ask if you'd like to take a break. And Mr. Reynolds here may object to certain questions that I ask. If he objects, I have three options. I can either withdraw my question, rephrase the question, or ask you to answer the question as posed.
If at any time during our discussion you remember additional information about a prior matter that we have discussed, please provide that information to me even if we have gone to another topic. If you wish to revise an answer or believe you are mistaken, please advise me of this fact at any time during the deposition.

The years at issue are 2002 and 2003. So all questions that I ask, unless I specify otherwise, relate to that period. Now, it's our understanding that you were employed by Mountain Air Charter, LLC from approximately November 2003 through October 2004; is that correct?

A. That is correct.

Q. Okay. So for any questions that I ask when I refer to your employer, I am referring to Mountain Air Charter and/or Mr. Thompson. If any answers that you provide to questions of mine relate to situations where you were performing certain activities or services outside the scope of your employment, please indicate so in your answer, okay?

A. Okay.

Q. You understand all that?

A. Yes.

Q. Very good.

MR. MALO: I'd like to have the following marked as Exhibit 1.

MR. REYNOLDS: May we go off the record just a minute?

MR. MALO: Certainly.

(Discussion off the record)

(Exhibit No. 7 was marked)

Q. (BY MR. MALO) Okay. Mr. Holderread, could you identify this document for me?

A. This is my current, as of April 18th, 2007, resume.
Q. Thank you. Would you state your full name for the record.
A. Michael David Holderread.
Q. And your address?
A. 607 Evans Drive, Euless, Texas, 76040.
Q. Telephone number?
A. 817-355-1032.
Q. Would you describe your educational background?
A. Associate's degree, Mountain View College, Dallas, Texas.
Q. And could you describe your formal flight training background?
A. Private instrument, commercial, multi-engine instructor, instructor -- instrument instructor multi-engine.
Q. Okay. Where did you learn how to fly?
A. Arlington, Texas.
Q. And did you learn how to fly through private instruction?
A. Yes.
Q. Did you ever take any commercial training courses in flying?
A. Yes, for the commercial pilot certificate.
Q. Can you name those commercial courses that you completed?

A. It's just a commercial -- the training for a commercial pilot certificate. It's one -- basically one course.

Q. Was there a company that provided this training?

A. No.

Q. When did you first begin working for Mountain Air?

A. October of 2003.

Q. Okay. Your resume indicates November. Was there a period of time prior to your employment with Mountain Air that you were in any way, shape, or form associated with Mountain Air Charter, LLC?

A. Yeah, that would have been the first flight to kind of get used to the airplane before I actually did the formal training for that airplane.

Q. Do you know when that occurred?

A. That first flight was October 28th, 2003.

Q. Okay. When did you begin interviewing for this position?

A. I don't know the exact date, but it had to have been mid-October of 2003.

Q. So from the period that you first began interviewing, mid-October 2003, to the period of time when you started working for hire, November 2003, is it an accurate statement to say that two to three weeks had elapsed?

A. I don't know. Possibly not that long.

Q. Possibly less time than that?
A. Yes.
Q. Prior to working for Mountain Air, had you ever flown a Pilatus PC-12?
A. No.
Q. Did you fly a similar type of aircraft?
A. I don't know how to answer that question.
Q. Okay. Let me --
A. It's a very -- it's really an airplane that I -- I don't know if I can compare in a similar fashion with other airplanes.
Q. Okay. Prior to working for Mountain Air, were you qualified to fly the Pilatus PC-12?
A. As far as the FAA is concerned, yes.
Q. Okay. How about for insurance purposes?
A. No.
Q. In what way were you not qualified to fly the Pilatus PC-12 for insurance purposes?
A. I had not been through formal simulator training in an approved school for that airplane.
Q. Did you complete simulator training in an approved school?
A. Yes.
Q. And what was the school?
A. SimCom in Orlando, Florida.

Q. When did you complete that training?
A. I don't know the exact date. I believe it was on Thanksgiving of 2003.
Q. Okay. So the same month that you began working?
A. Yes.
Q. Prior to completing the SimCom training, had you flown the Pilatus PC-12 on your own, solo?
A. No.
Q. Had you flown it at all?
A. Yes.
Q. With whom did you fly the plane?
A. With Tom Travis.
Q. And what was the purpose of flying with Tom Travis?
A. To become more familiar with the plane in preparation for training.
Q. And how many hours were required for you to train on the Pilatus PC-12?
A. In -- in training or before entering training?
Q. Prior to commencing your employment as a solo pilot on revenue-generating flights for Mountain Air Charter.
A. And the question was?
Q. How many hours did it take for you to train on a Pilatus PC-12 prior to commencing flights that you piloted for revenue?
A. I don't know.



