IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-211T
(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

v.

THE UNITED STATES,

Defendant

**SECOND SUPPLEMENTAL APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**VOLUME I**


| Description | Page(s) |
|---|---|
| Bromberg Treatise on Limited Partnerships<br>Bromberg III, 11:1-11:32 | 118-150 |

ASPEN PUBLISHERS

# BROMBERG AND RIBSTEIN ON PARTNERSHIP

VOLUME III

Successor to
*Crane and Bromberg on Partnership*

ALAN R. BROMBERG
University Distinguished Professor of Law
Southern Methodist University
Of Counsel, Jenkens & Gilchrist, P.C., Dallas

LARRY E. RIBSTEIN
Richard and Marie Corman Professor of Law
University of Illinois College of Law

Wolters Kluwer
Law & Business

AUSTIN BOSTON CHICAGO NEW YORK THE NETHERLANDS

Release No. 23 — 2007-2 Supplement

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

—From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations.

© 2007, 2006-1996, 1994, 1992, and 1988
Alan R. Bromberg and Larry E. Ribstein.

Published by Aspen Publishers. All Rights Reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to reproduce content should be directed to the Aspen Publishers website at *www.aspenpublishers.com*, or a letter of intent should be faxed to the permissions department at 212-771-0803.

Printed in the United States of America

1 2 3 4 5 6 7 8 9 0

Set ISBN 978-0-7355-1460-7
Vol. I 978-0-7355-5627-0
Vol. II 978-0-7355-5628-7
Vol. III 978-0-7355-5629-4
Vol. IV 978-0-7355-5630-0

Library of Congress Catalog No. 87-82663

**Release No. 23 — 2007-2 Supplement**

# ASPEN PUBLISHERS SUBSCRIPTION NOTICE

This Aspen Publishers product is updated on a periodic basis with supplements to reflect important changes in the subject matter. If you purchased this product directly from Aspen Publishers, we have already recorded your subscription for the update service.

If, however, you purchased this product from a bookstore and wish to receive future updates and revised or related volumes billed separately with a 30-day examination review, please contact our Customer Service Department at 1-800-234-1660, or send your name, company name (if applicable), address, and the title of the product to:

**ASPEN PUBLISHERS**
**7201 McKinney Circle**
**Frederick, MD 21704**

**Important Aspen Publishers Contact Information**

- To order any Aspen Publishers title, go to *www.aspenpublishers.com* or call 1-800-638-8437.
- To reinstate your manual update service, call 1-800-638-8437.
- To contact Customer Care, e-mail *customer.care@aspenpublishers.com*, call 1-800-234-1660, fax 1-800-901-9075, or mail correspondence to Order Department, Aspen Publishers, PO Box 990, Frederick, MD 21705.
- To review your account history or pay an invoice online, visit *www.aspenpublishers.com/payinvoices*.

Wolters Kluwer
Law & Business

**Release No. 23 — 2007-2 Supplement**

# About Wolters Kluwer Law & Business

Wolters Kluwer Law & Business is a leading provider of research information and workflow solutions in key specialty areas. The strengths of the individual brands of Aspen Publishers, CCH, Kluwer Law International and Loislaw are aligned within Wolters Kluwer Law & Business to provide comprehensive, in-depth solutions and expert-authored content for the legal, professional and education markets.

**CCH** was founded in 1913 and has served more than four generations of business professionals and their clients. The CCH products in the Wolters Kluwer Law & Business group are highly regarded electronic and print resources for legal, securities, antitrust and trade regulation, government contracting, banking, pension, payroll, employment and labor, and healthcare reimbursement and compliance professionals.

**Aspen Publishers** is a leading information provider for attorneys, business professionals and law students. Written by preeminent authorities, Aspen products offer analytical and practical information in a range of specialty practice areas from securities law and intellectual property to mergers and acquisitions and pension/benefits. Aspen's trusted legal education resources provide professors and students with high-quality, up-to-date and effective resources for successful instruction and study in all areas of the law.

**Kluwer Law International** supplies the global business community with comprehensive English-language international legal information. Legal practitioners, corporate counsel and business executives around the world rely on the Kluwer Law International journals, loose-leafs, books and electronic products for authoritative information in many areas of international legal practice.

**Loislaw** is a premier provider of digitized legal content to small law firm practitioners of various specializations. Loislaw provides attorneys with the ability to quickly and efficiently find the necessary legal information they need, when and where they need it, by facilitating access to primary law as well as state-specific law, records, forms and treatises.

Wolters Kluwer Law & Business, a unit of Wolters Kluwer, is headquartered in New York and Riverwoods, Ill. Wolters Kluwer is a leading multinational publisher and information services company.

# ≡ 11 ≡

# INTRODUCTION

§11.01 Limited Partnership in Perspective
- (a) In General
- (b) Comparison with General Partnerships
- (c) Comparison with Corporations
- (d) Comparison with Limited Liability Companies
- (e) Nature of Limited Partnership Law
- (f) The Limited Partnership in the United States Economy

§11.02 History and Source of Limited Partnership Law
- (a) Background and Early History
- (b) Uniform Limited Partnership Act (1916)
- (c) Revised Uniform Limited Partnership Act (1976)
- (d) Revised Uniform Limited Partnership Act (1985)
- (e) Revision of Uniform Limited Partnership Act ("Re-R.U.L.P.A.")

§11.03 Limited Partnership as a Legal Entity
- (a) In General
- (b) U.L.P.A.
- (c) R.U.L.P.A.

## §11.01 LIMITED PARTNERSHIP IN PERSPECTIVE

### *(a) In General*

Our treatment of limited partnerships largely parallels that of general partnerships in the previous volumes. The aims are to note similarities without undue repetition where they exist, but to emphasize differences where they exist. Chapters, sections, and their content and numbering correspond as closely as the subjects permit. Thus, this section, following the pattern of Section 1.01, above, introduces limited partnership law and the limited partnership as a type of business association. The limited partnership as a business association is presented primarily through comparison in structure and outline with the other principal types of business associations: general partnerships (Subsection (b), below), corporations (Subsection (c), below), and limited liability companies (Subsection (d), below). We also describe the role of limited partnerships in the economy in Subsection (e), below. Limited partnership law is considered in terms of the relative roles of statutes, case law, and private agreement in Subsection (f), below.

Those we described as "partners" in the prior volumes we must now describe as "general partners" to distinguish them from limited partners. The term "partners" has different meanings in limited partnership statutes. In the Uniform Limited Partnership Act—which we will refer to as U.L.P.A., or the 1916 Act—"partners" are only general partners. As explained in Section 12.01(d), below, limited partners are only "members" in that Act. In the Revised Uniform Limited Partnership Acts—which we will refer to as R.U.L.P.A., or, depending on which version, the 1976 Act or the 1985 Act, and in the Uniform Limited Partnership Act (2001), "partners" are both general and limited partners.

Limited partnerships are to be distinguished from limited partner associations. The limited partnership association is a statutory form of organization in which members are not personally liable for the association's debts and obligations and the association does not dissolve on the death or other mishap of a member. The form was adopted by a few states in the nineteenth

century and since then largely repealed or left unused.[0] However, a modern version was enacted by Colorado in 1995[0a] permitting considerable flexibility in structure according to the association's bylaws.[0b]

Limited partnerships are also to be distinguished from limited liability partnerships. The limited liability partnership, called registered limited liability partnership in some states, is a form of general partnership in which general partners are not personally liable for some or all kinds of partnership debts and obligations. Starting in Texas in 1991 and rapidly spreading to nearly every other state, it is discussed briefly in Subsection 1.01(b)(5) of this text and its supplement and comprehensively in Alan R. Bromberg & Larry E. Ribstein, Limited Liability Partnerships, the Revised Uniform Partnership Act and the Uniform Limited Partnership Act (2001) (annual editions).

