IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-211T
(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

v.

THE UNITED STATES,

Defendant

**SECOND SUPPLEMENTAL APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**VOLUME V**


| Description | Page(s) |
|---|---|
| Saltzman: IRS Practice & Procedure §3.02 Treasury Regulations | 229-254 |

Checkpoint Contents
Federal Library
Federal Editorial Materials
WG&L Federal Treatises
Tax Practice and Procedure
Saltzman: IRS Practice & Procedure
Chapter 3: Statements of IRS Position and Practice
¶3.02. Treasury Regulations

# ¶ 3.02 Treasury Regulations

Section 7805(a) gives the Secretary of the Treasury general authority to promulgate regulations that "prescribe all needful rules and regulations for enforcement" of the Code. Other, specific grants of authority for the Secretary to promulgate regulations can also be found throughout the Code. [5] Questions about what constitutes a rule or regulation, the process involved in drafting and adoption of regulations, and the legal effect of a regulation require separate treatment and are discussed later in this section.

## ¶ 3.02[1] "Rules," "Regulations," and "Rulings" Defined

In administrative law, a fundamental distinction is drawn between an agency's "rulemaking" (quasi legislative) actions and "adjudication" (quasi judicial) actions. [6] If the action of an agency, such as the Service, is quasi legislative, the APA's rulemaking requirements of preadoption notice and public hearing must be followed before an agency rule is finalized. [7] On the other hand, if the agency's action is quasi judicial, an entirely different set of APA adjudication procedures apply. [8]

There is no clear test for determining whether an agency's action constitutes rulemaking or adjudication. The APA makes a modest attempt to distinguish between the two administrative functions by defining both "rule" and "order" for purposes of the APA. A "rule," under the APA definition, is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." [9] Rulemaking is therefore the "agency process for formulating, amending, or repealing a rule." [10] Consequently, a "rule" in the context of Treasury and Service action has the following three characteristics:

1. A rule is the product of the legislative function of the Treasury and the Service, and resembles a statute in that it applies to a class or category of taxpayers generally. While the definition of "rule" says that it may be directed at a particular situation, this reference is intended to apply to rate-making situations and does not detract from the principle that a rule has general applicability. [11] In the case of federal tax rules directed at a specific, albeit unidentified, person or the particular facts of a transaction or situation, the rule is intended to apply generally to all persons whose facts or transactions are the same as those in the rule.

App. 229

2. A rule generally has future effect. [12]

3. A rule implements law or policy (legislative or substantive rules), interprets law (interpretive rules), or describes organization or procedure or practice requirements (procedural rules).

By contrast, under the APA, "order" means "the whole or any part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." [13] Under this definition, "adjudication" is any agency action that is not rulemaking, and that, at the end of the administrative process, results in a "final disposition" of a

matter involving a specific person. That final disposition may be a negative action, an injunction, or declaratory action.

The Code uses the terms "rules" and "regulations" interchangeably and, confusingly, in conjunction (e.g., in the civil penalty for intentional disregard of "rules *and* regulations"). [14] The Treasury also promulgates certain regulations as Treasury decisions, a term that implies some order or final disposition following an adjudicative process, when, in fact, the Treasury decision refers to a general rule adopted in accordance with its rulemaking function. The Statement of Procedural Rules resolves some of this confusion in terminology when it says that internal revenue "rules" take various forms, the "most important of which are issued as regulations and Treasury decisions prescribed by the Commissioner and approved by the Secretary or his delegate." [15] In other words, a "regulation" is one form of a "rule."

The more difficult question is whether a revenue ruling is a "rule." A revenue ruling differs from a regulation in important respects. First, rulemaking procedures (preadoption notice and public comment) prescribed by the APA govern the process for the Treasury's adoption rules and regulations. No preadoption notice and public comment procedures are required when the Service publishes a revenue ruling. A regulation is therefore the product of the formal process required when the Treasury and the Service states their position on a matter of tax law for future effect, while a revenue ruling is a type of informal statement of the Service's position about the application of the tax law to present or past facts. Because a rule or regulation is the product of a more formal rulemaking process that permits public comment, and presumably further consideration before the regulation is adopted, it is accorded greater weight and legal effect by the courts than a revenue ruling. Furthermore, the Internal Revenue Bulletin, in which revenue rulings are published, states that rulings and procedures reported in the Bulletin "do not have the force and effect of Treasury Department Regulations, but they may be used as precedents [in dealing with the Service]."

There is another fundamental difference between a rule or regulation and a revenue ruling. A regulation may deal with a specific situation or category of taxpayer, but it is intended to have general applicability for future transactions, and therefore the rule it establishes may be applied to facts and circumstances not specifically identified in the rule or regulation. A revenue ruling, by contrast, is the conclusion of the Service on how the law is applied to a specific set of facts. As the Service itself cautions, the conclusion reached in the ruling may not be relied on "unless the facts and circumstances [of the taxpayer] are substantially the same." [16]

## ¶ 3.02[2] The Regulations Process: The Requirement of Notice and Public Comment

Responsibility for drafting regulations rests with the Secretary's delegate, the Assistant Secretary of the Treasury for Tax Policy and the Assistant Secretary's legal advisers in the Office of Tax Legislative Counsel. However, the initial drafting of regulations has been delegated to the Commissioner of Internal Revenue and the Commissioner's legal advisers in the office of an Associate Chief Counsel. [17] When a decision is made to promulgate a new regulation or to amend an existing one, the process from drafting to approval is as follows:

1. An Associate Chief Counsel assigns the project to one of the appropriate branches (functions). An attorney-adviser within the branch prepares a draft with assistance from an attorney from Treasury.

2. Assistance of other necessary personnel in the Service and the Treasury is enlisted.

3. As drafting proceeds, members of the team attempt to reach agreement on a position with the assistance of reviewers. These reviewers can be other attorney-advisers or supervisory personnel, such as the Branch Chief.

App. 230

4. Depending on the type of project and its significance, the draft also may be reviewed by the Associate Chief Counsel, the Associate Chief Counsel (Litigation), the Associate Chief Counsel (International), and others.

5. The sequence for final review and sign-off on the regulation is to the Associate Chief Counsel, then to the Chief Counsel, thereafter to the Commissioner, and last to Treasury and the Assistant Secretary of the Treasury for Tax Policy. [18] Treasury attorneys may also conduct their own internal review.

6. The regulation as proposed is published in the Federal Register as a notice of proposed rulemaking.

7. Comments are solicited and hearings may be held on the proposed regulation.

8. Final regulations are drafted and adopted or are republished in the Federal Register for further comments. [19]

When an agency seeks to adopt a "substantive" rule, the APA requires the agency to (1) publish a notice of proposed rulemaking in the Federal Register; (2) give interested persons an opportunity to comment on the proposed rule; and (3) postpone the effective date of the rule until thirty days after publication in the Federal Register. [20] The published notice of the proposed rule must set forth (1) the time, place, and nature of public rulemaking proceedings; (2) the legal authority under which the rule is proposed; and (3) the terms or description of the subjects or issues involved.

Although the APA does not subject interpretive rules to these notice-and-comment procedures, the Treasury Department nevertheless follows them when adopting interpretive rules. Consequently, regulations issued pursuant to statutory authority to implement the statute (legislative regulations) and those advising the public of the agency's construction of a statute (interpretive regulations) are first published in proposed form and go through the notice-and-comment process before they are published in final form.

Temporary regulations must also be issued as proposed regulations. They are permitted to remain in effect for no more than three years after the date of their issuance. [21]

There are two general exceptions to the notice-and-comment procedures. First, the APA does not require the notice-and-comment procedures to be followed when organizational and procedural regulations are adopted. Accordingly, when the rule describes the Service's organization, procedure, or practice, the Treasury may adopt such a rule without providing notice and opportunity for public comment. [22] Second, the Treasury may publish regulations without following the above-discussed "notice-and-public comment" procedures if the regulation states that the Treasury has determined "for good cause" that these procedures are "impracticable, unnecessary, or contrary to the public interest." [23] The Treasury has frequently used this exception to issue temporary regulations for immediate guidance where substantial legislation has been enacted. [24] These temporary regulations are effective until superseded by permanent regulations.

The notice of proposed rulemaking, when required, must be published in the Federal Register at least thirty days before the rule becomes effective. [25] If the final regulation differs materially from the proposed rule (as published), the regulation may be invalid for not having been promulgated in accordance with the APA's notice requirements. In *American Standard, Inc. v. United States*, [26] a notice of proposed rulemaking was published in the Federal Register on September 8, 1966, but the proposed regulation differed substantially from the regulation ultimately adopted on December 30, 1966. The Court of Claims held that the published notice did not give the public fair or adequate notice of the final regulation and that, therefore, the final regulation was invalid because the notice provisions of the APA had been violated.

