IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-211T
(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

v.

THE UNITED STATES,

Defendant

**SECOND SUPPLEMENTAL APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**VOLUME VIII**


| Description | Page(s) |
|---|---|
| General Explanation of the Tax Reform Act of 1986, prepared by the Staff of the Joint Committee on Taxation (May 4, 2987), Table of Contents and Title V (Part 1) | 299-326 |

[JOINT COMMITTEE PRINT]

# GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986

(H.R. 3838, 99TH CONGRESS; PUBLIC LAW 99-514)

---

PREPARED BY THE STAFF

OF THE

## JOINT COMMITTEE ON TAXATION

MAY 4, 1987

72-236

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1987

JCS-10-87

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, DC 20402

CONGRESS OF THE UNITED STATES

(100TH CONG., 1ST SESS.)

JOINT COMMITTEE ON TAXATION

HOUSE

DAN ROSTENKOWSKI, Illinois,
*Chairman*
SAM GIBBONS, Florida
J.J. PICKLE, Texas
JOHN J. DUNCAN, Tennessee
BILL ARCHER, Texas

SENATE

LLOYD BENTSEN, Texas,
*Vice Chairman*
SPARK M. MATSUNAGA, Hawaii
DANIEL PATRICK MOYNIHAN, New York
BOB PACKWOOD, Oregon
ROBERT DOLE, Kansas

DAVID H. BROCKWAY, *Chief of Staff*
RANDALL D. WEISS, *Deputy Chief of Staff*

## SUMMARY CONTENTS

| | Page |
|---|---|
| Letter of Transmittal | XVII |
| I. Legislative Background of the Act | 1 |
| II. General Reasons for the Act | 6 |
| III. General Explanation of the Act | 12 |
| Title I. Individual Income Tax Provisions | 12 |
| Title II. Capital Cost Provisions | 89 |
| Title III. Capital Gains and Losses | 178 |
| Title IV. Agriculture, Natural Resources, and Energy | 187 |
| Title V. Tax Shelters; Interest Expense | 209 |
| Title VI. Corporate Taxation | 271 |
| Title VII. Minimum Tax Provisions | 429 |
| Title VIII. Accounting Provisions | 474 |
| Title IX. Financial Institutions | 549 |
| Title X. Insurance Products and Companies | 575 |
| Title XI. Pensions and Deferred Compensation; Employee Benefits; ESOPs | 624 |
| Title XII. Foreign Tax Provisions | 852 |
| Title XIII. Tax-Exempt Bonds | 1128 |
| Title XIV. Trusts and Estates; Minor Children; Gift and Estate Taxes; Generation Skipping Transfer Tax | 1243 |
| Title XV. Compliance and Tax Administration | 1269 |
| Title XVI. Exempt and Nonprofit Organizations | 1324 |
| Title XVII. Miscellaneous Provisions | 1333 |
| Appendix: Estimated Revenue Effects of the Act | 1353 |

## DETAILED CONTENTS

| | Page |
|---|---|
| Letter of transmittal | XVII |
| I. Legislative Background of the Act | 1 |
| II. General Reasons for the Act | 6 |
| III. General Explanation of the Act | 12 |
| Title I. Individual Income Tax Provisions | 12 |
| A. Basic Rate Structure | 12 |
| 1. Tax rate schedules | 12 |
| 2. Standard deduction | 13 |
| 3. Personal exemption | 14 |
| 4. Adjustments for inflation | 14 |
| 5. Two-earner deduction | 14 |
| 6. Income averaging | 14 |
| B. Earned Income Credit | 27 |
| C. Exclusions From Income | 29 |
| 1. Unemployment compensation benefits | 29 |
| 2. Prizes and awards | 30 |
| 3. Scholarships and fellowships | 38 |
| D. Deductions for Personal Expenditures | 46 |
| 1. Disallowance of itemized deduction for State and local sales taxes | 46 |
| 2. Increased floor for itemized deduction for medical expenses | 49 |
| 3. Repeal of deduction for certain adoption expenses | 52 |
| 4. Deductibility of mortgage interest and taxes allocable to tax-free allowances for ministers and military personnel | 53 |
| E. Expenses for Business or Investment | 55 |
| 1. Limitations on deductions for meals, travel, and entertainment | 55 |
| 2. Floor on deductibility of miscellaneous itemized deductions; modifications to certain employee business expense deductions | 76 |
| 3. Changes in treatment of hobby losses | 82 |
| 4. Changes in restrictions on deductions for business use of home | 83 |
| F. Repeal of Political Contributions Tax Credit | 88 |

| | Page |
|---|---|
| **Title II. Capital Cost Provisions** | 89 |
| A. DEPRECIATION; REGULAR INVESTMENT TAX CREDIT; FINANCE LEASES | 89 |
| 1. Depreciation | 99 |
| 2. Regular investment tax credit | 110 |
| 3. Finance leases | 110 |
| B. LIMITATION ON GENERAL BUSINESS CREDIT | 127 |
| C. RESEARCH AND DEVELOPMENT | 128 |
| 1. Tax credit for increasing research expenditures; university basic research credit | 128 |
| 2. Augmented charitable deduction for certain donations of scientific equipment | 140 |
| 3. Tax credit for orphan drug clinical testing | 141 |
| D. RAPID AMORTIZATION PROVISIONS | 143 |
| 1. Trademark and trade name expeditures | 143 |
| 2. Qualified railroad grading and tunnel bores | 144 |
| 3. Bus operating authorities; freight forwarders | 145 |
| 4. Removal of architectural and transportation barriers to the handicapped and elderly | 147 |
| E. REAL ESTATE PROVISIONS | 148 |
| 1. Tax credit for rehabilitation expenditures | 148 |
| 2. Tax credit for low-income rental housing | 152 |
| F. MERCHANT MARINE CAPITAL CONSTRUCTION FUND | 174 |
| **Title III. Capital Gains and Losses** | 178 |
| A. INDIVIDUAL CAPITAL GAINS AND LOSSES | 178 |
| B. CORPORATE CAPITAL GAINS | 181 |
| C. INCENTIVE STOCK OPTIONS | 184 |
| D. TAX STRADDLES | 186 |
| **Title IV. Agriculture, Natural Resources, and Energy** | 187 |
| A. AGRICULTURE PROVISIONS | 187 |
| 1. Special expensing provisions: soil and water conservation; clearing land | 187 |
| 2. Dispositions of converted wetlands and highly erodible croplands | 188 |
| 3. Prepayments of farming expenses | 190 |
| 4. Discharge of indebtedness income for certain farmers | 193 |
| B. OIL, GAS, GEOTHERMAL, AND HARD MINERAL PROPERTIES | 195 |
| 1. Intangible drilling costs and mining exploration and development costs | 195 |
| 2. Modification of percentage depletion rules | 199 |
| a. Denial of percentage depletion for lease bonuses and advance royalties | 199 |
| b. Excess percentage depletion for coal and iron ore | 200 |
| 3. Gain from disposition of interests in oil, gas, geothermal, or other mineral properties | 202 |
| C. ENERGY-RELATED TAX CREDITS AND OTHER INCENTIVES. | |
| 1. Business energy tax credits | 204 |

