IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-211T
(Judge Victor J. Wolski)

JAMES R. THOMPSON,

Plaintiff,

v.

THE UNITED STATES,

Defendant

**SECOND SUPPLEMENTAL APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**VOLUME IX**


| Description | Page(s) |
|---|---|
| General Explanation of the Tax Reform Act of 1986, prepared by the Staff of the Joint Committee on Taxation (May 4, 2987), Table of Contents and Title V (Part 2) | 327-350 |

income from one source with tax shelter deductions and credits from another.

The increasing prevalence of tax shelters—even after the highest marginal rate for individuals was reduced in 1981 from 70 percent to 50 percent—was well documented. For example, a Treasury study[3] revealed that in 1983, out of 260,000 tax returns reporting "total positive income"[4] in excess of $250,000, 11 percent paid taxes equaling 5 percent or less of total positive income, and 21 percent paid taxes equaling 10 percent or less of total positive income. Similarly, in the case of tax returns reporting total positive income in excess of $1 million, 11 percent paid tax equaling less than 5 percent of total positive income, and 19 percent paid tax equaling less than 10 percent of total positive income.[5]

Congress determined that such patterns gave rise to a number of undesirable consequences, even aside from their effect in reducing Federal tax revenues. Extensive shelter activity contributed to public concerns that the tax system was unfair, and to the belief that tax is paid only by the naive and the unsophisticated. This, in turn, not only undermined compliance, but encouraged further expansion of the tax shelter market, in many cases diverting investment capital from productive activities to those principally or exclusively serving tax avoidance goals.

Congress concluded that the most important sources of support for the Federal income tax system were the average citizens who simply reported their income (typically consisting predominantly of items such as salaries, wages, pensions, interest, and dividends) and paid tax under the general rules. To the extent that these citizens felt that they were bearing a disproportionate burden with regard to the costs of government because of their unwillingness or inability to engage in tax-oriented investment activity, the tax system itself was threatened.

Under these circumstances, Congress determined that decisive action was needed to curb the expansion of tax sheltering and to restore to the tax system the degree of equity that was a necessary precondition to a beneficial and widely desired reduction in rates. So long as tax shelters were permitted to erode the Federal tax base, a low-rate system could provide neither sufficient revenues, nor sufficient progressivity, to satisfy the general public that tax liability bore a fair relationship to the ability to pay. In particular, a provision significantly limiting the use of tax shelter losses was viewed as unavoidable if substantial rate reductions were to be provided to high-income taxpayers without disproportionately reducing the share of total liability under the individual income tax borne by high-income taxpayers as a group.

Congress viewed the question of how to prevent harmful and excessive tax sheltering as not a simple one. One way to address the

[3] Treasury Department, "Taxes Paid by High-Income Taxpayers and the Growth of Partnerships," reprinted in IRS *Statistics of Income Bulletin* (Fall 1985), beginning at page 55.

[4] Total positive income was defined as the sum of salary, interest, dividends, and income from profitable businesses and investments, as reported on tax returns.

[5] Other studies similarly reached the conclusion that tax shelters, by flowing through tax benefits to individuals with positive sources of income, permitted some taxpayers with sizeable economic incomes substantially to reduce their tax liabilities. *See* Joint Committee on Taxation, *Tax Reform Proposals: Tax Shelters and Minimum Tax* (JCS-34-85), August 7, 1985.

problem would have been to eliminate substantially all tax preferences in the Internal Revenue Code. For two reasons, however, this course was determined by Congress to be inappropriate.

First, while the Act reduces or eliminates some tax preference items that Congress decided did not provide social or economic benefits commensurate with their cost, there were many preferences that Congress concluded were socially or economically beneficial. It was determined that certain preferences were particularly beneficial when used primarily to advance the purposes upon which Congress relied in enacting them, rather than to avoid taxation of income from sources unrelated to the preferred activity.

Second, Congress viewed as prohibitively difficult, and perhaps impossible, the task of designing a tax system that measured income perfectly. For example, the statutory allowance for depreciation, even under the normative system used under the Act for alternative minimum tax purposes, reflects broad industry averages, as opposed to providing precise item-by-item measurements. Accordingly, taxpayers with assets that depreciate less rapidly than the average, or that appreciate over time (as may be the case with certain real estate), could engage in tax sheltering even under the minimum tax, in the absence of direct action regarding the tax shelter problem.

Even to the extent that rules for the accurate measurement of income could theoretically be devised, Congress concluded that such rules would involve undue complexity from the perspective of many taxpayers. For example, a system that required all taxpayers to use a theoretically pure accrual method of accounting (e.g., including unrealized appreciation, and allowing only the amount of depreciation actually incurred for each specific asset in each taxable year) would create serious difficulties in both compliance and administration.

However, Congress concluded that when the tax system permits simpler rules to be applied (e.g., generally not taxing unrealized gain, and allowing depreciation based on broad industry averages), opportunities for manipulation are created. Taxpayers may structure transactions specifically to take advantage of the situations in which the simpler rules lead to undermeasurement or deferral of income.

The question of what constituted a tax shelter that should be subject to limitations was viewed as closely related to the question of who Congress intends to benefit when it enacts tax preferences. For example, in providing preferential depreciation for real estate or favorable accounting rules for farming, it was not Congress's primary intent to permit outside investors to avoid tax liability with respect to their salaries by investing in limited partnership syndications. Rather, Congress intended to benefit and provide incentives to taxpayers active in the businesses to which the preferences were directed.

In some cases, the availability of tax preferences to nonparticipating investors was viewed as harmful to the industries that the preferences were intended to benefit. For example, in the case of farming, credits and favorable deductions often encouraged investments by wealthy individuals whose principal or only interest in farming was to receive an investment return, largely in the form of

tax benefits to offset tax on positive sources of income. Since such investors often did not need a positive cash return from farming in order to profit from their investments, they had a substantial competitive advantage in relation to active farmers, who commonly were not in a position to use excess tax benefits to shelter unrelated income. This significantly contributed to the serious economic difficulties being experienced by many active farmers.

The availability of tax benefits to shelter positive sources of income also harmed the economy generally, by providing a non-economic return on capital for certain investments. This encouraged a flow of capital away from activities that provided a higher pre-tax economic return, thus retarding the growth of the sectors of the economy with the greatest potential for expansion.

Congress determined that, in order for tax preferences to function as intended, their benefit should be directed primarily to taxpayers with a substantial and *bona fide* involvement in the activities to which the preferences related. Congress also determined that it was appropriate to encourage nonparticipating investors to invest in particular activities, by permitting the use of preferences to reduce the rate of tax on income from those activities; however, such investors were viewed as not appropriately permitted to use tax benefits to shelter unrelated income.

Congress believed that there were several reasons why it was appropriate to examine the materiality of a taxpayer's participation in an activity in determining the extent to which such taxpayer should be permitted to use tax benefits from the activity. A taxpayer who materially participated in an activity was viewed as more likely than a passive investor to approach the activity with a significant nontax economic profit motive, and to form a sound judgment as to whether the activity had genuine economic significance and value.

A material participation standard identified an important distinction between different types of taxpayer activities. It was thought that, in general, the more passive investor seeks a return on capital invested, including returns in the form of reductions in the taxes owed on unrelated income, rather than an ongoing source of livelihood. A material participation standard reduced the importance, for such investors, of the tax-reduction features of an investment, and thus increased the importance of the economic features in an investor's decision about where to invest his funds.