09d02059-7e04-4a87-b6af-ca76c090f8d5

Q. Is it accurate to state that the first time you flew in a Pilatus PC-12 was on October 28th, 2003?

A. Yes.

Q. And is it accurate that after completing the SimCom training, which you believe to be Thanksgiving weekend of 2003, that you began flying as a solo pilot?

A. Yes.

Q. Flying the Pilatus for revenue-paying passengers?

A. Yes.

Q. Would you be able to estimate how many hours between October 28th through Thanksgiving of 2003 you spent training on a Pilatus PC-12?

A. Yes. 18 hours.

Q. Is that independent of or in addition to SimCom training?

A. Independent.

Q. So 18 hours of actual flight training, plus SimCom training, which I believe is 20 hours?

A. The SimCom training is definitely training. The time that I flew before that was -- I don't think can be considered formal training. It was a form of training, but not formal training.

Q. Informal training, would you call it?

A. Yes.

Q. Okay. And what was the purpose of the 18 hours of

informal training that you received?
A. To become more familiar and comfortable with the airplane before the formal training.
Q. And after 18 hours of flying on the Pilatus, had you satisfied your own estimation of becoming sufficiently comfortable with the Pilatus to fly independently?
A. Yes.
Q. What other aircraft had you flown prior to the Pilatus PC-12?
A. Cessna 150 series, Cessna 170 series, Cessna 300 series, 400 series, 500 series, King Air 90 series. That would have been about it.
Q. How did those aircraft compare to a Pilatus?
A. Totally different.
Q. Are they different type?
A. Uh-huh.
Q. What's different about them?
A. The Cessna 150 series, 170 series, 300 and 400 are all reciprocating engines. The Pilatus is a turbine -- turboprop engine. The King Air series, although it was a turboprop like the Pilatus, it was a two-engine airplane; whereas, the Pilatus was one. And then the Cessna 500 series is turbojet.
Q. In relation to the other aircraft you flew, would you state that the Pilatus was more or less complex than any of the

other aircraft you had flown?
A. Probably more complex.
Q. Aside from the time that you spent with Mr. Travis, did you independently pursue any additional training on a Pilatus PC-12 prior to interviewing and working for Mountain Air Charters?
A. No.
Q. Since your employment with Mountain Air Charter, have you flown PC-12s?
A. No.
Q. And the records indicate that you terminated employment with Mountain Air Charter in October of 2004?
A. Yes.
Q. And why did you terminate employment?
A. I had a job offer with another company to fly turbojet aircraft.
Q. Which make or model of aircraft did you fly?
A. It was a Citation 550, which is the same thing as saying a Citation 2.
Q. And that's another turboprop aircraft?
A. No, this is a turbojet aircraft.
Q. Turbojet aircraft.
A. Uh-huh.
Q. When did you first become aware of this case?
A. Maybe two months ago. I -- I don't recall for sure.



09d02059-7e04-4a87-b6af-ca76c090f8d5

Q. How did you first learn about this case?
A. By an e-mail from Jim Thompson.
Q. And what did Mr. Thompson tell you by e-mail?
A. That he was in a case against the U.S. Government and would I mind helping him out by giving a deposition.
Q. Did he indicate in any way what the topics to be discussed in your deposition -- deposition would be?
A. No.
Q. Did you meet with anyone in connection with this litigation?
A. Stuart Reynolds.
Q. When did you meet with Mr. Reynolds?
A. It was last week.
Q. Is Mr. Reynolds representing you as an attorney?
A. No.
Q. When did you agree to testify in this case?
A. When I received the first e-mail from Jim Thompson.
Q. Did you review any particular documents in connection with your preparation for this deposition?
A. Yes.
Q. What did you review?
A. My logbook.
Q. Did you do anything else to prepare for this deposition?
A. No.