Note that many of the features described below, including liability of general partners in limited partnerships and "control" liability of limited partners, may change in the revision of the Revised Uniform Limited Partnership discussed below in Section 11.02(e) and described throughout this and the following chapters.

### *(b) Comparison with General Partnerships*

The sole proprietorship is described in Section 1.01(b), above, and need not be considered again here. The more important comparisons for the limited partnership are with general partnerships

**§11.01** [0] *See* Alan R. Bromberg, Crane & Bromberg on Partnership §26A (1968); Wayne M. Gazur and Neil M. Goff, Assessing the Limited Liability Company, 41 Case W. Res. L. Rev. 387, 393-394 (1991); Edward Schwartz, The Limited Partnership Association—An Alternative to the Corporation for the Small Business with "Control" Problems?, 20 Rut. L. Rev. 29 (1965).

[0a] Colo. Rev. Stat. §§7-63-101-7-63-117.

[0b] *See* John DeBruyn, Limited Partnership Associations—Rebirth or Relic, 9 Pubogram No. 3 (ABA Section of Business Law, Comm. on Partnership and Unincorporated Business Organizations) at 7-10 (July 1995); Larry E. Ribstein, Choosing a Business Form, 1 J. Asset Protection 44 (Sept./Oct. 1995).

and corporations and, since the late 1980s, with limited liability companies.

Limited partnerships resemble general partnerships in many ways. Limited partnerships involve at least two persons (here a general partner and a limited partner). Limited partnerships are legal, financial, business, and personal relationships. Profits and losses can be flexibly allocated by agreement, subject to some constraints if the allocations are to be recognized for federal income tax. The relations among general partners are essentially the same, as are their authority to deal with third persons and their fiduciary obligations. The unlimited personal liability of general partners also is the same in the standard version of the limited partnership, and general partners can obtain limited liability in both general and limited partnerships by forming limited liability partnerships. These and related features are discussed in later sections.

Limited partnerships differ from general partnerships in a number of ways. They call for greater formality and publicity in formation, although the required formality and publicity is less under the 1976 Act than under the 1916 Act and still less under the 1985 and 2001 Acts. They are less democratic and more hierarchical, with general partners having most or all of the control, and the limited partners little or none. Thus, typically general partners are active managers, and limited partners are passive investors. The relation between general partners and limited partners tends to be more financial and less personal than the relation among partners in general partnerships because the typical limited partner is an inactive and perhaps distant source of finance. A limited partnership may have a single general partner with managerial authority, while a general partnership has two or more. Limited partnerships are more rigid in structure, with requirements for contributions by limited partners and limitations on distributions to them. They offer limited liability to the limited partners (although that limited liability may be lost by taking part in control under the 1916, 1976, and 1985 Acts). The general partners traditionally have personal liability for the firm's debts, though they have long been able to avoid much of that by incorporating. They now may have limited liability if the partnership

is a limited liability limited partnership.[0c] Limited partnerships are less easily dissolvable than general partnerships; limited partners have little ability to dissolve and general partners generally have less ability than in general partnerships. These and other characteristics are discussed in greater detail in the following sections.

Nonpartnership laws affect the two kinds of partnerships differently. Because of limited partners' passivity, their partnership interests almost always are "securities" within federal and state securities laws, while the interests of general partners ordinarily are not. The securities laws impose disclosure requirements and other regulations on limited partnerships that normally do not apply to general partnerships. The federal income tax until 1997 treated limited partnerships differently from general partnerships in significant ways.

Limited partnerships remain suitable for small or closely held businesses. This was their historic use. Limited liability and delegated management make them suitable also for publicly held businesses. This was their widespread use in the 1970s and 1980s for tax shelter investments in oil and gas, real estate, and other activities. Changes in federal income tax legislation and interpretation have sharply reduced the utility of limited partnerships for publicly held businesses and the tax advantages of limited partnerships for all kinds of business.

### *(c) Comparison with Corporations*

The main features of corporations are noted in Section 1.01(b), above. Limited partnerships resemble corporations in various ways. Formalities of creation are much alike. Both forms of organization can attract investment capital by offering limited liability with roughly similar effects in limited partnerships and corporations. Limited liability necessitates some rules to protect corporate creditors. It facilitates passive ownership—a separation of ownership from control—that permits some efficiencies as well as poses some risks from delegated management. Thus,

[0c] *See* Bromberg & Ribstein on Limited Liability Partnerships, the Revised Uniform Partnership Act, and the Uniform Limited Partnership (2001), Chapter 5.

limited partners are somewhat analogous to shareholders (preferred shareholders[1] where limited partners have priorities over general partners in distributions). Information rights and fiduciary duties owed to limited partners are similar to those owed to shareholders. Limited partners, like shareholders, may bring derivative suits in behalf of the business entity against errant management. Limited partner interests are generally treated like corporate shares in the securities laws.[1a]

Limited partnerships differ from corporations in a number of ways. Limited liability in limited partnerships is not as complete as in corporations, though with limited liability partnerships and limited partnerships it is approaching corporate-type limited liability. The typical hierarchy of limited partnerships (passive limited partners and controlling general partners) is simpler than that of corporations (shareholders, directors, and a range of officers). While limited partners are somewhat analogous to shareholders, general partners in a limited partnership combine the roles of directors[2] and officers in a corporation. A highly significant difference is that general partners usually serve indefinitely; they are better entrenched than directors, who are elected periodically. Limited partners normally have even fewer rights than shareholders. For example, they cannot vote on major matters such as removal of management, merger, sale of assets, amendment of the organizational document, or dissolution, unless the partnership agreement provides otherwise. Therefore, a tailored agreement is necessary to give limited partners rights not provided by the "standard form" of the partnership statutes but provided shareholders by the "standard form" of the corporate statutes.

Limited partners lack the free transferability of interests that most shareholders have. Free transferability would logically follow

[1] *See, e.g.*, Klebanow v. New York Produce Exchange, 344 F.2d 294, 297 (2d Cir. 1965) (New York law).

[1a] *See* Energy Investors Fund, L.P. v. Metric Constructors, Inc., 525 S.E.2d 441, 443 (N.C. 2000) (quoting Text; applying corporate test for individual claims by shareholders).

[2] *See, e.g.*, Brooke v. Mt. Hood Meadows Or., Ltd., 81 Or. App. 387, 725 P.2d 925, 929 (1986).

for both groups from their passive role and limited liability. But until 1997 desire to assure federal income tax treatment as partnerships inhibited free transfer of limited partner interests.

Probably the most significant difference is that limited partnerships are not subject to corporate income tax; rather, income, deductions, and credits are treated as if realized by the partners individually (as in general partnerships). Corporations qualifying for Subchapter S[3] have many of the same tax features as limited partnerships but are less flexible and generally less advantageous. (On the other hand, S corporations offer limited liability for everyone, while a limited partnership has at least one general partner with full liability.)

### *(d) Comparison with Limited Liability Companies*

Perhaps the most important comparison is with limited liability companies.[4] There are variations in the many statutes but all permit wide flexibility in the regulations which are their main governing documents. Their critical similarity to limited (and general) partnerships is that post 1996 administrative interpretation permits them to be treated as partnerships (not corporations) for federal income tax.[5] Limited liability companies in some of the states that have authorized them are quite similar to limited partnerships.

The important difference is that limited liability companies offer limited liability to all members, regardless of whether the members participate in management. Thus, managing members who would be general partners in a limited partnership can enjoy limited liability in a limited liability company. And members who would be limited partners in a limited partnership but would lose

[3] I.R.C. §§1361-1379.

[4] *See, e.g.,* L. Ribstein & R. Keatinge, Ribstein and Keatinge on Limited Liability Companies (1992); Gazur & Goff, Assessing the Limited Liability Company, 41 Case W. Res. L. Rev. 387 (1991); Keatinge, Ribstein, Hamill, Gravelle & Connaughton, The Limited Liability Company: A Study of the Emerging Entity, 47 Bus. Law. 375 (1992).