After a notice of proposed rulemaking is published in the Federal Register, interested persons may submit any data, views, or arguments with respect to the proposed regulations. [27] If a public hearing is announced, they may also make oral comments at the hearing. Persons who wish to be heard at the public hearing must, within the time prescribed in the notice, submit an outline of the topics they want to discuss and the time they will devote to each topic. [28] An agenda is then prepared containing the order of presentation of oral comments and the time (ordinarily ten minutes) allotted to each presentation. [29] Persons making oral comments are requested to avoid the mere restatement of their previously submitted written comments and to be prepared to answer questions not only on the topics listed in the outline of their oral presentation but also on matters related to their written comments. [30]

The APA provides that regulations may not be made effective until at least thirty days after the date the notice of proposed rulemaking is published in the Federal Register. This requirement merely postpones the effective date of the regulation without stating what that effective date must be once the thirty-day rule is satisfied. [31] In the case of tax rules and regulations, Section 7805(b) also provides that no temporary, proposed, or final regulation may apply to any taxable period ending before the earliest of (1) the date on which the regulation is filed with the Federal Register; (2) in the case of a final regulation, the date on which a related proposed or temporary regulation was filed with the Federal Register; or (3) the date on which a notice substantially describing the expected content of a temporary, proposed, or final regulation was made public. [32] Moreover, where regulations amend existing regulations in a manner adversely affecting taxpayers or restricting treatment previously accorded them, the Treasury delays the effective date of the regulations, usually beyond the statutory thirty-day period. [33] The Service is also required to solicit comments from the Small Business Administration about the impact of proposed and temporary regulations on small business. The Service must take this action after the proposed or temporary regulations are issued (or before the promulgation of final regulations if final regulations are issued directly without the issuance of proposed regulations). [34]

## ¶ 3.02[3] Types of Regulations and Their Legal Effect

Regulations under the 1986 Code have been grouped under Title 26 of the Code of Federal Regulations. Within this title, regulations are divided into parts, and each set of regulations is given a part number. Regulations on income tax sections of the Code are designated Part 1, so that regulations under Section 162 appear in the Treasury Regulations as Section 1.162. As noted previously, there are three types of regulations: (1) legislative or substantive, (2) interpretive, and (3) procedural.

## ¶ 3.02[3][a] Legislative or Substantive Regulations

App. 232

Legislative or substantive regulations are regulations issued pursuant to a specific authorization from or direction by Congress in particular sections of the Code. These regulations are issued under the particular statute by which Congress makes the delegation to the "Secretary or his delegate." The best known example of this type of regulation is the consolidated return regulations promulgated pursuant to Section 1502 , which provides: "The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group...may be returned." With this legislative delegation to the Secretary or the Secretary's delegate, Congress enabled the consolidated return regulations, and not the statute, to constitute virtually the entire law dealing with consolidated tax returns. When the Treasury promulgates a legislative regulation, the regulation has the force and effect of law. [35]

In *Rowan Companies*, the Supreme Court described the standard of review applicable to legislative regulations, saying that "[w]here the Commissioner acts under specific authority, our primary inquiry is whether the interpretation or method is within the delegation of authority." [36] A reviewing court has no authority to substitute its judgment about the content of the regulation because Congress has placed maximum discretion in the agency and not in the courts. [37] Legislative regulations do not have the

effect of the enabling statute, however, unless they are (1) within the granted power of the agency, (2) issued pursuant to proper procedure, and (3) reasonable. [38]

Since the authority to promulgate legislative regulations derives from the enabling statute, a legislative regulation must be within the granted authority, or it will be ultra vires. The reasonableness requirement derives from considerations of both constitutional due process and the principle of statutory interpretation that presumes legislative bodies intend to avoid delegating the power to act unreasonably. [39] Under this doctrine, courts have held legislative regulations invalid when the regulation conflicted with a statute [40] or was unreasonable in attempting to tax income that would otherwise not be taxed. [41] A legislative regulation may also be held invalid if it has not been promulgated according to the requirements of the APA. [42]

## ¶ 3.02[3][b] Interpretive Regulations

Regulations that explain or construe the meaning of a statutory provision are called interpretive regulations. The explanation or construction offered in such regulations describes the position of the Treasury and the Service, commits the Treasury and the Service to an interpretation of law, and is generally binding upon both. [43] Interpretive regulations also give notice to taxpayers of the Service's position on a particular issue or transaction. Unlike legislative regulations, however, there is no specific grant of authority for the promulgation of an interpretive regulation. Authority for the promulgation of interpretive regulations is derived from the general grant of authority authorizing the Secretary or his delegate "to prescribe all needful rules and regulations for the enforcement of [the tax laws]." [44]

Unlike legislative regulations, an interpretation stated in an interpretive regulation is not controlling on a court. The weight given to an interpretive regulation by a court depends on a totality of circumstances. As the Supreme Court noted in *Skidmore v. Swift & Co.*, in regard to regulations interpreting the Fair Labor Standards Act:

> There is no statutory provision as to what, if any, deference courts should pay to the Administrator's conclusions....This Court has long given considerable and in some cases decisive weight to Treasury Decisions and to interpretative regulations of the Treasury and of other bodies that were not of adversary origin. We consider that the rulings, interpretations and opinions of the Administrator under [the Fair Labor Standards] Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. [45]

In a later statement, the Supreme Court in *National Muffler Dealers Association* described the judicial analysis in the following way: [46]

> In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonized with the plain language of the statute, its origin, and purpose. A regulation may have a particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during the subsequent re-enactments of the statute.

Factors that courts consider to bear on the validity of interpretive regulations include (1) whether the

court agrees or disagrees with the regulation; (2) whether the regulation reflects special administrative competence (i.e., the administrator considers the regulation to be reasonable in the context of the statutory scheme); (3) whether the regulation is longstanding; and (4) whether the statute has been reenacted, after promulgation of the regulation, by legislators who presumably knew the content of the rule. These factors are discussed more fully below.

## ¶ 3.02[3][b][i] Reasonableness.

Courts generally attach great weight, and thus frequently defer to, the Treasury's construction of a statute. In support of this notion, the Supreme Court stated that a regulation must be upheld "unless unreasonable and plainly inconsistent with the revenue statutes," [47] and that "the choice among reasonable alternatives is for the Commissioner, not the courts." [48] Nevertheless, despite this principle of deference, a court may find that as a matter of law an interpretive regulation is inconsistent with the statute and therefore is an unauthorized interpretation of it. Once such a finding is made, the interpretive regulation ceases to have any legal effect, and the court's interpretation of the statute will govern resolution of the issue. The rationale for this principle was stated by the Supreme Court in *Manhattan General Equipment Co. v. Commissioner*:

> The power of an administrative officer...to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law...but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. [49]

In a decision that has been described as the most important, as well as "notorious," administrative law decision "in recent years," the Supreme Court developed in *Chevron, USA, Inc. v. Natural Resources Defense Council* a two-part process for determining the validity of a regulation: [50]

> First, always, is the question whether Congress has directly spoken to the precise question or issue. If the intent of Congress is clear, that is the end of the matter, for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

The first part of the analysis, concerning whether the regulation is consistent with the statute and its purpose, is in the tradition of the *Manhattan General Equipment* case. The full import of the decision is therefore in the Court's description of the second part of the review process, which courts are to undertake if "Congress has not directly addressed the precise question at issue," and the statute is "silent or ambiguous" on the issue. If Congress did not directly address the issue, *Chevron* says, a court should not independently determine whether the regulation is inappropriate or incorrect. Instead, the court should examine whether the agency was reasonable in determining that its regulation is appropriate in the context of the statutory scheme. [51] If the statute is silent or ambiguous, other statements in *Chevron* make it difficult for a court to take any action other than to defer to the agency's view. Thus, the Court said that the agency's construction of the statute is accorded "considerable weight," and when the agency's choice "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [courts] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." [52] Under the *Chevron* doctrine, an interpretive regulation will not be invalidated by the court's conclusion that the agency interpretation was not the only permissible one or that it would have adopted a different interpretation if the matter had been before it in a judicial proceeding. [53]

Although a long line of Supreme Court cases, including tax cases, adopted a principle of deference to agency legal interpretations, [54] by providing a structure for analysis and application of this principle, *Chevron* has become the most cited case in administrative law in the last fifty years. [55]

After *Chevron*, courts have had to determine (1) whether Congress has "directly addressed" an issue, (2) whether the statute is unambiguous on the issue, and (3) whether the agency's interpretation of the statute is a permissible and reasonable one, even if it is not the correct one in the court's view.