| | Page |
|---|---|
| 2. Neat alcohol fuels | 206 |
| 3. Taxicab fuels tax exemption | 206 |
| 4. Duty on imported alcohol fuels | 207 |
| **Title V. Tax Shelters; Interest Expense** | 209 |
| A. LIMITATIONS ON LOSSES AND CREDITS FROM PASSIVE ACTIVITIES | 209 |
| 1. Overview | 215 |
| 2. Treatment of losses and credits | 222 |
| 3. Treatment of portfolio income | 231 |
| 4. Material participation | 235 |
| 5. Definition of activity | 245 |
| 6. Rental activity | 248 |
| 7. Working interest in oil and gas property | 250 |
| B. EXTENSION OF AT-RISK RULES TO REAL ESTATE ACTIVITIES | 255 |
| C. INTEREST DEDUCTION LIMITATIONS | 262 |
| **Title VI. Corporate Taxation** | 271 |
| A. CORPORATE TAX RATES | 271 |
| B. CORPORATE DIVIDENDS RECEIVED DEDUCTION | 274 |
| C. DIVIDEND EXCLUSION FOR INDIVIDUALS | 276 |
| D. STOCK REDEMPTION PAYMENTS | 277 |
| E. EXTRAORDINARY DIVIDENDS RECEIVED BY CORPORATE SHAREHOLDERS | 280 |
| F. SPECIAL LIMITATIONS ON NET OPERATING LOSS AND OTHER CARRYFORWARDS | 288 |
| G. RECOGNITION OF GAIN OR LOSS ON LIQUIDATING SALES AND DISTRIBUTIONS OF PROPERTY (*General Utilities*) | 328 |
| H. ALLOCATION OF PURCHASE PRICE IN CERTAIN SALES OF ASSETS | 355 |
| I. RELATED PARTY SALES | 361 |
| J. AMORTIZABLE BOND PREMIUM | 363 |
| K. CERTAIN ENTITY NOT TAXED AS A CORPORATION | 365 |
| L. COOPERATIVE HOUSING CORPORATIONS | 366 |
| M. DEFINITION OF PERSONAL HOLDING COMPANY INCOME | 371 |
| N. REGULATED INVESTMENT COMPANIES | 375 |
| O. REAL ESTATE INVESTMENT TRUSTS | 384 |
| P. MORTGAGE-BACKED SECURITIES | 402 |
| **Title VII. Minimum Tax Provisions** | 429 |
| MINIMUM TAX ON CORPORATIONS AND INDIVIDUALS | 429 |
| 1. Overview | 436 |
| 2. Preferences and adjustments applying to both individuals and corporations | 439 |
| 3. Additional preferences and adjustments (other than limitations on itemized deductions) applying to individuals | 445 |
| 4. Business untaxed reported profits and adjusted current earnings | 448 |
| 5. Additional preferences and adjustments applying to corporations | 462 |

Page

6. Alternative minimum tax itemized deductions for individuals ... 462
7. Tax credits ... 463
8. Net operating losses ... 468
9. Limitation on the use of foreign tax credits, net operating losses, and investment tax credits ... 470
10. Regular tax elections ... 471
11. Other rules ... 471

**Title VIII. Accounting Provisions** ... 474

A. LIMITATIONS ON THE USE OF THE CASH METHOD OF ACCOUNTING ... 474
B. SIMPLIFIED DOLLAR VALUE LIFO METHOD FOR CERTAIN SMALL BUSINESSES ... 481
C. INSTALLMENT SALES ... 488
D. CAPITALIZATION RULES FOR INVENTORY, CONSTRUCTION, AND DEVELOPMENT COSTS ... 501
E. LONG-TERM CONTRACTS ... 524
F. RESERVES FOR BAD DEBTS ... 531
G. TAXABLE YEARS OF PARTNERSHIPS, S CORPORATIONS, AND PERSONAL SERVICE CORPORATIONS ... 533
H. SPECIAL TREATMENT OF CERTAIN ITEMS ... 540
1. Qualified discount coupons ... 540
2. Income attributable to utility services ... 542
3. Contributions in aid of construction ... 544
4. Cancellation of indebtedness for solvent taxpayers ... 547

**Title IX. Financial Institutions** ... 549

A. RESERVES FOR BAD DEBTS ... 549
1. Commercial banks ... 549
2. Thrift institutions ... 553
B. INTEREST ON DEBT USED TO PURCHASE OR CARRY TAX-EXEMPT OBLIGATIONS ... 558
C. SPECIAL RULES FOR NET OPERATING LOSSES OF FINANCIAL INSTITUTIONS ... 567
D. REPEAL OF SPECIAL RULES FOR REORGANIZATIONS OF FINANCIALLY TROUBLED THRIFT INSTITUTIONS ... 569
E. TREATMENT OF LOSSES AND INTEREST ON DEPOSITS IN INSOLVENT FINANCIAL INSTITUTIONS ... 572

**Title X. Insurance Products and Companies** ... 575

A. INSURANCE POLICYHOLDERS ... 575
1. Interest on installment payments of life insurance proceeds ... 575
2. Treatment of structured settlement agreements ... 576
3. Life insurance policyholder loans ... 578
4. Deduction for nonbusiness casualty losses ... 580
B. LIFE INSURANCE COMPANIES ... 582
1. Special life insurance company deduction ... 582

Page

2. Tax-exempt organizations engaged in insurance activities ........ 583
3. Operations loss deduction of insolvent companies ........ 592

C. PROPERTY AND CASUALTY INSURANCE COMPANY TAXATION ........ 594
1. Inclusion in income of 20 percent of unearned premium reserve ........ 594
2. Treatment of certain dividends and tax-exempt interest ........ 598
3. Loss reserves ........ 600
4. Protection against loss account for mutual companies ........ 618
5. Special exemptions, rates, and deductions of small mutual companies; combination of Parts II and III of subchapter L ........ 619
6. Study of treatment of property and casualty insurance companies ........ 621
7. Physicians' and surgeons' mutual protection associations ........ 622

**Title XI. Pensions and Deferred Compensation; Employee Benefits; Employee Stock Ownership Plans (ESOPs)** ........ 624

A. LIMITATIONS ON TREATMENT OF TAX-FAVORED SAVINGS ........ 624
1. Individual retirement arrangements (IRAs) ........ 624
2. Qualified cash or deferred arrangements ........ 633
3. Nondiscrimination requirements for employer matching contributions and employee contributions ........ 645
4. Unfunded deferred compensation arrangements of State and local governments ........ 652
5. Deferred annuity contracts ........ 657
6. Elective contributions under tax-sheltered annuities ........ 661
7. Special rules for simplified employee pensions. 663
8. Deductible contributions permitted under section 501(c)(18) plans ........ 667