Moreover, Congress concluded that restricting the use of losses from business activities in which the taxpayer did not materially participate against other sources of positive income (such as salary and portfolio income) would address a fundamental aspect of the tax shelter problem. Instances in which the tax system applies simple rules at the expense of economic accuracy encouraged the structuring of transactions to take advantage of the situations in which such rules gave rise to undermeasurement or deferral of income. Such transactions commonly were marketed to investors who did not intend to participate in the transactions, as devices for sheltering unrelated sources of positive income (e.g., salary and portfolio income). Accordingly, by creating a bar against the use of losses from business activities in which the taxpayer does not materially participate to offset positive income sources such as salary

and portfolio income, Congress believed that it was possible significantly to reduce the tax shelter problem.

Further, in the case of a nonparticipating investor in a business activity, Congress determined that it was appropriate to treat losses of the activity as not realized by the investor prior to disposition of his interest in the activity. The effort to measure, on an annual basis, real economic losses from passive activities gave rise to distortions, particularly due to the nontaxation of unrealized appreciation and the mismatching of tax deductions and related economic income that could occur, especially where debt financing was used heavily. Only when a taxpayer disposes of his interest in an activity was it considered possible to determine whether a loss was sustained over the entire time that he held the interest.

The relationship to an activity of an investor who did not materially participate was viewed as comparable to the relationship of a shareholder to a corporation. So long as the investor retained an interest in the activity, any reduction in the value of such interest not only might be difficult to measure accurately, but would not have been realized by the investor to a greater extent than in the context of a C corporation. In the case of a C corporation, losses and expenses borne by the corporation, and any decline in the value of the corporation's stock, did not give rise to the recognition of any loss on the part of shareholders prior to disposition of their stock.[6]

The distinction that Congress determined should be drawn between activities on the basis of material participation was viewed as unrelated to the question of whether, and to what extent, the taxpayer was at risk with respect to the activities.[7] In general, the fact that a taxpayer placed a particular amount at risk in an activity did not establish, prior to a disposition of the taxpayer's interest, that the amount invested, or any amount, had as yet been lost. The fact that a taxpayer was potentially liable with respect to future expenses or losses of the activity likewise had no bearing on the question whether any amount had as yet been lost, or otherwise was an appropriate current deduction or credit.

At-risk standards, although important in determining the maximum amount that is subject to being lost, were viewed as not a sufficient basis for determining whether or when net losses from an activity should be deductible against other sources of income, or for determining whether an ultimate economic loss had been realized. Congress concluded that its goal of making tax preferences available principally to active participants in substantial businesses, rather than to investors seeking to shelter unrelated income, was best accomplished by examining material participation, as opposed to the financial stake provided by an investor to purchase tax shelter benefits.

In certain situations, however, Congress concluded that financial risk or other factors, rather than material participation, should be

[6] Gain of a C corporation, while generally not taxed to the shareholder prior to distribution, is taxed at the entity level upon recognition.

[7] The at-risk rules of prior law, while important and useful in preventing overvaluation of assets, and in preventing the transfer of tax benefits to taxpayers with no real equity in an activity, were viewed as not addressing the adverse consequences arising specifically from such transfers to nonparticipating investors.

the relevant standard. A situation in which financial risk was viewed as relevant related to the oil and gas industry, which was suffering severe hardship due to the worldwide decline of oil prices. Congress decided that relief for this industry required that tax benefits be provided to attract outside investors and, moreover, that such relief should be provided only with respect to investors who were willing to accept an unlimited and unprotected financial risk proportionate to their ownership interests in the oil and gas activities. Granting tax shelter benefits to investors in oil and gas activities who did not accept unlimited risk, proportionate to their ownership investments in the activities, was viewed as permitting the benefit of this special exception to be diverted unduly to the investors, while providing less benefit to oil and gas activities and threatening the integrity of the entire rule limiting the use of nonparticipatory business losses.

A further area in which the material participation standard was viewed as not wholly adequate was that of rental activities. Such activities predominantly involve the production of income from capital. For this reason, rental income generally was not subject to the self-employment tax, whether or not the activity constituted a trade or business (sec. 1402(a)(1)). Rental activities generally require less ongoing management activity, in proportion to capital invested, than business activities involving the production or sale of goods and services. Thus, for example, an individual who was employed full-time as a professional could more easily provide all necessary management in his spare time with respect to a rental activity than he could with respect to another type of business activity involving the same capital investment. The extensive use of rental activities for tax shelter purposes under prior law, combined with the reduced level of personal involvement necessary to conduct such activities, made clear that the effectiveness of the basic passive loss provision could be seriously compromised if material participation were sufficient to avoid the limitations in the case of rental activities.

Congress believed that a limited measure of relief, however, was appropriate in the case of certain moderate-income investors in rental real estate, who otherwise might experience cash flow difficulties with respect to investments that in many cases were designed to provide financial security, rather than to shelter a substantial amount of other income.

Additional considerations were viewed as relevant with regard to limited partnerships. In order to maintain limited liability status, a limited partner generally is precluded from materially participating in the business activity of the partnership; in virtually all respects, a limited partner more closely resembles a shareholder in a C corporation than an active business entrepreneur. Moreover, limited partnerships commonly were used as vehicles for marketing tax benefits to investors seeking to shelter unrelated income. In light of the widespread use of limited partnership interests in syndicating tax shelters, Congress determined that losses from limited partnership interests should not be permitted, prior to a taxable disposition, to offset positive income sources such as salary.

***Explanation of Provision***

**1. Overview**

The Act provides that deductions from passive trade or business activities, to the extent they exceed income from all such passive activities (exclusive of portfolio income), generally may not be deducted against other income. Similarly, credits from passive activities generally are limited to the tax attributable to the passive activities. Suspended losses and credits are carried forward and treated as deductions and credits from passive activities in the next year. Suspended losses from an activity are allowed in full when the taxpayer disposes of his entire interest in the activity.

The provision applies to individuals, estates, trusts, and personal service corporations. A special rule limits the use of passive activity losses and credits against portfolio income in the case of closely held corporations. Special rules also apply to rental activities. Losses from certain working interests in oil and gas property are not limited by the provision. Losses and credits attributable to a limited partnership interest generally are treated as arising from a passive activity. The provision is effective for taxable years beginning after 1986. For certain pre-enactment interests in passive activities, the provision is phased in, and becomes fully effective for taxable years beginning in 1991 and thereafter. Transitional relief is provided for losses from certain existing low-income housing activities.

Losses and credits from a passive activity (taking into account expenses such as interest attributable to acquiring or carrying an interest in the activity) may be applied against income for the taxable year from other passive activities or against income subsequently generated by any passive activity. Such losses (and credits) generally cannot be applied to shelter other income, such as compensation for services or portfolio income (including interest, dividends, royalties, annuities, and gains from the sale of property held for investment). For this purpose, property held for investment generally does not include an interest in a passive activity.

Salary and portfolio income are separated from passive activity losses and credits because the former generally are positive income sources that do not bear deductible expenses to the same extent as passive investments. Since taxpayers commonly can rely upon salary and portfolio income to be positive (and since, when economically profitable, these items generally yield positive taxable income), they are susceptible to sheltering by means of investments in activities that predictably give rise to tax losses (or credits in excess of the tax attributable to income from such investments). The passive loss provision ensures that salary and portfolio income, along with other non-passive income sources, cannot be offset by tax losses from passive activities until the amount of real economic losses from such activities is determined upon disposition.

Under the provision, suspended losses attributable to passive activities are allowed in full upon a taxable disposition of the taxpay-

er's entire interest in the activity.[8] The full amount of gain or loss from the activity can then be ascertained. To the extent the taxpayer's basis in the activity has been reduced by suspended deductions, resulting in gain on disposition, the remaining suspended deductions will, in effect, offset such gain. However, the character of any gain or loss (i.e., as ordinary or capital gain or loss) is not affected by this provision.