Q. What were your responsibilities as a pilot for Mountain Air Charter?
A. To fly the plane; answer calls or e-mails, if any; set up hotel and rent car, if needed for myself; and keep track of flight time for Mr. Thompson.
Q. Can you explain what you mean by that? Are you referring to your flight time, Mountain Air flight time, or Mr. Thompson's flight time?
A. It would be a Pilatus that belonged to Mountain Air, the flight time for that airplane.
Q. Did you maintain the flight time for all revenue flights?
A. Yes.
Q. Did you maintain the flight time for any non-revenue flights?
A. No.
Q. Did you maintain flight time for any flights that you did not pilot?
A. No.
Q. Are you aware of any flights that occurred that were non-revenue flights?
A. I know there were, but I couldn't tell you the dates or anything.
Q. Do you know enough about them to say whether these occurred frequently or infrequently?

A. I would say maybe not frequently, but fairly regularly.

Q. Can you maybe estimate how many times per month, how many times per year?

A. Maybe once or twice a month.

Q. And who piloted these flights?

A. Jim Thompson.

MR. REYNOLDS: Mr. Malo, could I get you to be a little bit more precise on dates? You have set the boundaries here as involving the years 2002 and 2003, and I think we're hearing about six weeks of relevant time period.

MR. MALO: Agreed.

MR. REYNOLDS: So I think the last answer was maybe spilling over into a non-relevant time period.

MR. MALO: Into 2004. Understood.

Q. (BY MR. MALO) When you interviewed --

A. I'm sorry. Going back to the last part of 2003, which I actually flew for Mountain Air Charter, I can't say for sure if I remember there being a non-revenue flight that -- or that I did not pilot in that last -- and maybe there was, but I really don't know.

Q. And during that last portion of 2003, are you aware of any flights that were piloted by Mr. Thompson?

A. I don't know for sure.

Q. Okay. During the process -- or the interviewing

process for your position with Mountain Air, was there any discussion about performing a role as an instructor?

A. No.

Q. During your employment in 2003 with Mountain Air, did you provide any flight instruction?

A. No.

Q. To the extent that you underwent training to fly the PC-12, you indicated that this training was necessary for insurance purposes?

A. Yes.

Q. Not for FAA regulatory purposes?

A. That is correct.

Q. During the course of a regular flight, can you please describe what the preflight procedures entail?

A. Supervise the airplane being pulled out of the hangar and onto the ramp, doing a thorough preflight inspection via the checklist in the airplane's book, putting ice or newspapers on board, getting the preflight clearance, setting up the cockpit for the flight.

Q. And can you describe post-flight activities?

A. Cleaning up anything in the plane, trash or whatever, securing the plane. And that's pretty much it.

Q. How much time would preflight activities typically take?

A. Typically a half-hour or 45 minutes.

Q. And post-flight?
A. Probably about a half-hour or a little less.
Q. And for that portion of 2003 that you were flying as the pilot for Mountain Air, did Mr. Thompson ever accompany you on a flight?
A. As the passenger.
Q. As a paying passenger?
A. I assume that ORIX Capital Markets was the paying company for the charter. As far as I knew, he was just a passenger in the back.
Q. Did he ever act as a pilot on any of these flights?
A. No.
Q. Did he ever assist you with preflight activities?
A. No.
Q. Did he ever assist you with post-flight activities?
A. No.
Q. You said you assumed that ORIX Capital Markets was the paying passenger or the paying entity for the flight. Why did you assume this?
A. Because, as far as I knew, the trips were for Mr. Thompson regarding business for the company that he worked for. I don't know.
Q. Was Mr. Thompson ever accompanied by other ORIX employees on these trips?
A. Yes.

Q. Do you know the identities of any of these employees?
A. No, I don't recall.
Q. Do you recall whether any flights -- again, for that 2003 period, do you recall whether any flights were dedicated to ORIX employees excluding Mr. Thompson?
A. I don't think there were.
Q. Okay. So it's an accurate statement that through the end of 2003, to the best of your knowledge, Mr. Thompson, either alone or with other ORIX employees, were passengers for Mountain Air Craft -- Air Charters?
A. That's correct.
Q. Were there any other passengers besides ORIX employees for 2003?
A. Yes.
Q. Did you pilot these passengers?
A. Yes.
Q. Do you know by any chance the names of any of those individuals?
A. I had one flight for Tim Gehan, G-E-H-A-N.
Q. And where did you fly him?
A. Dallas to Denver to Telluride, Colorado.
Q. Is it an accurate statement, then, that from the time you began employment with Mountain Air through the end of 2003, with the exception of Mr. Gehan, Mr. Thompson and other ORIX employees were exclusive passengers for Mountain Air Charters?