[5] Treas. Reg. §§301.7701-1 through 301.7701-3 (1996).

limited liability by taking part in control can enjoy limited liability in a limited liability company. These differences are shrinking, however, with the advent of limited liability partnerships and limited liability limited partnerships, and with the abolition of the "control rule" in U.L.P.A. 2001.

### *(e) Nature of Limited Partnership Law*

Limited partnership law, like general partnership law discussed in Section 1.01(d), above, is an amalgam that includes contract, property, agency, equity, and trust law. But to a greater extent than general partnership law it is governed by statute. This was previously the 1916 Uniform Limited Partnership Act (1916 Act or U.L.P.A.), which was adopted throughout the country and which still prevails for some partnerships in some states. Then it was the 1976 Revised Uniform Limited Partnership Act (1976 Act, or R.U.L.P.A. (1976), which replaced the 1916 Act in many states and still prevails in some. Still later it was the 1985 amendments to the 1976 Act, which revised the 1976 Act in many places.[6] The 1985 amendments are significant enough that we call the amended 1976 Act the 1985 Revised Uniform Limited Partnership Act (1985 Act, or R.U.L.P.A. (1985)). Where the 1976 and 1985 Acts are the same, we refer to them together as R.U.L.P.A. The most recent revision is the Uniform Limited Partnership Act (2001), or U.L.P.A. (2001).

The Uniform Acts are reproduced in the Appendices to these volumes. The Uniform Acts are differently numbered in the adopting states; we will cite the Uniform Acts rather than the local numbers, except where it is important to distinguish the latter.

Like most Uniform Acts, the partnership statutes are not perfectly uniform. Adopting states have made changes to fit particular needs or policies. Those changes have been collected elsewhere.[7] We note the more important variants.

[6] Adoption tables for the Uniform Acts are kept current in 6 U.L.A. (Supp.); Lexis-Nexis Library Model; Westlaw database ULA.

[7] Variations in each section are noted with that section in 6A U.L.A. (1995 & current Supp.); Lexis-Nexis Library Model, File UPARTA; Westlaw

Limited partnership law traditionally contains a large element of general partnership law. Under R.U.L.P.A., except where the limited partnership statutes are inconsistent, general partnership law applies. U.P.A. §6(2), R.U.L.P.A. §1105. U.L.P.A. (2001) is self-contained and does not refer to general partnership law, though it includes provisions similar or identical to those in the Revised Uniform Partnership Act.

Because of the extensive use of limited partnerships for federal income tax advantages, limited partnership law is heavily influenced by the Internal Revenue Code and its interpretations. The influence of tax law diminished after 1996 with the adoption of "Check the Box Regulations"[8] which permitted most unincorporated organizations, however structured, to choose whether to be taxed as partnerships or corporations. Restrictions on transferability of interests and requirements for dissolution have been relaxed in statutes as a result.

The partnership agreement forms a significant part of limited partnership law.[8a] The agreement may govern matters not specified in the statutes and, within limits somewhat narrower than for general partnerships, may vary matters otherwise governed by the statutes. See Section 12.05, below.

### *(f) The Limited Partnership in the United States Economy*

There is even less historical information on the role of limited partnerships than on the role of all partnerships. The published Securities and Exchange Commission statistics do not distinguish registered partnership offerings (much less limited partnership

---

database ULA. Full texts of current and some prior acts, with annotations and practices guides, are in State Limited Partnership Laws (M. A. Bamberger & J. J. Basile, Jr., eds., multivolume looseleaf, orig. pub. 1987).

[8] Treas. Reg. §§301.7701-1 through 7701-3 (1996).

[8a] *See* Carbine v. Xalapa Farm Ltd. Partnership, 980 F. Supp. 860, __ (E.D. La. 1997) ("As a creature of contract, a partnership is defined by the intent of the parties"); Kelsey v. Kelsey, 714 N.E.2d 187, 191 (Ind. App. 1999) (noting that agreement applies except where prejudice to non-partner creditors).

offerings) from corporate stock and most other equity offerings.[9] Some of the statistical data on partnerships from tax returns in Section 1.01(c), above, did not distinguish between general and limited partnerships until the 1980s. The annual reports issued by the International Association of Corporation Administrators, which obtains its data from state secretaries of state, reflect numbers of limited partnerships (and other types of firms) formed in given years in each state. They do not include data on size or profitability, or make clear which of the formations are new businesses as distinguished from changes in form by existing businesses. But it is evident that the use of limited partnerships increased enormously after the 1968 predecessor of this text, "[r]egarding the limited partnership as the forgotten man of business organizations,"[10] devoted substantial attention to the subject. The most striking development has been the mass marketing of partnership interests like corporate stocks and other investments. A private research firm estimated that total sales of limited partnership interests rose from about $5 billion in 1980 ($3 billion public, registered with the SEC, and $2 billion private) to $19 billion in 1984 ($9 billion public, $10 billion private), then dropped steadily to $9 billion in 1989 ($1 billion public, $8 billion private).[11] Overall, about $100 billion in limited partnership

[9] *E.g.*, 50 SEC Ann. Rep. 114 n.1, 118 n.1 (1984). Preferred stock is accounted for separately.

[10] 11 A. Bromberg, Crane & Bromberg on Partnership (1968). A local survey found that limited partnership formations in Texas rose from 1551 in 1974 to 5375 in 1984 (a 245 percent increase), while corporate formations rose from 17,631 to 44,459 (a 152 percent increase). Bromberg, Preface to Limited Partnership: Model Agreement and Certificate, 26 S. Tex. L.J. 15 (1985). One court observed that "3984, 4038, and 5800 Delaware limited partnerships were formed in each of the last three years, respectively. And, according to Laura Y. Marvel, Corporations Administrator for the Division of Corporations, the Division estimates that almost 6000 domestic limited partnerships were formed for fiscal year 1998. Obviously, the market for this alternative entity remains vibrant." Sonet v. Timber Co., L.P., 722 A.2d 319, 323, n.9 (Del. Ch. 1998).

[11] Bettner, Overexposed, Wall St. J., Aug. 10, 1990, at R11 (estimate of Robert A. Stanger & Co.). Figures are approximate since data are presented in chart form. According to Stanger, public limited partnership interests in 1984 represented about 10 percent of the $85.4 billion total equity offerings, which

interests were sold publicly in the 1970s and 1980s.[12] One sponsor alone sold $2.6 billion in interests in 100 real estate limited partnerships and related funds to 110,000 investors between 1981 and 1989.[13] One major securities broker-dealer sold $610 million in 1989.[14]

The growth of limited partnerships in the 1980s was largely due to their use as hoped-for tax shelters.[15] Limited partnerships have been particularly popular where the tax advantages of depletion and depreciation, income deferral, and ultimate capital gain treatment-combined with limited liability-have been most attractive, typically in oil and gas exploration and production and in real estate development and operation. Other areas that were popular for tax sheltering included farming, ranching, film and video production or exploitation, equipment leasing, and scientific and technological research and development.[16] Their appeal was frequently enhanced by leverage intended to permit greater interest and depreciation deductions and larger investment credits and operating losses. The leverage was often double: (1) initial limited partner contributions supplemented by much larger long-term notes or assumption agreements, which permitted (2) heavy

---

(as noted above) include partnership and corporate stock offerings. N.Y. Times, Feb. 20, 1985, at D20 col. 4.

[12] Stein, Failing Partnerships Limit Real-Estate Funds, Legal Times, Nov. 12, 1990, at S47.

[13] 13 Patner, Real Estate Syndicator Spins an Intricate Web and Gets Tangled in It, Wall St. J., Feb. 1, 1990, at A1 col. 6, describing VMS Realty Partners.