While some degree of deference to an agency's interpretation of a statute is a settled principle even in the case of interpretive regulations, courts (including the Supreme Court) have nevertheless rejected an agency's construction of a statute under certain circumstances. For example, three years after it decided *Chevron*, the Supreme Court carefully reviewed the language and legislative history of two statutory standards in the Immigration and Nationality Act, one for the withholding of deportation and the other for asylum. Upon doing so, the Court rejected the Immigration and Naturalization Service's interpretive rule that the two standards were the same, saying that the question "whether Congress intended the two standards to be identical is a pure question of statutory construction for the courts to decide." [56] The approach of the Court in this case is that courts, not agencies, are the "final authority on issues of statutory construction" (i.e., on the matter of whether Congress has spoken on the issue). As such, the courts are free to reject an administrative construction of a statute that is contrary to Congress's intent. [57] In another case, the Supreme Court applied the *Chevron* principle, and upheld a regulation of the Department of the Interior interpreting the Endangered Species Act. It did so, however, only after it examined the text of the Act, the broad purpose of the Act, and subsequent legislative action, all of which shed light on the meaning of the Act. The Court concluded that Congress did not "unambiguously manifest its intent to adopt" a view different from the agency interpretation, and that the agency's interpretation was a reasonable one. [58]

In tax cases, the Supreme Court has said that it "customarily" [59] defers to a Treasury interpretive regulation as long as it is found to "implement the congressional mandate in some reasonable manner." [60] Deference has sometimes been described in the strongest terms (i.e., foreshadowing *Chevron*), as in *South Texas Lumber Co.*, where the Court said that a regulation could not be held invalid unless the regulation was "plainly inconsistent with the statute." [61] As *Chevron* recognized, deference is given to an agency's construction of a statutory scheme because the agency is entrusted with the administration of the statute and has developed an institutional expertise and familiarity with the statute. [62]

If the agency's familiarity with the statute is fundamental to the *Chevron* doctrine, then the scope of the doctrine, or at least the extent of its applicability, may be questioned when the agency's interpretation is reviewed by a specialized court, such as the Tax Court. Before *Chevron*, the Tax Court stated its approach to the analysis as follows: [63]

> [J]udicial deference is not a substitute for judicial scrutiny and analysis. A regulation which contradicts the unambiguous language of the statute it purports to interpret cannot stand. Moreover, where the statute is unambiguous, and there is no valid reason for adding a requirement to those the statute already provides, the Commissioner may not usurp congressional authority by adding such a requirement by regulation. Finally, although a regulation does not clearly contradict or limit the provisions of the statute it purports to interpret, it is nonetheless invalid if it is inconsistent with the statute's origin and purpose.

This is not *Chevron*-type deference to the Treasury's and the Service's interpretation. However, it should be noted that the Tax Court's specialized jurisdiction enables it to determine whether the Service's or Treasury's choice among alternative interpretations is appropriate and reasonable, and the Tax Court may do so with a level of sophistication that courts of general jurisdiction may not be equipped to exhibit.

**App. 235**

Still, general propositions do not supply a ready test for predicting the level of deference a court will give an agency's interpretive regulation. Supreme Court decisions, albeit before *Chevron*, illustrate the problem. In *National Muffler Dealers*, the Supreme Court said that, in determining whether a statutory regulation carries out the congressional mandate, it considers whether the regulation "harmonizes" with the "statute, its origin, and its purpose;" the Court then found the regulation in issue to be valid. [64] In *Vogel Fertilizer*, calling upon the same principle, the Court held another regulation invalid. [65]

Courts, including the Supreme Court, have nevertheless struck down regulations because they were unreasonable interpretations of the statute. [66] Cases after *Chevron*, such as *Cardoza-Fonseca*, suggest that, while giving deference to the Treasury's interpretation, courts will not surrender their judicial role of "using the traditional tools of statutory construction" to reach a determination about the proper interpretation of the statute. Courts will determine whether a Treasury regulation is valid by first examining and construing the statute, or, as the Supreme Court said in *National Muffler Dealers*, "the plain language of the statute, its origin, and its purpose." If the statute is unambiguous and the regulation is inconsistent with the statute, that is the end of the matter, and the regulation will be held invalid. If the meaning of the statute is not plain, the court will look to legislative history to determine the origin and purpose of the statute. If Congress has not "directly addressed" the issue, however, *Chevron* requires the court to then uphold the regulation if the Treasury's or Service's interpretation is a permissible or reasonable interpretation of the statute. Despite its principle of deference, both the "directly addressed" and the reasonable interpretation elements of the *Chevron* doctrine give courts the flexibility and opportunity to reject the Treasury's or Service's interpretations of Code provisions.

Also, the Supreme Court seems to have moved away from an inflexible or purist application of *Chevron* deference to agency interpretations. In a case involving an opinion letter signed by the acting administrator of the Wage and Hour Division of the Department of Labor, the Court refused to give the interpretation contained in the letter *Chevron* deference. [66.1] The fact that the opinion letter was an informal statement of position, taken without the notice and comment of formal rulemaking, was significant in the Court's view. In other words, the letter simply was too informal an agency position to which *Chevron* deference should be applied. In a case decided a year later, the Court was faced an agency position contained in a tariff classification ruling letter that the U.S. Customs Service issued. [66.2]

Customs Service ruling letters appear basically the same as letter rulings the National Office issues to requesting taxpayers: The ruling represented the Customs Service's official position applying the law to a specific set of facts or issue; the official position is binding on the Customs Service until the Customs Service revoked or modified it, but the position is not precedent to be used by others if it had been modified or revoked. Without notice and comment procedures of formal rulemaking, the ruling letter was only an informal statement of position, which the Court concluded was not entitled to *Chevron* deference. Under *United States v. Mead*, [66.3] courts must examine the statute itself to determine whether Congress granted the agency claiming deference authority to make rules carrying the force of law (which seems more consistent with legislative rather than interpretative rules), and also to determine whether the agency's interpretation has been issued in the exercise of the force-of-law interpretative authority Congress gave the agency. The Court seems to expect that Congress will make explicit statements about what interpretative authority the agency will have and what weight the interpretation should be given, but this kind of express delegation in a statute seems to be unusual. Perhaps realizing this, *Mead* also directs courts to consider "statutory circumstances" to find whether in the legislative history there are "express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." [66.4] At least part of this inquiry is to search for an actual or circumstantial grant of authority to the agency to engage in formal (notice and comment) rulemaking. Without evidence of the requisite legislative intent, however, *Chevron* deference is not given to the administrative interpretation, although the agency's interpretation would still be considered in light of the agency's authority and expertise. [66.5]

## ¶ 3.02[3][b][ii] Timing.

Regulations that were promulgated contemporaneously with or shortly after the enactment of a statute are given more weight than regulations enacted later. [67] In the case of Treasury regulations, this practice seems justified where the bill is sponsored by the Administration through the Treasury and the bill survives the legislative process substantially intact. When the Treasury-sponsored bill is enacted, Treasury's regulations interpreting the statute reflect the intention of the writer of the statute (i.e., the Treasury). However, even if a bill does not originate in the Treasury or if a bill originating in the Treasury is substantially changed, the Treasury staff will still be well prepared to formulate regulations that articulate the intentions of Congress (or at least of its committees) because the Treasury staff will have participated in the preparation of the committee reports and the hearings on the bill. In the event that the Treasury staff did not participate in a bill or opposed it, logic (if not experience) indicates that regulations interpreting such statutory provision may not have the same weight.

## ¶ 3.02[3][b][iii] Duration.

The length of time that a regulation has been in force also is a factor indicating its validity and the level of deference to be accorded to it by the courts. The Supreme Court has even stated that longstanding rules should not be overruled except for weighty reasons, [68] and that "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." [69] Nevertheless, the Supreme Court has declared invalid established regulations with which it has disagreed, longstanding or not. [70]

## ¶ 3.02[3][b][iv] Reenactment.

The doctrine of legislative reenactment refers to the proposition that Congress implicitly approves all administrative interpretations of a statute it reenacts, thereby giving that administrative interpretation the force of law. This doctrine has frequently been cited in tax cases. [71] However, at best, the so-called "reenactment doctrine" should have no more status than as "an aid in statutory constructions." [72]

The reasoning of the doctrine assumes that members of the tax committees, or at least their staffs, review all existing regulations prior to reenacting a statute; one could hardly quarrel with judicial approval of a regulation specifically or implicitly approved by Congress. However, with the exponential growth in the number and length of regulations, it is doubtful that members of these committees will have the time or inclination to become sufficiently familiar with all of the Treasury interpretations concerning the reenacted provision to form a judgment as to their position on each individual interpretation. Accordingly, without a clear expression of congressional approval of an existing administrative interpretation, it may not be wise to infer approval from the mere reenactment of a statute after an interpretation thereof has been issued by an agency.