B. NONDISCRIMINATION REQUIREMENTS ........ 669
1. Minimum coverage requirements ........ 669
2. Minimum participation rule ........ 682
3. Vesting standards ........ 687
4. Application of nondiscrimination rules to integrated plans ........ 690
5. Benefits treated as accruing ratably for purposes of determining whether plan is top heavy ........ 700
6. Modification of rules for benefit forfeitures ........ 702
7. Definition of highly compensated employees ........ 703

C. TREATMENT OF DISTRIBUTIONS ........ 708
1. Uniform minimum distribution rules ........ 708
2. Uniform additional income tax for early distributions ........ 712
3. Taxation of distributions ........ 719

Page

4. Treatment of loans .......... 727

D. LIMITS ON TAX DEFERRAL UNDER QUALIFIED PLANS .......... 730
1. Adjustments to limitations on contributions and benefits under qualified plans .......... 730
2. Adjustments to section 404 limitations .......... 743
3. Excise tax on reversion of qualified plan assets to employer .......... 750
4. Excise tax on excess distributions from qualified retirement plans .......... 754

E. MISCELLANEOUS PENSION AND DEFERRED COMPENSATION PROVISIONS .......... 761
1. Discretionary contribution plans .......... 761
2. Requirement that collective bargaining agreements be bona fide .......... 762
3. Treatment of certain fishermen as self-employed individuals .......... 763
4. Cashout of certain accrued benefits .......... 764
5. Time required for plan amendments, issuance of regulations, and development of sec. 401(k) model plan .......... 766
6. Penalty for overstatement of pension liabilities .......... 769
7. Retirement Equity Act of 1984 (REA) effective date .......... 771
8. Employee leasing .......... 772
9. Federal Thrift Savings Plan .......... 776

F. EMPLOYEE BENEFIT PROVISIONS .......... 778
1. Nondiscrimination rules for certain statutory employee benefit plans .......... 778
2. Deductibility of health insurance costs of self-employed individuals .......... 815
3. Exclusions for educational assistance programs, qualified group legal services plans, and dependent care assistance programs .......... 817
4. Treatment of certain full-time life insurance salespersons .......... 820
5. Exclusion of cafeteria plan elective contributions from wages for purposes of employment taxes .......... 820
6. Exclusion for post-retirement group-term life insurance under a cafeteria plan .......... 821
7. Tax treatment of qualified campus lodging .......... 823
8. Health benefits for retirees .......... 825
9. Accrued vacation pay .......... 826
10. Military fringe benefits .......... 828

G. EMPLOYEE STOCK OWNERSHIP PLANS (ESOPs) .......... 831
1. Changes in qualification requirements relating to ESOPs .......... 831
2. Repeal of employee stock ownership credit .......... 841
3. Certain additional tax benefits relating to ESOPs .......... 843

| | Page |
|---|---|
| **Title XII. Foreign Tax Provisions** | 852 |
| A. FOREIGN TAX CREDIT | 852 |
| 1. Overview | 871 |
| 2. Separate foreign tax credit limitations | 873 |
| 3. Deemed-paid credit | 906 |
| 4. Foreign losses | 909 |
| 5. U.S. losses | 913 |
| 6. Subsidies | 914 |
| B. SOURCE RULES | 916 |
| 1. Determination of source in case of sales of personal property | 916 |
| 2. Special rules for transportation income | 924 |
| 3. Source rule for space and certain ocean activities | 932 |
| 4. Limitations on special treatment of 80/20 corporations | 936 |
| 5. Allocation of interest and other expenses to foreign source income | 941 |
| 6. One-year modification in regulations providing for allocation of research and experimental expenditures | 956 |
| C. U.S. TAXATION OF INCOME EARNED THROUGH FOREIGN CORPORATIONS | 962 |
| 1. Subpart F income subject to current taxation | 962 |
| 2. Thresholds for imposition of current tax under subpart F | 987 |
| 3. Application of accumulated earnings tax and personal holding company tax to foreign corporations | 993 |
| 4. Deduction for dividends received from certain foreign corporations | 994 |
| D. SPECIAL TAX PROVISIONS FOR U.S. PERSONS | 999 |
| 1. Possessions tax credit | 999 |
| 2. Taxation of U.S. persons in Panama | 1006 |
| 3. Reduction of foreign earned income exclusion; disallowance of exclusion for individuals in foreign countries in violation of law | 1009 |
| 4. Transfers of intangibles to related parties | 1011 |
| 5. Compliance provisions applicable to U.S. persons resident abroad and green card holders | 1018 |
| 6. Treatment of certain passive foreign investment companies | 1021 |
| E. TREATMENT OF FOREIGN TAXPAYERS | 1035 |
| 1. Branch profits tax | 1035 |
| 2. Treatment of deferred payments and appreciation arising out of business conducted within the U.S. (retain character of effectively connected income) | 1047 |
| 3. Treatment under section 877 of property received in tax-free exchanges, etc | 1050 |
| 4. Study of competitive effect on U.S. reinsurers of U.S. tax treaty exemptions for foreign insurers and reinsurers | 1051 |
| 5. Reporting by foreign-controlled corporations | 1053 |

Page

6. Withholding tax on amounts paid by partnerships to foreign partners ..... 1054
7. Income of foreign governments and international organizations ..... 1057
8. Transfer prices for imports ..... 1061
9. Dual residence companies ..... 1063

F. FOREIGN CURRENCY EXCHANGE RATE GAINS AND LOSSES ..... 1068
1. Overview ..... 1091
2. Functional currency ..... 1092
3. Foreign currency transactions ..... 1096
4. Foreign currency translation ..... 1108
5. Other issues ..... 1113

G. TAX TREATMENT OF POSSESSIONS ..... 1115

**Title XIII. Tax-Exempt Bonds** ..... 1128

A. TAX-EXEMPT BOND PROVISIONS ..... 1128
1. General structure of bond provisions ..... 1156
2. Definition of private activity bonds ..... 1159
3. Exceptions for certain private activity bonds ..... 1167
a. Exempt facility bonds ..... 1167
b. Qualified small-issue bonds ..... 1176
c. Student loan bonds ..... 1179
d. Mortgage revenue bonds and mortgage credit certificates ..... 1180
e. Qualified 501(c)(3) bonds ..... 1183
f. Qualified redevelopment bonds ..... 1188
4. State volume limitations for most private activity bonds ..... 1193
5. Arbitrage restrictions ..... 1201
6. Restrictions on advance refundings ..... 1213
7. Miscellaneous restrictions applicable to private activity bonds ..... 1216
8. Change in use of facilities financed with private activity bonds ..... 1219
9. Restrictions on Federally guaranteed bonds ..... 1222
10. Cost recovery for bond-financed property ..... 1223
11. Information reporting for all tax-exempt bonds ..... 1223