***Passive activity***

An activity generally is a passive activity if it involves the conduct of any trade or business, and if the taxpayer does not materially participate in the activity. A taxpayer who is an individual materially participates in an activity only if he is involved in the operations of the activity on a regular, continuous, and substantial basis. Regardless of whether an individual owns an interest in a trade or business activity directly (e.g., as a proprietorship), or owns an interest in an activity conducted at the entity level by a passthrough entity such as a general partnership or S corporation, he must be involved in the operations of the activity on a regular, continuous, and substantial basis, in order to be treated as materially participating.

In the case of a limited partnership interest, special considerations apply. The form of entity most commonly chosen to maximize tax benefits in a tax shelter investment has been the limited partnership. Moreover, since a limited partner generally is precluded from participating in the partnership's business if he is to retain his limited liability status, Congress concluded that it should not be necessary to examine general facts and circumstances regarding material participation in this context. Therefore, under the Act, a limited partnership interest is treated as intrinsically passive (except as provided in regulations).[9] Portfolio income of a partnership (net of directly allocable expenses and properly allocable interest expense), however, is not treated as passive (see sec. 3, below). A share of partnership income, or a guaranteed payment to a partner (including a limited partner) attributable to the performance of personal services (including past or expected future services) is not to be treated as passive. Losses from trade or business activities that are allocable to a limited partnership interest are not permitted, prior to disposition, to be applied against any income other than income from passive activities.

A passive activity under the Act does not include a working interest in oil or gas property where the taxpayer's form of owner-

---

[8] Gain recognized on a transfer of a partial interest in the passive activity, and gain (boot) on a tax-free transfer of an entire or partial interest, are treated as from a passive activity. Gain on such transfers may be offset by losses and credits from passive activities, but such transfers are not treated as dispositions triggering all suspended losses from the activity.

[9] Such regulatory authority might appropriately address the general situation where an individual holds a limited partnership interest in an activity for which the individual (or spouse) performs personal services, and treatment of net income attributable to the limited partnership interest as income from a passive activity would permit sheltering of the type of positive income meant to be separated from passive losses under the provision. For example, unintended results could arise if net income from an activity were treated as passive where the taxpayer's interest in it is held partly, but not wholly, as a limited partner, and the activity is an integral part of his (or his spouse's) source of livelihood. Thus, the Treasury may provide in regulations that, in appropriate circumstances, a person who is both a general partner and a limited partner in a limited partnership is not treated as passive with respect to the limited partnership interest.

ship does not limit his liability. Thus, an owner of such a working interest in oil or gas property is permitted to deduct otherwise allowable losses attributable to the working interest whether or not he materially participates in the activity being conducted through the working interest.

A passive activity is defined to include any rental activity, whether or not the taxpayer materially participates. However, an activity where substantial services are provided, and payments are for such services rather than principally for the use of property, is not a rental activity. For example, operating a hotel or similar transient lodging, where substantial services are provided and payments are not principally for the use of tangible property, is not a rental activity. An activity as a dealer in real estate also generally is not treated as a rental activity.[10] Long-term rentals or leases of property (e.g., apartments, leased office equipment, or leased cars), on the other hand, generally are considered to be rental activities. Losses from rental activities are allowed against income from other passive activities, but not against other income.

Under the provision, passive activities can include activities generating deductions allowable under section 174 of the Code as research and experimentation expenditures. Thus, if a taxpayer has an interest in an activity with respect to which deductions would be allowed as research and experimentation expenditures, and he does not materially participate in the activity, losses from the activity (including the research and experimentation expenditures) are subject to limitation under the rule.

*Passive activities that are not a trade or business.*—The Act provides that, to the extent provided in regulations, a passive activity may include an activity conducted for profit (within the meaning of sec. 212), including an activity that is not a trade or business. Congress anticipated that the exercise of this authority would be appropriate in certain situations where activities other than the production of portfolio income are involved. This regulatory authority is meant to cause the passive loss rule to apply with respect to activities that give rise to tax losses that can be used to shelter positive income, but that may not rise to the level of a trade or business.

*Interaction with interest deduction limitation.*—The Act provides that interest expense allocable to passive activities is treated as a passive activity expense and is not treated as investment interest (see Part C, below). Thus, deductions otherwise allowable for such interest expense are subject to limitation under the passive loss rule, and not under the investment interest limitation. Similarly, income and loss from passive activities generally are not treated as investment income or loss in calculating the amount of the investment interest limitation.[11]

[10] Under the at-risk rules as extended by the Act to the activity of holding real estate, the holding of real property includes the holding of personal property and the providing of services which are incidental to making real property available as living accommodations. Whether an activity constitutes the holding of real estate for purposes of the at-risk rules is not determinative of whether it constitutes a rental activity under the passive loss rule.

[11] However, as described in Part C, below, any passive losses allowed by reason of the phase-in of the passive loss provision reduce net investment income. Passive losses allowed on different grounds (e.g., disposition losses, or losses allowed by reason of the taxpayer's active participation in rental real estate activities) do not so reduce net investment income.

Interest on debt secured by the taxpayer's residence or a second residence is not subject to limitation under the passive loss rule, so long as the interest meets the definition of qualified residence interest under section 163(h) (as amended by the Act; see Part C, below). Thus, if a taxpayer rents out his vacation home (that he has selected as his second residence) and a portion of the mortgage interest (which meets the definition of qualified residence interest) is allocable to rental use of the home which would otherwise be treated as a passive activity, such interest expense is not subject to disallowance under this provision.

*Interaction with other Code sections.*—The passive loss rule applies to all deductions that are from passive activities, including deductions allowed under sections 162, 163, 164, and 165. For example, deductions for State and local property taxes incurred with respect to passive activities are subject to limitation under the passive loss rule whether such deductions are claimed above-the-line or as itemized deductions under section 164.

*Personal service income not treated as from passive activity.*—Income received by an individual from the performance of personal services with respect to a passive activity is not treated as income from a passive activity. Thus, for example, in the case of a limited partner who is paid for performing services for the partnership (whether by way of salary, guaranteed payment, or allocation of partnership income), such payments cannot be sheltered by passive losses from the partnership or from any other passive activity.

*Rental real estate in which the taxpayer actively participates.*—Under the Act, an individual may annually deduct up to $25,000 of passive activity losses (to the extent they exceed income from passive activities) that are attributable to rental real estate activities in which the taxpayer actively participates. The $25,000 offset is not available to corporations or trusts or, except in limited circumstances, to estates.[12] A taxpayer is not treated as actively participating in a rental real estate activity if he has an interest that is less than a 10 percent interest in the activity at any time during the year. Absent a sufficient ownership interest, Congress concluded, the taxpayer's management activity is most likely to relate predominantly to the interests of his co-owners, rather than to the management of his own interest; thus, it does not establish that the taxpayer is active in relation to his interest. A taxpayer is not presumed to be actively participating, however, merely by reason of having a 10 percent or greater interest. As discussed below, the active participation requirement is different from the material participation standard, and generally does not require as much personal involvement.

The $25,000 allowance for losses is phased out ratably as the taxpayer's adjusted gross income (determined without regard to passive activity losses) increases from $100,000 to $150,000. Thus, for example, a middle income taxpayer who has invested in a condominium apartment, and whose involvement in the operations nec-

[12] A trust does not qualify for the allowance of up to $25,000 in losses and (deduction equivalent) credits from a rental real estate activity in which there is active participation, so that individuals cannot circumvent the $25,000 ceiling, or multiply the number of $25,000 allowances, simply by transferring various rental real properties to one or more trusts.

essary to rent it and maintain it amounts to active participation, may deduct up to $25,000 per year of losses from the rental real estate activity.