A. Yes.
Q. And it was your assumption or your belief that ORIX was paying for these flights?
A. Yes.
Q. And what was the purpose of these flights?
A. Business, I think.
Q. Were there any flights that you think were dedicated to recreational purposes?
A. No.
Q. Did Mr. Thompson play any role on these flights?
A. As far as?
Q. Aside from being a passenger?
A. No.
Q. You mentioned earlier that you would answer calls or e-mails, if there were any. Does that mean that you were involved in scheduling flights?
A. Involved to the point of if there was a call, I would have to call Mr. Thompson and discuss it with him, as far as scheduling. But I couldn't just write it on the schedule.
Q. So there was some master calendar or log in which flights were scheduled?
A. Not that I'm aware of. If there was, it was being kept by Mr. Thompson.
Q. So describe to me how that process worked then. If -- if a call came in requesting a specific flight --

A. Then I would call Mr. Thompson and say, We have an interested party for this date.
And he would tell me if it was open on his end or not.
Q. Were you ever asked to quote fares by customers?
A. In 2003, I believe what I did on that was, again, went to Mr. Thompson and discussed the -- all the details of the flight, and then he would give -- tell me whatever the price was. And then I would call them back and tell them.
Q. So standard procedure would have been for a call to come in inquiring about availability for a certain flight from a certain point of origin to a certain destination on a certain date at a certain time. You would take that information, present it to Mr. Thompson, who would make a decision regarding whether or not Mountain Air Charter would take the flight and what the fare for the flight would be. Is that an accurate statement?
A. Yes.
Q. And then you would communicate that information back to the customer?
A. Yes. I might just add that probably for every call I received, Mr. Thompson probably received twice as many calls.
Q. Where would these calls come into?
A. Actually, with me, it was someone that I knew previously calling me on my phone, or I believe I may have had

an e-mail from someone I didn't know.

Q. Was there a main office for Mountain Air that these calls were received?

A. There was a main office, but it was not manned by anyone to take calls.

Q. Could you describe the main office?

A. Small room and a hangar with the basic computer and office supplies and a little bit of storage space.

Q. And a telephone?

A. Yeah, it did have a telephone.

Q. And you say the main office was not manned to take calls. Can you describe what you mean by that?

A. If I was there and not flying, it was manned. But if I was not scheduled to fly, then I did not go into the office. So it was just basically if one of us was there, that was when we would have been able to take a call on that phone.

Q. Was -- did Mr. Thompson spend a lot of time in that office?

A. I don't know.

Q. How is it that Mr. Thompson took twice as many calls as you?

A. He already had a -- probably already had a large base of people that knew about his plane that he knew.

Q. So potential customers would call him personally --

A. Uh-huh.

Q. -- to schedule flights?
A. Or inquire about a flight.
Q. You described this as a large base of customers?
A. Well, a larger base than what I had. I only had one or two guys that I know -- that I can think of during the whole time that I worked for Mountain Air Charter that knew me personally.
Q. And, to the best of your knowledge, again, through the end of 2003, at least, what was your understanding of Mr. Thompson's relationship with this large base of customers?
A. Well, let me just rephrase that. I don't think it was a large base. It was just a larger base than I had, which was almost nothing.
Q. I'll rephrase.
A. I really don't know how big of a base of customers he had. So rephrase the last question for me -- or say again the last question.
Q. Certainly. I'll rephrase as: What was your understanding of the nature of the relationship between Mr. Thompson and this group of customers?
A. I really don't know. Just people that maybe he had done business with in the past or knew from being at the airport in the past. But I really don't know for sure.
Q. Did you know any of them to be ORIX employees?
A. No.

Q. I'd like the following to be identified as Exhibit Number 8.

(Exhibit No. 8 was marked)

Q. (BY MR. MALO) Mr. Holderread, can you identify this document for me?

A. This is a photocopy of my logbook starting at December 18th, 2001, ending February 3rd, 2004 -- it started December 18th -- yeah, 2001. Sorry.

Q. And, Mr. Holderread, you sent this log to me electronically; is that correct?

A. Yes.

Q. And in the e-mail that you used to send this log to me, you indicated that the pages should be numbered 1A, 1B, 2A, 2B; is that correct?