[14] Power & Bettner, Partnership Woes Become Burden for Prudential Unit, Wall St. J., Sept. 20, 1990, at C1 col. 5, discussing Prudential-Bache Securities Inc. Between 1983 and 1989, the firm cosponsored 26 energy limited partnerships totaling $1.6 billion. *Id.* Prudential agreed to pay $20 million to settle customers' complaints. Power, Brokerage Firm Offers to Settle Investor Suit, Wall St. J., Apr. 3, 1991, at A2 col. 2.

[15] Internal Revenue Service, Statistics of Income, 1978-1982 Partnership Returns 1, 175-177 (1985). Of $10.4 billion cash equity public offerings in 1979, $2.3 billion were tax shelter limited partnerships; the corresponding figures in 1982 were $26.3 billion and $8.1 billion, respectively. 5 SOI Bull. 55, 59 (Fall 1985).

[16] Internal Revenue Service, Statistics of Income, 1978-1982 Partnership Returns 82 (1985).

borrowings for expensive asset purchases or other instalment investments by the partnerships. More traditional, less tax-oriented uses of limited partnerships are made in finance, manufacturing, services, and trade.

The boom in limited partnerships was ended by the Tax Reform Act of 1986,[17] which targeted tax shelters, particularly in real estate. Among other things, the Act curtailed the deductibility of passive losses (specifically defined to include those from limited partnership interests), applied the at-risk rules to real estate, limited the deduction of interest, and taxed capital gains as ordinary income.[18] The Act was also partly responsible for the collapse of the real estate industry, which burdened thrift and other financial institutions with hundreds of billions of dollars of bad loans. It is fair to say that the extensive use of limited partnerships as tax shelters was partly responsible for that collapse, too. Limited partnerships, overpriced because of their tax attractions, contributed to the overpricing and overbuilding of real estate, which were causes of its collapse.

Limited partnerships were disappointments, if not disasters, for many investors as their tax shelter shattered. In numerous cases they suffered loss of their investments because the deals were unsound or the prices inflated. But, ironically, limited partners further lost some of their limited liability in the sense that they had unanticipated income taxes-plus interest and penalties-to pay. The technical reasons included constructive income from disposition of mortgaged partnership assets, recapture of deductions or credits on disposition of partnership assets, and judicial determinations that the partnership lacked a profit objective or overvalued its assets.[19]

[17] Pub. L. No. 99-514, 100 Stat. 2085 (1986).

[18] *See, e.g.,* Messinger, How to Structure a Syndicated Real Estate Transaction in Today's Environment, 45-1 N.Y.U. Inst. Fed. Tax. 17-1 (1987); Weinberg, Investing in Real Estate Limited Partnerships Before and After the Tax Reform Act of 1986, 45-2 id. 42-1; Becker, The Effect of the Tax Reform Act of 1986 on Present and Future Tax Motivated Investments, 45-2 *id.* 43-1.

[19] A classic example is Krause v. Commissioner, 99 T.C. 132 (1992), denying 1980-1982 deductions and imposing additional interest in a test case for more than 2000 investors in 19 limited partnerships to use enhanced technology for recovery of oil and natural gas. Each of the 142 investors in

Most recently, limited partnerships have been used by closely held family firms to obtain estate tax benefits. This use is mainly

---

one of the partnerships bought a $230,000 unit (limited partner interest) by contributing $30,000 in the first three years, incurring a purportedly recourse $120,000 obligation due in 12-14 years, signing a nonrecourse non-interest-bearing $80,000 note due in 25 years, and nominally assuming up to $120,000 of the partnership's debt to acquire the technology. The partnership then acquired the technology under a five-year license requiring it to pay $35,000 a year for each limited partnership unit, mostly in the form of notes due in 25 years. The prices bore no relation to the value of the technology and precluded any realistic opportunity for profit. The court concluded:

> In summary, presented to us in this case is a chain or multi-layered series of obligations, stacked or multiplied on top of each other via the numerous partnerships to produce debt obligations in staggering dollar amounts, using a largely undeveloped and untested product, in a highly risky, very speculative, and non arm's-length manner in an attempt to generate significant tax deductions for investors. The transactions did not, and do not, constitute legitimate for-profit business transactions.

Losses of the partnership are disallowed under [I.R.C.] section 183, and accrued interest deductions are disallowed due to the nongenuine nature of the underlying debt obligations.

The court noted that the Commissioner had assessed deficiencies of more than $2 billion in similar cases. *Krause* was affirmed, Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), *cert. denied*, 513 U.S. 1078, 1079 (1995). The partnerships in Krause elicited numerous fraud claims; *see, e.g.*, Roberts v. Heim, 670 F. Supp. 1466 (N.D. Cal. 1987), *aff'd in part, rev'd in part*, Roberts v. Peat Marwick Mitchell & Co., 857 F.2d 646 (9th Cir. 1988), *cert. denied*, 493 U.S. 1002 (1989), and about a dozen other decisions in that case.

Another similarly structured oil and gas partnership, with more than 1000 limited partners and $145 million of contributions (80 percent in 19- to 21-year notes), claimed deductions for $79 million of advance royalties. The deductions were concededly not allowable and the interest and remaining deductions were largely disallowed. The court wrote:

> In summary, Western Reserve's machinations were carried out for the purposes of enriching . . . the promoters, who had no oil and gas business experience, and providing tax deductions for petitioners and other investor-limited partners. The Western Reserve served no other substantial commercial, legal or profit objectives.

Ferrell v. Commissioner, 90 T.C. 1154 (1988). This was a test case for some 200 others. The interests were sold as permitting a 4-to-1 writeoff, that is, first-year deductions equal to four times the cash investment.

important in connection with rules concerning dissolution and member dissociation.[20] Also, there are many publicly held "master limited partnerships" that mainly hold passively managed assets such as natural resources, real property or gas pipelines, because these are the only types of publicly traded partnerships that are now entitled to use single-level taxation.[21]

More generally, limited partnerships may have an advantage over corporations because of their more clearly contractual nature.[22] One court has asserted that, with the curtailment of special tax classification advantages of limited partnership:

> Clearly some other relevant characteristic of the limited partnership must contribute to its increasing popularity. One might reasonably conclude that the statutory authority granted to limited partnerships to contract around—or to enhance—fiduciary duties goes a long way in explaining this popularity.[23]

While the limited partnership has always been a highly useful form of business association, its tax benefits have sometimes encouraged transactions that are not economically feasible apart from tax considerations. Moreover, some have abused the limited partnership form by misrepresenting its tax and economic characteristics and its suitability for some kinds of investors.[24]

[20] *See* Sections 17.02(d) nn.21-22 and 17.06 nn.6-7, below.

[21] *See* Internal Revenue Code (26 U.S.C.) §7704(a) (defining publicly traded partnerships eligible for flow-through taxation). For a general description of the modern master limited partnership *see* Goodgame, Master Limited Partnership Governance, 60 Bus. Law.. 471 (2005).

[22] *See* Ribstein, Why Corporations?, 1 Berk. Bus. L. J. 183 (2004); *See also* Ribstein, Unlimited Contracting in the Delaware Limited Partnership and its Implications for Corporate Law, 17 J. Corp. L. 299 (1991).

[23] Sonet v. Timber Co., L.P., 722 A.2d 319, 323 (Del. Ch. 1998).