In *Bob Jones University v. United States*, the Supreme Court stated: "Ordinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation," and "[n]onaction by Congress is not often a useful guide." [73] However, the failure of Congress to modify IRS rulings of 1970 and 1971 that denied tax-exempt status to private schools not having a racially nondiscriminatory policy as to students, when it enacted other legislation affecting Section 501 , was held to "make out an unusually strong case of legislative acquiescence in and ratification by implication of the 1970 and 1971 rulings." [74] Also, Congress's knowledge of the Service's position was established by "its own studies and by public discourse," as well as the failure of thirteen bills introduced to overturn the IRS interpretation to emerge from any committee. On the other hand, where the record is silent, Congress's failure to act may reflect no more than a willingness to leave details to the special skills of administrators and judges. [75] As Judge Learned Hand put it: "To suppose that Congress must particularly correct each mistaken construction under penalty of incorporating it into the fabric of the statute appears to be unwarranted; our fiscal legislation is detailed and specific enough already." [76] Thus, legislative silence may at best mean nothing more than that the matter was not called to the attention of Congress. [77]

# ¶ 3.02[3][c] Procedural Regulations

The term "procedural regulation" can apply to regulations promulgated in four different circumstances:

1. Otherwise interpretive regulations covering such matters as what information a taxpayer must supply to the IRS on the occurrence of a transaction and when the information must be supplied. [78]

2. Regulations promulgated under the procedural and administrative provisions of the Code. [79]

3. Regulations governing such internal management-type practices as hours, overtime, pensions, and similar matters.

4. Regulations describing, for the benefit of IRS employees and taxpayers alike, how the Service conducts its business.

Unlike legislative and interpretive regulations, the Commissioner of Internal Revenue, not the Treasury, promulgates procedural regulations, such as the Statement of Procedural Rules. [80]

The four distinct types of procedural regulations are issued in different ways and have different legal effect. Regulations setting forth taxpayer obligations to file forms and information, frequently issued as part of interpretive regulations, are promulgated according to the same notice and hearing procedures that accompany interpretive regulations. However, once enacted, they appear to be given the greater weight of legislative regulations. Regulations interpreting the procedural and administrative provisions of the Code are interpretive regulations, and the Treasury treats them as such by using the notice and hearing provisions of the APA. [81]

Internal management rules and descriptions of IRS operations affecting taxpayers are promulgated by the Commissioner of Internal Revenue under the general housekeeping rulemaking authority of the APA at 5 USC § 301 . As seen below, these procedural regulations may not be binding on the Service. [82] Moreover, where the Commissioner issues housekeeping-type and procedural regulations, the notice requirements of the APA do not apply. [83]

As a general rule of administrative law, an agency is bound by its procedural regulations, at least where the procedural rule affects some vital personal interest of the taxpayer. [84] For reasons that are not entirely clear, a considerable body of law exists supporting the principle that the Service is not bound by procedural regulations issued by the Commissioner rather than the Treasury. [85] In *Luhring v. Glotzbach*, the Service sent a notice of deficiency to the taxpayer without the prior thirty-day letter required by the Service's procedural regulations. The Court of Appeals for the Fourth Circuit held that compliance with the Statement of Procedural Rules was not essential to the validity of a notice of deficiency, because these rules are promulgated without the approval of the Secretary of the Treasury, and, accordingly, lack the authority of regulations promulgated with the approval of the Secretary. To determine whether the Service is bound by its own procedural rules, the circuit court distinguished between procedural rules "promulgated without the approval of the Secretary...laid down by the Commissioner for the regulation of the affairs of his office" under Section 7802 and "formal regulations with the force and effect of law" that are prescribed by the Secretary of the Treasury under Section 7805 . Unlike Treasury regulations, the Commissioner's rules were "directory and not mandatory in legal effect," because if they were mandatory, they would operate to curtail the higher authority of the Secretary (in this case, to send a notice of deficiency).

Despite this authority, courts (including the circuit court which decided *Luhring v. Glotzbach* ) have nevertheless required, in certain instances, that the Service comply with statements of procedure issued in less formal circumstances than the Statement of Procedural Rules. When special agents

investigating criminal violations of the tax law failed to give partial Miranda warnings in accordance with a technical information release, several circuit courts ordered the statements obtained from the taxpayers under investigation suppressed. [86] However, in *United States v. Caceres*, [87] the Supreme Court determined that agents obtained evidence of an attempted bribery in violation of electronic monitoring procedures in the Internal Revenue Manual, but nevertheless held that the agent's failure to comply with the Manual did not warrant suppression of the evidence. The Supreme Court reasoned that the Manual's procedures were not required by either the Constitution or statute, and thus violation of the procedures did not raise constitutional issues. It has apparently escaped courts in later cases, however, that the Supreme Court accepted the principle that the Service, or any other agency for that matter, is bound by the procedural rules it adopts. [88] Specifically, in *Caceres*, the Supreme Court found that the principle did not apply, because (1) the agent's failure to comply with the Manual was the result of a good-faith, although erroneous, interpretation of the Manual's requirements; (2) the electronic monitoring procedures in question were not for taxpayer-defendant's benefit, but for the guidance of Service personnel; and (3) in any event, the defendant did not rely on them to his detriment. Moreover, it was significant to the Court's *Caceres* opinion that the remedy sought was not simply the invalidation of the agency's action under the APA, but the more extreme remedy under a rigid exclusionary rule that, if granted, would result in suppression of all evidence obtained in violation of the procedural rule. [89]

What conclusions regarding the treatment of procedural rules may be drawn from these disparate authorities? First, the Service may be bound by procedural rules it adopts even where these procedures are more stringent than the law requires or where important interests of the taxpayer are at stake (the *Heffner* and *Sourapas* cases). Next, strict compliance may not be required where the procedure (e.g., a conference) is less significant. This is because either (1) taxpayers will still have their day in court (the *Luhring v. Glotzbach* line of cases) or (2) the relief requested is drastic (e.g., suppression) and the agency's failure to comply is not intentional (*Caceres*).

## ¶ 3.02[4] The Problem of Retroactivity

App. 239

Regulations for statutory provisions enacted on or after July 30, 1996, generally may not be given retroactive effect. As amended by the Taxpayer Bill of Rights 2, Section 7805(b) prohibits any temporary, proposed, or final regulation relating to the internal revenue laws to apply to a taxable period ending before the earliest of the following dates: (1) the date on which the regulation is filed with the Federal Register; (2) in the case of a final regulation, the date on which any proposed or temporary regulation that preceded the final regulation was filed with the Federal Register; or (3) the date of any notice "substantially describing" the expected contents of a temporary, proposed, or final regulation is issued to the public. [90]

Elimination of the discretionary authority of Treasury to issue regulations having retroactive effect has certain exceptions. Specifically, the Treasury still has discretionary authority to apply regulations retroactively (1) if they are filed or issued within eighteen months after the date of enactment of the statutory provision to which the regulation relates [91] ; (2) if they are given retroactive effect to prevent abuse [92] ; (3) if the regulation is given retroactive effect to correct some procedural defect in a previously issued regulation [93] ; (4) if the regulations relate to internal Treasury Department policies, practices, or procedures [94] ; and (5) if Congress legislatively grants Treasury the authority to prescribe the effective date of the regulation. [95] In addition, Treasury may permit any taxpayer to elect retroactive application of any regulation before the date that the regulation is otherwise required to take effect according to Section 7805(b)(1) . [96]

With respect to legislation passed before July 30, 1996 (i.e., the effective date of the amended Section 7805(b) ), the Treasury and the Service had explicit statutory authority to "prescribe the extent, if any, to which any ruling or regulation, relative to the internal revenue laws, shall be applied without retroactive effect." [97] Treasury had the discretion to apply a regulation prospectively only, but, if Treasury did not exercise this discretion, it appears that a regulation ordinarily had retroactive effect.