B. GENERAL STOCK OWNERSHIP CORPORATIONS (GSOCs) ..... 1238

APPENDIX XIII-1: JOINT STATEMENT ON THE EFFECTIVE DATES OF PENDING TAX REFORM LEGISLATION (March 14, 1986) ..... 1239

APPENDIX XIII-2: JOINT STATEMENT ON THE EFFECTIVE DATE RELATING TO ARBITRAGE PROFITS (July 17, 1986) ..... 1241

| | Page |
|---|---|
| **Title XIV. Trusts and Estates; Minor Children; Gift and Estate Taxes; Generation-Skipping Transfer Tax** | 1243 |
| A. Income Taxation of Trusts and Estates | 1243 |
| 1. Rate schedule of trusts and estates | 1243 |
| 2. Revision of grantor trust rules | 1246 |
| 3. Taxable years of trusts | 1249 |
| 4. Requirement that trusts and estates make estimated payments of income tax | 1251 |
| B. Unearned Income of Certain Minor Children | 1253 |
| C. Gift and Estate Taxes | 1256 |
| 1. Filing estate tax current use valuation elections | 1256 |
| 2. Gift and estate tax deductions for certain conservation easements | 1257 |
| 3. Special rule for estate of James H.W. Thompson | 1258 |
| D. Generation-Skipping Transfer Tax | 1259 |
| **Title XV. Compliance and Tax Administration** | 1269 |
| A. Penalties | 1269 |
| 1. Penalties for failure to file information returns or statements | 1269 |
| 2. Increase in penalty for failure to pay tax | 1271 |
| 3. Negligence and fraud penalties | 1273 |
| 4. Penalty for substantial understatement of tax liability | 1277 |
| B. Interest Provisions | 1279 |
| 1. Differential interest rate | 1279 |
| 2. Interest on accumulated earnings tax | 1281 |
| C. Information Reporting Provisions | 1282 |
| 1. Information reporting on real estate transactions | 1282 |
| 2. Information reporting on persons receiving contracts from certain Federal agencies | 1284 |
| 3. Information reporting on royalties | 1285 |
| 4. Taxpayer identification numbers (TINs) required for dependents claimed on tax returns | 1286 |
| 5. Tax-exempt interest required to be shown on tax returns | 1287 |
| 6. Modification of separate mailing requirement for certain information reports | 1288 |
| D. Tax Shelters | 1290 |
| 1. Tax shelter registration | 1290 |
| 2. Tax shelter penalties | 1290 |
| 3. Tax shelter interest | 1292 |
| E. Estimated Tax Payments | 1294 |
| 1. Individuals | 1294 |
| 2. Certain tax-exempt organizations | 1295 |
| 3. Waiver of estimated tax penalties | 1295 |
| F. Tax Litigation and Tax Court | 1297 |
| 1. Awards of attorney's fees in tax cases | 1297 |
| 2. Exhaustion of administrative remedies | 1300 |
| 3. Report on Tax Court inventory | 1301 |

| | Page |
|---|---|
| 4. Tax Court provisions | 1302 |
| a. Tax Court practice fee | 1302 |
| b. Clarification of jurisdiction over penalty for failure to pay tax | 1302 |
| c. U.S. Marshals | 1303 |
| d. Special Trial Judges | 1303 |
| e. Election to practice law after retirement and receive retirement pay | 1304 |
| f. Appeals from interlocutory orders | 1305 |
| g. Annuities for surviving spouses and dependent children of Tax Court judges | 1306 |
| G. TAX ADMINISTRATION PROVISIONS | 1307 |
| 1. Suspend statute of limitations during prolonged dispute over third-party records | 1307 |
| 2. Authority to rescind statutory notice of deficiency | 1308 |
| 3. Authority to abate interest due to errors or delay by the IRS | 1309 |
| 4. Suspension of compounding where interest on deficiency is suspended | 1311 |
| 5. Exemption from levy for service-connected disability payments | 1312 |
| 6. Modification of administrative rules applicable to forfeiture | 1312 |
| 7. Certain recordkeeping requirements | 1313 |
| 8. Disclosure of return information to certain cities | 1314 |
| 9. Priority of local law in certain forfeitures | 1315 |
| 10. Release of certain seized property to the owner | 1315 |
| 11. Allocation of employee tips | 1316 |
| 12. Treatment of forfeitures of land sales contracts | 1317 |
| H. MODIFICATION OF WITHHOLDING SCHEDULES | 1319 |
| I. REPORT ON THE RETURN-FREE TAX SYSTEM | 1322 |
| **Title XVI. Exempt and Nonprofit Organizations** | 1324 |
| A. EXCHANGES AND RENTALS OF DONOR OR MEMBER LISTS OF CERTAIN TAX-EXEMPT ORGANIZATIONS; DISTRIBUTION OF LOW COST ARTICLES BY CHARITIES | 1324 |
| B. EXPANSION OF UBIT EXCEPTION FOR CERTAIN TRADE SHOW INCOME | 1327 |
| C. TAX-EXEMPT STATUS FOR CERTAIN TITLE-HOLDING COMPANIES | 1328 |
| D. EXCEPTION TO MEMBERSHIP ORGANIZATION DEDUCTION RULES | 1330 |
| E. TAX-EXEMPT STATUS FOR A TECHNOLOGY TRANSFER ORGANIZATION | 1331 |
| F. DEFINITION OF DISQUALIFIED PERSON FOR PRIVATE FOUNDATION RULE PURPOSES | 1332 |
| **Title XVII. Miscellaneous Provisions** | 1333 |
| A. TARGETED JOBS TAX CREDIT | 1333 |
| B. COLLECTION OF DIESEL FUEL AND GASOLINE EXCISE TAXES | 1336 |

Page

1. Diesel fuel tax ........ 1336
2. Gasoline tax ........ 1337

C. SOCIAL SECURITY AND FUTA PROVISIONS ........ 1339

1. Re-election of social security coverage by certain ministers ........ 1339
2. Application of FUTA tax to certain Indian tribal governments ........ 1340
3. Treatment of certain technical personnel ........ 1341

D. OTHER PROVISIONS ........ 1346

1. Exclusion from gross income for certain foster care payments ........ 1346
2. Reinstatement of rules for spouses of Vietnam MIAs ........ 1347
3. Tax exemption for certain reindeer-related income ........ 1348
4. Due dates for certain HHS quality control study and regulations relating to AFDC and Medicaid ........ 1349
5. Adoption assistance program of the Social Security Act ........ 1350

**APPENDIX: Estimated Revenue Effects of the Act** ........ 1353

TABLE A-1. SUMMARY OF ESTIMATED BUDGET EFFECTS OF THE ACT ........ 1354

TABLE A-2. ESTIMATED BUDGET EFFECTS OF THE PROVISIONS OF THE ACT ........ 1359

# LETTER OF TRANSMITTAL

---

U.S. CONGRESS,
JOINT COMMITTEE ON TAXATION,
*Washington, DC, May 4, 1987.*

Hon. DAN ROSTENKOWSKI, *Chairman,*
Hon. LLOYD BENTSEN, *Vice-Chairman,*
*Joint Committee on Taxation,*
*U.S. Congress, Washington, DC.*

DEAR MESSRS. CHAIRMEN: This document, the General Explanation of the Tax Reform Act of 1986 (P.L. 99-514), was prepared by the staff of the Joint Committee on Taxation, in consultation with the staffs of the House Committee on Ways and Means and the Senate Committee on Finance. It is comparable to similar material prepared by the Joint Committee staff with respect to other major revenue acts in recent years.