The $25,000 allowance for rental real estate applies, in a deduction equivalent sense, to credits attributable to rental real estate activities as well. Under a special rule, the $25,000 allowance applies to low-income housing and rehabilitation credits regardless of whether the taxpayer claiming the credit actively participates in the low-income housing or rehabilitation activity (including in the case of a limited partner). In addition, the adjusted gross income phaseout range for the $25,000 allowance for these two credits is $200,000 to $250,000, rather than $100,000 to $150,000 (as for losses). For purposes of calculating the phase-out of the $25,000 allowance at adjusted gross income between $100,000 to $150,000 (or $200,000 to $250,000, in the case of certain credits), adjusted gross income is calculated without regard to IRA contributions and taxable social security benefits.

A single $25,000 amount (and phaseout thereof) applies on an aggregate basis to credits (including the low-income housing and rehabilitation credits) and to deductions, as opposed to allowing a $25,000 amount for each. If the total net rental real estate losses and credits (deduction equivalents) exceed the $25,000 amount allowable against other income, the taxpayer generally must allocate the allowable amount among activities to determine which of the rental real estate losses and credits (including those suspended in prior years) are allowable. This allocation is necessary for purposes of determining the total suspended losses and credits attributable to each activity, because losses are allowable in full upon a disposition of the taxpayer's entire interest in the activity, and a special election applies with respect to credits.

In performing this allocation, losses are treated as allowed before credits. Losses are allowed before credits because credits are considered in the nature of incentives which may not bear a relation to accurate measurement of income or loss from an activity. As between activities, when there are excess losses (or credits), allocation is *pro rata* with respect to the amount of losses (or credits) from each loss activity. Thus, for example, if a taxpayer who qualifies for the full $25,000 allowance has $10,000 of losses from one activity and $40,000 of losses from a second activity, then $5,000 is treated as allowed from the first activity and $20,000 is treated as allowed from the second activity.

In order to determine the amount of losses potentially qualifying for the $25,000 allowance, it is necessary first to net income and loss from all of the taxpayer's rental real estate activities in which he actively participates. If there is a net loss for the year from such activities, net passive income (if any) from other activities is then applied against it, in determining the amount eligible for the $25,000 allowance.

For example, assume that a taxpayer has $25,000 of losses from a rental real estate activity in which he actively participates. If he also actively participates in another rental real estate activity, from which he has $25,000 of gain, resulting in no net loss from rental real estate activities in which he actively participates, then no amount is allowed under the $25,000 allowance for the year.

This result follows whether or not the taxpayer has net losses from other passive activities for the year.

With respect to active participation, just as with respect to material participation, a change in the nature of the taxpayer's involvement does not trigger the allowance of deductions carried over from prior taxable years. Thus, if a taxpayer begins to actively participate in an activity in which, in prior years, he did not actively participate, the rule allowing up to $25,000 of losses from rental real estate activities against non-passive income does not apply to losses from the activity carried over from such prior years.[13] The same rule applies to credits, to the extent that active participation is relevant to their allowability.

*Special rule for estates.*—In the case of an estate of a taxpayer who, in the taxable year in which he died, owned an interest in a rental real estate activity in which he actively participated, the estate is deemed to actively participate for the two taxable years of the estate following the death of the taxpayer. Thus, the taxpayer's estate may continue to receive the same tax treatment with respect to the rental real estate activity as did the taxpayer in the taxable year of his death. This treatment applies to the taxpayer's estate until the end of the second taxable year of the estate after his death, to facilitate the administration of the estate without requiring the executor or fiduciary to reach decisions with respect to the appropriate disposition of the rental real property within a short period following the taxpayer's death.

*Married individuals filing separately.*—The amount of the $25,000 allowance, and the adjusted gross income ranges in which the allowance is phased out (i.e., $100,000 to $150,000, except in the case of certain credits where the range is $200,000 to $250,000) generally are halved in the case of married individuals filing separate returns. In the case of married individuals filing separately, who, at any time during the taxable year, do not live apart, the amount of the $25,000 allowance is reduced to zero. Absent such a rule, married taxpayers where one spouse would be eligible for a portion of the $25,000 amount if they filed separately would have an incentive so to file; Congress concluded that rules that encourage filing separate returns give rise to unnecessary complexity and place an unwarranted burden on the administration of the tax system.

***Taxpayers subject to the rule***

The passive loss rule applies to individuals, estates and trusts. The rule also applies to personal service corporations without regard to certain limitations in the applicable attribution rules. A corporation is not treated as a personal service corporation for this purpose unless the employee/owners together own more than 10 percent, by value, of the corporation's stock. Congress intended that taxpayers not be able to circumvent the passive loss rule merely by virtue of the form in which they conduct their affairs. Thus, the rule was designed to prevent individuals from being able

[13] By contrast, losses (or credits) carried over from a year in which the taxpayer did actively participate, but that were not allowed against non-passive income in such year because they exceeded $25,000 (as reduced by the applicable AGI phaseout), are deductible (or allowable) under the $25,000 rule in a subsequent year, but only if the taxpayer is actively participating in the activity in such subsequent year.

to shelter income derived from the performance of personal services simply by creating personal service corporations and acquiring tax shelter investments at the corporate level.

It also was not intended that incorporation of an individual's portfolio investments be available as a way to avoid the passive loss rule. For this reason, the passive loss rule, in modified form, applies to all closely held C corporations (other than personal service corporations, which are subject to the general passive loss rule) that are subject to the at-risk rules (generally, where 5 or fewer individuals, directly or indirectly, own more than 50 percent of the stock).[14] Such C corporations may not offset losses or credits from passive activities against portfolio income. Such corporations may, however, offset passive losses and credits against active business income (i.e., trade or business income which is not from a passive activity).

Thus, for example, if a closely held C corporation has $400,000 of passive losses from a rental activity, $500,000 of active business income, and $100,000 of portfolio income, the passive losses may be applied to reduce the active business income to $100,000, but may not be applied against the portfolio income.[15] In determining whether a corporation materially participates in an activity, and hence whether the activity is a passive activity, the material participation in the corporation's activity of corporate employees and owners is examined. As is generally true under the passive loss rule, losses and credits from a non-passive trade or business activity are not subject to any special limitation.

*Affiliated groups.*—In the case of affiliated groups of corporations filing consolidated returns, Congress determined that the passive loss limitation should be applied on a consolidated group basis. Thus, for example, it was intended that losses from any passive activity within a consolidated group that is treated as closely held under the rule be permitted to offset net active income, but not portfolio income, of the group. In general, under the rule, an activity may be conducted by several corporations, just as one corporation may be engaged in several activities. Portfolio income is accounted for separately from income or loss from each activity.

In determining whether an activity (other than a rental activity) conducted within the closely held consolidated group is a passive activity, the material participation test was intended to be applied on a consolidated basis. Thus, for example, if one or more individual shareholders holding stock representing more than 50 percent of the common parent's stock materially participate in an activity of any member of the group, the group is considered to materially participate. Similarly, if the requirements of section 465(c)(7)(C) (without regard to clause (iv) thereof) are met with respect to an activity by any member (or several members together), then the group is considered to materially participate in the activity.

---

[14] Closely held C corporations that also constitute personal service corporations for purposes of the passive loss rule are subject to the rule in full, rather than to the more limited closely held rule.

[15] See colloquy between Senators Johnston and Packwood, 132 Cong. Rec. S13958-9 (September 27, 1986), and statement of Mr. Rostenkowski affirming the colloquy at 132 Cong. Rec. E 3390 (October 2, 1986).