A. Yes. That was just for the purposes of the number of pages that I was e-mailing you so that you could know the order. But they are not actually numbered in my logbook.

Q. If I could ask you, then, to turn to what we -- we have identified in our exhibit as Page 17A, which is also October 28th, 2003.

A. Okay.

Q. And it's my understanding that what you said earlier, that this entry on October 28th for a PC-12 Tail Number 463JT, that was the first occasion that you had flown a Pilatus PC-12?

A. Yes.

Q. Mr. Holderread, would you please explain to me how this pilot's log works? Can you explain how you would fill out entries for flight?

A. Well, the duration of the flight is 1.9 hours. So that's what the "1.9" is.

Q. Okay.

A. The first column -- every flight that I do goes in the column because it's total duration of flight. It's regardless of any type of aircraft that I fly. So at the bottom of that page you can see the amount forwarded, with the last page at 5,989.6. And then when I filled the page up, totaled it all up, there's my total flight time as a pilot.

The second column is single-engine. The Pilatus PC-12 was a single-engine, so it was logged there. And the airplane multi-engine land column, although I wrote it there, I scratched it out at the time because I had been used to filling out that column. TP, the column that's marked TP, is for turboprop. And the PC-12 was a turboprop. And then the jet column was not. Landings, there were two day landings on that flight and zero night landings.

Q. And as we continue across, you had -- on what is identified for us as Page 17B, describe the rest of that entry.

A. There's a night column. That was a day flight, so no time was logged there. Actual instrument is time that the airplane is flown by reference to instruments because, you

know, maybe you're in the clouds. You get a simulated instrument with a hood, which is typically for training only. There's an instrument approach column, how many you did and what type they were; flight simulator column; cross-country column. Now, that's -- any time you take off one airport and land at a different airport it's considered cross-country flight. And so that was cross-country flight.

Solo is typically reserved for the purposes of a pilot who is training to get their private pilot license and they are flying without an instructor. And that's typically why that's called a solo flight. And I was with Tom Travis that day, so that was not a solo flight. Pilot in command, I was the sole manipulator of the control, so that -- I can log that as pilot in command. We have second in command, dual received, and as flight instructor.

The last column is remarks and endorsements. As far as endorsements go, if I was receiving some sort of official required by the FAA-type training, the instructor would need to endorse that column with his signature and say in detail what kind of training I received. Other than that, you're really not required to put anything here, but I've always made a practice of putting what company I did the flight for, in this case Mountain Air, and then whoever was sitting in the other seat flying with me. And in that case, it was Travis, as in Tom Travis.

Q. Okay. So your -- your use of the remarks and endorsements column, it was your personal practice to write down the name of the passenger and the company that the passenger was related to?
A. No, it's the company that owns the airplane. And if there was another pilot in the front, I would write that. Or if -- in a lot of -- in some of these columns I wrote the passenger -- or the lead passenger's name. I believe I made kind of a habit out of doing that when I worked for Mountain Air Charter. I would write Jim Thompson's name down because he was the lead passenger.
Q. Okay. So turning to what we have identified as Page 18A, which is also, for your records in your logbook, the date that begins on November 12th, 2003, there are a series of entries with remarks and endorsements; Mountain Air, Travis, Mountain Air, Travis, and then some additional names. We see the FAA 135 V-ride Chuck Dawson. Can you describe what that is?
A. That is the FAA 135 checkride, and Chuck Dawson was the FAA examiner. And I can't legally pilot a charter plane on a charter without having completed this checkride.
Q. So this is a regulatory requirement that's satisfied by this flight?
A. Well, typically, yes. But there were two flights on this page that were 135 checkrides. The first one was cut

short because of weather, so we finished it up on another day.
Q. Okay. Continuing down that column, you have another entry marked as a fairy flight. Can you describe what a "fairy flight" is?
A. That would be flying the plane empty with no passengers for the purpose of typically maintenance.
Q. And then the subsequent entry is "solo"?
A. Yeah. I wrote solo just meaning that there was nobody on board other than me.
Q. Okay. And then we see the flights involving Mr. Gehan that you mentioned were revenue flights?
A. Uh-huh.
Q. And the remaining entries on the page are Mr. Thompson --
A. Correct.
Q. -- and ORIX employees?
A. Correct.
Q. And on the final page of 2003, with the exception of two maintenance flights and the final two entries, all of these flights were -- in fact, the final two entries relate to 2004, I believe. The remaining flights for 2003, with the exception of the maintenance flights, are all Mr. Thompson. I guess there's just one on that page then. Is that correct?
MR. REYNOLDS: That question was a little garbled. There are three entries --