[24] Securities and Exchange Commission v. Prudential Securities, Inc., No. 93 Civ. 2164 (D.D.C. Oct. 21, 1993), S.E.C. Litig. Rel. No. 13840 (D.D.C. Oct. 21, 1993), 55 SEC Docket 709 (1993), Fed. Sec. L. Rep. (CCH) ¶97,780 and In re Prudential Securities, Inc., S.E.C. Sec. Exch. Act Rel. No. 33082 (Oct. 21, 1993), 55 SEC Docket 624 (1993), Fed. Sec. L. Rep. (CCH) ¶85,238 offer a classic example. These concurrent judicial and administrative actions were brought against a securities broker-dealer that sold $8 billion of limited

The following provides a recent snapshot of the limited partnership in the United States.[25] According to 2002 federal tax returns, there were a total of 376,963 domestic limited partnerships with 6,918,515 partners. The largest categories were real estate (212,809 partnerships with 3,162,866 partners), finance and insurance (82,064 partnerships with 1,607,965 partners) and agriculture, forestry, fishing, and hunting (13,944 partnerships with 126,225 partners).

## §11.02 HISTORY AND SOURCE OF LIMITED PARTNERSHIP LAW

### *(a) Background and Early History*

Since business employs both capital and services that may come from very different sources, a need exists for a form of

---

partner interests in more than 700 partnerships between 1970 and 1980. The SEC charged a variety of violations by Prudential including:

> Misrepresentation of speculative illiquid limited partnerships as safe, income-producing investments, suitable for safety-conscious and conservative investors.
>
> Misleading statements about the character of distributions from the partnerships.
>
> Projections of future distributions contrary to prospectus statements barring projections.
>
> Continuing to send customers periodic statements showing the partnership interests at cost rather than at their declining value.

Without admitting or denying the charges, Prudential consented to court and SEC orders requiring it to repay at least $330 million to investors with valid claims, to pay $41 million of fines to regulatory agencies, and to adopt extensive procedures to avoid future violations. Prudential later estimated its total payments pursuant to the SEC agreement at $1.5 billion. Wall Street Journal, Nov. 19, 1996 at A2 col. 3 (Sw. ed.). The saga of Prudential limited partnership sales is the subject of two volumes, Kurt Eichenwald, Serpent on the Rock (1995) and Kathleen Sharp, In Good Faith (1995).

[25] *See* Wheeler & Parsons, *Partnership Returns, 2002,* at 12, available at http://www.irs.gov/pub/irs-soi/02partnr.pdf.

association that permits capital investment without responsibility for services or management and without liability for losses beyond the amount invested.[1] A creditor has such a position but may feel that the fixed return traditional for creditors-particularly if restricted by usury laws-is incommensurate with the risk. The need encompasses, then, a right to share profits (or some other measure of success of the business) with limited liability for losses.

The need gave rise to the corporation. But much earlier, in the middle ages, it gave rise to the *commenda*, in continental Europe.[2] In this commonly used arrangement the *commendator* supplied money to the *commendatarius* (or *tractator*) to be employed in trade. The *commendator* received a portion of the profits-often one-fourth-but had no liability for losses, was not guilty of usury, and (if, as was often true, a member of the clergy or nobility) did not violate inhibitions against engaging in trade. He had no claim against the *commendatarius* for loss of the capital investment not caused by the latter's fault. The arrangement evolved from single to multiple ventures, from overseas trade to local trade and industry, and from single to multiple *commendatarii*.[3]

In one of the first American court opinions to deal with the limited partnership, the learned Surrogate Alexander Bradford delved into its historical antecedents and found them important not only in commercial but in sociopolitical terms:

**§11.02** [1] Ribstein, An Applied Theory of Limited Partnership, 37 Emory L.J. 835 (1988), develops this theme fully in economic and efficiency terms.

[2] 8 G. Holdsworth, History of English Law 195 (2d ed. 1937); Mitchell, Early Forms of Partnership, 3 Select Essays, Anglo-American Legal History 183 (1909); J. Heenen, Partnership and Other Personal Associations for Profit, 13 International Encyclopedia of Comparative Law I-161, at I-166 (A. Conard ed. 1975). The early history of the *commenda* is treated in Lobingier, The Natural History of the Private Artificial Person, 13 Tul. L. Rev. 41, 56 (1938); *see also* Section 1.02, above. A modern version of the commenda is discussed in Comment, Partnership in Commendam-Louisiana's Limited Partnership, 35 Tul. L. Rev. 815 (1961), and Comment, Partnership in Commendam, Tax Consequences and Business Risks, 36 La. L. Rev. 260-278 (1975).

[3] 8 G. Holdsworth, History of English Law 195-197 (2d ed. 1937), also discussing why the arrangement did not take root in England; id. at 104, discussing usury aspects.

Under the name of *la Societe en commandite*, it has existed in France from the time of the middle ages; mention being made of it in the most ancient commercial records, and in the early mercantile regulations of Marseilles and Montpelier. . . . In the statutes of Pisa and Florence, it is recognized so far back as the year 1160; also in the ordinance of Louis-le-Hutin, of 1315; the statutes of Marseilles, 1253; of Geneva, of 1588. In the middle ages it was one of the most frequent combinations of trade, and was the basis of the active and widely-extended commerce of the opulent maritime cities of Italy. It contributed largely to the support of the great and prosperous trade carried on along the shores of the Mediterranean, was known in Languedoc, Provence and Lombardy, entered into

[*Next page is 11:21.*]

> most of the industrial occupations and pursuits of the age, and even travelled under the protection of the arms of the Crusaders to the city of Jerusalem. At a period when capital was in the hands of nobles and clergy, who, from pride of caste, or canonical regulations, could not engage directly in trade, it afforded the means of secretly embarking in commercial enterprises, and reaping the profits of such lucrative pursuits, without personal risk; and thus the vast wealth, which otherwise would have lain dormant in the coffers of the rich, became the foundation, by means of this ingenious idea, of that great commerce which made princes of the merchants, elevated the trading classes, and brought the Commons into position as an influential estate in the commonwealth.[4]

The *commenda* was sanctioned by the French Ordinance on Commerce of 1673 (which required formation by a public document) and carried forward in the French Commercial Code of 1807, sections 23-28.

In the United States, the limited partnership has traditionally been regarded as a creature of legislation, unknown to the common law,[5] although it has come to have some common law recognition (Sections 12.03-12.04, below). The French Code inspired the earliest U.S. limited partnership laws. The first statutes were adopted in New York (1822), Connecticut (1822), and Pennsylvania (1836). Most of the eastern seaboard states soon followed, using New York's act as a model. This was said by a leading contemporary commentator to be the first instance in which American states derived statutory law from a country other than England.[6] The impetus for adoption here was the desire to avoid the doctrine of partnership liability to third persons, based solely on profit sharing, that followed in the wake of the 1793 decision in *Waugh v. Carver*[7] and, more generally, to "encourage . . . commerce by permitting the investment of capital in trade, without danger to the public, or risk to the special [limited] partner beyond

[4] Ames v. Downing, 1 Bradf. 321, 329-330 (N.Y. Surr. 1850).

[5] Ruzicka v. Rager, 305 N.Y. 191, 111 N.E.2d 875, 881, 39 A.L.R.2d 288 (1953); Allen v. Amber Manor Apartments Partnership, 95 Ill. App. 3d 541, 51 Ill. Dec. 26, 420 N.E.2d 440, 445 (1981).

[6] 3 J. Kent, Commentaries on American Law *36 (1828).

[7] 2 H. Bl. 235, 126 Eng. Rep. 525 (1793), discussed in Section 2.07(b), above.

the extent of the amount invested."[8] Limited partnerships were not recognized in England until legislation was passed in 1907.[9]

Despite the expressed desire to create limited liability, the older U.S. acts were strictly worded with creditor protection in mind. In New York's original act, for example, the capital (contribution) of a limited partner (special partner in the language of the early statutes) had to be paid in full in cash and could not be reduced or withdrawn before termination of the firm (and then only after payment of creditors). The limited partner could not transact any business for the firm as agent or otherwise. Any false statement in the certificate made all limited partners fully liable for all debts of the firm. This was in addition to more familiar requirements for filing a certificate stating the term, capital contributions, names of partners, and nature of business.[10]

The strictness of the early statutes, combined with the view that limited liability was in derogation of the common law, led courts to construe narrowly the immunity from liability.[11] The common view was that a limited partner was essentially a general partner with immunity conditioned on full and exact compliance with the statutory details.[12] Gradually some courts took a less rigid attitude and shifted to the view that limited or special partners were liable only to the extent and in the circumstances expressly

[8] Ames v. Downing, 1 Bradf. 321, 325-326 (N.Y. Surr. 1850).