In its prior form, Section 7805(b) reflected Congress's recognition that when Treasury applied a regulation retroactively, the retroactive application could result in hardship and inequity. [98] The harsh result that may follow a retroactive application of a regulation also led to some judicial restrictions on the Treasury's exercise of its discretion.

These decisions and other case law on retroactive regulations still have relevance today. This is because, as amended, Section 7805(b) gives Treasury the discretion to apply a regulation retroactively when necessary to prevent abuse or when Congress specifically grants the Treasury such authority. Since Section 7805(b) was only amended in 1996, case law under the prior statute offers a background for better understanding the current version and its future development.

Under these pre-amendment cases, a regulation may be retroactively applied where there is (1) no prior administrative practice; (2) conflicting or confused administrative and judicial authority; or (3) under certain circumstances, a change in prior administrative practice or regulation. [99] The issuance of interpretive regulations, after the enactment of a new statute (for which there has been no formal administrative guidance), that are retroactively applicable to the effective date of the statute generally does not constitute an abuse of discretion, even if a taxpayer has in the interim consummated a transaction that adversely affected by the regulation. [100] In *Reynolds*, the Supreme Court said that to hold that a taxpayer "had a vested interest in a hypothetical decision in his favor prior to the advent of the regulations would introduce into the scheme of the Revenue Acts refined notions of statutory construction which would, to say the least, impair an important administrative responsibility in the tax collecting process." [101] Section 7805(b)(2) now incorporates this principle by providing an exception for promptly issued regulations.

Even if no regulation has previously been promulgated, courts have not always permitted the Treasury to apply an interpretive regulation retroactively. The courts first scrutinize the circumstances surrounding the regulation's retroactive application to determine whether retroactivity is proper or fair. [102] In *Chock Full O' Nuts Corp. v. United States*, [103] the taxpayer claimed a deduction for bond discount, said to have resulted from the sale of convertible debentures at par, equal to the value of the conversion privilege. At the time the debentures had been sold, no Treasury regulation or other authority existed on the subject. Subsequently, a Treasury regulation was promulgated defining "issue price" in such a way as to remove all possibility of discount in the taxpayer's case. The Second Circuit held that, although retroactivity of tax regulations is "presumptively permissible," the courts must determine in each case whether "under all the circumstances retroactive application would be warranted." [104] The court of appeals clearly recognized that taxpayers have no vested right in a hypothetical decision in their favor prior to promulgation of applicable regulations. Nevertheless, the court ruled that the Commissioner (or the Secretary) may not take advantage of the power to promulgate retroactive regulations and thereby, during the course of litigation, provide the Service with an argument based on the presumptive validity of those "just in time" regulations. Although it declined to resolve the issue, the court said: "[I]t is questionable whether [the Treasury regulation] represents a valid exercise of the Commissioner's [sic] power to promulgate retroactive regulations." [105]

A regulation may be retroactively applied where it clarifies confused or otherwise unsettled law. Here, retroactive application usually works no unfairness, since taxpayers cannot have relied on any definitive view or statement of the law in planning and executing the affected transaction. In such instances, the taxpayer acts at its own peril in consummating a transaction using a view of unsettled law that may later be contradicted or challenged in a retroactively applied regulation. [106]

Courts will limit the Treasury's power to apply a regulation retroactively if the new regulation conflicts with a settled administrative practice or regulation that is relied upon by a taxpayer. [107] In this situation, retroactive application of the regulation has been held to constitute an abuse of discretion, at least where the prior interpretation has been impliedly approved by Congress by its reenactment of the interpreted statute. [108]

**App. 240**

If an erroneous interpretation by a taxpayer is not involved, a retroactive change in administrative practice or regulation may constitute an abuse of discretion where it would lead to inequality of treatment between competitor taxpayers or the result in a particular case would be unduly harsh or unfair. [109] By contrast, if the superseding regulation corrects an erroneous interpretation of the statute, it may be applied retroactively despite a taxpayer's detrimental reliance on the superseded but erroneous regulation. [110]

No matter how longstanding the regulation, it cannot alter the statute. As the Supreme Court said in *Manhattan Gen. Equipment Co.*, [111]

> The statute defines the rights of the taxpayer and fixes a standard by which such rights are to be measured. The regulation constitutes only a step in the administrative process. It does not, and could not, alter the statute. It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case at hand."

---

5

IRC § 7805(a) . Section 7805(a) grants the authority to the Secretary, except where "such authority is expressly given by [the Code] to any person other than an officer or employee of the Treasury Department." Also, the Secretary's authority to prescribe "all needful rules and regulations" includes "all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."

---

6

The Supreme Court has also said that there is a "recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." United States v. Florida E. Coast Ry., 410 US 224, 245 (1973) ; Schwartz, Administrative Law, 232 (3d. ed.); Gellhorn et al., Administrative Law 209 et seq. (8th ed.).

---

7

5 USC § 503 .

---

8

5 USC § 504 .

---

9

5 USC § 551(4) .

---

10

5 USC § 551(5) .

---

App. 241

11

The reference to a rule's "particular applicability" is said to ensure that the definition applies to rulemaking "addressed to named persons." See Administrative Procedure Act, Legislative History 283 n.1, quoted in Schwartz, Administrative Law, p.166 (3d ed. 1991). The reference is also said to be an "historical anomaly" intended to incorporate ratemaking proceedings, such as those public utilities and

common carriers file for the approval of tariffs or rate schedules, as rulemaking proceedings rather than adjudications. W. Gelhorn & R. Levin, Administrative Law and Process 300 (West 1997).

12

See Bowen v. Georgetown Univ. Hosp., 488 US 204, 221 (1988) ("Adjudication deals with what the law was; rulemaking deals with what the law will be"). However, Treasury regulations, under certain circumstances, may be effective retroactively if the Secretary so decides. See IRC § 7805(b) . See infra ¶ 3.02[4] .

13

5 USC § 551(6) . "Adjudication" means "agency process for the formulation of an order." 5 USC § 551 (7) .

14

See IRC § 6662(b)(1) .

15

26 CFR § 601.601(a)(1) .

16

See Rev. Proc. 2003-1 § 2.05, 2003-1 IRB 1.

17

26 CFR § 601.601(a) . See generally Schmid, "The Tax Regulations Making Process—Then and Now," 24 Tax Law. 541 (1971); Rogovin, "The Four R's: Regulations, Rulings, Reliance, and Retroactivity," 43 Taxes 756 (1965); Williams, "Preparation and Promulgation of Treasury Department Regulations," 8 USC Inst. on Fed. Tax'n 736, 741 (1956).

18

26 CFR § 601.601(a) . This description of the procedure was the one set out in CCDM (39)314.3-(39) 314.9, MT (39)-4 (Oct. 7, 1988) (Regulations and Legislation).

19

See, e.g., Announcement 79-171, 1979-52 IRB 28 , announcing public hearings on proposed regulations defining "gross cash rental" for purposes of electing to value certain farm real property according to its actual use. Proposed regulations were originally published on July 19, 1978, and hearings held on April 3, 1979. On September 19, 1979, a notice was issued withdrawing the portion of the proposed regulations concerning the definition of "gross cash rental."

20

5 USC §§ 553(b) , 553(c) , 553(d) .

**App. 242**

21

IRC § 7805(e) , added by Technical and Miscellaneous Revenue Act of 1988, § 6232 (Sept. 10, 1988)

(effective for regulations issued more than ten days after enactment date).

22

5 USC § 553(b)(A) .

23

5 USC § 553(b)(B) .

24

For a reasoned argument that Treasury should promulgate regulations in proposed form, rather than as temporary regulations, to permit preadoption public comment, see Asimow, "Temporary Regulations," 49 Tax Notes 451 (Oct. 22, 1990).

25

5 USC § 553(d) .

26

American Standard, Inc. v. United States, 602 F2d 256 (Ct. Cl. 1979) .

27

26 CFR § 601.601(b) . See, e.g., Announcement 80-25, 1980-8 IRB 27 , providing notice of a public hearing on proposed regulations relating to the application of conventions under the Class Life Asset Depreciation Range System. See also Announcement 80-23, 1980-11 IRB 39 , announcing public hearings on proposed regulations relating to requirements for depositing Social Security and withheld income taxes.

28

After a timely request is made, the Treasury may grant additional time to submit the outline.

29

26 CFR § 601.601(a)(3)(iii) .

30

26 CFR § 601.601(a)(3)(ii) . A person who wishes copies of written comments of others must make a request for such copies within the time prescribed in the notice of hearing and be prepared to pay copying costs. 26 CFR § 601.601(a)(3)(ii) .