A committee report on legislation issued by a Congressional committee sets forth the committee's explanation of the bill as it was reported by that committee. In some instances, a committee report does not also serve as an explanation of the final provisions of the legislation as enacted by the Congress. This is because the versions of the bill reported by the House and Senate committees may differ significantly from the versions of the bill as passed by the House, as passed by the Senate, or as enacted after action by a conference committee.

The Tax Reform Act of 1986, because of its comprehensive scope and the numerous changes which were made to the bill by the Senate and the conference committee, is an example of legislation with respect to which the differences between provisions of the reported bill or committee amendment and provisions of the public law are significant.

The first part of the document is an overall chronology of the legislative background of the Act in the 99th Congress. (In addition to this overall chronology, specific references to the legislative background of each provision of the Act are set forth in footnotes accompanying the explanations of the provisions in the third part of the document.) The second part presents the general reasons for the legislation. The third part consists of explanations of the provisions of the Act. (Title XVIII of the Act, making technical corrections to prior tax legislation, is not described in this document.) An appendix sets forth the estimated budget effects of the provisions of the Act described in the document for fiscal years 1987-1991.

Sincerely yours,

DAVID H. BROCKWAY, *Chief of Staff.*

## I. LEGISLATIVE BACKGROUND OF THE ACT

The following is an overall chronology of the legislative background in the 99th Congress of H.R. 3838, the Tax Reform Act of 1986 (Public Law 99-514).[1]

### A. Administration Tax Reform Proposal

In May 1985, President Reagan submitted the Administration's tax reform proposals to the Congress.[2] Previously, the Treasury Department, in response to the President's request in his 1984 State of the Union Address, had conducted a comprehensive study of the U.S. tax system and submitted the results of the study with recommendations to the President in November 1984.[3]

### B. House Action

**Ways and Means Committee**

H.R. 3838 was introduced and ordered favorably reported by the House Committee on Ways and Means on December 3, 1985, after almost a year-long review of tax reform proposals by the full committee and subcommittees in public hearings and in markup consideration. The following is an overview of full committee and subcommittee activity on tax reform legislation during 1985.

***Committee hearings***

The Ways and Means Committee held 30 days of full committee public hearings on comprehensive tax reform proposals. The committee began public hearings on comprehensive tax reform proposals on February 27, 1985. Committee hearings on tax reform issues continued on March 26; May 30; June 4, 5, 7, 11-14, 17, 18, 20, 24-27; and July 8-12, 17, 19, 22, 25, 26, 29-31, 1985. Also, a committee hearing was held on May 16, 1985, on proposed technical corrections to the Deficit Reduction Act of 1984 (P.L. 98-369) and the Retirement Equity Act of 1984 (P.L. 98-397).

The committee's tax reform hearing consideration included 1984 Treasury Department recommendations, the President's tax reform proposal made in May 1985, as well as various Congressional and other proposals.

---

[1] In addition to this overall chronology of the Act, specific references to the legislative background of each provision are set forth in footnotes accompanying the explanation of the provisions in Part III of this document. These legislative background references include, as appropriate, citations to the following: H.R. 3838, as reported by the House Committee on Ways and Means on December 7, 1985 (H. Rep. 99-426); H.R. 3838, as reported by the Senate Committee on Finance on May 29, 1986 (S. Rep. 99-313); House and Senate floor amendments to H.R. 3838; and the conference report on H.R. 3838 as filed on September 18, 1986 (H. Rep. 99-841).

[2] The White House, *The President's Tax Reform Proposals to the Congress for Fairness, Growth, and Simplicity*, May 1985.

[3] Treasury Department, *Tax Reform for Fairness, Simplicity, and Economic Growth*, November 1984.

### *Subcommittee hearings*

Several Ways and Means Subcommittee hearings were held during 1985 that related to subject matters included in H.R. 3838.

*Subcommittee on Select Revenue Measures.*—The Select Revenue Measures Subcommittee held hearings on the following areas:

March 19, 1985 — Targeted jobs tax credit

April 1, 2, 16, 1985 — Acquisitions and mergers (with Oversight Subcommittee)

April 25, 1985 — Attorney's fees

May 22, 1985 — Carryover of net operating losses (NOLs)

June 6, 1985 — Tax burdens of low-income wage earners

*Subcommittee on Oversight.*—The Oversight Subcommittee held hearings on the following areas:

June 21, 1985 — IRS taxpayer refund delays

July 18, and September 5, 6, 1985 — Retirement income security (with Social Security Subcommittee)

September 20, 1985 — High-income taxpayers and partnership tax issues

### *Committee markup*

The Ways and Means Committee conducted 26 days of markup on tax reform proposals: beginning on September 18, 1985; continuing on September 26, 30, October 1-4, 7-9, 11, 15, 23, 25-27, November 6, 15-17, 19-23; and concluding on December 3, 1985, when the tax reform bill, H.R. 3838, was introduced and ordered favorably reported (by a vote of 28-8). There was also a committee markup on technical corrections to the 1984 tax legislation on September 27, 1985, which was included as a separate title of the bill.

The committee report on H.R. 3838 was filed on December 7, 1985 (H. Rep. 99-426).

### House Floor Action

On December 10, 1985, the House Rules Committee approved a modified closed rule on H.R. 3838 (H. Res. 336), making certain amendments in order for House floor consideration. This initial rule failed of passage (202-223, 1 "present") on December 11, 1985. On December 16, 1985, the Rules Committee approved another modified closed rule (H. Res. 343), which was adopted (258-168, 1 "present") by the House on December 17, 1985.

The House passed H.R. 3838, as amended, by voice vote, on December 17, 1985.

## C. Senate Action

### Finance Committee

H.R. 3838 was ordered favorably reported by the Senate Committee on Finance on May 6, 1986, with an amendment in the nature of a substitute. This action followed an almost year-long comprehensive review in the 99th Congress of tax reform proposals by the full committee and subcommittees in public hearings and markup

consideration. The following is an overview of full committee and subcommittee activity on tax reform legislation during 1985 and 1986.

*Committee hearings*

The Finance Committee held 36 days of full committee public hearings on comprehensive tax reform proposals in 1985 and 1986. In 1985, the committee held public hearings on comprehensive tax reform proposals on May 9, June 11-13, 17-20, and 25-27; July 9-11, 16-19, and 24-25; September 24 and 26; and October 1-4 and 9-10. In 1986, committee hearings were held on January 29-30; February 3-16; March 4; and April 21.

The committee's tax reform hearing consideration included the President's tax reform proposal made in May 1985, the House-passed bill, and various Congressional and other proposals.

*Subcommittee hearings*

Several Finance Subcommittee hearings were held during 1985 and 1986 that related to subject matters included in H.R. 3838, as amended by the Committee on Finance.