In the case of a personal service corporation which is a member of a consolidated group, similar principles were intended to apply. For example, a corporation may be treated as a personal service corporation for purposes of the rule where the owners who render the requisite services are employees of a subsidiary, rather than of the parent corporation. The Act provides that the definition of a personal service corporation is applied taking into account attribution of ownership of stock as provided in section 269A(b), with certain modifications.

### 2. Treatment of losses and credits

#### *In general*

*Losses.*—Losses arising from a passive activity generally are deductible only against income from that or another passive activity. Suspended passive activity losses for the year are carried forward indefinitely, but are not carried back, and are allowed in subsequent years against passive activity income. Suspended losses from an activity are allowed in full upon a taxable disposition of the activity, as discussed below.

If any passive losses are not deductible in any given year, the amount of the suspended losses from each passive activity is determined on a pro rata basis. With respect to each activity, the portion of the loss that is suspended, and carried forward, is determined by the ratio of net losses from that activity to the total net losses from all passive activities for the year. This allocation is necessary in order to determine the suspended losses for any particular activity, which are allowed in full upon a disposition.

In the case of the $25,000 allowance for passive losses from rental real estate activities in which an individual actively participates, a situation could arise in which losses would be allowable for the year under the passive loss rule, but the taxpayer has insufficient (or no) non-passive income against which to apply them. In such a case, the otherwise allowable rental real estate losses are thereupon treated as losses which are not from a passive activity. They may give rise to net operating losses (NOLs) treated as arising in that year, and may be carried forward and back in accordance with the rules applicable to NOLs.

In general, NOL carryovers, like current-year losses other than passive losses, are allowed against any income of the taxpayer.[16] In the case of individuals, estates and trusts, and personal service corporations, however, such nonpassive losses and NOLs are taken into account only after reducing income from passive activities by current and suspended deductions from passive activities (but not below zero). Thus, the application of any prior-year suspended passive losses against current year passive income is taken into account before such NOLs are applied against net passive income. This permits the taxpayer to obtain the full benefit of suspended passive activity losses (which are limited in application) before using any losses that are not from passive activities (or NOL car-

[16] For example, net operating losses carried forward from taxable years prior to 1987 are not limited under the passive loss rule even though they may arise from activities that, once the provision becomes effective, are treated as passive activities.

ryovers). If a taxpayer has net passive activity income for the year (after the application of all suspended passive losses), the income may be offset by current-year non-passive losses and by NOL carryovers.

In the case of a closely held C corporation (other than a personal service corporation), the passive loss rule applies in modified form: passive losses may be used to offset active business income, but not portfolio income. In applying this rule, losses from passive activities (including such losses carried over from prior years after the effective date) are offset against income from passive activities to determine the aggregate passive loss, if any. If there is such a loss, it may be applied only against active business income, but not portfolio income, of the corporation. As is generally the case, NOLs are applied after the application of the passive loss rule.

The determination of whether a loss is suspended under the passive loss rule is made after the application of the at-risk rules. A loss that would not be allowed for the year because the taxpayer is not at risk with respect to it is suspended under the at-risk provision, not the passive loss rule. Such amounts may become subject to the passive loss rule in subsequent years when they would be allowable under the at-risk rule.[17]

Under the Act, interest deductions allocable to passive activities are subject to the passive loss rule (as under the Senate amendment), but are not subject to the investment interest limitation (see Part C., below). Thus, for example, if a taxpayer has net passive losses of $100 for a taxable year beginning after 1986, $40 of which consists of interest expense, the entire $100 is subject to limitation under the passive loss rule, and no portion of the loss is subject to limitation under the investment interest limitation.

*Credits.*—Credits arising with respect to passive activities generally are treated in the same manner as deductions.[18] That is, credits may not be used to offset tax attributable to income other than passive income. The amount of tax attributable to net passive income is determined by comparing (i) the amount that the taxpayer would pay with regard to all income, with (ii) the amount that the taxpayer would pay with regard to taxable income other than net passive income (disregarding, in both cases, the effect of credits).

For example, if a taxpayer would owe $50,000 of tax disregarding net passive income, and $80,000 of tax considering both net passive and other taxable income (in both cases, disregarding the effect of credits), then the amount of tax attributable to passive income is $30,000. In this case, any passive credits not in excess of $30,000 attributable to the taxpayer's passive activities are allowable. Any passive credits not in excess of $30,000 are, in addition, subject to

[17] Amounts at risk are reduced even if deductions which would be allowed under the at-risk rules are suspended under the passive loss rule. Similarly, basis is reduced as under present law, even in the case where deductions are suspended under the passive loss rule. However, if an amount at risk or basis has been reduced by a deduction not allowed under the passive loss rule, the amount at risk or basis is not again reduced when the deduction becomes allowable under the passive loss rule.

[18] The allowability of foreign tax credits, however, is unaffected by the passive loss provision. Instead, foreign tax credits are limited solely by the various rules applying generally to such credits (e.g., the sec. 904 limitation, which is applied after determining the amounts of foreign source and worldwide income consistently with the application of the passive loss rule).

other limitations applicable to the allowance of credits. In the absence of net passive income for a taxable year, no tax is attributable to passive income, and passive credits generally are not allowable for the year.

Passive credits may be allowable to offset tax on income other than passive income with respect to the special rule providing up to $25,000 of benefit for certain rental real estate activities. Under this rule, credits are allowed to offset tax on the portion of the $25,000 (or less, as appropriate) that the taxpayer has not been able to offset by the use of deductions.

The amount of tax on such remaining portion (and thus, the amount of credits that can be used against other income, assuming that there are sufficient credits available) is determined by comparing (i) the amount that the taxpayer would owe (disregarding credits) with respect to income other than any net passive losses, but reduced by rental real estate deductions in the full amount allowable under the $25,000 rule, with (ii) the amount that the taxpayer would owe (again disregarding credits) if the allowable rental real estate deductions equalled $25,000 (or less as appropriate, i.e., in the phaseout range for this amount).

In general, credits arising with respect to passive activities, like deductions relating to such activities, can be carried forward indefinitely, and cannot be carried back. However, the character of a credit relating to a passive activity changes, in effect, when the credit becomes allowable under the passive loss rule (i.e., there either is sufficient passive income to allow its use, or it is within the scope of the $25,000 benefit for rental real estate activities). At such time, such credit is aggregated with credits relating to non-passive activities of the taxpayer, for purposes of determining whether all such credits are allowable in light of other limitations applying to the use of credits (e.g., the 75 percent tax liability limitation, and the provision that credits cannot be used to reduce regular tax liability to less than tentative minimum tax liability).

In the event that any credits are not allowable because of such other limitations, the passive credits that are allowable under the passive activity rules are thereupon treated as non-passive credits arising in the current taxable year. Thus, the treatment of such credits then is determined in all respects by the general rules applying to such credits, including carryover periods.[19] The credit carryover periods begin to run, with respect to a credit (or portion thereof) theretofore disallowed under the passive loss rule, in the year when the credit (or portion thereof) first is allowable under the passive loss rule. This treatment of credit carryover periods is distinguishable from the treatment of credits under the credit at-risk rules (sec. 46).