MR. MALO: Three entries for 2003.
MR. REYNOLDS: -- for 2003.
Q. (BY MR. MR. MALO) Two are maintenance flights?
A. Correct.
Q. And the final entry was Mr. Thompson?
A. Correct.
MR. MALO: Okay. I suggest we take a little break.
MR. REYNOLDS: Sure.
(Break taken from to 1:26 p.m. to 1:40 p.m.)
MR. MALO: Thank you. We're returning from a break. We probably won't need too much more time here, Mr. Holderread, but I just wanted to follow up on a couple of comments that we had during our first -- first discussion this afternoon.
Q. (BY MR. MALO) You mentioned that you spent 18 hours in actual flight in the PC-12 in what you called not formal training. Did all of that time occur prior to your training at SimCom?
A. Yes.
Q. And after completing the SimCom training, you were able to fly revenue flights?
A. Yes.
Q. And the SimCom training was only a simulator?
A. Yes.


09d02059-7e04-4a87-b6af-ca76c090f8d5

Q. Perhaps in reference to your log, can you identify the actual date on which you began employment with Mountain Air Charter?
A. Define "employment" -- "began employment."
Q. Were officially on payroll.
A. To be honest, I do not remember when I was on payroll.
Q. Okay. Perhaps with the assistance of your log, can you define the first revenue flight that you flew for Mountain Air Charter?
A. December 4th, 2002 -- I'm sorry. December 4th, 2003.
Q. Who was your passenger on that flight?
A. Gehan.
Q. Do you know who Mr. Gehan was?
A. Mr. Gehan was who I used to work for -- well, not even a whole year before I started working for Mountain Air.
Q. Was Mr. Gehan a customer of Mountain Air that used Mountain Air services as a result of a connection through you?
A. Yes.
Q. I'd like to ask you a little more about your prior experience as well. You mentioned a host of an aircraft type that you had flown on prior to your employment with Mountain Air. Can you tell me if you flew any of them in a Part 135 operation?
A. Yes.

Q. Okay. Which of your former employers were Part 135?
A. Ravenair Charters, Lifeguard Aeromed, Zebra Air. And that's it.
Q. That's it. What were your remaining employers identified as?
A. Corporate Part 91.
Q. In either your experience as a Part 91 or a Part 135 pilot prior to your employment with Mountain Air, did you operate in a single-pilot environment?
A. Yes.
Q. Did you ever have a crew?
A. Yes.
Q. And what role did the crew play for you?
A. Co-pilot or co-captain.
Q. And what activities or what services did they perform in that role?
A. Share the responsibilities of the flight.
Q. Was there any allocation of responsibilities in terms of specific duties to be performed by each member of the crew?
A. Yes. The captain typically flies, controls the plane. Co-pilot typically operates the radios. And both pilots work together for the safety of the flight.
Q. And what's the difference when flying as a single pilot?
A. You do everything.


09d02059-7e04-4a87-b6af-ca76c090f8d5

Q. Is this a significantly more complex role?
A. In certain situations, like low weather days, yes.
Q. What is a low weather day?
A. Clouds -- low enough clouds that require you to do an instrument approach to find the runway, or also more of a workload in a high-traffic situation, like flying into a major metropolitan airport.
Q. When you began working with Mountain Air through 2003 and, to your knowledge, prior to your employment with Mountain Air, did Mountain Air fly into major metropolitan airports?
A. Yes.
Q. Which ones?
A. Well, San Antonio would be considered one, Denver, Kansas City, Chicago.
Q. And how are you defining that term, "a major metropolitan airport"?
A. By the airport having a Class B air space.
Q. And what does that mean?
A. It's just a level of control that aircraft are required to be under entering the air space.
Q. Is "Class B" an FAA-recognized term?
A. Yes.
Q. Is the FAA the regulatory authority that established those class ratings?
A. Yes.

Q. You also mentioned earlier that you would occasionally answer phones or respond to e-mails regarding inquiries for potential flights and potential customers. You indicated that if a flight inquiry was made, you would relay the relevant information to Mr. Thompson and call him to see if Mountain Air was open or not. Can you define what you mean by "whether Mountain Air was open or not"?