[9] 7 Edw. VII. ch. 24 (1907). The English act is now undergoing a comprehensive revision. *See* Law Commn. & Scottish Law Commn., Partnership Law (Joint Consultation Paper 161, 2001), available at http://www.lawcom.gov.uk/library/lccp161/cp161.pdf.

[10] 1822 N.Y. Laws ch. 244; 1827 N.Y. Laws ch. 50; 3 J. Kent, Commentaries on American Law *35-36 (1828).

[11] Klein v. Weiss, 284 Md. 36, 395 A.2d 126, 135 (1978), citing the predecessor of this text; Rathke v. Griffith, 36 Wash. 2d 394, 218 P.2d 757, 758-759 (1950), citing a more remote predecessor of this text.

[12] In re Merrill, 17 Fed. Cas. 82, 83 (No. 9,467) (N.D.N.Y. 1874); Andrews v. Schott, 10 Pa. 47 (1848); Rathke v. Griffith, 36 Wash. 2d 394, 218 P.2d 757, 18 A.L.R.2d 1349 (1950), *noted in* 26 Wash. L. Rev. 222 (1951), citing a predecessor of this text. *See also* Crane, Are Limited Partnerships Necessary?, 17 Minn. L. Rev. 351-355 (1933); Comment, 48 Mich. L. Rev. 347 (1950). *See* Ames v. Downing, 1 Bradf. 321, 325-329 (N.Y. Surr. 1850), treating a limited partnership as a general partnership in order to hold that it was dissolved by the death of a limited partner so that the surviving general partner had to account to the estate of the limited partner for the value of the limited partner's interest.

required by the statutes, such as for false statements in the certificate or for failure to file the certificate.[13]

### *(b) Uniform Limited Partnership Act (1916)*

The Uniform Limited Partnership Act[14] (here "U.L.P.A.," or "1916 Act") was presented in 1916 by the National Conference of Commissioners on Uniform State Laws (an offshoot of the American Bar Association) and written by the Committee on Commercial Law. The Committee was the same group that produced the U.P.A. in 1914, the Negotiable Instruments Law in 1896, the Uniform Sales Act in 1906, and other early twentieth century efforts to codify and standardize commercial law.[15] The drafter was William Draper Lewis, dean of the University of Pennsylvania Law School, who also drafted the final version of the U.P.A. The text of the U.L.P.A. is reprinted in Appendix B, below.

The U.L.P.A. was issued with very few explanatory notes by the Commissioners. The only substantive note states that the older limited partnership statutes had become virtually useless because of their strict requirements for formalities of formation and for

[13] Chick v. Robinson, 95 F. 619, 52 L.R.A. 833 (6th Cir. 1899); Henkel v. Heyman, 91 Ill. 96 (1878); Crehan v. Megargel, 234 N.Y. 67, 136 N.E. 296 (1922); White v. Eiseman, 134 N.Y. 101, 31 N.E. 276, 277 (1892); Richardson v. Hogg, 39 Pa. 153 (1861).

Other examples of relaxation of the older view include Allegheny Natl. Bank v. Bailey, 147 Pa. 111, 23 A. 439 (1892) (special partner not liable to creditors who dealt with firm as limited partnership); McKnight v. Ratcliff, 44 Pa. 156 (1863) (special partner not liable for torts).

*See also* Sections 12.03, 12.08, below.

[14] 6 U.L.A. 561 (1969 & current Supp. preceding §1) with list of adoptions and notes of variations by adopting states and notes of court decisions.

[15] *See* G. Gilmore, The Ages of American Law 25-36, 68-74, 80-86 (1977), on American movements for uniformity and codification in the nineteenth and twentieth centuries. *See also* Section 1.02, above.

nonparticipation by limited partners in the control of the business.[16] The Commissioners adopted two basic assumptions:

1. No public policy requires liability of one who provides capital to a business, acquires an interest in its profits, and has some degree of control if creditors have no reason to believe the person is liable for the debts of the business.
2. Businesspersons who are liable for business debts should be able to obtain capital from others who acquire some ownership rights if the contributors do not compete with creditors for the assets of the business.[17]

In pursuit of these policies, the 1916 Act reduced the liability exposure of a limited partner in various ways, including treating him or her as a member rather than a partner,[18] making substantial compliance with formation formalities sufficient,[19] confining liability for certificate falsity to limited partners with knowledge of the falsity and then only to relying creditors,[20] and rejecting "the rule that statutes in derogation of the common law are to be strictly construed."[21] In implementation of these policies, an early and influential U.S. Supreme Court decision called for liberal interpretation to counter the strictness of decisions under prior law.[22]

[16] Official Comment to U.L.P.A. §1, 6 U.L.A. 563-564 (1969). *Accord,* Lewis, The Uniform Limited Partnership Act, 65 U. Pa. L. Rev. 715, 720-723 (1917), citing horrible examples of liability imposed.

[17] Official Comment to U.L.P.A. §1, 6 U.L.A. 564 (1969).

[18] Section 12.01(d), below.

[19] U.L.P.A. §2(2), discussed in Section 12.03, below.

[20] U.L.P.A. §6, discussed in Section 15.15(c), below.

[21] U.L.P.A. §28(1). The section has occasionally been invoked to support a holding that a limited partner is not liable, despite some unspecified failure to comply with the statute, to a partnership creditor who did not rely on the credit of the limited partner. Outlet Co. v. Wade, 377 So. 2d 722 (Fla. Dist. Ct. App. 1980). The section was paraphrased in dictum in Klein v. Weiss, 284 Md. 36, 395 A.2d 126, 135 (1978).

[22] Giles v. Vette, 263 U.S. 553 (1924).

The 1916 Act added flexibility by allowing a limited partner's contribution to be in either property or cash[23] and by permitting some changes in structure so long as the certificate was amended accordingly.[24] Nonetheless, the 1916 Act preserved in U.L.P.A. §7 the basic concept that a limited partner who takes part in control loses limited liability. Interpretations of this provision are discussed in Sections 15.14(a)-(e), below. The 1916 Act was intended to give some greater protection to investors (providers of capital) while still favoring creditors, thereby further encouraging business and investment.[25] Indeed, the encouragement of capital investment is probably the primary purpose of the 1916 Act[26] and its successors.

The 1916 Act is supplemented by the U.P.A., which applies to limited partnerships except insofar as the 1916 Act or other limited partnership law is inconsistent.[27] The U.P.A. is a substantial part of limited partnership law; the meshing of the two bodies of law is complex and is considered at many points below. As the Revised Uniform Partnership Act is adopted by states, U.L.P.A. will presumably be supplemented by it.

U.L.P.A. was widely adopted, first in Illinois and Pennsylvania in 1917, then in New York in 1922, and throughout the country by the 1970s. Some states modified it in ways that are discussed at relevant points in later sections. But the intent was for uniformity, evidenced not only by the title of the Act but also by the provision that it "be so interpreted as to effect its general purpose to make uniform the law of those states that enact it."[28]

[23] U.L.P.A. §2(1)(a)(VI); Section 12.07(d), below.

[24] U.L.P.A. §24.

[25] Klein v. Weiss, 284 Md. 36, 395 A.2d 126, 135 (1978).