31

The promulgation date of a regulation or Treasury decision is the date the regulation or decision is filed by the Federal Register Division, National Archives and Records Service, for public inspection. Rev. Rul. 56-517, 1956-2 CB 966 .

32

Section 7805(b) applies to regulations relating to legislation enacted on or after July 30, 1996. Retroactive effect may still be given to a regulation if it is adopted to prevent abuse, to correct a procedural defect in a prior regulation, the regulation applies to internal Treasury Department policies, practices, or procedures, Congress has authorized retroactive application, or a taxpayer has elected to apply the regulation retroactively. IRC § 7805(b)(b)(3) .

33

Schmid, "The Tax Regulations Making Process—Then and Now," 24 Tax Law. 541, 542 (1971).

34

IRC § 7805(f) .

35

See Anderson, Clayton & Co. v. United States, 562 F2d 972, 976 n.6 (5th Cir. 1977) , cert. denied, 436 US 944 (1978) ; Union Elec. Co. of Missouri v. United States, 305 F2d 850, 854 (Ct. Cl. 1962) .

36

Rowan Cos. v. United States, 452 US 247, 253 (1981) .

37

Rowan Cos. v. United States, 452 US 247, 253 (1981) . Compare City of Tucson v. Comm'r, 820 F2d 1283, 1292 (DC Cir. 1987) , where the circuit court stated:

> With all due regard for the Treasury Department's pivotal role as administrator of the revenue laws, and as well as its considerable expertise in the field of taxation, we hold that the challenged regulation exceeds the Department's delegated power to implement Section 103(c)(2)(B) . The regulation attributes to the statutory word "replace" an unnatural and unreasonably broad interpretation, and thereby enlarges both the section's coverage and the Department's administrative authority beyond the boundaries contemplated by Congress.

38

See Union Carbide Corp. v. United States, 612 F2d 558, 563 (Ct. Cl. 1979) ; American Standard, Inc. v. United States, 602 F2d 256, 261, 267 (Ct. Cl. 1979) ; American Trans-Ocean Navigation Corp. v. Comm'r, 229 F2d 97, 98 (2d Cir. 1956) ; Comm'r v. General Mach. Corp., 95 F2d 759, 761 (6th Cir. 1938) ; Corner Broadway-Maiden Lane, Inc. v. Comm'r, 76 F2d 106, 108 (2d Cir. 1935) .

39

Davis, Administrative Law Treatise § 5.03 (2d ed. 1978). See, e.g., L&F Sales Corp. v. United States, 912 F2d 377 (9th Cir. 1990) (challenge to DISC regulation rejected; held, sixty-day rule, rather than two-and-one-half-months rule, not unreasonable).

**App. 244**

40

Union Carbide Corp. v. United States, 612 F2d 558, 563 (Ct. Cl. 1979) ; American Standard, Inc. v. United States, 602 F2d 256, 261, 267 (Ct. Cl. 1979) ; Comm'r v. General Mach. Corp., 95 F2d 759,

761 (6th Cir. 1938) ; Corner Broadway-Maiden Lane, Inc. v. Comm'r, 76 F2d 106, 108 (2d Cir. 1935) ; Phillips Petroleum Co. & Subsids. v. Comm'r, 97 TC 30 (1991), aff'd, 70 F3d 1282 (10th Cir. 1992) . In Tate & Lyle, Inc. v. Comm'r, 103 TC 656 (1994) , the Tax Court held that regulations promulgated under Section 267(a)(3) , applying the matching principle of Section 267(a)(2) to non-U.S. persons, were invalid because the regulations precluded the accrual and deduction of interest when the payee's noninclusion of income was attributable to an income tax treaty, and not to its accounting method as provided in Section 267(a)(2) . The Third Circuit, however, reversed and remanded the decision, 87 F3d 99 (3d Cir. 1996) .

41

Joseph Weidenhoff, Inc. v. Comm'r, 32 TC 1222, 1242 (1959) .

42

American Standard, Inc. v. United States, 602 F2d 256 (Ct. Cl. 1979) (notice of regulation's basis and purpose was not published, in violation of the APA).

43

The binding effect of interpretative regulations is described at ¶¶ 3.02[4][b] and 3.02[5] , infra.

44

IRC § 7805(a) .

45

Skidmore v. Swift & Co., 323 US 134, 139–140 (1944) . The Tax Court has not given interpretive regulations as much weight as legislative regulations. See Pacific First Fed. Sav. Bank v. Comm'r, 94 TC 101 (1990) (interpretive regulations are "not entitled to as much deference as that owed to 'legislative regulations'").

46

National Muffler Dealers Ass'n v. United States, 440 US 472, 477 (1979) . See also Comm'r v. Engle, 464 US 206, 224 (1984) (deference accorded to administrative interpretations only sets "framework for judicial analysis; it does not displace it").

47

Comm'r v. South Tex. Lumber Co., 333 US 496, 501 (1948) .

48

National Muffler Dealers Ass'n v. United States, 440 US 472, 477, 488 (1979) . See also Fulman v. United States, 434 US 528, 533 (1978) ; Allen Oil Co. v. Comm'r, 614 F2d 336, 340 (2d Cir. 1980) ; United States v. Correll, 389 US 299, 307 (1967) .

49

Manhattan Gen. Equip. Co. v. Comm'r, 297 US 129, 134 (1936) .

**App. 245**

50

Chevron, USA, Inc. v. Natural Resources Defense Council, 467 US 837, 842–843 (1984) (interior footnotes and citations omitted).

51

Chevron, USA, Inc. v. Natural Resources Defense Council, 467 US 837, 845 (1984) .

52

Chevron, USA, Inc. v. Natural Resources Defense Council, 467 US 837, 844–845 (1984) (quoting United States v. Shimer, 367 US 374, 382, 383 (1961) ).

53

Other administrative law cases have stated the same principle. See, e.g., FEC v. Democratic Senatorial Campaign Comm., 454 US 27, 39 (1981) . *Chevron* 's deferential standard is thus similar to the standard of appellate court review of a trial court's decision where the reviewing court must uphold a finding of fact even if the court might have decided the issue differently so long as the finding is not "clearly erroneous."

54

B. Schwartz, Administrative Law (3d ed. 1991).

55

J. Reese, Administrative Law, 768 (West, 1995); W. Gellhorn & R. Levin, Administrative Law and Process, 81 (West, 1997) ("*Chevron* is the most widely cited of a long line of cases directing courts to defer to agencies' legal interpretations").

56

Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 US 421, 446–448 (1987) .

57

Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 US 421, 446 (1987) . Justice Scalia, concurring, criticized this approach, saying that the Court was erroneously interpreting *Chevron*, "by implying that courts may substitute their interpretation for that of the agency whenever [employing] 'traditional tools of statutory construction,' they are able to reach a conclusion about the proper construction of the statute." Id. at 454. Justice Scalia went on to say that the Court's approach would eviscerate *Chevron* by "authorizing courts to defer [to agencies] only if they would otherwise be unable to construe the enactment at issue." Id.

58

Babbitt v. Sweet Home Chapter of Comms. for a Great Or., 515 US 687 (1995) .

59

National Muffler Dealers Ass'n, Inc. v. United States, 440 US 472 (1979) .

60

App. 246

United States v. Correll, 389 US 299, 307 (1939) .

61

Comm'r v. South Tex. Lumber Co., 333 US 496, 501 (1948) .

62

Chevron v. Natural Resources Defense Council, 467 US 837, 844 (1984) .

63

CWT Farms, Inc. v. Comm'r, 79 TC 1054, 1062 (1982) , aff'd, 755 F2d 790 (11th Cir. 1985) . See Edward L. Stephenson Trust v. Comm'r, 81 TC 283, 288 (1983) ("A regulation is not a reasonable statutory interpretation unless it harmonizes with the plain language, origin, and purpose of the statute").

The Tax Court has also said that although an interpretive regulation "is entitled to respect, it is not entitled to the high degree of deference accorded to a legislative regulation." Ann Jackson Family Found. v. Comm'r, 97 TC 534, 538 (1991), aff'd, 15 F3d 917 (9th Cir. 1994) ("Accordingly, the mere fact that the interpretative regulation in the instant appeal was issued by the Secretary of the Treasury some twenty years ago is no argument against either the Tax Court's overturning that regulation or our upholding that ruling if the regulation fails to 'implement the congressional mandate in some reasonable manner'").