*Subcommittee on Savings, Pensions, and Investment Policy.*—The Savings, Pensions, and Investment Policy Subcommittee held hearings on the following areas:

September 9, 1985 — Post-retirement health benefits

November 22, 1985 — Targeted jobs tax credit extension

January 28, 1986 — Retirement Income Policy Act

*Subcommittee on Energy and Agricultural Taxation.*—The Energy and Agricultural Taxation Subcommittee held a hearing on the following area:

June 21, 1985 — Impact of taxation on energy policy

*Subcommittee on Health.*—The Health Subcommittee held a hearing on the following area:

September 9, 1985 — Asbestos-related disease trust fund

*Subcommittee on Taxation and Debt Management.*—The Taxation and Debt Management Subcommittee held a hearing on the following area:

January 31, 1986 — Mortgage-backed securities

*Committee markup and reporting of bill*

The Finance Committee conducted 17 days of markup on the tax reform bill: beginning on March 19, 1986; continuing on March 24-26, April 8-10, 14-18, 22, 24, 28, and May 5; and concluding on May 6, 1986, when the tax reform bill, H.R. 3838, as amended, was ordered favorably reported (by a vote of 20-0).

The committee report on H.R. 3838 was filed on May 29, 1986 (S. Rep. 99-313).

**Senate Floor Action**

H.R. 3838, as amended by the Finance Committee, was brought up on the Senate floor on June 4, 1986, and debate on the bill con-

tinued on June 9-13, 16-20, and 23-24, 1986, with passage of the bill, as amended, on June 24 (by vote of 97-3).

### D. Conference Action

**Conference**

The Senate requested a conference on H.R. 3838 on July 15, 1986, and appointed the following conferees: Senators Packwood, Dole, Roth, Danforth, Chafee, Wallop, Long, Bentsen, Matsunaga, Moynihan, and Bradley. On July 16, the House agreed to the Senate request for a conference on the bill, and appointed the following conferees: Messrs. Rostenkowski, Pickle, Rangel, Stark, Gephardt, Russo, Pease, Duncan, Archer, Vander Jagt, and Crane.

Formal conference committee meetings were held on July 17-18 and 21, 1986, and concluded on August 16, 1986, when the conferees met and approved the conference agreement. The conference report on H.R. 3838 was filed on September 18, 1986 (H. Rep. 99-841, Vols. I and II).

**House-Senate consideration of Conference Report**

The House approved the conference report on H.R. 3838 on September 25, 1986, by a vote of 292-136, after a motion to recommit failed by a vote of 160-268. The conference report was considered by the Senate on September 26, 1986, and passed by a vote of 74-23 on September 27, 1986.

### E. Enactment into Law

H.R. 3838, the Tax Reform Act of 1986, was signed into law by President Reagan on October 22, 1986 (P.L. 99-514).

### F. House-Senate Consideration of H. Con. Res. 395

On September 25, 1986, immediately after its approval of the conference report on H.R. 3838, the House passed (by voice vote) H. Con. Res. 395, to instruct the enrolling clerk to make certain technical and clerical corrections in the conference report statute.

H. Con. Res. 395 was agreed to by the Senate (by voice vote) on October 16, 1986, with amendments. The House Rules Committee granted a rule on October 16, and the House adopted the rule (by voice vote) on October 17 for consideration of the resolution as amended by the Senate. Also on October 17, the House concurred in the Senate amendment with further amendments and returned the resolution to the Senate.

On October 18, 1986, the Senate agreed (by voice vote) to certain of the House amendments to the resolution, disagreed to certain other amendments, and insisted on certain of its amendments. Also on October 18, the House disagreed to the Senate amendments to the House amendments to the original Senate amendment. H. Con. Res. 395 was not agreed to by both the House and the Senate before the 99th Congress adjourned *sine die* on October 18, 1986.

### G. Subsequent Related Tax Legislation

H.R. 5300, the Omnibus Budget Reconciliation Act of 1986 (P. L. 99-509, signed on October 21, 1986), contains a provision (sec. 8002)

increasing the Code section 6661(a) penalty on underpayments of tax to 25 percent rather than 20 percent as provided in H.R. 3838 (sec. 1504). The conference report on H.R. 5300 was filed on October 17, 1986 (H. Rep. 99-1012), and was passed by the Senate and the House also on October 17. Although H.R. 5300 was signed before H.R. 3838, the H.R. 5300 provision was intended to prevail since it was considered and passed by the House and the Senate subsequent to passage of H.R. 3838.[4]

In addition, H.R. 5300 includes a provision (sec. 8071) relating to a truck leasing transitional rule included in the Senate amendment to H.R. 3838 (sec. 204(a)), application of at-risk rule to low-income housing credit (sec. 8072 of H.R. 5300 and sec. 252(a) of H.R. 3838), and a transitional rule relating to treatment of certain rural housing under the passive loss rules (sec. 8073 of H.R. 5300 and sec. 502(d) of H.R. 3838).

[4] See explanation in Title XV. Part. A., footnote 14. A technical correction may be needed so that the statute reflects this intent.

## II. GENERAL REASONS FOR THE ACT

**Overview**

The Tax Reform Act of 1986 (the "Act") represents one of the most comprehensive revisions of the Federal income tax system since its inception. Congress was concerned that many taxpayers found the prior-law tax system unfair and overly complex. Further, Congress believed that a number of features of the prior-law tax system resulted in excessive interference in labor, investment, and consumption decisions of taxpayers.

After extensive review of virtually the entire prior tax statute, Congress concluded that only a thorough reform could assure a fairer, more efficient, and simpler tax system. Congress believed that the Act, establishing the Internal Revenue Code of 1986, will restore the trust of the American people in the income tax system and lead the nation's economy into greater productivity.

The Act makes sweeping changes to the prior-law tax system. First, Congress desired a fairer tax system. Congress questioned the fairness of a tax system that allowed some high-income individuals to pay far lower rates of tax than other, less affluent individuals. The Act provides new limitations on the use of losses from passive investments to shelter other types of income and expands the minimum tax to curtail these tax inequities in the future. The Act also completely removes six million low-income individuals from the income tax roll and provides significant reductions in the tax burden of other working low-income individuals.

Second, Congress desired a more efficient tax system. The prior-law tax system intruded at nearly every level of decision-making by businesses and consumers. The sharp reductions in individual and corporate tax rates provided by the Act and the elimination of many tax preferences will directly remove or lessen tax considerations in labor, investment, and consumption decisions. The Act enables businesses to compete on a more equal basis, and business success will be determined more by serving the changing needs of a dynamic economy and less by relying on subsidies provided by the tax code.

Third, Congress desired a simpler tax system for individuals. Beginning in 1988, the Act establishes two individual income tax rates—15 percent and 28 percent—to replace more than a dozen tax rates in each of the prior-law rate schedules, which extended up to 50 percent. Significant increases in the standard deduction and modifications to certain personal deductions provide further simplicity by greatly reducing the number of taxpayers who will itemize their deductions.