The Act provides that for the rehabilitation and low-income housing credits, the phase-out range for offsetting tax on up to $25,000 of non-passive income is increased to between $200,000 and $250,000 of adjusted gross income (calculated without regard to net passive losses, IRA contributions, or taxable social security bene-

[19] Credits that are subject to special limitations (e.g., the limitation on the use of research and development credits to offset certain unrelated income of the taxpayer) continue to be subject to such limitations when they cease to be limited by the passive activity rules.

fits), and such credits are allowed under the $25,000 rule regardless of whether the taxpayer actively participates in the activity generating the credits. In the case of the low-income housing credit, the increase in the phase-out range (to between $200,000 and $250,000, as opposed to between $100,000 and $150,000 as for other rental real estate losses and credits), and the waiver of the requirement that the taxpayer actively participate in the activity generating the low-income housing credit, apply only with respect to the original credit compliance period for the property, and only to property placed in service before 1990, except if the property is placed in service before 1991, and 10 percent or more of the total project costs are incurred before 1989.

This increase in the adjusted gross income phase-out range may be illustrated as follows. Assume that an individual has $5,000 (deduction equivalent amount) of low-income housing credits from a limited partnership interest (in which, under the passive loss rule, he is considered not to materially or actively participate) in a rental real estate activity. His adjusted gross income (determined without regard to passive losses) is $200,000, and he has no other passive losses, credits or income for the year. The individual is permitted under the $25,000 allowance rule to take the low income housing credit.

*Other credit limitations.*—The limitation on the credit for research and development activities to the tax on income from such activities is applied before the passive loss limitation is applied to such credits. The overall limitation on credits under the Act (providing that credits generally cannot offset more than 75 percent of the taxpayer's tax liability for the year or reduce regular tax below tentative minimum tax) is applied after the amount of credits allowable under the passive loss rule is determined. Once a credit is allowed for a year under the passive loss rule, it is treated as an active credit arising in that year.

***Dispositions***

*In general.*—When a taxpayer disposes of his entire interest in a passive activity, the actual economic gain or loss on his investment can be finally determined. Thus, under the passive loss rule, upon a fully taxable disposition, any overall loss from the activity realized by the taxpayer is recognized and allowed against income (whether active or passive income). This result is accomplished by triggering suspended losses upon disposition.

The reason for this rule is that, prior to a disposition of the taxpayer's interest, it is difficult to determine whether there has actually been gain or loss with respect to the activity. For example, allowable deductions may exceed actual economic costs, or may be exceeded by untaxed appreciation. Upon a taxable disposition, net appreciation or depreciation with respect to the activity can be finally ascertained. Since the purpose of the disposition rule is to allow real economic losses of the taxpayer to be deducted, credits, which are not related to the measurement of such loss, are not specially allowable by reason of a disposition. Disallowed credits are carried forward (but not back) until they become allowable under the passive loss rule, as discussed above.

*Taxable dispositions of entire interest in activity.*—The type of disposition that triggers full recognition of any loss from a passive activity (and of suspended losses from a former passive activity) is a fully taxable disposition of the taxpayer's entire interest in the activity to an unrelated person. A fully taxable disposition generally includes a sale of the property to a third party at arm's length, and thus, presumably, for a price equal to its fair market value. Gain realized upon a transfer of an interest in a passive activity generally is treated as passive, and is first offset by the suspended losses from that activity. This accomplishes the purpose of the rule to recognize net income or loss with respect to the activity when it can be finally determined.

Where the taxpayer transfers an interest in a passive activity in a transaction in which the form of ownership merely changes, suspended losses generally are not allowed, because the gain or loss he has realized with respect to the activity has not been finally determined. (Such suspended losses are allowed, however, to the extent that any gain recognized on such a transfer, together with other income from passive activities for the year, exceeds losses from passive activities for the year.) Special rules are provided for gifts and in the case of death of the taxpayer. No disposition occurs when the taxpayer is treated as no longer subject to the passive loss rule with respect to the activity (i.e., where the taxpayer does not dispose of his interest in the activity, but it is treated as no longer passive).

The taxpayer must dispose of his entire interest in the activity in order to trigger the recognition of loss. If he disposes of less than his entire interest, then the issue of ultimate economic gain or loss on his investment in the activity remains unresolved. A disposition of the taxpayer's entire interest involves a disposition of the taxpayer's interest in all entities that are engaged in the activity, and to the extent held in proprietorship form, of all assets used or created in the activity. If a partnership or S corporation conducts two separate activities, fully taxable disposition by the entity of all the assets used or created in one activity constitutes a disposition of the partner's or shareholder's entire interest in the activity. Similarly, if a grantor trust conducts two separate activities, and sells all the assets used or created in one activity, the grantor is considered as disposing of his entire interest in that activity. If the taxpayer has adequate records of the suspended losses that are allocable to that activity, and includes in income the gain (if any) allocable to his entire interest in the activity, such losses are allowed in full upon the disposition.

An installment sale of the taxpayer's entire interest in an activity in a fully taxable transaction triggers the allowance of suspended losses. The losses are allowed in the ratio that the gain recognized in each year bears to the total gain on the sale.

A transfer of a taxpayer's interest in an activity by reason of his death causes suspended losses to be allowed to the extent they exceed the amount, if any, by which the basis of the interest in the activity is increased at death under section 1014. Suspended losses are eliminated to the extent of the amount of the basis increase. The losses allowed generally would be reported on the final return of the deceased taxpayer.

A transaction constituting a sale (or other taxable disposition) in form, however, to the extent not treated as a taxable disposition under general tax rules, does not give rise to the allowance of suspended deductions. For example, sham transactions, wash sales, and transfers not properly treated as sales due to the existence of a put, call, or similar right relating to repurchase, do not give rise to the allowance of suspended losses.

*Related party transactions.*—The Act provides that the taxpayer is not treated as having disposed of an interest in a passive activity, for purposes of triggering suspended losses, if he disposes of it in an otherwise fully taxable transaction to a related party (within the meaning of sec. 267(b) or 707(b)(1), including applicable attribution rules). In the event of such a related party transaction, because it is not treated as a disposition for purposes of the passive loss rule, suspended losses are not triggered, but rather remain with the taxpayer. Such suspended losses may be offset by income from passive activities of the taxpayer.

When the entire interest owned by the taxpayer and the interest transferred to the related transferee in the passive activity are transferred to a party who is not related to the taxpayer (within the meaning of sec. 267(b) or 707(b)(1), including applicable attribution rules) in a fully taxable disposition, then to the extent the transfer would otherwise qualify as a disposition triggering suspended losses, the taxpayer may deduct the suspended losses attributable to his interest in the passive activity.

*Certain insurance transactions.*—In the case of certain transactions involving dispositions of interests in syndicates that insure U.S. risks, generally, when an owner of an interest in such a syndicate that is treated as a passive activity enters into a transaction whereby he disposes of his interest in the syndicate in a fully taxable closing transaction, he is treated as having made a disposition of his interest in the passive activity.

*Abandonment.*—The scope of a disposition triggering suspended losses under the passive loss rule includes an abandonment, constituting a fully taxable event under present law, of the taxpayer's entire interest in a passive activity. Thus, for example, if the taxpayer owns rental property which he abandons in a taxable event which would give rise to a deduction under section 165(a), the abandonment constitutes a taxable disposition that triggers the recognition of suspended losses under the passive loss rule.

Similarly, to the extent that the event of the worthlessness of a security is treated under section 165(g) of the Code as a sale or exchange of the security, and the event otherwise represents the disposition of an entire interest in a passive activity, it is treated as a disposition. No inference is intended with respect to whether a security includes an interest in any entity other than a corporation.

*Interaction with capital loss limitation.*—Upon a fully taxable disposition of a taxpayer's entire interest in a passive activity, the passive loss rule provides that any deductions previously suspended with respect to that activity are allowed in full. However, to the extent that any loss recognized upon such a disposition is a loss from the sale or exchange of a capital asset, it is limited to the amount of gains from the sale or exchange of capital assets plus $3,000 (in the case of individuals). The limitation on the deductibil-

ity of capital losses is applied before the determination of the amount of losses allowable upon the disposition under the passive loss rule.