A. Whether the plane was already scheduled for something that Mr. Thompson had set up or if Mr. Thompson was going to use the plane on one of his personal trips during that time.

Q. Can you identify specifically what the potential conflicts could be then for customers inquiring? It sounds -- if I understand you correctly, you're saying that Mountain Air might have already scheduled a revenue flight with another customer or Mr. Thompson may have had personal intentions for the use of the aircraft?

A. Yes.

MR. REYNOLDS: Are we still talking about six weeks in 2003?

MR. MALO: Yes, sir.

MR. REYNOLDS: Okay.

Q. (BY MR. MALO) And -- and, just to clarify, it was my understanding that during the period that you were first employed by Mountain Air, you handled this -- phone calls and e-mails and took inquiries about potential flights?

A. I honestly don't remember if I had a single e-mail or phone call other than my former employer, Mr. Gehan.
Q. Okay.
A. I honestly don't remember. I would guess I probably didn't have any calls at that time.
Q. Then I suppose is it an inaccurate statement to say that your subsequent experience beyond 2003 is the basis upon which you have developed an opinion as to what would have happened if you had experienced a conflict in those six weeks?
A. No. This was discussed when Mr. Thompson first hired me, of how this was going to work.
Q. Okay. So as part of your initial employment, part of your understanding of your job duties, you're instructed that scheduling of flights were to be approved by Mr. Thompson?
A. Yes.
Q. And that revenue customer flights would only be taken to the extent that they did not conflict with either other paying customers or Mr. Thompson's personal use of the aircraft?
A. That they would not conflict with other passengers who have already scheduled something. But a possibility was that if Mr. Thompson had already made plans to take the plane for his personal use, he would consider changing his plans to accommodate a potential customer.
Q. Okay. And during that 2003 period, this situation


09d02059-7e04-4a87-b6af-ca76c090f8d5

was never encountered?
A. No.
Q. But, as a practical matter, to the extent you had paying customers, ORIX Corporation and Mr. Thompson formed a large percentage --
A. Yes.
Q. -- of those customers. Is that an accurate statement?
A. Yes, it is.
Q. So it was not likely that there would have been a scheduling conflict between Mr. Thompson's personal use of the aircraft and paying customers through the ORIX Corporation?
MR. REYNOLDS: Objection; form.
Q. (BY MR. MALO) Is it accurate to say that when Mr. Thompson was a passenger on the aircraft it would not be possible for him to have a conflict with his personal use of the aircraft?
A. Not to my knowledge.
Q. Okay.
A. Whatever conflict there would have been through that, he would have taken care of himself.
Q. Okay.
MR. MALO: Well, sir, I don't think I have any further questions.
MR. REYNOLDS: We'll reserve our questions.

Thank you.

(Proceedings concluded at 3:22 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: MICHAEL D. HOLDERREAD DATE OF DEPOSITION: APRIL 23, 2007

PAGE LINE CHANGE REASON



09d02059-7e04-4a87-b6af-ca76c090f8d5

I, MICHAEL D. HOLDERREAD, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________________
MICHAEL D. HOLDERREAD

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared MICHAEL D. HOLDERREAD, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

___________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________
COMMISSION EXPIRES: _______________

STATE OF TEXAS)

I, Diana Pereira, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 23rd of April, A.D., 2007, at 2:07 p.m., at WINSTEAD, located at 5400 Renaissance Tower, 1201 Elm Street, in the city of Dallas, State of Texas, the following name person, to wit: MICHAEL D. HOLDERREAD, who was by me duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath, and his examination was reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn to and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows.

Mr. Stuart M. Reynolds, Jr. - 00:00,
Mr. Steve Frahm - 00:00,
Mr. Jeffrey R. Malo - 01:01.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that, before completion of the deposition, the Deponent, MICHAEL D. HOLDERREAD, and the Plaintiff, did request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this ___ day of _________________, A.D., 2007.

Diana Pereira
____________________________.
Diana Pereira, Texas CSR 8129
Expiration Date: 12/31/2007
Firm Registration No. 286
Esquire Deposition Services
1700 Pacific Avenue
Suite 4750
Dallas, Texas 75201
(214) 257-1436

AUTHENTIC COPY
The original certified E-Transcript file was electronically signed using RealLegal technology.