[26] *See* Vulcan Furniture Mfg. Corp. v. Vaughn, 168 So. 2d 760, 764 (Fla. Dist. Ct. App. 1964).

[27] U.P.A. §6(2). Examples include Inland Real Estate Corp. v. Christoph, 107 Ill. App. 3d 183, 63 Ill. Dec. 9, 437 N.E.2d 658 (1961) (general partner's actual or apparent authority to sell partnership real estate); Klein v. Weiss, 284 Md. 36, 395 A.2d 126, 143 (1978) (estoppel).

[28] U.L.P.A. §28(2) (identical to U.P.A. §4(4)). The U.L.P.A. section has been applied in, e.g., Grenada Bank v. Willey, 705 F.2d 176, 178 n.2 (6th Cir. 1983) (Tennessee law); In re Dutch Inn of Orlando, Ltd., 2 Bankr. 268, 272

U.L.P.A. has largely been replaced by the Revised Uniform Limited Partnership Acts (1976 and 1985) described below, but it is still in effect in some states for some partnerships. Moreover, in many respects its interpretation is precedent for interpretation of the later Acts. Therefore, it will be discussed thoroughly in this text, and only the more important state variations will be considered. The reader interested in a specific jurisdiction should determine not only whether its statute is based on the 1916 Act (or the 1976 or 1985 Acts described below) but whether it deviates on the point under discussion.

### *(c) Revised Uniform Limited Partnership Act (1976)*

To replace the 1916 Act, the Revised Uniform Limited Partnership Act (here "R.U.L.P.A.," or "1976 Act") was presented in 1976, after several years of preparation, by the National Conference of Commissioners on Uniform State Laws, the same organization that presented the 1916 Act. The 1976 Act was drafted by the Special Committee on Uniform Limited Partnership Act, chaired by Brockenbrough Lamb, Jr., of the Virginia bar; Stephen J. Friedman, of the New York bar, was the Reporter. The text of the Act is reprinted in Appendix C, below.

While the 1916 Act was motivated largely by the underutilization of its predecessors, the 1976 Act was motivated largely by the overutilization of its predecessor. Rising prosperity and high income-tax rates coupled with numerous special deductions and credits led to the creation and growth of a major tax shelter industry from the 1960s onward. The limited partnership was the favorite vehicle, as described in Section 11.01(f), above. Into it the syndicator or promoter (who often became or selected the general partner) put the oil and gas lease, apartment complex, or other asset. Shares were sold to investors in the form of interests (often called units) in the limited partnership. Investors thus could enjoy the tax benefits attached to ownership or development of the asset

(Bankr. M.D. Fla. 1980) (Florida law); Shindler v. Marr & Assocs., 695 S.W.2d 699, 703 (Tex. App. 1985).

(until restricted by legislative changes) but with limited liability. The 1916 Act, which contemplated small numbers of limited partners, simple financial arrangements, and local operations, was not well suited to the hundreds or thousands of limited partners, intricate financial arrangements, and multistate operations in some of the modern firms.

Like the 1916 Act, the 1976 Act preserves the fundamental concept that a limited partner may lose limited liability by taking part in control of the partnership. But the 1976 Act reduces the scope of that liability. It does so by requiring for liability a higher level of participation and by listing a number of things limited partners may do without taking part in control.[29] It classifies limited partners as partners rather than just as members (Section 12.01(d), below). It does not repeat the 1916 Act rejection of the rule that statutes in derogation of the common law are to be strictly construed, presumably because that rule has now withered away. Nonetheless, some states, for safety, have added that rejection.[30]

As might be expected from the experience with large and often publicly held limited partnerships, the 1976 Act moves closer to the corporate model in ways that include central (rather than local) filing of the certificate,[31] regulation of firm name,[32] designation of a registered office and agent,[33] qualification in other states in which the partnership does business,[34] and authorization of derivative suits.[35] But the 1976 Act preserves more flexibility for the drafter of a limited partnership than for the drafter of a corporation-though less than for the drafter of a general partner-

[29] R.U.L.P.A. §303 (1976), discussed in Section 15.14(f)-(h), below. The drafters summarized the major features of the 1976 Act, including principal changes from the 1916 Act, in Prefatory Note preceding R.U.L.P.A. §1, reprinted in 6 U.L.A. (current Supp.) and Appendix C, below.

[30] *E.g.,* Ala. Code §10-9A-200(b); Del. Code tit. 6, §17-1101(b); Kan. Stat. Ann. §56-1a601(b).

[31] R.U.L.P.A. §201 (1976), discussed in Section 12.02(i), below.

[32] R.U.L.P.A. §§102-103 (1976); discussed in Section 12.02(b), below.

[33] R.U.L.P.A. §104, discussed in Section 12.02(d), below.

[34] R.U.L.P.A. §§901-908, discussed in Section 12.12, below.

[35] R.U.L.P.A. §1001-1004, discussed in Section 15.05, below.

ship-and gives the partnership agreement relatively greater primacy over the certificate than did the 1916 Act.[36]

Changes important mainly for the small partnership include authorizing a limited partner's contribution to be services as well as cash or property.[37]

R.U.L.P.A. is supplemented by U.P.A. in any case not provided for by R.U.L.P.A.[38] U.P.A., however, applies somewhat differently to R.U.L.P.A. partnerships than to U.L.P.A. partnerships. The reason is that "partner" (used throughout U.P.A.) includes limited partners in R.U.L.P.A. but not in U.L.P.A. The U.P.A. is a substantial part of R.U.L.P.A. law. As the Revised Uniform Partnership Act is adopted by states, R.U.L.P.A. will presumably be supplemented by it.[39] The 1976 Act was first adopted in 1979 by Connecticut, Arkansas, and Wyoming. States were slow to adopt the Act primarily because of uncertainty whether a 1976 Act organization, with its greater similarity to a corporation, would be treated as a partnership or as a corporation for federal income tax purposes.[40] In 1983 the Department of the Treasury finally decided the issue in favor of partnership.[41] Adop-

[36] E.g., R.U.L.P.A. §§401, 402, 601, 603, 605, 704, 801, discussed in Section 12.05, below.

[37] R.U.L.P.A. §501; discussed in Section 12.07(d), below.

[38] R.U.L.P.A. §1105; U.P.A. §6(2).

[39] Note that R.U.P.A. does not include the language in U.P.A. §6(2), which applies general partnership law to limited partnerships in unprovided-for cases. Nevertheless, general partnership law presumably will continue to be applicable to some extent after adoption of R.U.P.A. by reason of R.U.L.P.A. §§403 and 1105. *See* Ribstein, Linking Statutory Forms, 58 J. Law & Contemp. Prob. 187 (Spring 1995).

[40] *See, e.g.*, Hecker, The Tax Classification of Limited Partnerships Revisited, 88 Com. L.J. 537 (1983); Banoff, Can Tax Practitioners Support the Revised ULPA?, 60 Taxes 97 (1982); Haims & Strock, Federal Income Tax Classification of Limited Partnerships Formed under the Revised Uniform Limited Partnership Act, 9 St. Mary's L.J. 489 (1978).

[41] Treas. Reg. §301.7701-2(a)(5), as amended by T.D. 7889, 1983-1 C.B. 362 (references to U.L.P.A. are deemed to include R.U.L.P.A. so that partnerships organized under statutes corresponding to R.U.L.P.A. would lack corporate features and therefore be treated as partnerships). The hangup was an Internal Revenue Service perception that an unrestricted right of limited partners to remove a general partner resembled the corporate characteristic of

tions then accelerated so that virtually all states have either the 1976 or 1985 Act. Some states, notably California and Delaware, made substantial variations from the 1976 Act.[42] These are dis-

centralized management and that the Act might permit a provision limiting the liability of general partners giving a second corporate characteristic of limited liability. (R.U.L.P.A. §403 as originally issued read "[e]xcept as provided in this Act or in the partnership agreement, a general partner . . . is subject to the restrictions and liabilities of a partner in a partnership without limited partners." The 1983 amendment of this section is described below.) Some limited partnerships by their agreements have a degree of free transferability (a possible third corporate characteristic) but limited partnerships do not have continuity of life (a fourth corporate characteristic) as construed by the IRS. Thus, it was possible for a limited partnership to possess a majority of the four corporate characteristics and therefore be treated as an association taxable as a corporation under Treas. Reg. §301.7701-2(a)(3).