For a case illustrating the Tax Court's analysis of the validity of interpretive and legislative regulations, see Sim-Air, USA, Ltd. v. Comm'r, 98 TC 187, 194 (1992) (Reg. § 1.993-3(d)(2)(i)(b) is held to be an interpretive regulation, and its imposition of a one-year limitation with respect to domestic international sales corporation export property is reasonable). Compare St. Jude Medical, Inc. v. Comm'r, 34 F3d 1394, 1402 (8th Cir. 1994) (invalidating for domestic international sales corporation (DISC) reporting purposes one portion of the research and development expenditure regulations, Regulation § 1.861-8 (e)(3) , because it conflicted with the origin and purpose of the relevant DISC provision, Section 994 (b) ) with Perkin-Elmer Corp. & Subs. v. Comm'r, 103 TC 464, 481 (1994) (holding that, absent some unequivocal language in the legislative history, another portion of Regulation § 1.861-8(e)(3) describing the sales method of apportioning research and development expenses was not unreasonable, although the taxpayer's method produced better results in certain situations).

64

National Muffler Dealers Ass'n v. United States, 440 US 472 (1979) .

65

Vogel Fertilizer Co. v. United States, 455 US 16 (1982) .

66

For cases in which the Supreme Court found Treasury's interpretation of a statute unreasonable, see United States v. Vogel Fertilizer Co., 455 US 16 (1982) (involving the interpretation of "controlled group of corporations" in IRC § 1563 ); Rowan Cos., Inc. v. United States, 452 US 247 (1981) (definition of "wages"). Compare Comm'r v. Portland Cement Co., 450 US 156, 170 (1981) (depletion regulations held "reasonable"). Even when the interpretation of the administering agency is given great deference, a regulation may be found unreasonable. See Beneficial Corp. & Subsids. v. United States, 814 F2d 1570, 1574 (Fed. Cir. 1987) (finding nevertheless that the IRS interpretation "pervert[ed] the intent of Congress and [was] unreasonable").

**App. 247**

66.1

Christensen v. Harris County, 529 US 576 (2000) .

66.2

United States v. Mead, 533 US 218 (2001) . For a critical analysis of the application of the *Chevron* rule in judicial review of regulations and rulings, see John F. Coverdale, *Chevron's* Reduced Domain, 55 Administrative Law Rev. 39 (2003).

66.3

United States v. Mead, 533 US 218 (2001) .

66.4

United States v. Mead Corp., 533 US 218, 229 (2001) .

66.5

See Skidmore v. Swift & Co., 323 US 134, 139-140 (1944) . Some would say "respect." see John F. Coverdale, *Chevron's* Reduced Domain, 55 Administrative Law Rev. 39, 54 (2003).

67

National Muffler Dealers Ass'n v. United States, 440 US 472, 477 (1979) ; Comm'r v. South Tex. Lumber Co., 333 US 496, 501 (1948) ; Fawcus Mach. Co. v. United States, 282 US 375, 378 (1931) .

68

Comm'r v. Estate of Sternberger, 348 US 187, 199 (1955) .

69

Helvering v. Winmill, 305 US 79, 83 (1938) ; United States v. Correll, 389 US 299, 307 (1939) . See Fribourg Navigation Co. v. Comm'r, 383 US 272, 283 (1966) ; Lykes v. United States, 343 US 118 (1952) .

70

Koshland v. Helvering, 298 US 441 (1936) (regulations had been in force for sixteen years). See also Estate of Kappel v. Comm'r, 615 F2d 91 (3d Cir. 1980) (mitigation regulations in effect since adoption of 1954 Code); Ann Jackson Family Found. v. Comm'r, 15 F3d 917 (9th Cir. 1994) (private foundation excise tax regulation had been in effect for more than twenty years).

71

Helvering v. RJ Reynolds Tobacco Co., 306 US 110, 116 (1939) . See National Muffler Dealers Ass'n v. United States, 440 US 472, 477 (1979) ; Comm'r v. South Texas Lumber Co., 333 US 496, 502-503 (1948) ; Helvering v. Winmill, 305 US 79, 83 (1938) . For a case where Treasury's reenactment argument was analyzed and rejected, see Rowan Cos. v. United States, 452 US 247, 260-262 (1981) .

72

Helvering v. Reynolds, 313 US 428, 432 (1941) .

73

Bob Jones Univ. v. United States, 461 US 574, 600 (1983) .

74

Bob Jones Univ. v. United States, 461 US 574, 599 (1983) .

75

Davis, Administrative Law Treatise § 5.07 (2d ed. 1978). The statute in Helvering v. RJ Reynolds Tobacco Co., 306 US 110, 114–116 (1939) , was reenacted after regulations were issued, and then reenacted again after the regulations had been changed. Theoretically, Congress can be viewed as having approved both the original and the amended regulations.

76

FW Woolworth Co. v. United States, 91 F2d 973, 976 (2d Cir. 1937), cert. denied, 302 US 768 (1938) .

77

United States v. Calamaro, 354 US 351, 359 (1957) . See Wendland v. Comm'r, 79 TC 355, 385 (1982) (reenactment doctrine rejected because statute was not considered by Congress during period that regulation and rulings allegedly relied on were adopted). See also McCoy v. United States, 802 F2d 762, 764–766 (4th Cir. 1986) (taxpayer argued that legislative reenactment doctrine applied so that administrative interpretation could only be changed by Congress, but court said the doctrine did not preclude the Service "from later adopting some other reasonable and lawful interpretation of the statute").

78

See, e.g., Reg. § 1.332-6 , regarding the records to be kept and information to be filed with the return filed for the year in which a subsidiary is liquidated.

79

Reg. §§ 1.6001 et seq.

80

26 CFR Part 601 .

81

See, e.g., Legis. Reg. 160-81, 1982-1 CB 560, containing "proposed regulations relating to the authority of the Service to serve notice of levy by mail," providing for comments and public hearing, but stating, "the Internal Revenue Service has concluded that the proposed regulations herein are interpretative and that the notice and public [hearing] procedure requirements of 5 USC § 553 do not apply."

---

82

Luhring v. Glotzbach, 304 F2d 560, 565 (4th Cir. 1962) . See also Rosenberg v. Comm'r, 450 F2d 529, 533 (10th Cir. 1971) ; Cleveland Trust Co. v. United States, 421 F2d 475 (6th Cir. 1970), cert. denied, 400 US 819 (1970) .

---

83

5 USC § 553(b)(A) .

---

84

See the discussion in United States ex rel. Accardi v. Shaughnessy, 347 US 260 (1954) , at ¶ 1.06 [3] .

---

85

Luhring v. Glotzbach, 304 F2d 560 (4th Cir. 1962) ; Rosenberg v. Comm'r, 450 F2d 529 (10th Cir. 1971) (failure to grant appellate conference); Cleveland Trust Co. v. United States, 421 F2d 475 (6th Cir.), cert. denied 400 US 819 (1970) ; United States v. Goldstein, 342 F. Supp. 661 (EDNY 1972) (taxpayer denied district and regional conferences in criminal case).

---

86

United States v. Sourapas, 515 F2d 295, 298 (9th Cir. 1975) ; United States v. Leahey, 434 F2d 7, 10-11 (1st Cir. 1970) ; United States v. Heffner, 420 F2d 809, 812 (4th Cir. 1969) ; cf. United States v. Leonard, 524 F2d 1076 (2d Cir. 1975) . However, after *Caceres*, the First Circuit stated that *Leahey* is no longer good law. United States v. Irvine, 699 F2d 43, 46 (1st Cir. 1983) .

---

87

United States v. Caceres, 440 US 741 (1979) .

---

88

The Court also said: "It does not necessarily follow, however, as a matter of either logic or law, that the agency had no duty to obey [regulations more rigorous than either the Constitution or law required]." United States v. Caceres, 440 US 741, 751, n.14 (1979) . For further discussion of the effect of administrative rules, see Chapter 1.

---

89

United States v. Caceres, 440 US 741, 755 (1979) .

---

**App. 250**

90

IRC § 7805(b) , amended by the Taxpayer Bill of Rights 2, Pub. L. No. 104-168, § 1101(a) . According to the Joint Committee explanation of the reason for change in Section 7805(b) , "the congress believed that it was generally inappropriate for Treasury to issue retroactive regulations." Staff of Joint Comm. on Tax'n, General Explanation of Tax Legislation Enacted in the 104th Congress, p.44 (Dec. 18, 1996). See also, Cohen & Harrington, "Is the Internal Revenue Service Bound by Its Own Regulations and Rulings?" 51 Tax Law. 675, 714 (1998) ("Taxpayer Bill of Rights 2 should be viewed as having made a significant change in the status of Treasury Regulations which relate to statutory provisions

enacted on or after July 30, 1996").