**Fairness**

A primary objective of Congress was to provide a tax system that ensures that individuals with similar incomes pay similar amounts of tax. The ability of some individuals to reduce their tax liability excessively under prior law eroded the tax base and required tax rates to be higher than otherwise would have been necessary. Congress was concerned that other individuals, unable to take advantage of tax shelters, had lost confidence in the tax system and may have responded by evading their tax liability.

The Act provides a new restriction on the use of passive losses to offset unrelated income. Further, a strengthened minimum tax precludes higher income individuals from substantially eliminating income tax liability through the excessive use of preferences. With the adoption of these restrictions, the elimination of other preferences, and other base-broadening provisions, the Act sharply reduces the top individual tax rate from 50 percent to 28 percent, while leaving the tax burden of the highest income groups essentially unchanged.

Congress believed that as a result of the sharp reductions in tax rates, it was no longer necessary to provide a lower tax rate for capital gains income of individuals. Eliminating the preferential treatment of capital gains income, and thereby eliminating the incentive to recharacterize certain income in order to qualify for capital gains treatment, is expected to eliminate the abuse of this provision and reduce the complexity of the tax system.

The Act retains the most widely utilized itemized deductions, including deductions for home mortgage interest, State and local income taxes, real estate and personal property taxes, charitable contributions, casualty and theft losses, and medical expenses (above an increased floor). Other deductions that benefited a limited number of taxpayers, added complexity to tax filing, or were subject to abuse are restricted by the Act. For example, the Act tightens the requirements for deducting business meals and permits only 80 percent of business meal and entertainment expenses to be deducted. Other deductions available under prior law, such as deductions for attending investment seminars and for "educational" travel costs, have been eliminated. These expenditures differ little from other personal consumption expenditures, which generally are not deductible.

As part of the approach of the Act to reduce tax rates through base-broadening, the Act disallows the itemized deductions for State and local sales taxes and phases out the deduction for personal interest expense for other than a mortgage on a first or second home. Congress also believed that these deductions provided tax benefits for consumption at the expense of savings and resulted in unnecessary complexity.

Certain items of income that are similar to taxable compensation are no longer excluded from taxable income under the Act. For example, the prior-law partial exclusion for unemployment compensation is repealed, and most prizes and awards are includable in income. Also, the Act restricts the prior-law practice of some high-income families taking advantage of the graduated rate structure by transferring investment property to their minor children and

thus sheltering their investment earnings at their children's lower tax rates.

The Act makes numerous changes to increase employee eligibility for pension benefits. The Act expands the rules requiring coverage of a broad group of employees under an employer-maintained retirement plan, reduces from 10 years to five years the maximum time an employee must work for a given employer before becoming vested, and eliminates the ability of employers to offset completely the pension benefits of low-paid workers by the amount of their social security benefits. The Act also reduces the amount of income that can be deferred from taxation using qualified cash or deferred arrangements (sec. 401(k) and 403(b) plans), and provides tighter nondiscrimination tests to ensure that such plans do not disproportionately benefit highly compensated employees.

Congress believed the prior-law tax treatment of individual retirement accounts (IRAs) was unnecessarily generous for individuals who participate in other tax-favored retirement arrangements, and the Act eliminates the deduction for contributions to an IRA for such individuals with income above specified levels. Congress believed that the lower tax rates provided by the Act will themselves stimulate additional work effort and saving, thereby eliminating the need for this deduction for these individuals. The Act permits these individuals, however, to make nondeductible contributions to an IRA and to defer taxes on the earnings of these contributions. To ensure universal availability of tax-favored retirement arrangements, the Act retains the prior-law IRA deduction for individuals unable to participate in other plans.

In addition to ensuring that high-income taxpayers pay their share of the Federal tax burden, the Act provides tax relief to low- and middle-income wage earners. To achieve this goal, the Act substantially increases the standard deduction (the prior-law zero bracket amount) and almost doubles the personal exemption. Together with the greatly expanded earned income credit, these provisions relieve approximately six million low-income individuals from income tax liability and ensure that no families below the poverty level will have Federal income tax liability. The child care credit is preserved to assist working parents with their dependent care expenses.

The elderly and blind also receive tax relief under the Act. Although such individuals will not receive an extra personal exemption as under prior law, an additional standard deduction amount of $600 is provided for married elderly or blind individuals and of $750 for single elderly or blind individuals. These extra standard deduction amounts are in addition to the increased standard deduction and personal exemption provided for all taxpayers. The prior-law credit for certain elderly individuals and for individuals who are permanently and totally disabled is retained.

Congress also believed that fairness in the tax system requires that corporate taxpayers pay amounts of tax appropriate for their level of earnings. Congress found it unjustifiable that under prior law some corporations reported large earnings and paid significant dividends to their shareholders, yet paid little or no taxes on that income to the government. Congress designed a strong alternative minimum tax for corporations, with a broad income tax base, to

prevent corporations from significantly reducing or eliminating their tax liability.

The Act makes changes to several accounting rules to provide more accurate matching between the recognition of income and deductions for expenditures related to this income. Large commercial banks will no longer be allowed to take deductions for bad debts before the underlying loan is determined to be wholly or partially worthless. Use of the installment method is restricted, and certain costs of inventory and self-constructed assets are required to be capitalized under the Act. Use of the completed contract method also is limited. Similarly, the Act reduces the deduction for unpaid losses of property and casualty insurance companies to account better for the timing difference beween the deduction and payment of losses.

The Act modifies the tax treatment of foreign income. Congress desired to limit the incentives under prior law to move income offshore to avoid tax; accordingly, the Act restricts the ability of firms to use tax havens. The Act also limits the ability of taxpayers to use foreign taxes imposed on one kind of income to offset U.S. tax on unrelated income. The Act further provides for more accurate characterization of income as foreign source (and thus eligible for the foreign tax credit) or U.S. source (and thus ineligible for that credit). Certain provisions of prior law that benefited U.S. exporters paying high foreign taxes were retained, however, so as not to hinder the international competitiveness of U.S. firms.

Together with other changes made by the Act, the aggregate corporate income tax liability is estimated to increase by approximately $120 billion over fiscal years 1987 through 1991, while the aggregate individual income tax liability is reduced by a similar amount. Even with these changes, the share of total income tax receipts paid by corporations will remain below pre-1980 levels.

Congress also believed that it is important to maintain the trust of honest taxpayers in the tax system by ensuring that other taxpayers cannot illegally evade their tax liability. The Act extends information reporting requirements and provides for increased penalties for failure to report information properly to the Internal Revenue Service and for failure to pay tax.

**Efficiency**

The Act's most important measures in promoting the efficiency of the economy and in reducing the interference of the tax system in labor, investment, and consumption decisions are the dramatic reductions in personal and corporate tax rates. Lower marginal tax rates stimulate work effort and saving by leaving more of each additional dollar of wage and investment income in the hands of the taxpayer. Further, lower tax rates reduce the value of tax deductions, leading investment and consumption decisions to be made more on the basis of their economic merits and less on the value of tax benefits.