Thus, for example, if a taxpayer has a capital loss of $10,000 upon the disposition of a passive activity, and is also allowed to deduct $5,000 of previously suspended ordinary losses as a result of the disposition, the $5,000 of ordinary losses are allowed, but the capital loss deduction is limited to $3,000 for the year (assuming the taxpayer has no other gains or losses from the sale of capital assets for the year). The remainder of the capital loss from the disposition is carried forward and allowed in accordance with the provisions determining the allowance of such capital losses.

*Basis adjustment for credits.*—Under the Act, an election is provided in the case of a fully taxable disposition of an interest in an activity in connection with which a basis adjustment was made as a result of placing in service property for which a credit was taken. Upon such a disposition, the taxpayer may elect to increase the basis of the credit property (by an amount no greater than the amount of the original basis reduction of the property) to the extent that the credit has not theretofore been allowed by reason of the passive loss rule. At the time of the basis adjustment election, the amount of the suspended credit which may thereafter be applied against tax liability is reduced by the amount of the basis adjustment. The purpose for providing this election is to permit the taxpayer to recognize economic gain or loss, taking account of the full cost of property for which no credit was allowed.

This rule may be illustrated as follows. A taxpayer places in service rehabilitation credit property generating an allowable credit of $50, and reduces the basis of the property by $50 as required by the provisions governing the rehabilitation credit, but is prevented under the passive loss rule from taking any portion of the credit. In a later year, having been allowed no portion of the credit by virtue of the passive loss rule, the taxpayer disposes of his entire interest in the activity, including the property whose basis was reduced. Immediately prior to the disposition, the taxpayer may elect to increase basis of the credit property by the amount of the original basis adjustment (to the extent of the amount of the unused credit) with respect to the property.

If the property is disposed of in a transaction that, under the passive loss rule, does not constitute a fully taxable disposition of the taxpayer's entire interest in the passive activity, then no basis adjustment may be elected at any time. To the extent the credit has been suspended by virtue of the passive loss rule, however, it may remain available to offset tax liability attributable to passive income.

*Disposition of activity of limited partnership.*—In general, under the passive loss rule, suspended deductions are allowed upon a taxable disposition of the taxpayer's entire interest in an activity, because it becomes possible at that time to measure the taxpayer's actual gain or loss from the activity. A disposition of the taxpayer's entire interest in an activity conducted by a limited partnership, like a disposition of an activity conducted in any other form, may constitute a disposition giving rise to the allowance of suspended deductions from the activity.

Nevertheless, it is the intent of Congress that a limited partnership interest in an activity is (except as provided in Treasury regulations) treated as an interest in a passive activity. Because a limited partner generally is precluded from materially participating in the partnership's activities, losses and credits attributable to the limited partnership's activities are generally treated as from passive activities, except that items properly treated as portfolio income and personal service income are not treated as passive.

*Changes in nature of activity.*—The fact that the nature of an activity changes in the course of its development does not give rise to a disposition for purposes of the passive loss provision. For example, when a real estate construction activity becomes a rental activity upon the completion of construction and the commencement of renting the constructed building, the change is not treated as a disposition.

***Other transfers***

A gift of all or part of the taxpayer's interest in a passive activity does not trigger suspended losses. However, if he has given away his entire interest, he cannot make a future taxable disposition of it. Suspended losses are therefore added to the basis of the property (i.e., the interest in the activity) immediately before the gift. Similarly, if the taxpayer gives away less than all of his interest, an allocable portion of any suspended losses are added to the donee's basis.[20] Suspended losses of the donor are eliminated when added to the donee's basis, and the remainder of the losses continue to be suspended in the donor's hands. The treatment of subsequent deductions from the activity, to the extent of the donee's interest in it, depends on whether the activity is treated as passive in the donee's hands.

An exchange of the taxpayer's interest in an activity in a nonrecognition transaction, such as an exchange governed by sections 351, 721, or 1031 in which no gain or loss is recognized, does not trigger suspended losses. Following such an exchange, the taxpayer retains an interest in the activity (or, e.g., in another like-kind activity), and hence has not realized the ultimate economic gain or loss on his investment in it. To the extent the taxpayer does recognize gain on the transaction (e.g., boot in an otherwise tax-free exchange), the gain is treated as passive activity income, against which passive losses may be deducted.

The suspended losses not allowed upon such a nonrecognition transaction continue to be treated as passive activity losses of the taxpayer, except that in some circumstances they may be applied against income from the property received in the tax-free exchange which is attributable to the original activity.[21] Such suspended

---

[20] For purposes of determining the donee's loss in a subsequent transaction, however, the donee's basis may not exceed the fair market value of the gift at the time the donee received it. *See*, sec. 1015(a). As under prior law, losses attributable to unrealized depreciation in value of the property at the time of the gift are not deductible.

[21] This rule does not apply, however, to permit the offset of suspended passive losses against dividends or other income or gain otherwise treated as portfolio income. In addition, following some transactions such as a sec. 1031 like-kind exchange, for example, the taxpayer may no longer have an interest in the original activity. Therefore, there is no special rule permitting suspended losses from the prior interest to be offset by income from the new activity, unless it, too, is a passive activity.

losses may not be applied against income from the property which is attributable to a different activity from the one which the taxpayer exchanged.[22]

***Activity no longer treated as passive activity***

Other circumstances may arise which do not constitute a disposition, but which terminate the application of the passive loss rule to the taxpayer generally, or to the taxpayer with respect to a particular activity. For example, an individual who previously was passive in relation to a trade or business activity which generates net losses may begin materially participating in the activity. When a taxpayer's participation in an activity is material in any year after a year (or years) during which he was not a material participant, previously suspended losses remain suspended and continue to be treated as passive activity losses. Such previously suspended losses, however, unlike passive activity losses generally, are allowed against income from the activity realized after it ceases to be a passive activity with respect to the taxpayer. As with tax-free exchanges of the taxpayer's entire interest in an activity, however, the taxpayer must be able to show that such income is from the same activity in which the taxpayer previously did not materially participate.[23]

A similar situation arises when a corporation (such as a closely held C corporation or personal service corporation) subject to the passive loss rule ceases to be subject to the passive loss rule because it ceases to meet the definition of an entity subject to the rule. For example, if a closely held C corporation makes a public offering of its stock and thereafter ceases to meet the stock ownership criteria for being closely held, it is no longer subject to the passive loss rule. The corporation's ownership has been so broadened that the reason for limiting the corporation's ability to shelter its portfolio income becomes less compelling. A corporation which is not closely held is less susceptible to treatment as the alter ego of its shareholders, but competing considerations also apply. So as not to encourage tax-motivated transactions involving free transferability of losses, the suspended passive losses are not made more broadly applicable (i.e., against portfolio income) by the change in ownership, but continue to be applicable against all income other than portfolio income of the corporation. Deductions arising in years after the year in which the corporation's status changes are not subject to limitation under the passive loss rule.

The Act provides that the rule applicable to a change in status of a closely held C corporation also applies to a change in status of a personal service corporation. That is, if a personal service corporation ceases to meet the definition of a personal service corporation subject to the passive loss rule in any year, losses from a passive

---

[22] For example, suspended passive activity losses cannot be applied against portfolio income of a pass-through entity.