The 1983 Treasury amendment retained elements of the hangups. A "substantially restricted right of the limited partners to remove a general partner (e.g., in the event of the general partner's gross negligence, self-dealing or embezzlement) will not itself cause the partnership to possess centralized management." The implication is that a less restricted removal right may amount to centralized management. The implication is reinforced by the statement that if there is a removal right, "all the facts and circumstances must be taken into account in determining whether the partnership possesses centralized management." Treas. Reg. §301.7701-2(c)(4).

Somewhat similarly, if the agreement provides that a general partner is not personally liable for partnership debts, "it shall be presumed that personal liability does not exist with respect to that partner unless it is established that the provision is ineffective under local law." *Id.* §301.7701-2(d)(2). In anticipation of this problem, R.U.L.P.A. §403 was amended in 1983 to delete the possibility of limiting by the partnership agreement a general partner's liability to third persons: "Except as provided in this Act, a general partner . . . has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners." This language does not preclude a general partner from obtaining limited liability by agreement with third persons, as by nonrecourse financing.

Thus, if drafters of limited partnership agreements seek partnership tax treatment (as they almost invariably do), they were until 1997 under pressure to avoid unrestricted removal powers and attempts to limit the liability of general partners to third persons. *See* Section 12.22, below, on tax classification of limited partnerships.

[42] Dates of adoption and citations are collected before R.U.L.P.A. §1 in 6A U.L.A. (current Supp.); Lexis-Nexis Library Model, File UPARTA; Westlaw database ULA. Variations are collected under each section of the Act in 6A

cussed at relevant points later. The intent for uniformity is expressed not only in the name of the Act but also by a provision that the Act "shall be so applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this Act among states enacting it."[43] R.U.L.P.A. (1976) is discussed thoroughly in this text.

### *(d) Revised Uniform Limited Partnership Act (1985)*

Experience with the 1976 Act, and its modification by some states, particularly California and Delaware, led the National Conference of Commissioners on Uniform State Laws to make 1985 amendments to the 1976 Act, in effect writing a new 1985 Act, which we refer to as R.U.L.P.A. (1985). The amendments further reduce the scope of liability of limited partners by requiring a reasonable belief by the suing creditor that the defendant limited partner participating in control is a general partner and by expanding the list of things a limited partner may do without participating in control.[44] Thus, even more than its predecessors, the 1985 Act is intended to encourage capital investment by offering limited liability. The 1985 amendments also dispense with naming limited partners and their contributions in the certificate[45] and make a number of conforming changes. The 1985 Act shifts emphasis from the limited partnership certificate to the limited partnership agreement as the principal document of the partnership (Section 12.05, below). In most other respects, the discussion of the 1976 Act in Subsection (c), above, applies to the 1985 Act as well. The text of the 1985 Act is reproduced below in Appendices D (showing changes from the 1976 Act) and E (clean text).

Most states now have the 1985 Act adopted in toto or as amendments to the previously adopted 1976 Act.

---

U.L.A. (1995 & current Supp.); Lexis-Nexis Library Model, File UPARTA; Westlaw database ULA.

43 R.U.L.P.A. §1101.

44 R.U.L.P.A. §303 (1985), discussed in Section 15.14(i)-(k), below.

45 R.U.L.P.A. §201 (1985), discussed in Section 12.02(c), below.

The 1985 changes are discussed at relevant points in this text. A section unaffected by the 1985 amendments is cited simply as "R.U.L.P.A." An affected section is cited as "R.U.L.P.A. (1976)" in its original form and as "R.U.L.P.A. (1985)" in its amended form. The adoption of the revised Uniform Partnership Act (1994) for general partnerships and questions about its relationship to limited partnerships have led to proposals for further revisions to R.U.L.P.A. discussed in the next subsection.

### *(e) Revision of Uniform Limited Partnership Act ("U.L.P.A. (2001)")*

The National Conference of Commissioners on Uniform State Laws has approved a new version of the Uniform Limited Partnership Act, referred to here as "(U.L.P.A. (2001)").[46] We report on some significant changes made in the Act throughout this and the following chapters, and in more detail in Bromberg and Ribstein on Limited Liability Partnerships, the Revised Uniform Partnership Act, and the Uniform Limited Partnership Act (2001), Chapter 9.[47] Among the more important changes are elimination of linkage between the limited and general partnership acts,[48] elimination of limited partners' "control" liability (*see* Section 15.14, below), and elimination of default payouts to dis-

[46] *See* National Conference of Commissioners on Uniform State Laws, Uniform Limited Partnership Act (2001), reprinted in Appendix D to Bromberg and Ribstein on Limited Liability Partnerships, the Revised Uniform Partnership Act, and the Uniform Limited Partnership Act (2001). *See also,* Closely-Held Business Symposium: The Uniform Limited Partnership Act, 37 Suffolk L. Rev. 577-981 (2004); Kleinberger, A User's Guide to the New Uniform Limited Partnership Act, 37 Suffolk L. Rev. 583 (2004).

[47] For an analysis of an earlier version of the revision which focuses on basic policy issues, *see* Ribstein, Limited Partnerships Revisited, 67 U. Cin. L. Rev. 953 (1999).

[48] *See* Miller, Linkage and Delinkage: A Funny Thing Happened to Limited Partnerships when the Revised Uniform Partnership Act Came Along, 37 Suffolk L. Rev. 891 (2004). Because of the elimination of linkage, courts should be careful to interpret U.L.P.A. (2001) differently from how they apply R.U.L.P.A. (1985). An example of a case that failed to do so is Drenis v. Haligiannis, 452 F. Supp. 2d 418 (S.D.N.Y. 2006), discussed in Section 1.04(f), n. 65b.

sociating general and limited partners (*see* Section 17.13, below). The Act had been adopted by six states as of the summer of 2005.

## §11.03 LIMITED PARTNERSHIP AS A LEGAL ENTITY

### *(a) In General*

The entity and aggregate characteristics of general partnerships are discussed in Section 1.03, above. The predominance of entity characteristics in limited partnerships is greater than in general partnerships, and even greater under R.U.L.P.A. than under U.L.P.A.

### *(b) U.L.P.A.*

This Act contains a number of entity features in addition to those in the U.P.A. First, of course, is the limited liability of the limited partners,[1] which—like the passive role contemplated for them—underscores their distinctness from the firm. That distinctness is also reflected in the authorization for a limited partner to be a creditor of the firm, on a parity with general creditors,[2] and in the statement that a limited partner is not a proper party to proceedings by or against the partnership.[3] Since a limited partner is considered only a member of the firm rather than a partner,[4] his or her rights in specific partnership property are certainly more attenuated than a general partner's[5] (and are probably nonexistent). There is greater continuity (that is, nondissolution) than in a general partnership, despite such factors (in some or all cases) as

**§11.03** [1]U.L.P.A. §§1, 7, discussed in Sections 15.13-15.16, below.

[2]U.L.P.A. §13.

[3]U.L.P.A. §26, discussed in many parts of Chapter 15 below, especially Sections 15.02 and 15.05(c).

[4]Official Comment to U.L.P.A. §1, 6 U.L.A. 564 (1969); Section 12.01(d), below.

[5]U.P.A. §25, discussed in Sections 3.04-3.05, above, and Sections 13.04-13.10, below. *See* n.15, below.