91

IRC § 7805(b)(2) (1996) .

92

IRC § 7805(b)(3) (1996) .

93

IRC § 7805(b)(4) (1996) .

94

IRC § 7805(b)(5) (1996) .

95

IRC § 7805(b)(6) (1996) .

96

IRC § 7805(b)(7) (1996) .

97

IRC § 7805(b) prior to amendment.

98

See HR Rep. No. 704, 73d Cong., 2d Sess. 48 (1934). Provisions somewhat similar to Section 7805(b) have been in the tax law since the Revenue Act of 1921. See Helvering v. RJ Reynolds Tobacco Co., 306 US 110, 116 n.11 (1939) .

For commentary on how the Treasury should be allowed to exercise its discretion, see Griswold, "A Summary of the Regulations Problem," 54 Harv. L. Rev. 348 (1941) (an analysis critical of retroactivity). See also Nolan & Thuroniyi, "Retroactive Application of Changes in IRS or Treasury Department Position," 61 Taxes 777, 783-785 (1983); Waver, "Retroactive Regulatory Interpretations: An Analysis of Judicial Responses," 61 Notre Dame L. Rev. 167 (1986).

99

**App. 251**

The judicial response to retroactive application of a tax statute provides a context for analyzing the issues raised by the application of a regulation or ruling. In *Welch v. Henry*, the Supreme Court tested whether retroactive application of a tax law was "harsh and oppressive" using three factors: (1) past legislative practice, (2) legislative need, and (3) retroactive periods of relatively short duration. Welch v. Henry, 305 US 134, 148-151 (1938) ; see also United States v. Darusmont, 449 US 292, 296-297 (1981) (minimum tax enacted October 4, 1976, but made retroactive to January 1, 1976, upheld because there was a "customary congressional practice" to apply tax provisions retroactively" for short and limited periods"). Commentators have noted that the Supreme Court "has exhibited extraordinary tolerance to retroactive tax laws, and has applied a deferential standard pursuant to which a retroactive tax statute is not of itself unconstitutional unless it is 'harsh and oppressive,' thus violating

due process." Comm. on Federal Legislation, "Retroactive Application of Federal Legislation," The Records of the Ass'n of the Bar of the City of New York, 51:836, 854 (Dec. 1996); see also Bittker, "Constitutional Limits on the Taxing Power of the Federal Government," 41 Tax Law. 3, 11–12 (1987).

100

Helvering v. Reynolds, 313 US 428, 433 (1941) ; cf. Chock Full O' Nuts Corp. v. United States, 453 F2d 300, 303 (2d Cir. 1971) .

101

The affected taxpayer could not have reasonably relied on any interpretation in his favor. Helvering v. Reynolds, 313 US 428, 433 (1941) .

102

Compare CWT Farms, Inc. v. Comm'r, 79 TC 1054, 1067–1070 (1982) (retroactive application of regulations upheld, despite change of rules contained in the DISC Handbook, which Treasury said could be relied on until regulations were proposed), aff'd, 755 F2d 790 (11th Cir. 1985) , cert. denied, 477 US 903 (1986) . Retroactive application of the regulations involved in *CWT Farms, Inc.* was denied, and its reasoning rejected in LeCroy Research Sys. Corp. v. Comm'r, 751 F2d 123, 126 (2d Cir. 1984) (retroactive application an abuse of discretion because Treasury's Handbook for Exporters expressly promised regulations would be applied prospectively). See also Thomas Int'l, Ltd. v. United States, 84-2 USTC ¶ 9857 (Cl. Ct. 1984), rev'd, 773 F2d 300 (Fed. Cir. 1985), cert. denied, 475 US 1045 (1986) . For an analysis of the cases and judicial review of Treasury regulations, see Note, "Thomas International Ltd. v. United States," 38 Tax Law. 715 (1985).

When proposed regulations were published in 1983, defining "partnership items" for purposes of the unified partnership proceeding rules, they were intended to apply to tax years beginning after September 3, 1982. The final regulations, promulgated in 1986, were "very similar" to the proposed regulations. For this reason, a court held that the retroactive application of the final regulations was not an abuse of discretion and did not produce an unduly harsh result for the taxpayer. Meserve Drilling Partners v. Comm'r, 82 AFTR2d 98-5818 (9th Cir. 1998) .

103

Chock Full O' Nuts Corp. v. United States, 453 F2d 300, 303 (2d Cir. 1971) .

104

Chock Full O' Nuts Corp. v. United States, 453 F2d 300, 303 (2d Cir. 1971) .

105

Chock Full O' Nuts Corp. v. United States, 453 F2d 300, 303 (2d Cir. 1971) .

App. 252

106

Anderson, Clayton & Co. v. United States, 562 F2d 972, 983 (5th Cir. 1977), cert. denied, 436 US 944 (1978) .

107

Compare Wilson v. United States, 588 F2d 1168, 1173 (6th Cir. 1978) (taxpayer could not have relied

on settled law because the case relied on by the taxpayer was an aberration, and Service said it would not follow it). See also Wendland v. Comm'r, 79 TC 355, 385 (1982) . In *Wendland*, the Service issued a news release on October 29, 1976, stating that it would publish proposed regulations and suspend the application of certain rulings modifying the treatment of advanced royalties under mineral leases as of the news release date. On November 2, 1976, the Treasury published a notice of proposed rulemaking in the Federal Register. The final regulation was promulgated on December 19, 1977, and made retroactive to October 29, 1976. The taxpayer had invested in a coal partnership on December 30, 1976, that purchased a coal lease and other property. The Service challenged the tax treatment of deductions claimed by the partners based on the changed regulations. The Tax Court held that the Service had complied with the APA in promulgating the amended regulation, and had validly and reasonably exercised its authority under Section 7805(b) in making the amendment retroactive. The taxpayer had notice of the intent of the Service to apply the proposed change retroactively.

However, in Elkins v. Comm'r, 81 TC 669 (1983) , the taxpayer was an investor in a partnership that had been formed, and he had become obligated to pay advanced royalties before October 29, 1976, the effective date of the new regulation. When the final regulations were adopted in 1977, they provided that a partner could not deduct his share of partnership loss resulting from the payment of advanced royalties unless he was a member of the partnership on October 29, 1976. The Treasury's 1976 notice had only stated that the modified regulation would not apply if, prior to October 29, 1976, the payment of advanced royalties was required under a lease "binding...upon the party" who pays or accrues the royalties. The Commissioner moved for summary judgment against the taxpayer on the ground that he did not become a partner until after October 29, 1976, and therefore the claimed deductions could be denied under the regulations. The Tax Court denied the motion (and motion for reconsideration of its ruling) on the ground that

> it would constitute an abuse of discretion for [the Commissioner] first to state a concise rule through the medium of an official pronouncement and then belatedly to alter that rule to the substantial disadvantage of a taxpayer who had meanwhile acted in reliance on the most reasonable interpretation of it.

Id. at 681. Footnote references omitted.

---

108

Helvering v. RJ Reynolds Tobacco Co., 306 US 110, 116 (1939) .

---

109

See Anderson, Clayton & Co. v. United States, 562 F2d 972, 981 (5th Cir. 1977), cert. denied, 436 US 944 (1978) ; Chock Full O' Nuts Corp. v. United States, 453 F2d 300, 302-303 (2d Cir. 1971) ; cf. Wilson v. United States, 588 F2d 1168, 1172-1173 (6th Cir. 1978) .

---

110

Manhattan Gen. Equip. Co. v. Comm'r, 297 US 129, 134-135 (1936) . See Dixon v. United States, 381 US 68, 72-75 (1965) ; Dickman v. Comm'r, 465 US 330, 343 (1984) . For an analysis of the issue of retroactive corrections of erroneous regulations and rulings that concludes that, even though an erroneous regulation or ruling may not be binding on the Service, it may be an abuse of discretion for the Service not to apply the regulation or ruling to a taxpayer who has relied on the Service's published statement of position, see Cohen & Harrington, "Is the Internal Revenue Service Bound by Its Own Regulations," 51 Tax Law. 675 (Summer 1998).

---

111

Manhattan Gen. Equip. Co. v. Comm'r, 297 US 129, 135 (1936) .

END OF DOCUMENT -

© 2007 Thomson/RIA. All rights reserved.