The prior-law tax system contained a number of tax preferences that did not satisfactorily serve the purposes for which they were designed. In the past few years, tax incentives have contributed to the excessive construction of office buildings and record vacancy rates, excess investment in agriculture tax shelters by high-income

investors with little knowledge of farming, and distortions at all levels of business—from financing choices to production decisions.

Congress desired to make the tax treatment of diverse economic activities more even. Neutral taxation promotes the efficient allocation of investment and yields productivity gains without requiring additional saving. The Act repeals the investment tax credit, which discriminated against long-lived investment and was used as a tax shelter device. The incentive for investment provided by the credit instead will be provided by lower tax rates and accelerated depreciation.

The Act retains the prior-law Accelerated Cost Recovery System with some modifications to provide for more neutral depreciation treatment across diverse assets. The depreciation period of certain assets, such as real property and long-lived equipment, is lengthened to reflect more closely the actual useful life of such assets. Congress believed these changes will help provide a more efficient capital cost recovery system.

Tax incentives under prior law favoring mergers and acquisitions also are restricted by the Act. The Act repeals the *General Utilities* doctrine, which allowed capital gains from corporate liquidations to escape tax at the corporate level. The *General Utilities* doctrine created a bias favoring acquisitions as a technique for tax-free realization of corporate gains and at the same time allowing the purchaser of the liquidating corporation's assets a higher basis for purposes of depreciation and depletion. The Act further reduces the incentive for tax-motivated corporate acquisitions by limiting the use of net operating losses obtained through an acquisition to offset income of the acquiring firm.

The Act also adopts reforms affecting the availability of tax-exempt financing. The Act restricts tax-exempt financing for fundamentally private activities and discourages the issuance of tax-exempt bonds which under prior law was motivated in part by the opportunity to gain arbitrage profits.

The Act generally preserves the prior-law treatment of natural resources and retains a number of business incentives that Congress believed to be beneficial to the economy. The incremental research tax credit, which was scheduled to expire at the end of 1985, was extended for three additional years at a 20-percent rate. The benefits of research expenditures to the economy as a whole are frequently greater than the rewards received by those undertaking the risks of research; extending the credit helps ensure that adequate amounts of research are undertaken to enhance productivity. Certain expired business energy tax credits also are temporarily extended by the Act, although at reduced rates.

The Act provides a new tax credit for low-income rental housing to consolidate the uncoordinated subsidies under prior law. The credit is better targeted to low-income individuals than prior-law provisions, and requires that tenants' rents be limited to affordable amounts in relation to their incomes. The Act also preserves rehabilitation tax credits for historic and pre-1936 structures at a reduced rate. The credit has been found to be useful in revitalizing depressed urban areas and in preserving America's architectural past for future generations.

**Simplicity**

Under prior law, many taxpayers were concerned with the recordkeeping, paperwork, and computations necessitated by tax filing. Many taxpayers felt a need to rely on paid tax preparers in order to calculate accurately their tax liability. The complexity of the tax code was further increased by other taxpayers who, seeking to reduce their tax liability, helped spawn a thriving tax shelter industry which sought to reduce tax liability by making use of special tax provisions and by engaging in sophisticated financial arrangements. The cost to taxpayers of complying with all the requirements of the individual income tax under prior law in terms of the time spent on recordkeeping and tax filing was estimated to equal 5 to 10 percent of the tax actually paid. Thus, simplification of the tax code itself is a form of tax reduction.

The Act reduces the complexity of the tax code for many Americans. The Act provides just two individual tax brackets, and over 80 percent of all individual taxpayers will pay no tax or tax at a marginal rate no higher than 15 percent. As a result of the significant increases in the standard deduction and modifications to certain personal deductions provided by the Act, the number of itemizers is estimated to decline by approximately one-quarter. Taxpayers who will use the standard deduction rather than itemize their deductions will be freed from much of the recordkeeping, paperwork, and computations that were required under prior law.

Other individuals who under prior law devoted a great amount of time and effort to find investments that reduced their tax liability also benefit from tax simplification. Many of these investments would have been unprofitable if not for the paper losses they created. With the significant rate reductions achieved by this Act, many taxpayers will find such investments unnecessary and noncompetitive with other less complex and more productive investments.

Some taxpayers who under prior law used various preferences to reduce their tax liability by large amounts may find that the Act does not simplify the tax filing process for them as much as it does for other individuals. In part, the complexity of the tax system for these individuals is needed to measure accurately their income and to ensure that these individuals pay a rate of tax appropriate for their income.

In conclusion, Congress believed that the Tax Reform Act of 1986 provides a fairer, more efficient, and simpler tax system. The changes made by this Act represent a historic reform of the Federal income tax structure. By providing sharply lower tax rates to individuals and corporations, the need for special tax preferences is greatly diminished. The Act eliminates needless interference with economic activity and establishes the framework for a growing and productive economy.

# TITLE V—TAX SHELTERS; INTEREST EXPENSE

## A. Limitations on Losses and Credits from Passive Activities (secs. 501 and 502 of the Act and new sec. 469 of the Code)[1]

### *Prior Law*

In general, no limitations were placed on the ability of a taxpayer to use deductions from a particular activity to offset income from other activities. Similarly, most tax credits could be used to offset tax attributable to income from any of the taxpayer's activities.

There were some exceptions to this general rule. For example, deductions for capital losses were limited to the extent that there were not offsetting capital gains.[2] For purposes of the alternative minimum tax applying to individuals, expensed intangible drilling costs could be used to reduce net oil and gas income to zero, but could not offset other income of the taxpayer. Foreign tax credits could be used to reduce tax on foreign source income, but not U.S. source income. Research and development credits could be used by individuals to reduce tax liability attributable to research and development activities, but not taxes attributable to other income of the taxpayer.

In the absence of more broadly applicable limitations on the use of deductions and credits from one activity to reduce tax liability attributable to other activities, taxpayers with substantial sources of positive income could eliminate or sharply reduce tax liability by using deductions and credits from other activities, frequently by investing in tax shelters. Tax shelters commonly offered the opportunity to reduce or avoid tax liability with respect to salary or other positive income, by making available deductions and credits, possibly exceeding real economic costs or losses currently borne by the taxpayer, in excess or in advance of income from the shelters.

### *Reasons for Change*

Congress concluded that it had become increasingly clear that taxpayers were losing faith in the Federal income tax system. This loss of confidence resulted in large part from the interaction of two of the system's principal features: its high marginal rates (in 1986, 50 percent for a single individual with taxable income in excess of $88,270), and the opportunities it provided for taxpayers to offset

[1] For legislative background of the provision, see: H.R. 3838, as reported by the Senate Committee on Finance on May 29, 1986, sec. 1401; S.Rep. 99-313, pp. 713-746; Senate floor amendment, 132 Cong. Rec. S8146-8158 (June 23, 1986); and H.Rep. 99-841, Vol. II (September 18, 1986), pp. 137-150 (Conference Report).

[2] In the case of an individual, a net capital loss of up to $3,000 was deductible. Net capital losses of corporations generally were not deductible.