[23] The reason for this treatment is that the taxpayer could have deducted the suspended losses against income from the activity had the change in his relation to the activity not occurred. Although income from the activity may no longer be passive activity income, prior passive activity losses generated by *that activity* continue to be deductible against income from the activity. It would be inequitable to give less favorable treatment to a taxpayer whose income from an activity becomes active (i.e., not passive) than to one who continues to be merely a passive investor.

activity conducted by the corporation and previously suspended by reason of the application of the passive loss rule are not triggered by the change in status, but are allowed against income from that activity. Any previously suspended losses and (deduction equivalent) credits in excess of income from the activity continue to be treated as from a passive activity. Losses and credits from an activity arising in a year when the corporation does not meet the definition of a personal service corporation (or a closely held C corporation) are not subject to limitation under the passive loss rule.

**3. Treatment of portfolio income**

***In general***

Under the Act, portfolio income is not treated as income from a passive activity, and passive losses and credits generally may not be applied to offset it. Portfolio income generally includes interest, dividends, annuities, and royalties. Also included in portfolio income are gain or loss attributable to disposition of (1) property that is held for investment (and that is not a passive activity) and (2) property that normally produces interest, dividend, annuity, or royalty income.

Portfolio investments ordinarily give rise to positive income, and are not likely to generate losses which could be applied to shelter other income. Therefore, for purposes of the passive loss rule, portfolio income generally is not treated as derived from a passive activity, but rather is treated like other positive income sources such as salary. To permit portfolio income to be offset by passive losses or credits would create the inequitable result of restricting sheltering by individuals dependent for support on wages or active business income, while permitting sheltering by those whose income is derived from an investment portfolio.

Under the Act, dividends on C corporation stock,[24] dividends, and income from a REIT, RIC, or REMIC, interest on debt obligations, and royalties from the licensing of property generally are included in portfolio income. Similarly, gains (or losses) from the sale of interests which normally produce such income are treated as portfolio income or losses. These types of assets ordinarily are positive income sources. On the other hand, except as provided below, income from a general or limited partnership interest, from S corporation stock, from a grantor trust, or from a lease of property generally are not treated as portfolio income. Such interests can generate losses which may be applied to shelter unrelated income of the taxpayer. In addition, although such interests might otherwise be considered as held for investment, gains from the sale of such interests, when they are interests in passive activities, are not treated as portfolio income, except to the extent gain on sale of such interests is itself attributable to portfolio income. For example, if a general partnership owns a portfolio of appreciated stocks and bonds and also conducts a business activity, a part of the gain

[24] Similarly, dividends paid by an S corporation that was formerly a C corporation, that are treated as derived from earnings and profits from a C corporation year under Code sec. 1368, are treated as portfolio income, even though the income or loss passed through to the S corporation shareholders would otherwise be treated as passive. Subpart F income that is included in the taxpayer's gross income under sec. 951 is likewise treated as portfolio income.

on sale of a partnership interest would be attributable to portfolio income and would, consequently, be treated as portfolio income.

Portfolio income of a passive activity is taken into account separately from other items relating to the activity. Thus, for example, portfolio income of an entity which is not attributable to, or part of, an activity of the entity that constitutes a passive activity is accounted for separately from any passive income or loss. Where a taxpayer has an interest in a passive activity, portfolio income of the activity is not taken into account in determining passive income or loss from the activity. Rather, such portfolio income is treated as non-passive income of the taxpayer. This rule is necessary in part because taxpayers otherwise would be able to shelter portfolio income to the extent that they transferred the assets from which it is derived to passive activities in which they had investment interests.

The application of the rule can be explained with regard to the example of a limited partnership that is engaged in the publication of a magazine. The partnership also holds a portfolio of dividend and interest bearing securities, but the income from them is more than offset by the tax losses of operating the magazine. Each limited partner must separately account for his share of the portfolio income and the losses from the operations of the magazine, and may not offset them against each other in calculating his tax liability. The portfolio income retains its character as income that is not income from a passive activity, despite the fact that non-portfolio income and loss attributable to a limited partnership interest is treated as income or loss from a passive activity.

The rule treating portfolio income as not from a passive activity does not apply to the extent that income, of a type generally regarded as portfolio income, is derived in the ordinary course of a trade or business. For example, the business income of a bank typically is largely interest. Similarly, a securities broker/dealer may earn a substantial portion of the income from the business in the form of dividends and gains on sales of dividend-bearing instruments. Interest income may also arise in the ordinary course of a trade or business with respect to installment sales and interest charges on accounts receivable.

In these cases, the rationale for treating portfolio-type income as not from the passive activity does not apply, since deriving such income is what the business activity actually, in whole or in part, involves. Accordingly, interest, dividend, annuity, or royalty income which is derived in the ordinary course of a trade or business is not treated, for purposes of the passive loss provision, as portfolio income. If a taxpayer directly, or through a passthrough entity, owns an interest in an activity deriving such income, such income is treated as part of the activity, which, as a whole, may or may not be treated as passive, depending on whether the taxpayer materially participates in the activity.

The rationale for treating interest income as portfolio income normally does apply, however, in the case where a taxpayer makes a complete disposition of his interest in a passive activity (triggering suspended losses), and the consideration is an interest-bearing instrument. Although the gain, if any, on such a disposition is generally treated as passive income, the interest on the instrument is

appropriately treated as portfolio income, where the disposition (as is likely to be true of dispositions of entire interests in passive activities) is not a transaction arising in the ordinary course of a trade or business.

No exception is provided for the treatment of portfolio income arising from working capital, i.e., amounts set aside for the reasonable needs of the business. Although setting aside such amounts may be necessary to the trade or business, earning portfolio income with respect to such amounts is investment-related and not a part of the trade or business itself. Under this rule, for example, interest earned on funds set aside by a limited partnership operating a shopping mall, for the purpose of expanding the mall, is treated as portfolio income and is not taken into account in determining a limited partner's passive income or loss from the activity of operating the shopping mall.

*Expenses allocable to portfolio income.*—The Act provides that portfolio income is reduced by the deductible expenses (other than interest) that are clearly and directly allocable to such income. Properly allocable interest expense also reduces portfolio income. Such deductions accordingly are not treated as attributable to a passive activity.

The Congress anticipated that the Treasury Department would issue regulations setting forth standards for appropriate allocation of expenses and interest under the passive loss rule. These regulations should be consistent with the purpose of the passive loss rules to prevent sheltering of income from personal services and portfolio income with passive losses. Moreover, the regulations should attempt to avoid inconsistent allocation of interest deductions under different Code provisions.[25]

In the case of entities, a proper method of allocation may include, for example, allocation of interest to portfolio income on the basis of assets, although there may be situations in which tracing is appropriate because of the integrated nature of the transactions involved. Because of the difficulty of recordkeeping that would be required were interest expense of individuals allocated rather than traced, it is anticipated that, in the case of individuals, interest expense generally will be traced to the asset or activity which is purchased or carried by incurring or continuing the underlying indebtedness.

*Self-charged interest.*—A further issue with respect to portfolio income arises where an individual receives interest income on debt of a passthrough entity in which he owns an interest. Under certain circumstances, the interest may essentially be "self-charged," and thus lack economic significance. For example, assume that a taxpayer charges $100 of interest on a loan to an S corporation in which he is the sole shareholder. In form, the transaction could be viewed as giving rise to offsetting payments of interest income and passthrough interest expense, although in economic substance the taxpayer has paid the interest to himself.[26]

[25] For example, an interest deduction that is disallowed under sec. 265 should not be allowed, capitalized, or suspended under another provision.

[26] Similar considerations apply where a partnership makes a loan to a partner (e.g., to finance such partner's purchase of all or part of his interest in the partnership, and the interest expense may be treated as part of his passive loss).